SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
DAVID R. BUCHANAN
550 Broad Street, Suite 920
Newark, NJ  07102
Telephone:  973/639-9100
713/639-9393 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
LUKE O. BROOKS
RYAN A. LLORENS
ERIC I. NIEHAUS
ANGEL P. LAU
JEFFREY J. STEIN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiffs

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| TIAA-CREF LARGE-CAP GROWTH FUND, TIAA-CREF LARGE-CAP VALUE FUND, TIAA-CREF EQUITY INDEX FUND, TIAA-CREF LARGE-CAP VALUE INDEX FUND, TIAA-CREF GROWTH & INCOME FUND, TIAA-CREF S&P 500 INDEX FUND, TIAA-CREF LARGE-CAP | ) ) ) ) ) ) ) ) ) | No. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| | ) | DEMAND FOR JURY TRIAL |

[Caption continued on following page.]

GROWTH INDEX FUND, TIAA-CREF )
ENHANCED LARGE-CAP VALUE )
INDEX FUND, TIAA-CREF )
ENHANCED LARGE-CAP GROWTH )
INDEX FUND, TIAA-CREF LIFE )
GROWTH EQUITY FUND, TIAA- )
CREF LIFE STOCK INDEX FUND, )
TIAA-CREF LIFE GROWTH & )
INCOME FUND, TIAA-CREF LIFE )
LARGE-CAP VALUE FUND, TIAA- )
CREF SEPARATE ACCOUNT VA-1, )
COLLEGE RETIREMENT EQUITIES )
FUND, TIAA-CREF INVESTMENT )
MANAGEMENT, LLC and )
TEACHERS ADVISORS, LLC, )

                      Plaintiffs, )

     vs. )

ALLERGAN PLC, PAUL M. BISARO, )
BRENTON L. SAUNDERS, R. TODD )
JOYCE, MARIA TERESA HILADO, )
SIGURDUR O. OLAFSSON, DAVID A. )
BUCHEN, A. ROBERT D. BAILEY, )
JAMES H. BLOEM, CHRISTOPHER )
W. BODINE, TAMAR D. HOWSON, )
JOHN A. KING, CATHERINE M. )
KLEMA, JIRI MICHAL, JACK )
MICHELSON, PATRICK J. )
O'SULLIVAN, RONALD R. TAYLOR, )
ANDREW L. TURNER, FRED G. )
WEISS, NESLI BASGOZ, )
CHRISTOPHER J. COUGHLIN and )
JAMES D'ARECCA, )

                     Defendants. )

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................2

II.   JURISDICTION AND VENUE........................................................21

III.  EXCHANGE ACT ALLEGATIONS ...............................................22

   A.   Plaintiff ..............................................................................22

   B.   Defendants...........................................................................23

        1.   Allergan plc...................................................................23

        2.   The Individual Defendants........................................25

        3.   The Director Defendants............................................28

   C.   The Co-Conspirators ........................................................30

   D.   Factual Allegations...........................................................30

        1.   A Brief Overview of the Generic Pharmaceutical Market .......30

        2.   The Distribution and Manufacture of Generic Drugs..............37

        3.   The Markets for Allergan's Generic Drugs Were
             Susceptible to Price Fixing .......................................38

             a.   High Level of Market Concentration ............................39

             b.   Significant Barriers to Entry...........................................40

             c.   Lack of Available Substitutes.........................................41

             d.   Commodity-Like Product ...............................................41

             e.   Inelastic Demand ...........................................................42

             f.   Absence of Competitive Sellers .....................................42

**Page**

g.   Inter-Competitor Contacts and Communications at Trade Association Events ...............................43

(1)   The Generic Pharmaceutical Association ...........46

(2)   The Healthcare Distribution Alliance .................49

(3)   The National Association of Chain Drug Stores .........................................................51

4.   Propranolol...................................................................58

a.   The Co-Conspirators' Price Hikes.................................58

b.   No Commercial Justification for Price Hikes................61

c.   The Market for Generic Propranolol HCL Was Susceptible to Anticompetitive Conduct ......................62

(1)   Market Concentration........................................62

(2)   Significant Barriers to Entry ...............................63

(3)   Lack of Available Substitutes .............................64

(4)   Commodity-Like Product....................................64

(5)   Inelastic Demand................................................64

(6)   Absence of Competitive Sellers ...........................65

d.   Collusive Revenue .......................................................66

5.   Ursodiol......................................................................67

a.   The Co-Conspirators' Price Hikes.................................67

b.   No Commercial Justification for Price Hikes................69

- ii -

**Page**

c.   The Market for Generic Ursodiol Capsules Was
Susceptible to Anticompetitive Conduct ......................70

(1)   Market Concentration...........................................70

(2)   Significant Barriers to Entry ...............................71

(3)   Lack of Available Substitutes .............................71

(4)   Commodity-Like Product.....................................71

(5)   Inelastic Demand.................................................72

(6)   Absence of Competitive Sellers ..........................72

d.   Collusive Revenue ..........................................................73

6.   Doxycycline ............................................................................73

a.   The Co-Conspirators' Price Hikes..................................74

b.   No Commercial Justification for Price Hikes................75

c.   The Market for Generic Doxycycline Was
Susceptible to Anticompetitive Conduct ......................76

(1)   High Level of Market Concentration ..................76

(2)   Significant Barriers to Entry ...............................77

(3)   Lack of Available Substitutes .............................77

(4)   Commodity-Like Product.....................................78

(5)   Inelastic Demand.................................................78

(6)   Absence of Competitive Sellers ..........................78

**Page**

d.    Collusive Revenue ........................................................79

7.    Desonide.................................................................................80

    a.    The Co-Conspirators' Price Hikes...................................80

    b.    No Commercial Justification for Price Hikes................82

    c.    The Market for Generic Desonide Was Susceptible
    to Anticompetitive Conduct............................................83

        (1)    High Level of Market Concentration ..................83

        (2)    Significant Barriers to Entry ...............................84

        (3)    Lack of Available Substitutes .............................84

        (4)    Commodity-Like Product....................................84

        (5)    Inelastic Demand.................................................85

        (6)    Absence of Competitive Sellers ..........................85

    d.    Collusive Revenue ........................................................86

8.    Tretinoin................................................................................86

    a.    The Co-Conspirators' Price Hikes...................................86

    b.    No Commercial Justification for Price Hikes................87

    c.    The Market for Generic Tretinoin External Cream
    Was Susceptible to Anticompetitive Conduct...............88

        (1)    High Level of Market Concentration ..................88

        (2)    Significant Barriers to Entry ...............................89

**Page**

(3) Lack of Available Substitutes .............................89

(4) Commodity-Like Product....................................90

(5) Inelastic Demand................................................90

(6) Absence of Competitive Sellers ..........................90

d. Collusive Revenue ........................................................91

9. Additional Drugs........................................................................92

a. Glyburide-Metformin ....................................................92

b. Verapamil ......................................................................94

10. Government Investigations into Allergan's
Anticompetitive Conduct .........................................................95

E. Misleading Statements and Omissions...............................................102

1. Statements Regarding the Competitive Nature of the
Generic Drug Market and Source of Revenues .....................102

2. Statements Regarding Compliance with Laws and
Regulations...............................................................................119

3. Financial Statements ...............................................................126

4. False Certifications .................................................................132

5. Code of Conduct .....................................................................136

F. Loss Causation .....................................................................................137

G. Summary of Scienter Allegations .......................................................141

H. No Safe Harbor....................................................................................156

**Page**

I.   Applicability of the Presumption of Reliance: Fraud on the Market...................................................................................156

IV.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT.......................157

COUNT I ................................................................................................157

COUNT II ...............................................................................................159

COUNT III..............................................................................................161

COUNT IV ..............................................................................................164

V.   SECURITIES ACT ALLEGATIONS.......................................................167

A.   Securities Act Parties....................................................................167

1.   Plaintiff...............................................................................167

2.   Securities Act Defendants...................................................168

a.   Officer Defendants....................................................168

b.   Director Defendants...................................................170

B.   Additional Background Allegations...............................................173

C.   Actionable False and Misleading Statements in the Offering Materials.........................................................................................175

1.   The Form S-4 Registration Statements and Joint Proxy Statement/Prospectus ...........................................................176

2.   The Form 8-K Superseding Portions of the 2013 Form 10-K......................................................................................181

3.   The 2014 Form 10-K ...........................................................185

**Page**

        4.     The Form 8-K Underwriting Agreements ...............................189

    D.     No Safe Harbor....................................................................192

VI.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ......................193

    COUNT V.....................................................................................193

    COUNT VI ...................................................................................195

    COUNT VII ..................................................................................196

VII.    PRAYER FOR RELIEF .......................................................................198

VIII.    JURY TRIAL DEMANDED....................................................................199

TIAA-CREF Large-Cap Growth Fund, TIAA-CREF Large-Cap Value Fund, TIAA-CREF Equity Index Fund, TIAA-CREF Large-Cap Value Index Fund, TIAA-CREF Growth & Income Fund, TIAA-CREF S&P 500 Index Fund, TIAA-CREF Large-Cap Growth Index Fund, TIAA-CREF Enhanced Large-Cap Value Index Fund, TIAA-CREF Enhanced Large-Cap Growth Index Fund, TIAA-CREF Life Growth Equity Fund, TIAA-CREF Life Stock Index Fund, TIAA-CREF Life Growth & Income Fund, TIAA-CREF Life Large-Cap Value Fund, TIAA-CREF Separate Account VA-1, College Retirement Equities Fund, TIAA-CREF Investment Management, LLC and Teachers Advisors, LLC (collectively, "Plaintiff") by the undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and on information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of defendants' public documents, conference calls and announcements made by defendants, U.S. Securities and Exchange Commission ("SEC") filings made by Allergan and Actavis,[1] wire and press releases published by and regarding analysts' reports and advisories about Allergan, information obtainable on the Internet, court filings, drug pricing and market share information from proprietary databases, and consultation

---

[1]   Before June 15, 2015, Allergan plc was known as Actavis plc.  Allergan plc and Actavis plc are collectively referred to herein as "Allergan" or the "Company."

with industry experts.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    Plaintiff brings this federal securities action under the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the "Securities Act") against Allergan and certain of its former and current officers and directors to recover damages for losses Plaintiff has suffered in connection with its acquisition of Allergan securities between October 29, 2013 and November 3, 2016, both dates inclusive (the "Relevant Period").  Plaintiff purchased or otherwise acquired Allergan securities at artificially inflated prices during the Relevant Period and suffered damages as a result of the violations of the securities laws alleged herein.  In particular, Plaintiff seeks to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under §§11, 12(a)(2) and 15 of the Securities Act, §§10(b), 14(a), and 20(a) of the Exchange Act and SEC Rules 10b-5 and 14a-9 of the Exchange Act.

2.    Plaintiff's Securities Act claims seek to recover damages arising from its purchase and/or acquisition of securities in or traceable to the Company's public offering of (i) approximately 111.2 million Actavis plc ordinary shares (the "Ordinary Shares Offering") in partial exchange for the outstanding shares of Allergan Inc. common stock in the March 17, 2015 merger, and (ii) 14,513,889

Actavis plc ordinary shares and 5,060,000 5.500% mandatory convertible preferred shares (the "Ordinary/Preferred Shares Offerings") to finance the acquisition of Allergan Inc. (together, the Ordinary Shares Offering and the Ordinary/Preferred Shares Offerings are referred to herein as the "Offerings").

3.      Allergan is a specialty pharmaceutical company that develops, manufactures, markets and distributes medical aesthetics, biosimilar and over-the-counter pharmaceutical products worldwide.  Allergan has operations in more than 100 countries.  Founded in 1983, the Company was formerly known as Actavis plc. In November 2014, Actavis plc announced its intention to acquire Allergan Inc.  On March 17, 2015, Actavis plc completed its acquisition of Allergan Inc., changing its name to Allergan plc on June 15, 2015.  Allergan is headquartered in Dublin, Ireland, and its administrative headquarters are located in Parsippany, New Jersey. The Company's common stock has traded on the New York Stock Exchange ("NYSE") under the ticker symbol "AGN" since June 15, 2015 and its preferred stock trades on the NYSE under the ticker symbol "AGN.PA."  Before June 15, 2015, the common stock of Actavis plc traded on the NYSE under the ticker symbol "ACT."

4.      On July 26, 2015, Allergan entered into a Master Purchase Agreement, under which Teva Pharmaceutical Industries Ltd. ("Teva") agreed to acquire the

Company's global generic pharmaceuticals business unit.  On August 2, 2016, the companies announced the completion of the acquisition.

5.     This action arises out of Allergan's participation in a generic drug price-fixing conspiracy that is the focus of investigations by Congress, the U.S. Department of Justice's Antitrust Division ("DOJ"), and 45 state Attorneys General.  Beginning in 2013, Allergan entered into anticompetitive agreements with its competitors in the generic drug market.  In particular, Allergan entered into agreements to fix the prices of or allocate the market for at least seven generic drugs: Propranolol, Ursodiol, Doxycycline, Desonide, Tretinoin, Glyburide-Metformin and Verapamil.  Three of the seven drugs – Desonide, Doxycycline and Ursodiol – were "key products which comprised a majority of product sales for North American Generic for the year-ended December 31, 2014, according to the 2014 Form 10-K.

6.     Substantial facts support the allegations that Allergan colluded to fix the prices of these drugs.  The drugs' prices moved in near-perfect unison, and increased suddenly and simultaneously at each drug company.  The price increases were exponential.  There is a clear pattern of an industry conference attendance by Allergan and its competitors, followed by an abrupt and unprecedented spike in Allergan's prices, closely timed with spikes in Allergan's competitors' prices.

7.     There is no non-collusive explanation for these sudden, synchronized price increases – there was no supply shortage, production problem, or sudden increase in demand for these drugs during this period.  The price hikes were not precipitated by competitors leaving the market.  Moreover, the markets for these drugs are highly susceptible to collusion – they are dominated by only a few companies and this market concentration lends itself to collusion.  The market for these drugs featured several other characteristics that facilitated collusion: demand for the drugs was inelastic, with increases or miniscule reductions in the quantities sold even after massive and sudden price hikes; the drugs were commodity-like products – generic drugs whose only distinguishing factor for purchasers was price; the drugs lacked a viable substitute; they had high barriers to entry; and information sharing and price discovery were common.  Finally, the drug prices did not decrease following the initial price increases as one would expect if the sudden price increases reflected temporary supply shortages, cost increases or other benign market explanations.

8.     Allergan's extraordinary and historic price increases for these generic drugs would have been against Allergan's economic self-interest absent the existence of a price-fixing scheme.  Generic drugs are commodity products.  Absent price collusion, if one manufacturer raises the price of a given drug, its competitors will seek to increase their own market share by selling the drug to the first

manufacturer's customers at lower prices. Indeed, under the "maximum allowable cost" ("MAC") pricing regime that governs much of the U.S. generic pharmaceutical market, drug cost reimbursements from insurance companies are capped at a certain price, and if a drug manufacturer raises its prices above this cap while its competitors do not, the reimbursements for the higher priced drug will cease. Thus, it would not be in any drug manufacturer's interest to increase the prices of its generic drugs unless it had an agreement with the other manufacturers that they would do the same.

9.     The suspicious price increases by Allergan and other drug manufacturers have spawned investigations by Congress, the DOJ, and at least 45 state Attorneys General. These investigations have begun to reveal a broad, well-coordinated and long-running series of schemes to fix prices for  a number of generic drugs. They have also revealed that collusion on generic drug prices was centered around meetings of trade associations, such as the Generic Pharmaceutical Association ("GPhA"), and other industry gatherings attended by senior Allergan officials, including some of the Individual Defendants (as defined below).

10.    As discussed below, Allergan's former Associate Director of Finance confirmed that Allergan officials who attended the industry conferences preceding these historic and stratospheric price increases were responsible for generic drug pricing at the Company during the Relevant Period.

11.     The government investigations trace back to late 2013, when a survey of over 1,000 pharmacists conducted by the National Community Pharmacist Association ("NCPA") revealed that prices of various generic drugs had skyrocketed.  Many of these drugs were essential to senior citizens, and the dramatic price increases forced many elderly people to either pay significantly higher out-of-pocket costs due to Medicare's coverage gap or forsake their medications altogether.  In light of these concerns, the Chief Executive Officer ("CEO") of the NCPA wrote a letter to Congress on January 8, 2014 requesting an oversight hearing to determine the causes of the price jumps.

12.     In July 2014, the State of Connecticut began issuing subpoenas to drug manufacturers requesting documents relating to anticompetitive generic drug pricing.  In October 2014, Senator Bernie Sanders and Representative Elijah E. Cummings sent letters to 14 generic drug manufacturers demanding information relating to ten drugs that had experienced average price increases ranging from 388% to 8,281% between 2012 and 2014.

13.     In November 2014, the DOJ, as part of its ongoing investigation, convened a grand jury in the Eastern District of Pennsylvania.  On November 3, 2014, Lannett Co. Inc. ("Lannett") – one of the companies that hiked the prices of their generic drugs at or close to the same time that Allergan raised its prices – reported that its Senior Vice President of Sales and Marketing had received a

subpoena from the DOJ in connection with the federal investigation of the generic pharmaceutical industry requesting information on Lannett's generic drug pricing and its communications with competitors.  On December 5, 2014, Lannett itself received a subpoena requesting similar information.  This grand jury has issued subpoenas and requests for information to at least ten other generic drug manufacturers as well, including Heritage Pharmaceuticals Inc. ("Heritage"), Impax Laboratories, Inc. ("Impax"), and Mylan Pharmaceuticals Inc. ("Mylan") – companies that also raised the prices of some of their generics at or close to the same time as Allergan's price increases.  On May 2, 2017, the FBI raided another co-conspirator Perrigo Company plc's ("Perrigo") offices as part of the criminal price-fixing probe.

14.     According to media reports in July 2015, citing a June 26, 2015 article by Policy and Regulatory Report ("PaRR"), the DOJ's investigation is wide-ranging: "A PaRR source says prosecutors see the case much like its antitrust probe of the auto parts industry, which has gone on for years and morphed into the department's largest criminal antitrust probe ever.  Like in that case, prosecutors expect to 'move from one drug to another in a similar cascading fashion.'"

15.     On August 6, 2015, media outlets reported that Allergan disclosed in a filing with the SEC that it had received a subpoena from the DOJ in June 2015, stating that "Allergan Plc's Actavis unit got a subpoena from the U.S. Justice

Department seeking information on the marketing and prices of its generic drugs, becoming the biggest company yet to draw scrutiny in the government's widening antitrust probe of the industry," and noting that Allergan joined other companies that "have made similar disclosures in the past several months." On this news, Allergan's common share price fell $17.17 per share, or approximately 5%, from its previous closing price to close at $319.47 per share on August 6, 2015, and its preferred share price fell $39.24 per share, or approximately 3.5%, from its previous closing price to close at $1,084.00 per share on August 6, 2015.

16. The fact that the DOJ sent a subpoena to Allergan after sending subpoenas to certain of its competitors strongly suggests that discovery from those other investigations led the DOJ to believe that Allergan was also participating in a price-fixing conspiracy. Moreover, the DOJ has filed motions to intervene in at least six civil antitrust actions alleging price-fixing in violation of the Sherman Antitrust Act ("Sherman Act") against Allergan and/or the Actavis generic drug unit sold to Teva in August 2016, as well as other sellers of the generic drugs mentioned above. In these cases, the plaintiffs have requested that the various generic drug-company defendants produce all documents produced to the DOJ in the criminal investigation. In one such motion to intervene, the DOJ explained that the "action presents a risk to the United States' interest in ensuring the integrity of its ongoing criminal investigation" because, among other reasons, "its ongoing

criminal antitrust investigation shares common questions of law and fact with the civil claims" and because the plaintiffs have sought the same documents produced to the federal prosecutors.[2]  The civil antitrust cases are now consolidated into 18 multidistrict lawsuits, including the Attorneys General lawsuit, alleging civil antitrust claims (the "Generic Drugs MDL").  The DOJ moved to stay discovery in the Generic Drugs MDL, explaining that "[e]vidence uncovered during the criminal investigation implicates other companies and individuals (including a significant number of the Defendants [in the Generic Drugs MDL]) in collusion with respect to doxycycline hyclate, glyburide, and other drugs (including a significant number of the drugs at issue [in the Generic Drugs MDL])."[3]  The DOJ's intervention in these civil actions implicating Allergan's price-fixing activities gives rise to a strong and credible inference that the allegations of price-fixing are supported (at least in part) by documents and other information provided to the DOJ.

---

[2]   *In re Propranolol Antitrust Litig.*, No. 1:16-cv-09901-JSR (S.D.N.Y. Jan. 30, 2017), ECF No. 72, at 5, 7.  The district court in this action denied the defendants' motion to dismiss the complaint on April 6, 2017.  *See In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712 (S.D.N.Y. 2017) (now consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litig. – Propranolol Cases*, No. 2:16-md-02724-CMR (E.D. Pa.)).

[3]   *In re Generic Pharm. Pricing Antitrust Litig.*, No. 2:16-md-02724-CMR (ED. Pa. May 1, 2017), ECF No. 279, at 1-2.

17.    On November 3, 2016, media outlets reported that U.S. prosecutors might file criminal charges against Allergan and several other pharmaceutical companies for unlawfully colluding to fix generic drug prices.  In an article titled "U.S. Charges in Generic-Drug Probe to Be Filed by Year-End," *Bloomberg* reported, in relevant part:

> U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion, a fresh challenge for an industry that's already reeling from public outrage over the spiraling costs of some medicines.
>
> The antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter.  The grand jury probe is examining whether some executives agreed with one another to raise prices, and the first charges could emerge by the end of the year, they said.
>
> Though individual companies have made various disclosures about the inquiry, they have identified only a handful of drugs under scrutiny, including a heart treatment and an antibiotic.  Among the drugmakers to have received subpoenas are industry giants Mylan NV and Teva Pharmaceutical Industries Ltd.  ***Other companies include Actavis, which Teva bought from Allergan plc in August***, Lannett Co., Impax Laboratories Inc., Covis Pharma Holdings Sarl, Sun Pharmaceutical Industries Ltd., Mayne Pharma Group Ltd., Endo International Plc's subsidiary Par Pharmaceutical Holdings and Taro Pharmaceutical Industries Ltd.
>
> All of the companies have said they are cooperating except Covis, which said last year it was unable to assess the outcome of the investigation.[4]

---

[4]    Unless otherwise noted herein, all emphasis is added.

18.    On this news, Allergan's common share price fell $9.07 per share, or 4.58%, to close at $188.82 per share on November 3, 2016, and its preferred share price fell $30.03 per share, or approximately 4%, to close at $708.45 per share on November 3, 2016.

19.    On December 12 and December 13, 2016, the DOJ filed the first criminal charges stemming from its ongoing investigation (the "Heritage Indictments"). *See United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016); *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 13, 2016). These cases allege that two former senior executives of generic drugmaker Heritage violated the Sherman Act by participating in conspiracies to fix prices, rig bids and allocate customers for, among other generic pharmaceuticals, doxycycline hyclate, which was one of the drugs sold by Allergan at historically high prices during the Relevant Period.

20.    According to Count One of the Heritage Indictments, "[t]he charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among the defendant and co-conspirators, the substantial terms of which were to allocate customers, rig bids, and fix and maintain prices for doxycycline hyclate sold in the United States." The Heritage Indictments allege that Glazer and Malek, along with co-conspirators, carried out the conspiracy by engaging in anticompetitive conduct, including the participation of subordinate

employees in meetings, conversations and communications with co-conspirators to allocate customers, fix prices or rig bids for doxycycline hyclate sold in the United States.

21.     On January 9, 2017, Glazer and Malek pleaded guilty to conspiring to manipulate prices of doxycycline hyclate, as well as other generic drugs, between April 2013 and December 2015.  At the plea hearing, DOJ prosecutors stated that the conspiracy also involved rival companies.

22.     While federal and state investigations were still ongoing, the State of Connecticut and 19 other states filed an "initial civil action" in December 2016 against six generic drug manufacturers – including Teva Pharmaceuticals USA, Inc. ("Teva USA"), Mayne Pharma (USA) Inc. ("Mayne") and Mylan, also alleging price fixing, market allocation and bid rigging of generic pharmaceuticals (the "AG Complaint") – for illegal schemes involving market share allocation and anticompetitive price inflation.  Twenty-five more state attorneys general later joined the case.  As reported by *The New York Times* on December 15, 2016, in an interview about the AG Complaint, Connecticut's Attorney General George Jepsen stated that there was more to come:

> "We believe that this is just the tip of the iceberg," George C. Jepsen, Connecticut's attorney general, whose office started the inquiry that led to the charges, said in an interview on Thursday.  "I stress that our investigation is continuing, and it goes way beyond the two drugs in this lawsuit, and it involves many more companies than are in this lawsuit."

- 13 -

23.     Teva's Actavis unit (part of Allergan before July 26, 2015) received a subpoena from the Connecticut Attorney General in connection with its price-fixing investigation.   The AG Complaint states that the Attorneys General "have uncovered a wide-ranging series of conspiracies implicating numerous different drugs and competitors, which will be acted upon at the appropriate time."   AG Complaint, ¶9.  The Attorneys General describe these conspiracies as "schemes to fix and maintain prices, allocate markets and otherwise thwart competition" and explain that they are carried out by generic drug companies through their senior executives who "exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements."  *Id*., ¶¶7, 8.

24.     The Connecticut Attorney General's December 15, 2016 press release regarding the AG Complaint states that the Connecticut Attorney General "'has dedicated significant resources to this investigation for more than two years and has developed compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States.'" The Connecticut Attorney General's press release further states that "'*[w]e have evidence of widespread participation in illegal conspiracies across the generic-drug industry*.'"

25.    On October 31, 2017, the state Attorneys General made public their [Proposed] Consolidated Amended Complaint ("Amended AG Complaint"), which contained additional details about Allergan's price-fixing activities.  For example, the state Attorneys General describe how, when necessary, collusive agreements reached at trade meetings and industry dinners were reinforced through phone calls and text messages between executives and sales people from Allergan and the Co-Conspirators (as defined below).  On these calls, the companies' representatives discussed, among other things, their desire to maintain or raise prices with respect to specific drugs.  Phone records referenced in the AG Complaint demonstrate that these types of communications occurred with great frequency across the industry. For example, the records revealed at least 334 separate communications between Allergan and its co-conspirator Teva from July 2013 to July 2014, the period when most of the collusive price hikes occurred.

26.    The Amended AG Complaint also details records demonstrating that Allergan finalized an agreement with Heritage to increase prices of Glyburide-Metformin, Verapamil and other generic drugs during a nine-minute telephone call on April 22, 2014.  Information about the agreement spread quickly throughout the sales and pricing teams at Allergan.  On April 28, 2014, the Company circulated an internal email regarding potential price increases for Glyburide-Metformin, Verapamil and several other drugs.  Shortly after reaching this agreement, Allergan

and Heritage contacted Teva and Aurobindo Pharma USA, Inc. ("Aurobindo"), the only other companies in the market, to discuss the deal. On May 1, 2014, an Allergan representative listed as a recipient to the April 28 email contacted a Teva representative and they spoke for five minutes. They spoke three more times on May 6, 2014, with one of the calls lasting 15 minutes, and continued to communicate frequently over the next several months. In all, Allergan and Teva communicated via phone or text message at least 119 times between May 2014 and July 2014.

27.    According to the Amended AG Complaint, phone records also demonstrate that Allergan communicated with Aurobindo, the other manufacturer in the market. On May 12, 2014, an Allergan representative spoke with the CEO of Aurobindo two separate times. As alleged in the Amended AG Complaint, although the companies did not increase customer prices for Glyburide-Metformin in July 2014, like they did for many other drugs, they did increase their wholesale acquisition cost ("WAC") prices.[5]

28.    Throughout the Relevant Period, defendants fraudulently concealed their illegal conduct, misrepresented the generic drug market's competitiveness, misled investors about the true cause of Allergan's growth, revenues, profits and

---

[5]    "WAC price" refers to the amount a manufacturer charges wholesalers or direct purchasers before discounts and rebates.

improved product pricing, and falsely claimed competitive advantages based on expertise and execution, when in reality they were derived from illegal price-fixing. As a result, Allergan's public statements were materially false and misleading at all relevant times. Defendants' false and misleading statements led investors to believe that Allergan's results were an accurate representation of its products' success in a competitive market. In fact, the reported sales figures were inflated by almost ***$1 billion*** as a result of anticompetitive conduct and did not reflect sales that would have been achieved absent the price-fixing activities. Furthermore, Allergan's sales inflation through illegal price-fixing carried the significant risk of state and federal prosecution along with the attendant negative financial and reputational harm. Defendants downplayed that risk, falsely assured investors that they had done nothing wrong, and offered false and misleading explanations of Allergan's price increases. Truthful disclosure of their participation in patently illegal schemes would have altered the mix of information about the Company. The materiality of this information is further exemplified by the dramatic drops in Allergan's stock price when investors learned the truth.

29.     During the Relevant Period, revenue from the manufacture and sale of generic pharmaceuticals was vital to Allergan. In its Form 8-K filed on December 5, 2014, Allergan reported that North American Generics generated $3.9 billion in revenues in 2013, or approximately ***45% of the Company's total revenues***. The

Company also told its investors that "market share, revenues and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market [and] **pricing**" and emphasized that Allergan "**actively compete[s]** in the generic pharmaceutical industry."

30.     Allergan reiterated statements about the Company's success in the generics market in its 2014 Annual Report dated February 18, 2015, and in its 2015 Annual Report dated February 26, 2016.  In each of these annual reports, Allergan also reported sustained revenues attributable to its generic pharmaceutical business, with revenues for the North American Generics increasing to approximately $4.2 billion in 2014.

|  | **2013** | **2014** | **2015** |
|---|---|---|---|
| **Revenues from North American Generics** | $3.9 billion (45% of total revenues) | $4.2 billion (32% of total revenues) | $6.37 billion (42.2% of total revenues)[6] |

31.     During this period of significant sustained revenues, Allergan's cost of sales for the generic drug segment actually **declined**.  According to the 2015 Form

---

[6]   As a result of Allergan's July 27, 2015 announcement that the Company had agreed to sell its global generics business to Teva, Allergan only reported net revenues from its global generics business in the "Income from discontinued operations" portion of the Company's February 26, 2016 Form 10-K.

10-K, in 2014, for example, the Company's revenues increased by $230 million over the prior year, but the cost of sales declined by $213.5 million.

| | 2013 | 2014 | 2015 |
|---|---|---|---|
| **Cost of Sales for Segment Including Generics Business** | $3.32 billion | $3.11 billion | $3.05 billion |

32.     During the Relevant Period, Allergan also touted its ability to both raise and maintain generic drug prices, without ever mentioning the price fixing it was engaged in with its rival drugmakers.   For example, during an analyst conference on May 29, 2014, defendant Paul M. Bisaro, the Company's then-CEO, explained that Allergan is seeing more "sustainable and longer-term higher pricing in the generic industry than people are generally used to," as companies are increasingly "taking those price increases and those price increases are sticking." Similarly, during Allergan's August 5, 2014 conference call with analysts and investors, defendant Brenton L. Saunders, the Company's current CEO, stated that "there are more opportunities to take price [increases], particularly as we leverage our strong supply chain and the reliability of high-quality supply that we can offer customers."   During the Company's second quarter 2015 conference call on May 11, 2015, Saunders similarly explained that while "the model for generics is price decreases as more competitors come into the market . . . the environment has remained pretty stable and favorable."

33.     During the Relevant Period, defendants denied outright that they were engaged in any improper market practices.  On the same day Allergan announced it had been subpoenaed by the DOJ, Allergan CEO Saunders appeared on *Mad Money* with Jim Cramer to quell market concerns.   He revealed that the subpoena concerned three Allergan products, but assured the market that the suspicious price increases were caused purely by "supply and demand" rather than illegal collusion.

34.     In February 2016 at the RBC Capital Markets Healthcare Conference, defendants continued to falsely assure investors that "[w]e have never been aggressive price takers."  Instead, defendants told investors that Allergan's practice and philosophy was to always look out for its customers:

> [W]e have always explained that this is a customer long-term relationship and to the extent you poke them in the eye over and over again, they are going to poke back.
>
> . . . You just don't treat customers that way.  There has to be mutual respect and planning, and so we price our drugs appropriately.
>
> We look to take price increases as we believe we can, but we have never done it in a significant way because our products don't lend themselves to that in large part.  But also our business model and our philosophy doesn't lend itself to that.

35.     Through these representations, defendants led investors to falsely believe that higher generic drug pricing was sustainable and that the Company's success was the result of its active competition in the industry.  Defendants' misleading statements voluntarily put the source of Allergan's revenue from generic drugs at issue while concealing the use of illegal anticompetitive conduct to drive

- 20 -

that revenue.  The Company's income statements were also misleading, because they conveyed a sense of strong profitability without mentioning the price-fixing collusion that fueled that profitability.

36.    As Allergan and the Individual Defendants made these false statements and omissions throughout the Relevant Period – during a time in which they had knowledge of (or recklessly disregarded) the Company's price-fixing conduct – some of them, including defendants Bisaro, David A. Buchen, R. Todd Joyce and Sigurdur O. Olafsson, made substantial sales of their Allergan stock totaling millions of dollars.  These insider sales further evidence defendants' intent to defraud the investing public.

37.    As a result of defendants' acts and omissions, and the precipitous decline in the market value of Allergan's securities, Plaintiff has suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

38.    The claims asserted herein arise under §§11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o, and §§10(b), 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), 78n(a), and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. §240.10b-5, and SEC Rule 14a-9, 17 C.F.R. §240.14a-9.

39.    This Court has jurisdiction over the subject matter of this action pursuant to §22(a) of the Securities Act, §27 of the Exchange Act, 15 U.S.C. §78aa, and under 28 U.S.C. §1331, because this is a civil action arising under the laws of the United States.

40.    Venue is proper in this District pursuant to §22(a) of the Securities Act, 15 U.S.C. § 77v(a), §27 of the Exchange Act and 28 U.S.C. §1391(b), because defendant Allergan conducts business in this District and also maintains its administrative headquarters in this District.

41.    In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mail, interstate telephone communications, and the facilities of the national securities exchange.

## III.    EXCHANGE ACT ALLEGATIONS

### A.    Plaintiff

42.    Plaintiff includes funds and accounts managed by TIAA-CREF Investment Management, LLC and Teachers Advisors, LLC.   TIAA-CREF Investment Management, LLC and Teachers Advisors, LLC are wholly-owned subsidiaries of Teachers Insurance and Annuity Association of America ("TIAA"). TIAA was founded in 1918 and is a joint stock life insurance company incorporated in New York with its headquarters in New York.  TIAA offers traditional annuities,

as well as variable annuities that invest, among other things, in real estate and in mutual funds that invest in equities and fixed income investments. CREF, a companion organization to TIAA, is a not-for-profit membership corporation incorporated in New York with its principal place of business in New York. Together, TIAA and CREF constitute a Fortune 100 financial services organization that forms the principal retirement system for the nation's education and research communities and one of the largest retirement systems in the world based on assets under management. As of December 31, 2016, TIAA served over five million individuals overall (with more than 3.9 million clients in institutional retirement plans) and managed in excess of $907 billion in assets. Plaintiff purchased or otherwise acquired Allergan securities at artificially inflated prices during the Relevant Period and suffered damages as a result of the violations of the Exchange Act alleged herein.

### B.   Defendants

#### 1.   Allergan plc

43.   Defendant Allergan is incorporated in Ireland, and the Company's principal executive offices are located at Clonshaugh Business and Technology Park, Coolock, Dublin, D17 E400, Ireland. The Company's administrative headquarters are located at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey. Allergan's common stock trades on the NYSE under the

ticker symbol "AGN" and its preferred stock trades on the NYSE under the ticker symbol "AGN.PA."

44.     On February 17, 2014 Allergan entered into an Agreement and Plan of Merger with Forest Laboratories (the "Forest Merger Agreement").  Pursuant to the Forest Merger Agreement, Allergan acquired Forest Laboratories through a series of merger transactions (the "Forest Merger").   Allergan solicited and received shareholder approval of the Forest Merger through a joint proxy statement and prospectus filed on Form 424B3 with the SEC on May 6, 2014 (the "May 6, 2014 Proxy").    Allergan announced the completion of its acquisition of Forest Laboratories on July 1, 2014.

45.     Actavis plc and Allergan Inc. announced on November 17, 2014 that they had entered into a definitive agreement under which Actavis plc would acquire Allergan Inc. for a combination of cash and stock in a transaction valued at approximately $66 billion (the "Actavis Merger").   Actavis plc solicited and received shareholder approval of the Actavis Merger through a joint proxy statement and prospectus filed with the SEC on January 27, 2015 (the "January 27, 2015 Proxy").  On March 17, 2015, Actavis plc announced the completion of the Actavis Merger.  On June 15, 2015, Actavis plc announced that the Company had adopted Allergan plc as its new global name and would begin trading on the NYSE under the "AGN" ticker, abandoning the Company's prior "ACT" ticker.

46.     On July 27, 2015, Teva announced that it had entered into a definitive agreement with Allergan to acquire Allergan's generics business in exchange for $33.75 billion in cash and $6.75 billion in Teva stock, amounting to just under a 10% ownership.  In connection with this deal, Teva agreed to sell the rights and assets related to 79 pharmaceutical products following Federal Trade Commission ("FTC") charges that Teva's acquisition of Allergan's generics business would be anticompetitive.  On August 2, 2016, Teva announced that the acquisition was complete.

### 2.     The Individual Defendants

47.     Defendant Paul M. Bisaro ("Bisaro") served as Allergan's CEO and President between October 2013 and July 2014.  Bisaro also served on Allergan's Board of Directors ("Board") when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.  On March 27, 2017, Bisaro was appointed as President and CEO of Impax.  Bisaro signed certifications pursuant to the Sarbanes-Oxley Act ("SOX") and Rule 13a-14(a) under the Exchange Act ("Rule 13a-14(a)") for the Company's 3Q 2013 and 1Q 2014 Forms 10-Q and 2013 Form 10-K, and signed the Registration Statements  and 2014 Form 10-K – all of which contained false and misleading statements and omissions; he also made false and misleading statements

and omissions in the Company's 3Q 2013, 4Q 2013, 1Q 2014 and 2Q 2014 Forms

8-K, at a healthcare conference, and during a Company earnings call.[7]

48.     Defendant Brenton L. Saunders ("Saunders") has served as Allergan's

CEO and President since July 2014.  Saunders also served on Allergan's Board

when the January 27, 2015 Proxy was issued.  Saunders signed certifications

pursuant to SOX and Rule 13a-14(a) for the Company's 2Q 2014, 3Q 2014, 1Q

2015, 2Q 2015, 3Q 2015, 1Q 2016, 2Q 2016 and 3Q 2016 Forms 10-Q and 2014

and 2015 Forms 10-K, and signed the Registration Statements – all of which

contained false and misleading statements and omissions; he also made false and

misleading statements and omissions during the Company's earnings calls.

49.     Defendant R. Todd Joyce ("Joyce") served as Allergan's Chief

Financial Officer ("CFO") from October 2009 to December 2014.  Joyce signed

certifications pursuant to SOX and Rule 13a-14(a) for the Company's 3Q 2013, 1Q

2014, 2Q 2014 and 3Q 2014 Forms 10-Q and 2013 Form 10-K, which contained

false and misleading statements and omissions.  Joyce also signed Allergan's 3Q

2013, 4Q 2013, 1Q 2014, 2Q 2014 and 3Q 2014 Forms 8-K, and the December 5,

2014 Form 8-K, which contained false and misleading statements and omissions.

---

[7]   Each of the Company's Relevant Period SEC filings is defined below.

50.     Defendant Maria Teresa Hilado ("Hilado") has served as Allergan's CFO since December 2014.  Hilado signed certifications pursuant to SOX and Rule 13a-14(a) for the Company's 1Q 2015, 2Q 2015, 3Q 2015, 1Q 2016, 2Q 2016 and 3Q 2016 Forms 10-Q and 2014 and 2015 Forms 10-K, which contained false and misleading statements and omissions.  Hilado also signed Allergan's 4Q 2014, 1Q 2015, 2Q 2015, 3Q 2015, 4Q 2015 Forms 8-K and the March 2, 2015 Form 8-K underwriting agreements relating to the Ordinary/Preferred Shares Offerings, all of which contained false and misleading statements and omissions.  Hilado announced her resignation on September 25, 2017.

51.     Defendant Sigurdur O. Olafsson ("Olafsson") served as a director of Allergan and the President of Actavis Pharma, the Allergan segment that included the Company's generics business, between April 2012 and June 2014.  Olafsson also served on Allergan's Board when the May 6, 2014 Proxy was issued.  Olafsson subsequently served as the President and CEO of the Global Generic Medicines Group at Teva before stepping down in early 2017.  Olafsson made a false and misleading statement and omission during a Company earnings call and also signed the Company's 2013 Form 10-K.

52.     Defendant David A. Buchen ("Buchen") served as Allergan's Chief Legal Officer (Global) and Secretary from April 2012 to July 2014 and then served as the Executive Vice President Commercial, North American Generics and

International, from July 2014 to May 1, 2015.  Upon his termination, Buchen served as a consultant for the Company until May 1, 2016.  Buchen made a false and misleading statement and omission on one of the Company's earnings calls.

53.     Defendant A. Robert D. Bailey ("Bailey") was an Executive Vice President and has served as Allergan's Chief Legal Officer and Secretary since July 2014.  Bailey signed the Registration Statements and the March 2, 2015 Form 8-K containing underwriting agreements relating to the Ordinary/Preferred Shares Offerings – all of which contained false and misleading statements and omissions.

54.     The defendants referenced in this section are referred to herein as the "Individual Defendants."

### 3.     The Director Defendants

55.     Defendant James H. Bloem ("Bloem") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

56.     Christopher W. Bodine ("Bodine") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

57.     Tamar D. Howson ("Howson") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

58.     John A. King ("King") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

59.     Catherine M. Klema ("Klema") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

60.     Jiri Michal ("Michal") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

61.     Jack Michelson ("Michelson") served on Allergan's Board when the May 6, 2014 Proxy was issued.

62.     Patrick J. O'Sullivan ("O'Sullivan") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

63.     Ronald R. Taylor ("Taylor") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

64.     Andrew L. Turner ("Turner") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

65.     Fred G. Weiss ("Weiss") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

66.     Bisaro, Olafsson, Bloem, Bodine, Howson, King, Klema, Michal, Michelson, O'Sullivan, Taylor, Turner and Weiss are referred to herein as the "2014 Board of Directors."

67.     Nesli Basgoz ("Basgoz") served on Allergan's Board when the January 27, 2015 Proxy was issued.

68.   Christopher J. Coughlin ("Coughlin") served on Allergan's Board when the January 27, 2015 Proxy was issued.

69.   Bisaro, Bloem, Bodine, Howson, King, Klema, Michal, O'Sullivan, Taylor, Turner, Weiss, Basgoz and Coughlin are referred to herein as the "2015 Board of Directors."

### C.   The Co-Conspirators

70.   Various other persons, firms, corporations, and entities participated as Co-Conspirators (the "Co-Conspirators") with Allergan in the anticompetitive conduct alleged herein. The Co-Conspirators include, but are not limited to: Lannett; Impax; Heritage; Mylan; Teva; Aurobindo; Epic Pharma, LLC ("Epic"); West-Ward Pharmaceutical Corporation ("West-Ward"); Mutual Pharmaceutical ("Mutual"); Perrigo; and Taro Pharmaceutical Industries Ltd. ("Taro"). To engage in this anticompetitive conduct, the Co-Conspirators performed acts in furtherance of the anticompetitive practices and conspiracies alleged herein.

### D.   Factual Allegations

#### 1.   A Brief Overview of the Generic Pharmaceutical Market

71.   Generic pharmaceutical drugs – drugs that are pharmaceutically equivalent in dosage, form, route of administration, strength or concentration and have the same active ingredients as the reference-listed brand name drug – save consumers and our healthcare system tens of billions of dollars annually because

they introduce competition into a market where none previously existed.  When a high-priced branded drug comes off patent, generic drugs offer the prospect of lower prices and greater access to healthcare for all consumers in the United States. In a January 31, 2012 report, the Government Accounting Office ("GAO") noted that "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."

72.    Generic drugs have long been referred to as one of the few "bargains" in the U.S. healthcare system and historically healthcare experts have said that cost savings from the growing number of generic drugs have gone a long way toward keeping the lid on overall increasing healthcare costs.  This was the way the generic drug market was intended to work, and has generally worked, since the implementation of the Hatch-Waxman Act in 1984.

73.    The Hatch-Waxman Act, formally titled the Drug Price Competition and Patent Term Restoration Act, was intended to balance two interests: encouraging drug innovation and promoting competition between brand and generic drugs in order to lower drug prices.  To encourage innovation, the Hatch-Waxman Act gave branded drug manufacturers longer periods of market exclusivity.  To promote competition, the law simplified the regulatory hurdles for bringing generic drugs to market and eliminated the prior requirement that generic drug companies file costly New Drug Applications ("NDA") to obtain U.S. Food

and Drug Administration ("FDA") approval.  Under the revised process, generic drug companies can instead file an Abbreviated New Drug Application ("ANDA"). A generic drug company that submits an ANDA generally is not required to include clinical trial data to establish the safety and efficacy of the drug.  Instead, the generic drug company can rely on the safety and efficacy data supplied by the original NDA holder for a given drug.

74.     A generic drug must meet certain bioequivalence and pharmaceutical equivalence standards set by the FDA to ensure that the generic drug is essentially an exact substitute for the brand-name drug.  To receive FDA approval through an ANDA, a generic drug must contain the same active ingredient, in the same dosage form, in the same strength, to be bioequivalent to the reference listed drug (*i.e.*, the original brand-name version approved by the FDA through an NDA).  The FDA uses a review process to ensure that brand-name and generic drugs that are rated "therapeutically equivalent" have the same clinical effect and safety profile. According to the FDA: "Products classified as therapeutically equivalent can be substituted with the full expectation that the substituted product will produce the same clinical effect and safety profile as the prescribed product."[8]  The FDA assigns

---

[8]   *See* U.S. Department of Health and Human Services – Food and Drug Administration ("Orange Book"), *Approved Drug Products with Therapeutic Equivalence Evaluations* vii (37th ed. 2017).

generics that are deemed to be therapeutically equivalent to their brand-name counterparts an "AB" rating. Even drugs that are bioequivalent, but that do not share the same dosage form, are not AB-rated.

75. The Hatch-Waxman Act also provides a 180-day exclusivity period for the first generic drug company that files an ANDA and simultaneously challenges the validity of the patent for a brand-name drug. This exclusivity period, which allows the generic drug company to market its generic version free from competition, is intended to spur generic drug companies to provide alternatives to brand-name drugs. When generic drugs enter the market, they are often priced well below the brand-name drugs and quickly take a large market share from the brand-name drug company. The first generic drug will generally be priced 15% to 20% below the brand-name drug. Once the exclusivity period ends and more generic versions enter the market, the price of the generic drugs continues to fall and their combined share of the market for that drug, relative to the brand-name equivalent, continues to grow. The price of the generic versions of a given drug can fall to as little as 10% to 20% of the original price for the brand-name drug. This competition allows purchasers to buy the generic equivalent of a brand-name drug at substantially lower prices. As Stephen W. Schondelmeyer, Professor of Pharmaceutical Care & Health Systems at the University of Minnesota, College of Pharmacy, explained in his testimony before the Senate HELP Committee:

The Congressional Budget Office has credited the Hatch-Waxman Act and, importantly, the process for easy and routine A-rated generic substitution by pharmacists with providing meaningful economic competition from generic drugs, and with achieving billions of dollars of savings for drug purchasers such as consumers and employers.[9]

76.    The price differential between a brand-name drug and the generic equivalents, and the proportion of the market captured by the brand-name versus the generics, generally follows a predictable pattern.  Specifically, as mentioned above, the first generic to enter the market is generally priced 15% to 20% lower than the brand-name drug.  As more approved generics enter the market, the price of the generics generally declines in both absolute terms and in relation to the brand-name drug for around five years.  Eventually, the price of the generic drugs reaches an equilibrium price point, at or close to the manufacturers' marginal production costs, resulting in significant savings for consumers, insurers and employers.

77.    Between 2005 and 2014, generic drugs saved the U.S. healthcare system more than $1.6 trillion dollars.  Since the Hatch-Waxman Act was passed, generic drugs have moved from being less than 20% of prescriptions filled in the United States to 80% of prescriptions filled.  In their complaint, the state Attorneys

---

[9]   *Why Are Some Generic Drugs Skyrocketing in Price?: Hearing Before the S. Comm. on Health, Education, Labor and Pensions*, 113th Cong. 7 (Nov. 20, 2014) (statement of Stephen W. Schondelmeyer).

General cite a study that found that in 2011 alone, generic drugs saved $193 billion for consumers.

78.     The MAC pricing regime also serves to control drug prices.  Under this regime, individual states or pharmacy benefits managers ("PBMs") – third party administrators of prescription drug programs – establish an MAC for drug products using a variety of different inputs and formulas.  If the cost for a pharmacy to dispense a given drug exceeds the MAC, the pharmacy will either opt to substitute a less expensive version, if available, or sell the drug at a loss to service the patient.  This MAC framework incentivizes pharmacies to fill prescriptions with the least expensive, therapeutically equivalent version of a drug to maximize their potential profits.

79.     Over the last several years, however, that price dynamic has changed for a large number of generic drugs.  Prices for dozens of generic drugs have uncharacteristically risen – some have skyrocketed – for no apparent reason, sparking outrage from public officials, payers and consumers across the country whose costs have doubled, tripled or in some cases increased a 1,000% or more.  A December 2016 analysis conducted by the GAO found that more than 300 of the 1,441 established generic drugs examined by the study had one or more instances of "'extraordinary price increases'" – *i.e.*, "periods of prices at least doubling over the five-year study period."   In 2014 alone, more than 100 generic drugs

experienced these extraordinary price increases.  For 48 of these 100 drugs, the price increases were 500% or higher.

80.     The growing outrage and public reports of unexplained price increases caused the State of Connecticut to commence an investigation in July of 2014, which was followed shortly thereafter by a Congressional inquiry and a reported criminal grand jury investigation by the DOJ.

81.     Generic drug manufacturers have argued publicly that the significant price increases were due to a myriad of benign factors, such as industry consolidation, FDA-mandated plant closures, or elimination of unprofitable generic drug product lines.  What regulators have found through their investigations, however, is that the reason underlying many of these price increases is much more straightforward, and nefarious – collusion among generic drug competitors.

82.     As detailed in the AG Complaint, *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-02056 (D. Conn. Dec. 14, 2016), a joint complaint filed by the Attorneys General of 20 states following a lengthy investigation into generic drug price increases, generic drug manufacturers operate through their respective senior leadership and marketing and sales executives in a manner that fosters and promotes routine and direct interaction among their competitors.  *Id.*, ¶7.  The companies exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the

seeds for their illegal agreements.  *Id*.  The anticompetitive agreements are further refined and coordinated at regular "industry dinners," "girls nights out," lunches, parties and numerous and frequent telephone calls, emails and text messages.  *Id.*, ¶¶7, 55.

### 2.    The Distribution and Manufacture of Generic Drugs

83.    Generic drug manufacturers control the sale of drugs to many different drug wholesalers, distributors, retailers and group purchasing organizations ("GPOs"). Wholesalers and distributors purchase drugs from the manufacturers and distribute them to customers such as pharmacies, hospitals and medical facilities. Some of the larger wholesalers and distributors of generic drugs include Cardinal Health, Inc. and AmerisourceBergen Corporation.  Retailers of generic drugs include retail or supermarket chain pharmacies (such as Walgreens and Walmart), mail-order or specialty pharmacies, hospitals, healthcare plans and GPOs.  GPOs are membership-based entities that negotiate with manufacturers, wholesalers and distributors on behalf of a group of purchasers to obtain optimal prices and terms for their members.  GPOs can represent retail, governmental or healthcare groups. Some of the larger GPOs include Vizient and Premier, Inc.

84.    Because the various generic drugs produced by different drug manufacturers are all therapeutically equivalent, the competition between manufacturers to sell generic drugs to wholesalers, distributors, retailers and GPOs

is largely based on each manufacturer's price and ability to provide a supply of that drug. Allergan and the Co-Conspirators are all drug manufacturers and/or suppliers such that they should be competing directly with each other for the sale of the generic drugs discussed herein to U.S. consumers.

### 3. The Markets for Allergan's Generic Drugs Were Susceptible to Price Fixing

85. The markets discussed herein were highly conducive to price-fixing. Characteristics that facilitated collusion include: (i) a high level of market concentration, (ii) significant barriers to entry, (iii) lack of available substitutes, (iv) the commoditized-nature of the products, (v) inelastic demand, (vi) the absence of a competitive fringe of sellers, and (vii) the ease of information sharing, including inter-competitor contacts and communications. As discussed in more detail below, each of these factors was present in the markets for certain dosages of Propranolol, Ursodiol, Doxycycline, Desonide, Tretinoin, Glyburide-Metformin and Verapamil. The anticompetitive behaviors by Allergan and its Co-Conspirators left behind a series of collusive markers in the market for the drugs, as evidenced by uniform price hikes within close timeframes marked by high correlations, the low volatility of drug prices post-collusion, and the high stability of market shares inconsistent with competitive markets.

### a.    High Level of Market Concentration

86.    The Herfindahl-Hirschman Index ("HHI") is a widely accepted market concentration measurement and is used by antitrust enforcement agencies, such as the FTC and the DOJ, for assessing market competitiveness.   An HHI of 0 is indicative of perfect competition and an HHI of 10,000 is indicative of a monopoly. The DOJ and FTC's Horizontal Merger Guidelines classify a market as unconcentrated when HHI is below 1,500, moderately concentrated when HHI is between 1,500 and 2,500, and highly concentrated when HHI exceeds 2,500.

87.    The score is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers.  For example, in a market consisting of three companies with market shares of 10%, 40% and 50%, the HHI is 4,200 (100 + 1,600 + 2,500).

88.    A highly concentrated market is vulnerable to coordinated activities because fewer firms are involved in the negotiation, collusive revenues are high for each firm, and the cartel tends to be stable with the absence of cheating.  In addition, in a highly concentrated market, there is a lower probability that each firm has different production costs, which facilitates the formation and maintenance of a price-fixing scheme.

### b.      Significant Barriers to Entry

89.    Collusion is more effective in markets with high barriers to entry because new competitors cannot easily enter the market and undercut the agreed-upon price.

90.    Barriers to entry into a market can delay, diminish or even prevent the attraction and arrival of new market participants, which is the usual mechanism for checking the market power – *i.e.*, the ability to set prices above market costs – of existing participants.  Entry barriers include things like: trade secrets, patents, licenses, capital outlays required to start a new business, pricing elasticity and difficulties buyers may have in changing suppliers.  If there is no significant threat that new firms will enter a market, a combination of firms with a significant percentage of the market is able to engage in anticompetitive conduct, such as restricting output and raising prices to the detriment of consumers.

91.    A competitor attempting to enter the generic drug market faces numerous barriers, including high manufacturing costs and regulatory and intellectual property requirements.  For example, an ANDA approval by the FDA takes an average of 36 months.  Upon approval, the manufacturing facility is subject to regulatory oversight, compliance expenses and other significant costs.

### c.      Lack of Available Substitutes

92.     The lack of a viable substitute encourages collusive behavior because consumers cannot replace the product after significant price hikes.

93.     In the context of prescription drugs, a pharmacist presented with a prescription for a given drug can only substitute another drug if that drug has an "AB" rating.  Only generic and brand-name versions of a drug are AB-rated to one another.  Therefore, a pharmacist can only fill a prescription for a given drug with the brand-name version or one of the AB-rated generic versions and cannot substitute another drug.

94.     Additional barriers in the medical field also serve to promote the resistance to prescription changes.  These barriers include doctors' reluctance to change well-known prescriptions, insurance and Medicare's absorption of most of the price shock, lags in co-payment tiering changes, and the restriction on Medicare from negotiating drug prices with pharmaceutical companies.

### d.      Commodity-Like Product

95.     A commodity-like product is a standardized product where price is the distinguishing factor for purchasers.  Such products increase the susceptibility of a given market to anticompetitive conduct.  By their very nature, all generic versions of a given drug are interchangeable, as every generic version of a drug must be bioequivalent to the original brand-name drug.

- 41 -

96.     For commodity-like products, price hikes are only sustainable through collusion if the dominant manufacturers participate.  Price hikes by Allergan without the Co-Conspirators' agreement to join the heightened price levels would enable competitors to take market share away by simply setting prices below Allergan's price point.  Thus, the coordinated massive price hikes could only be sustainable with the cooperation and agreement among the Co-Conspirators.

### e.      Inelastic Demand

97.     Elasticity of demand ("Ed") is measured by the change in quantity of goods sold relative to the change in price.  When Ed is zero, demand is perfectly inelastic, as there is no change in the quantity of goods sold despite a large increase in price.  Inelastic demand encourages cartel behavior, as a significant increase in price has minimal effect on quantity demanded by consumers.  As such, the cartel can maximize profit because price increases will directly translate into revenues.

### f.      Absence of Competitive Sellers

98.     The presence of firms that manufacture the same product but are not part of the anticompetitive conspiracy – also called fringe sellers – can erode the conspirators' market share by offering the product at lower, more competitive prices.  This reduces the conspirators' revenue and makes it more difficult to sustain the conspiracy.  By contrast, the absence of fringe sellers can increase the susceptibility of a given market to anticompetitive conduct.

g.   **Inter-Competitor Contacts and**
     **Communications at Trade Association Events**

99.   Information sharing is important in a conspiracy to enable the cartel to come to an agreement and monitor pricing decisions and compliance.

100.   Representatives from Allergan and the Co-Conspirators routinely attended conferences, meetings and trade shows sponsored by various pharmaceutical trade associations.  These events provided frequent opportunities for individuals from Allergan and the Co-Conspirators to interact with each other and discuss their respective businesses and customers.  Social events and other recreational activities – including golf outings, lunches, cocktail parties and dinners – were also organized in conjunction with the trade association events and provided further opportunities for representatives from the drug manufacturers to meet outside of the traditional business setting.  These trade associations and the related formal and informal events, discussed in more detail below, provided representatives from Allergan and the Co-Conspirators with ample opportunities to meet, discuss, devise and implement the price-fixing schemes set forth herein.

101.   The 45 state Attorneys General stated that "these trade shows and customer conferences provide generic drug manufacturers, including but not limited to the Defendants, with ample opportunity to meet, discuss, devise and implement a host of anticompetitive schemes that unreasonably restrain competition in the United States' market for generic drugs."  AG Complaint, ¶52.  As such, the DOJ

is scrutinizing "'trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers.'"

102.   The Allergan representatives who attended the majority of these trade meetings were Andrew Boyer ("Boyer"), Senior Vice President of Generic Sales, Marketing, and National Accounts; Marc Falkin ("Falkin"), Vice President of Marketing, Pricing, and Contracts; and Richard Rogerson ("Rogerson"), Executive Director of Pricing & Business Analytics.  Boyer, Falkin and Rogerson comprised the management team for Allergan's generics business during the Relevant Period.

103.   Confidential Witness No. 1 ("CW1"), an Associate Director of Finance at Allergan from March 2011 to March 2016, confirmed that Boyer was responsible for the Company's pricing decisions and that Falkin and Rogerson were members of Boyer's management team.  According to CW1, Boyer ran the generics business at Allergan and made all decisions regarding generic drugs, including pricing decisions.

104.   Confidential Witness No. 2 ("CW2"), a former Global VP of Finance and Operations at Allergan between 2011 and August 2016, corroborated CW1's account.  CW2 stated that the key people involved with Allergan's generic pricing were Boyer, Falkin, Napoleon Clark ("Clark") and Rogerson.  Rogerson reported to Clark, who reported to Falkin, who reported to Boyer.  CW2 further stated that

Clark was responsible for a lot of the detailed analytics used to make pricing decisions. Rogerson "blessed" all pricing decisions and his team maintained all of the pricing models. All generic pricing was generated using the analytics maintained by Rogerson's team, but Boyer had final authority over both Falkin and Rogerson in terms of final pricing decisions. According to CW2, Bisaro and Olafsson also attended the pricing meetings, weighing in and exerting influence on pricing decisions. CW2 was aware of these details because he/she attended the pricing meetings during which the data used for pricing decisions was evaluated and received the pricing models that were used to determine the prices.

105.   CW2 also indicated that Boyer, Falkin, Clark and Rogerson frequently attended industry events, such as meetings of the National Association of Chain Drug Stores, and socialized with competitors at these events. He/she knew that Boyer's team attended the industry conferences because there was typically an agenda of who went and what was discussed. According to CW2, the industry was so small that personnel from the various companies knew each other and spoke to one another outside of the trade shows.

106.   CW2 said that during his/her tenure as Global VP of Finance and Operations, only rarely was a supplier's increased costs the reason for pricing increases. According to CW2, pricing stayed flat for the most part. In fact, CW2

could not recall any supply, manufacturing or other operational factor that had any influence on pricing during her/his tenure as Global VP of Finance and Operations.

107.   The generics management team of Boyer, Falkin, Clark and Rogerson reported to Olafsson, as President of Actavis Pharma, the Allergan segment that included the Company's generics business.   Olafsson in turn reported to CEO Bisaro.   When Olafsson left the Company, Boyer, Falkin and Rogerson began reporting to Buchen, who reported to Bisaro and then Saunders when Bisaro departed in July 2014.

### (1)   The Generic Pharmaceutical Association

108.   The Association for Accessible Medicines (formerly known as the Generic Pharmaceutical Association) ("GPhA") is, according to its website, "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."   The GPhA's website describes itself as "the unifying and organizing force" for generic drug companies, and touts its members' ability to "[n]etwork with other members and professionals across the industry."   It claims that GPhA members supply "9 out of every 10" generic prescription drugs dispensed in the U.S. and "form an integral, and powerful, part of the healthcare system."

109. Senior executives and corporate officers from Allergan and the Co-Conspirators served on the GPhA's Board of Directors before the Relevant Period. For example, the 2012 Board of Directors included Tony Mauro ("Mauro"), President of Mylan North America; Douglas Boothe ("Boothe"), CEO of Actavis; and Jeffrey Glazer ("Glazer"), CEO of Heritage. The 2013 Board of Directors included Mauro, President of Mylan North America; Glazer, President and CEO of Heritage; and Charlie Mayr, Chief Communications Officer at Actavis.

110. Representatives from Allergan and the Co-Conspirators regularly attended GPhA meetings before and during the Relevant Period, including the following meetings:

- October 1-3, 2012 GPhA 2012 Fall Technical Conference in Bethesda, Maryland, attended by representatives from Allergan, Heritage, Impax, Lannett, Mylan, Perrigo, Sun[10] and Taro.

- February 20-22, 2013 GPhA 2013 Annual Meeting in Orlando, Florida, attended by representatives from Allergan (including Olafsson), Heritage, Impax, Mylan, Perrigo, Taro and URL.

- June 4-5, 2013 GPhA 2013 CMC Workshop in Bethesda, Maryland, attended by representatives from Allergan, Heritage, Impax, Lannett, Mylan, Perrigo, Sun and Taro.

---

[10] Sun Pharmaceutical Industries, Inc. ("Sun") purchased URL Pharma, Inc. ("URL") from Takeda Pharmaceuticals USA Inc. in 2012, and Mutual Pharma is a subsidiary of URL.

- October 28-30, 2013 GPhA 2013 Fall Technical Conference in Bethesda, Maryland, attended by representatives from Allergan, Heritage, Impax, Lannett, Mylan, Perrigo, Sun and Taro.

- December 9-11, 2013 16th Annual IGPA Conference in Brussels, Belgium, attended by representatives from Allergan, Hikma[11] and Mylan.

- February 19-21, 2014 GPhA 2014 Annual Meeting in Orlando, Florida, attended by representatives from Allergan, Epic, Heritage, Impax, Mylan, Perrigo, Sun and Taro.

- June 3-4, 2014 GPhA 2014 CMC Workshop in Bethesda, Maryland, attended by representatives from Allergan, Heritage, Impax, Lannett, Mylan, Perrigo, Sun and Taro.

- October 27-29, 2014 GPhA 2014 Fall Technical Conference in Bethesda, Maryland, attended by representatives from Allergan, Heritage, Lannett, Mylan, Perrigo, Sun, Taro and West-Ward.

- November 19-21 2014, 17th Annual IGPA Conference in Miami, Florida, attended by representatives from Allergan (including Buchen), Hikma and Mylan.

- February 9-11, 2015 GPhA 2015 Annual Meeting in Miami Beach, Florida, attended by representatives from Allergan, Epic, Heritage, Mylan, Perrigo, Taro and West-Ward.

- June 9-10, 2015 GPhA 2015 CMC Workshop in Bethesda, Maryland, attended by representatives from Allergan, Heritage, Impax, Lannett, Mylan, Perrigo, Sun, Taro and West-Ward.

- November 2-4, 2015 GPhA 2015 Fall Technical Conference in Bethesda, Maryland, attended by representatives from Allergan, Heritage, Impax, Lannett, Mylan, Perrigo, Sun, Taro and West-Ward.

---

[11] Hikma Pharmaceuticals PLC ("Hikma") is the parent company of West-Ward.

### (2)    The Healthcare Distribution Alliance

111.    The Healthcare Distribution Alliance ("HDA") was originally founded as the Western Wholesale Druggists' Association in 1876.  After a series of name changes, the association became known as the HDA.  As the HDA's website explains, the association "represents 34 distribution companies – national, regional, and specialty – as well as more than 145 manufacturer and more than 50 service provider/international members, respectively."  The HDA's mission "is to protect patient safety and access to medicines through safe and efficient distribution; advocate for standards, public policies and business processes that enhance the safety, efficiency and value of the healthcare supply chain; and, create and exchange industry knowledge and best practices."

112.    The HDA's website states that HDA "membership provides access to networking opportunities, research, member-developed education and resources for the healthcare supply chain."  The association's membership includes domestic and international drug distributors, drug manufacturers, service providers and health, beauty and wellness/consumer manufacturers.

113.    The HDA describes its Business and Leadership Conference ("BLC") as "the healthcare distribution industry's signature annual conference, developed by and for healthcare supply chain leaders and innovators."  The HDA further states: "Exclusive to HDA member companies, the conference brings together high-level

executives, thought leaders and influential managers from across the healthcare supply chain to hold strategic business discussions on the most pressing industry issues.  This forum offers unmatched opportunities to network with your peers and trading partners at all levels of the healthcare distribution industry."  The BLC events provided Allergan and the Co-Conspirators with opportunities to meet one-on-one and engage in collusive conduct.

114.   As described in other public pleadings, representatives from Allergan and the Co-Conspirators attended the HDA's BLC events set forth below:

| Date | Meeting | Allergan Attendees | Co-Conspirator Attendees |
|---|---|---|---|
| June 1-4, 2014 | HDA 2014 BLC in Phoenix, AZ | Anthony Giannone (Executive Director, Sales); Falkin (Sr. VP Sales, U.S. Generics) | **Mylan**: Richard Isaac (Sr. Manager, Strategic Accounts); Lance Wyatt (Director, National Accounts) |
| | | | **Heritage**: Neal O'Mara (Sr. Director, National Accounts); Anne Sather (Sr. Director, National Accounts) |

| Date | Meeting | Allergan Attendees | Co-Conspirator Attendees |
|------|---------|-------------------|--------------------------|
| June 7-10, 2015 | HDA 2015 BLC in San Antonio, TX | Boyer (Sr. VP, Generic Sales, Marketing, National Accounts); Falkin (VP Marketing, Pricing and Contracts); Rogerson (Executive Director Pricing & Business Analytics) | **Mylan**: Todd Bebout (VP NA Supply Chain Management); Janet Bell (Director, National Accounts); Richard Isaac (Sr. Manager, Strategic Accounts); Stephen Krinke (National Account Manager); Robert O'Neill (Head of Sales Generic, NA); Sean Reilly (National Account Manager); John Shane (Trade Relations); Erik Williams (VP NA Pricing & Contracts); Lance Wyatt (Director, National Accounts) |
| | | | **Heritage:** Glazer (CEO and Chairman); Jason Malek (Sr. VP, Commercial Operations); Neal O'Mara (Sr. Director, National Accounts); Anne Sather (Sr. Director, National Accounts); Matthew Edelson (Associate Director, National Accounts) |

### (3)    The National Association of Chain Drug Stores

115.    According to its website, the NACDS states that its four strategic goals are to: (i) "Foster an advantageous business and political environment in which NACDS chain member companies are better able to achieve their business objectives"; (ii) "Promote the role and value of chain community pharmacy as an integral component of the healthcare system, thus helping to preserve its viability"; (iii) "Provide effective channels of communication, involvement and forums for

members and other stakeholders"; and (iv) "Ensure that NACDS internally operates as a cutting edge association, effectively meeting the needs of its membership."

116. The NACDS describes the membership benefits for suppliers as including: "Access to the NACDS Annual Meeting, NACDS Regional Chain Conference and NACDS Total Store Expo"; "Online Membership Directory listing and access chain member, sales and marketing, peer, and other B2B solution contacts"; and "Popular 'Meet the Retailer' and 'Meet the Market' programming at NACDS events with preparatory webinars throughout the meeting cycle." The NACDS lists as another benefit for supplier members the "NACDS-Nielsen Company Syndicated Data Program," which it describes as providing "syndicated data to help those members gain a better understanding of the competitive marketplace and to position their products accordingly."

117. The NACDS holds several events, including an Annual Meeting and Total Store Expo. The NACDS describes its Annual Meeting as the association's "signature event," highlighting "results . . . relationships . . . [and] member service." According to the NACDS's website, "[p]articipants at the Annual Meeting include Retail Chairmen, CEOs, Presidents, and Senior Vice Presidents of Marketing, Merchandising, Operations, and Pharmacy and their executive-level counterparts and decision makers from supplier companies." In addition, the

NACDS represents that the "Annual Meeting provides numerous opportunities to meet and discuss strategic issues with key trading partners."

118.   The NACDS describes its Total Store Expo as "the industry's largest gathering of its most influential leaders."   The NACDS further states: "It is a combination of both strategic and tactical business meetings between existing and new trading partners and is attended by industry decision makers.  It will give you and your company a unique opportunity to gain new insights into today's evolving marketplace and set your course for the future."

119.   The NACDS describes its Foundation Dinner as "a premier event that brings together the NACDS Board of Directors and senior executives of NACDS Chain and Associate Members, as well as many friends."

120.   Before and during the Relevant Period, representatives from Allergan and the Co-Conspirators attended the NACDS events, which provided opportunities for these representatives to meet in person, in furtherance of the collusive conduct alleged herein.   As described in other public pleadings, representatives from Allergan and the Co-Conspirators attended the NACDS events set forth below:

| Date | Meeting | Allergan Attendees | Co-Conspirator Attendees |
|---|---|---|---|
| April 20-23, 2013 | NACDS 2013 Annual Meeting in Palm Beach, FL | Bisaro (Board Member); Boyer (Sr. VP, Generic Sales, Marketing, National Accounts); Olafsson (Board Member, | **Mylan**: Joe Duda (President); Mauro (Chief Commercial Officer); Robert Potter (Sr. VP of North America National Accounts and Channel Development); Jeffrey May |

| Date | Meeting | Allergan Attendees | Co-Conspirator Attendees |
|---|---|---|---|
| | | President, Actavis Pharma); Michael Reed (Executive Director of Trade Relations); Michael Baker (Executive VP of Trade Sales and Development); Paul Reed (Sr. Director of Trade Sales and Development); Robert Stewart (Chief Operating Officer) | (VP of North America Product Strategy); Jim Nesta (VP of Sales) |
| August 10-13, 2013 | NACDS 2013 Total Store Expo in Las Vegas, NV | Boyer (Sr. VP, Generic Sales, Marketing, National Accounts); Falkin (VP Marketing, Pricing and Contracts); Rogerson (Executive Director, Pricing & Business Analytics) | **Mylan**: Mike Aigner (Director National Accounts); Kevin McElfresh (Executive Director National Accounts); Joe Duda (President); Robert Potter (Sr. VP North America National Accounts and Channel Development); Rob O'Neill (Head of Sales); Lance Wyatt (Director National Accounts) |
| | | | **Heritage**: Glazer (CEO and Chairman); Matthew Edelson (Sr. Director of Sales); Jason Malek (Sr. VP, Commercial Operations); Gina Gramuglia (Commercial Operations); Neal O'Mara (Sr. Director, National Accounts); Anne Sather (Sr. Director, National Accounts) |

| Date | Meeting | Allergan Attendees | Co-Conspirator Attendees |
|---|---|---|---|
| December 3, 2013 | NACDS 2013 NYC Week and Annual Foundation Dinner in New York, NY | Boyer (Sr. VP, Generic Sales, Marketing, National Accounts); Falkin (VP Marketing, Pricing and Contracts) | **Mylan**: Joe Duda (President); Mauro (Chief Operating Officer); Robert Potter (Sr. VP of North America National Accounts and Channel Development); Rob O'Neill (Head of Sales) |
| April 26-29, 2014 | NACDS 2014 Annual Meeting in Scottsdale, AZ | Bisaro (Board Member); Boyer (Sr. VP, Generic Sales, Marketing, National Accounts); Olafsson (Board Member, President, Actavis Pharma); Paul Reed (Sr. Director of Trade Sales and Development); Robert Stewart (Chief Operating Officer); Falkin (VP Marketing, Pricing and Contracts) | **Mylan**: Joe Duda (President); Mauro (President); Robert Potter (Sr. VP of North America National Accounts and Channel Development); Rob O'Neill (Head of Sales)<br><br>**Heritage**: Glazer (CEO and Chairman) |
| August 23-26, 2014 | NACDS 2014 Total Store Expo in Boston, MA | Boyer (Sr. VP, Generic Sales, Marketing, National Accounts); Falkin (VP Marketing, Pricing and Contracts); Rogerson (Executive Director of Pricing & Business Analytics) | **Mylan**: Joe Duda (President); Mauro (President); Robert Potter (Sr. VP of North America National Accounts and Channel Manager); Mike Aigner (Director, National Accounts); Kevin McElfresh (Executive Director, National Accounts); Gary Tighe (Director, National Accounts); Lance Wyatt (Director, National Accounts) |

| Date | Meeting | Allergan Attendees | Co-Conspirator Attendees |
|---|---|---|---|
| | | | **Heritage**: Glazer (CEO and Chairman); Jason Malek (Sr. VP, Commercial Operations); Heather Beem (National Account Manager, Institutional); Katie Brodowski (Associate Director Institutional Sales); Matthew Edelson (Senior Director of Sales); Gina Gramuglia (Commercial Operations); Neal O'Mara (Sr. Director, National Accounts); Anne Sather (Sr. Director, National Accounts) |
| December 3, 2014 | NACDS 2014 NYC Week and Annual Foundation Dinner in New York, NY | Saunders (President, CEO and Chairman); Boyer (Sr. VP, Generic Sales, Marketing, National Accounts); Falkin (VP Marketing, Pricing and Contracts) | **Mylan**: Mike Aigner (Director National Accounts); Mauro (Chief Operating Officer); Robert Potter (Sr. VP of North America National Accounts and Channel Development) |
| April 25-28, 2015 | NACDS 2015 Annual Meeting in Palm Beach, FL | Boyer (Sr. VP, Generic Sales, Marketing, National Accounts); Falkin (VP Marketing, Pricing and Contracts) | **Mylan**: Mauro (President); Robert Potter (Sr. VP of North America National Accounts); Rob O'Neill (Head of Sales); Gary Tighe (Director National Accounts) |
| August 22-25, 2015 | NACDS 2015 Total Store Expo in Denver, CO | Boyer (Sr. VP, Generic Sales, Marketing, National Accounts); Falkin (VP Marketing, Pricing and Contracts); | **Mylan**: Mike Aigner (Director National Accounts); Mauro (President); Robert Potter (Sr. VP of North America National Accounts); Kevin McElfresh (Executive |

| Date | Meeting | Allergan Attendees | Co-Conspirator Attendees |
|------|---------|--------------------|--------------------------|
|      |         | Rogerson (Executive Director Pricing & Business Analytics) | Director, National Accounts); Robert O'Neill (Head of Sales) |
|      |         |                    | **Heritage:** Glazer (CEO and Chairman); Jason Malek (Sr. VP, Commercial Operations); Neal O'Mara (Sr. Director, National Accounts); Anne Sather (Sr. Director, National Accounts); Matthew Edelson (Sr. Director of Sales); Gina Gramuglia (Commercial Operations) |

121.   In addition, representatives from Allergan and the Co-Conspirators also attended the NACDS 2016 Total Store Expo on August 19-22, 2016 in San Diego, California.

122.   When necessary, the agreements reached at trade meetings and industry dinners were reinforced through phone calls and text messages between executives and sales people from Allergan and the Co-Conspirators.  On these calls, the companies' representatives discussed, among other things, their desire to maintain or raise prices with respect to specific drugs.  Phone records referenced in the Amended AG Complaint demonstrate that these types of communications occurred with great frequency across the industry.  For example, the records revealed at least 334 separate communications between Allergan and its co-

conspirator Teva from July 2013 to July 2014, the period when most of the collusive price hikes occurred.

### 4.    Propranolol

123.   Discovered in the 1960s, Propranolol is a beta blocker used to treat high blood pressure and certain types of irregular heart rates, to prevent migraines, and to treat further heart problems in individuals who suffered a previous heart attack or have angina.  Beta blockers work by blocking the effects of epinephrine, causing a patient's heart to beat slower and with less force, thereby reducing blood pressure. Propranolol is included as a preventative anti-migraine medicine on the Core List within the World Health Organization's ("WHO") Model List of Essential Medicines – a list "of minimum medicine needs for a basic health-care system, listing the most efficacious, safe and cost-effective medicines for priority conditions."

### a.    The Co-Conspirators' Price Hikes

124.   Allergan and the Co-Conspirators engaged in anticompetitive conduct by colluding to improperly raise and maintain the prices of Propranolol beginning in late 2013.  For example, Allergan, Heritage, Impax and Mylan raised the price of generic Propranolol HCL 10mg, 20mg, and 80mg tablets by as much as *1,200%* between December 2014 and December 2015.

125.   The graph below similarly shows the price hikes of Propranolol HCL sustained release capsules manufactured by Allergan, Mylan and other Co-Conspirators in late 2013:



126.   This drastic increase in the price of Propranolol HCL sustained release capsules occurred shortly after and/or in conjunction with the GPhA 2013 Fall Technical Conference in October 2013.

127.   In addition, Allergan and its Co-Conspirators raised the price of Propranolol HCL tablets by as much as 1,200% between December 2014 and December 2015.  The drastic increase in the price of Propranolol HCL 10mg tablets occurred shortly after and/or in conjunction with the following trade association meetings:

- GPhA 2015 Annual Meeting in February 2015 attended by representatives from Allergan, Heritage, Mylan and other Co-Conspirators;

- 59 -

- NACDS 2015 Annual Meeting in April 2015 attended by representatives from Allergan (including Boyer and Falkin) and representatives from Mylan, along with representatives from other Co-Conspirators;

- GPhA 2015 CMC Workshop in June 2015 attended by representatives from Allergan, Heritage, Impax, Mylan and other Co-Conspirators;

- HDA 2015 BLC in June 2015 attended by representatives from Allergan (including Boyer, Falkin and Rogerson) and representatives from Mylan and Heritage, along with representatives from other Co-Conspirators; and

- NACDS 2015 Total Store Expo in August 2015 attended by representatives from Allergan (including Boyer, Falkin and Rogerson) and representatives from Mylan and Heritage, along with representatives from other Co-Conspirators.

128.   The drastic increase in the price of Propranolol HCL 20mg tablets occurred shortly after and/or in conjunction with the following trade association meetings:

- GPhA 2015 Annual Meeting in February 2015 attended by representatives from Allergan, Heritage, Mylan and other Co-Conspirators;

- NACDS 2015 Annual Meeting in April 2015 attended by representatives from Allergan (including Boyer and Falkin) and representatives from Mylan, along with representatives from other Co-Conspirators;

- GPhA 2015 CMC Workshop in June 2015 attended by representatives from Allergan, Heritage, Impax, Mylan and other Co-Conspirators;

- HDA 2015 BLC in June 2015 attended by representatives from Allergan (including Boyer, Falkin and Rogerson) and representatives from Mylan and Heritage, along with representatives from other Co-Conspirators; and

- NACDS 2015 Total Store Expo in August 2015 attended by representatives from Allergan (including Boyer, Falkin and Rogerson) and representatives from Mylan and Heritage, along with representatives from other Co-Conspirators.

129. The drastic increase in the price of Propranolol HCL 80mg tablets occurred shortly after and/or in conjunction with the following trade association meetings:

- GPhA 2015 Annual Meeting in February 2015 attended by representatives from Allergan, Heritage, Mylan and other Co-Conspirators;

- NACDS 2015 Annual Meeting in April 2015 attended by representatives from Allergan (including Boyer and Falkin) and representatives from Mylan, along with representatives from other Co-Conspirators;

- GPhA 2015 CMC Workshop in June 2015 attended by representatives from Allergan, Heritage, Impax, Mylan and other Co-Conspirators;

- HDA 2015 BLC in June 2015 attended by representatives from Allergan, (including Boyer, Falkin and Rogerson) and representatives from Mylan and Heritage, along with representatives from other Co-Conspirators; and

- NACDS 2015 Total Store Expo in August 2015 attended by representatives from Allergan (including Boyer, Falkin and Rogerson) and representatives from Mylan and Heritage, along with representatives from other Co-Conspirators.

**b.     No Commercial Justification for Price Hikes**

130. There was no reasonable justification for the price hikes discussed above. While a supply shortage can explain an abrupt rise in prices, here – notwithstanding the drug manufacturers' obligation to report shortages to the FDA

– no such shortage of Propranolol was reported during the relevant time period.  In addition, there was no significant increase in the demand for Propranolol or in the drug's production costs that would explain the enormous price increase.  Even if there was such a benign market explanation for the price increase, at no point following the initial spike did the price return to the pre-spike equilibrium price point.

131.  In addition, price increases of this magnitude would have been contrary to each of the Co-Conspirators' economic interest absent the price-fixing scheme.  Without the certainty that all of the Co-Conspirators would raise and maintain the prices for generic Propranolol, each Co-Conspirator risked getting undercut by the others, leading to a loss of market share and a loss of revenue.  This risk was alleviated by the Co-Conspirators' agreement to raise and maintain their prices for generic Propranolol.

### c.    The Market for Generic Propranolol HCL Was Susceptible to Anticompetitive Conduct

### (1)    Market Concentration

132.  In 2014 and 2015, the markets for generic Propranolol HCL were highly concentrated, as demonstrated by the HHI calculations below:

|  | 2014 HHI | 2015 HHI |
|---|---|---|
| **Propranolol HCL 10mg tablets** | 2,444 | 2,786 |
| **Propranolol HCL 20mg tablets** | 2,506 | 3,034 |
| **Propranolol HCL 80mg tablets** | 2,514 | 2,684 |

| Propranolol HCL Sustained Release Capsules | 4,446 | 3,569 |
|---|---|---|

133.   At the time of the price hike, Allergan and its Co-Conspirators combined to account for more than 75% of the total markets for generic Propranolol HCL 10mg, 20mg and 80mg tablets and almost 100% of the total market for Propranolol HCL sustained release capsules, as set forth in the chart below.



Propranolol HCL Sustained Release Capsules: Total Quantity %

**(2)    Significant Barriers to Entry**

134.   As mentioned above, the barriers to entry into the markets for generic Propranolol HCL included high manufacturing costs as well as certain regulatory and intellectual property barriers. For example, the requirement that generic drug companies file an ANDA and receive FDA approval can delay entry into the market by an average of 36 months.

### (3)    Lack of Available Substitutes

135.   As discussed above, pharmacists presented with a prescription for a given drug can only substitute another drug if that drug has an "AB" rating.  Only generic Propranolol and brand-name Propranolol for a given dosage are AB-rated to one another.  Therefore, a pharmacist can only fill a prescription for Propranolol with the brand-name version or one of the AB-rated generic versions and cannot substitute another drug.

### (4)    Commodity-Like Product

136.   As mentioned above, all generic versions of any given brand-name drug are necessarily interchangeable. Generic Propranolol is no exception.  The FDA-approved versions of generic Propranolol HCL manufactured by the Co-Conspirators each has an "AB" rating.  Thus, pharmacists are able to substitute one manufacturer's generic version of Propranolol for another.

### (5)    Inelastic Demand

137.   The generic Propranolol market was characterized by nearly perfect inelastic demand with Ed measured at close to zero.  For example, at the time of the collusive price-fixing, the market for generic Propranolol sustained release capsules was so inelastic that the dramatic price increase had no negative effect on sales whatsoever and the quantities sold actually increased by 2%.  As a result, the coordinated price hike translated immediately and directly into collusive revenues shared by Allergan and its Co-Conspirators.

### (6)    Absence of Competitive Sellers

138.    In the case of generic Propranolol sustained release capsules and Propranolol HCL 10mg, 20mg and 80mg tablets, there was no realistic threat that minor market participants would take market share from Allergan and its Co-Conspirators.  The dominance of Allergan and the Co-Conspirators facilitated their ability to raise prices without losing market share to minor market participants.  Indeed, following the dramatic price increases discussed above, neither Allergan nor the Co-Conspirators were willing to meaningfully undercut prices to gain market share, thereby further demonstrating the absence of a competitive market.

139.    Allergan and its Co-Conspirators' coordinated price hikes left behind a trail of collusive markers which are evidence of anticompetitive behavior.  For example, the Propranolol sustained release capsules' price increases by the Co-Conspirators for the period from May 2013 to December 2016 were so uniform that they registered at 86% to 98% correlation.  Under the collusion scheme, after the price hike, the volatility of Allergan's price for the drug steadily declined from 10.8% in 2013 to 0.6% in 2016 as prices were sustained at heightened levels.  Allergan's market share remained uncharacteristically stable despite the price hike, with an annual standard deviation ranging from a mere 2.1% to 9.0% during the Relevant Period.

### d.    Collusive Revenue

140.   Collusive revenue represents the amount of additional revenue that Allergan received due to anticompetitive behavior.  This is calculated by taking the difference between the actual price Allergan received minus the "but for" price and multiplied by the actual quantity sold. The "but for" price is  based on three distinct methodologies: (i) "But for" Price Regression; (ii) "But for" Price Regression + CPI; and (iii) "But for" Price Average Drug Price Trend.  These three values are depicted, respectively, by the first three bars for each year on the collusive revenue chart below.

141.   As a result of the price hikes in Propranolol, Allergan improperly recognized over $91 million of collusive revenue[12] between 2014 and 2016:

---

[12] The average of all three methodologies – depicted as the fourth bar in the collusive revenue chart – is used *infra* for the purposes of aggregating revenue throughout the Relevant Period.



### 5.  Ursodiol

142.  Ursodiol, or ursodeoxycholic acid, is a bile acid used to treat gallbladder stones and is usually prescribed to patients with small gallstones who cannot undergo gallbladder surgery.  The drug decreases the amount of cholesterol produced by the liver and absorbed by the intestines and helps to break down cholesterol that has formed into gallstones.  Generic versions of Ursodiol in capsule form have been on the market since 2000.  Allergan listed Ursodiol as one of the "key products" that made up "a majority of product sales for North American Generics" for 2014 in the Company's 2014 Form 10-K.

### a.  The Co-Conspirators' Price Hikes

143.  Allergan and the Co-Conspirators engaged in anticompetitive conduct by colluding to improperly raise and maintain the prices of Ursodiol, beginning in

early 2014. For example, as demonstrated below, Allergan and co-conspirators Epic and Lannett raised the prices of Ursodiol capsules by almost *1,200%*.

144. The graph below shows the price hikes of Ursodiol capsules manufactured by Allergan, Epic and Lannett between December 2010 and October 2016:



145. The drastic increase in the price of Ursodiol capsules occurred shortly after and/or in conjunction with the following trade association meetings:

- GPhA 2014 Annual Meeting in February 2014 attended by representatives from Allergan, Epic and other Co-Conspirators;

- NACDS 2014 Annual Meeting in April 2014 attended by representatives from Allergan (including Boyer and Falkin) and certain Co-Conspirators;

- GPhA 2014 CMC Workshop in June 2014 attended by representatives from Allergan, Lannett and other Co-Conspirators;

- HDA 2014 BLC in June 2014 attended by representatives from Allergan (including Falkin) and certain Co-Conspirators;

- NACDS 2014 Total Store Expo in August 2014 attended by representatives from Allergan (including Boyer, Falkin and Rogerson) and certain Co-Conspirators; and

- In addition to these industry meetings, the AG Complaint describes a dinner at a steakhouse in Bridgewater, New Jersey in January 2014, just before the price for Ursodiol skyrocketed. The dinner was attended by high-ranking executives from Allergan, Lannett and other generic manufacturers.

### b.   No Commercial Justification for Price Hikes

146.   There was no reasonable justification for the price hikes discussed above. While a supply shortage can explain an abrupt rise in prices, here – notwithstanding the drug manufacturers' obligation to report shortages to the FDA – no such shortage of Ursodiol was reported during the relevant time period. In addition, there was no significant increase in the demand for Ursodiol or in the drug's production costs that would explain the enormous price increase. Even if there was such a benign market explanation for the price increase, at no point following the initial spike did the price return to the pre-spike equilibrium price point.

147.   In addition, price increases of this magnitude would have been contrary to each of the Co-Conspirators' economic interest absent the price-fixing scheme. Without the certainty that all of the Co-Conspirators would raise and maintain the prices for generic Ursodiol, each Co-Conspirator risked getting

undercut by the others, leading to a loss of market share and a loss of revenue. This risk was alleviated by the Co-Conspirators' agreement to raise and maintain their prices for generic Ursodiol.

**c.**     **The Market for Generic Ursodiol Capsules Was Susceptible to Anticompetitive Conduct**

**(1)**     **Market Concentration**

148. In 2014, the market for generic Ursodiol capsules was highly concentrated, as demonstrated by the HHI calculation below:

| | **2014 HHI** |
|---|---|
| **Ursodiol 300mg capsules** | 3,579 |

149. During this period, Allergan and co-conspirators Epic and Lannett combined to account for more than 95% of the total market for generic Ursodiol capsules, as shown in the chart below:



### (2)     Significant Barriers to Entry

150.   As mentioned above, the barriers to entry into the market for generic Ursodiol capsules included high manufacturing costs as well as certain regulatory and intellectual property barriers.  For example, the requirement that generic drug companies file an ANDA and receive FDA approval can delay entry into the market by an average of 36 months.

151.   Further discouraging new entrants into the market for generic Ursodiol capsules is the relatively small size of the worldwide market for the drug.

### (3)     Lack of Available Substitutes

152.   As discussed above, pharmacists presented with a prescription for a given drug can only substitute another drug if that drug has an "AB" rating. Only generic Ursodiol and brand-name Ursodiol for a given dosage are AB-rated to one another.  Therefore, a pharmacist can only fill a prescription for Ursodiol with the brand-name version or one of the AB-rated generic versions and cannot substitute another drug.

### (4)     Commodity-Like Product

153.   As mentioned above, all generic versions of any given brand-name drug are necessarily interchangeable.  Generic Ursodiol is no exception.  The FDA-approved versions of generic Ursodiol capsules manufactured by co-conspirators Allergan, Epic and Lannett each has an "AB" rating.  Thus, pharmacists are able to substitute one manufacturer's generic version of Ursodiol for another.

### (5)     Inelastic Demand

154.   The generic Ursodiol market was characterized by nearly perfect inelastic demand with Ed measured at close to zero.  For example, at the time of the collusive price fixing, the market for generic Ursodiol capsules was so inelastic that the dramatic price increase had negligible effect on sales with the quantities sold declining by a mere 1%.   As a result, the coordinated price hike translated immediately and directly into collusive revenues shared by Allergan and its Co-Conspirators.

### (6)     Absence of Competitive Sellers

155.   In the case of generic Ursodiol capsules, there was no realistic threat that the other market participants, who collectively contributed less than 5% of the total generic Ursodiol capsule sales, would take market share from Allergan and co-conspirators Epic and Lannett.  The dominance of Allergan and the Co-Conspirators facilitated their ability to raise prices without losing market share to non-conspirators.  Moreover, following the dramatic price increases in the second half of 2014, discussed above, neither Allergan nor the Co-Conspirators were willing to meaningfully undercut prices to gain market share, thereby further demonstrating the absence of a competitive market.

156.   Allergan and its Co-Conspirators' coordinated price hikes left behind a trail of collusive markers which are evidence of anticompetitive behavior.  The

Ursodiol capsules' price increases by the Co-Conspirators from 2014 to 2016 were so uniform that they registered at 88% to 97% correlation.  Under the collusion scheme, after the price hike, the volatility of Allergan's price for the drug went from 35% in 2014 to 0% in 2016, as prices were sustained at heightened levels.  Allergan's market share remained uncharacteristically stable despite the price hike, with an annual standard deviation ranging from a mere 0.8% to 11.0% during the Relevant Period.

### d.    Collusive Revenue

157.    As a result of the price hikes in Ursodiol, Allergan improperly recognized over $189 million of collusive revenue between 2014 and 2016:



### 6.    Doxycycline

158.    Patented in 1957 and put into commercial use in 1967, Doxycycline is a broad-spectrum antibiotic in the tetracycline class.  Doxycycline is commonly

produced in two salt forms: hyclate and monohydrate.  Doxycycline is used to treat a variety of bacterial infections, including pneumonia, acne, chlamydia, Lyme disease, cholera and syphilis.  Doxycycline, in combination with quinine, is also used to treat malaria.  Doxycycline is included on the Core List within the WHO's Model List of Essential Medicines.  Allergan listed doxycycline hyclate as a "key product" in the Company's 2013 Form 10-K and December 5, 2014 Form 8-K.  For 2014, the drug was one of the "key products" that made up "a majority of product sales for North American Generics," according to the 2014 Forms 10-K.

### a.  The Co-Conspirators' Price Hikes

159.   Allergan and the Co-Conspirators engaged in anticompetitive conduct by colluding to improperly raise and maintain the prices of Doxycycline beginning in early 2013.  For example, Allergan, Mutual and West-Ward raised the prices of Doxycycline capsules and by as much as ***5,000%***.

160.   The graph below shows the price hikes of Doxycycline manufactured by Allergan, Sun and West-Ward from January 2012 to July 2014:



161. This drastic increase in the price of Doxycycline capsules occurred in conjunction with the GPhA 2013 Annual Meetings in October 2012 and February 2013 attended by representatives from Allergan (including Olafsson) and other Co-Conspirators.

### b. No Commercial Justification for Price Hikes

162. There were no reported shortages of Doxycycline that justified the drastic price increases discussed above. While the FDA did report a shortage of Doxycycline in January 2013, this shortage cannot explain the significant price increases because, among other reasons, the Doxycycline prices did not return to the pre-shortage levels following the resolution of the shortage in October 2013. Indeed, Allergan's price immediately before the shortage was significantly lower and never returned to this level after March 2013. There were also no significant

increases in the demand for this drug that would explain the enormous price increases.

163. In addition, price increases of this magnitude would have been contrary to each of the Co-Conspirators' economic interest absent the price-fixing scheme. Without the certainty that all of the Co-Conspirators would raise and maintain the prices for generic Doxycycline, each Co-Conspirator risked getting undercut by the others, leading to a loss of market share and a loss of revenue. This risk was alleviated by the Co-Conspirators' agreement to raise and maintain their prices for generic Doxycycline.

### c. The Market for Generic Doxycycline Was Susceptible to Anticompetitive Conduct

### (1) High Level of Market Concentration

164. In 2012 and 2013, the market for generic Doxycycline capsules was highly concentrated, as demonstrated by the HHI calculation below:

|  | 2012 HHI | 2013 HHI |
|---|---|---|
| **Doxycycline capsules** | 3,187 | 2,550 |

165. During this period, Allergan and the Co-Conspirators combined to account for almost 100% of the total market for generic Doxycycline, as shown in the charts below:



### (2)  Significant Barriers to Entry

166.   As mentioned above, the barriers to entry into the market for generic Doxycycline capsules included high manufacturing costs as well as certain regulatory and intellectual property barriers.  For example, the requirement that generic drug companies file an ANDA and receive FDA approval can delay entry into the markets for generic Doxycycline by an average of 36 months.

### (3)  Lack of Available Substitutes

167.   As discussed above, pharmacists presented with a prescription for a given drug can only substitute another drug if that drug has an "AB" rating.  Only generic Doxycycline and brand-name Doxycycline for a given dosage are AB-rated to one another.  Therefore, a pharmacist can only fill a prescription for Doxycycline

with the brand-name version or one of the AB-rated generic versions and cannot substitute another drug.

### (4)    Commodity-Like Product

168.    As mentioned above, all generic versions of any given brand-name drug are necessarily interchangeable.  Generic doxycycline hyclate is no exception.  The FDA-approved versions of generic doxycycline hyclate manufactured by co-conspirators Allergan, Sun and West-Ward each has an "AB" rating.  Thus, pharmacists are able to substitute one manufacturer's generic version of doxycycline hyclate for another.

### (5)    Inelastic Demand

169.    The generic Doxycycline market was characterized by nearly perfect inelastic demand with Ed measured at close to zero.  For example, at the time of the collusive price fixing, the market for generic Doxycycline capsules was so inelastic that the dramatic price increase had negligible effect on sales, with quantities sold declining by only 3%.  As a result, the coordinated price hike translated immediately and directly into collusive revenues shared by Allergan and its Co-Conspirators.

### (6)    Absence of Competitive Sellers

170.    In the case of generic Doxycycline capsules, there was no realistic threat that the other small market participants would take market share from Allergan and co-conspirators Sun and West-Ward.  The dominance of Allergan and the Co-Conspirators facilitated their ability to raise prices without losing market

share to non-conspirators.  Moreover, following the dramatic price increases in early 2013, discussed above, neither Allergan nor the Co-Conspirators were willing to meaningfully undercut prices to gain market share, thereby further demonstrating the absence of a competitive market.

171.   Allergan and its Co-Conspirators' coordinated price hikes left behind a trail of collusive markers which are evidence of anticompetitive behavior.  The Doxycycline capsules' price increases by the Co-Conspirators were so uniform that they registered at 90% to 99% correlation.  Under the collusion scheme, after the price hike, the volatility of Allergan's price for the drug went from 29% to 0.8% as prices were sustained at heightened levels.  Allergan's market share remained uncharacteristically stable despite the price hike, with an annual standard deviation ranging from a mere 0.8% to 11.6% during the Relevant Period.

### d.   Collusive Revenue

172.   As a result of the price hikes in Doxycycline, Allergan improperly recognized over $574 million of collusive revenue between 2013 and 2016:



### 7. Desonide

173.   Desonide is a mild topical corticosteroid produced in cream, gel and ointment form.  Desonide is used to treat a variety of skin conditions, including eczema, seborrheic and contact dermatitis, allergies and psoriasis, and works by reducing the swelling, itching and redness that accompanies these conditions. Allergan listed Desonide lotion and cream as "key products" in the Company's 2013 Form 10-K and December 5, 2014 Form 8-K.  For 2014, the drug was listed as one of the "key products" that made up "a majority of product sales for North American Generics," according to the 2014 Form 10-K.

### a. The Co-Conspirators' Price Hikes

174.   Allergan and the Co-Conspirators engaged in anticompetitive conduct by colluding to improperly raise and/or maintain the prices of Desonide.  Between March and September of 2013, co-conspirators Taro and Perrigo raised the price of

Desonide cream by as much as *470%*. Allergan entered the Desonide cream market after the price hike in September 2013 and, despite the new competition, the price remained inflated, strongly suggesting that Allergan joined the conspiracy. Similarly, Allergan raised prices of Desonide lotion along with its Co-Conspirators more than *442%* between June 2011 and September 2013. Allergan and its Co-Conspirators first hiked prices of Desonide lotion in 2011 and, as reflected in the chart below, more than doubled the already inflated price again in the middle of 2013

175.   The graph below shows the price hikes of Desonide lotion manufactured by Taro, Fougera Pharmaceuticals ("Fougera") and Allergan between January 2012 and May 2017:



176.   These drastic increases in the price of generic Desonide lotion and Allergan's entrance into the market at an inflated price occurred shortly after the

GPhA 2013 Annual Meeting in February 2013 attended by representatives from Allergan (including Olafsson) and other Co-Conspirators, the NACDS 2013 Annual Meeting in April 2013 attended by representatives from Allergan (including Bisaro and Boyer) and certain Co-Conspirators, and the GPhA 2013 CMC Workshop in June 2013 attended by representatives from Allergan and other Co-Conspirators.

### b.    No Commercial Justification for Price Hikes

177.   There was no reasonable justification for the price hikes discussed above.   While a supply shortage can explain an abrupt rise in prices, here – notwithstanding the drug manufacturers' obligation to report shortages to the FDA – no such shortage of Desonide was reported during the relevant time period.   In addition, there was no significant increase in the demand for Desonide or in the drug's production costs that would explain the enormous price increase.   Even if there was such a benign market explanation for the price increase, at no point following the initial spike did the price return to the pre-spike equilibrium price point.

178.   In addition, price increases of this magnitude would have been contrary to each of the Co-Conspirators' economic interest absent the price-fixing scheme.   Without the certainty that all of the Co-Conspirators would raise and maintain the prices for generic Desonide, each Co-Conspirator risked getting undercut by the others, leading to a loss of market share and a loss of revenue.   This

risk was alleviated by the Co-Conspirators' agreement to raise and maintain their prices for generic Desonide.

### c.   The Market for Generic Desonide Was Susceptible to Anticompetitive Conduct

#### (1)   High Level of Market Concentration

179.   From 2011 to 2014, the market for generic Desonide lotion was highly concentrated, as demonstrated by the HHI calculation below:

|  | 2011 HHI | 2012 HHI | 2013 HHI | 2014 HHI |
|---|---|---|---|---|
| **Desonide 0.05% 15gm tube** | 5,190 | 5,163 | 8,738 | 5,551 |

180.   During this period, Allergan and the Co-Conspirators combined to account for almost 100% of the total market for generic Desonide lotion:



- 83 -

### (2)    Significant Barriers to Entry

181.   As mentioned above, the barriers to entry into the market for generic Desonide included high manufacturing costs as well as certain regulatory and intellectual property barriers.   For example, the requirement that generic drug companies file an ANDA and receive FDA approval can delay entry into the market by an average of 36 months.

### (3)    Lack of Available Substitutes

182.   As discussed above, pharmacists presented with a prescription for a given drug can only substitute another drug if that drug has an "AB" rating.   Only generic Desonide and brand-name Desonide for a given dosage are AB-rated to one another.   Therefore, a pharmacist can only fill a prescription for Desonide with the brand-name version or one of the AB-rated generic versions and cannot substitute another drug.

### (4)    Commodity-Like Product

183.   As mentioned above, all generic versions of any given brand-name drug are necessarily interchangeable.   Generic Desonide is no exception.   The FDA-approved versions of generic Desonide manufactured by Allergan and the Co-Conspirators each has an "AB" rating.   Thus, pharmacists are able to substitute one manufacturer's generic version of Desonide for another.

### (5)   Inelastic Demand

184.   The generic Desonide market was characterized by highly inelastic demand with Ed measured at -0.197.  For example, at the time of the collusive price fixing, the market for generic Desonide was so inelastic that the dramatic price increase had only a small effect on sales, with quantities sold declining by 12%.  As a result, the coordinated price hike translated immediately and directly into collusive revenues shared by Allergan and its Co-Conspirators.

### (6)   Absence of Competitive Sellers

185.   In the case of generic Desonide lotion and cream, there were no other market participants who could take market share from Allergan and co-conspirators Perrigo, Taro and Fougera.  The complete dominance of Allergan and the Co-Conspirators facilitated their ability to raise prices without losing market share to non-conspirators.  Moreover, following the dramatic price increases, discussed above, neither Allergan nor the Co-Conspirators were willing to meaningfully undercut prices to gain market share, thereby further demonstrating the absence of a competitive market.

186.   Allergan and its Co-Conspirators' coordinated price hikes left behind a trail of collusive markers which are evidence of anticompetitive behavior.  The Desonide lotion's price increases by the Co-Conspirators were so uniform that they registered at close to 78% correlation.  Under the collusion scheme, after the price

hike, the volatility of Allergan's price for the drug went from 33.8% in 2013 to 0.6% in 2016, as prices were sustained at heightened levels. Allergan's market share remained uncharacteristically stable despite the price hike, with an annual standard deviation ranging from a mere 0.7% to 7.7% during the Relevant Period.

### d. Collusive Revenue

187. As a result of the price hikes in Desonide lotion, Allergan improperly recognized almost $16 million of collusive revenue between 2013 and 2016:



#### 8. Tretinoin

188. Tretinoin is a medication used for the treatment of acne. Allergan sold generic versions of Tretinoin during the Relevant Period.

### a. The Co-Conspirators' Price Hikes

189. Allergan and the Co-Conspirators engaged in anticompetitive conduct by colluding to improperly raise and maintain the prices of Tretinoin external cream

beginning in early 2014. For example, as demonstrated by the graph and table below, Allergan and co-conspirator Perrigo raised the prices of Tretinoin cream by over *190%*.

190. The graph below shows the Tretinoin external cream price hikes during the Relevant Period:



191. This drastic increase in the price of Tretinoin external cream occurred shortly after and/or in conjunction with the following trade association meetings:

- GPhA 2014 Fall Technical Conference in October 2013 attended by representatives from Allergan and other Co-Conspirators; and

- GPhA Annual Meeting in February 2014 attended by representatives from Allergan and other Co-Conspirators.

### b.    No Commercial Justification for Price Hikes

192. There was no reasonable justification for the price hikes discussed above. While a supply shortage can explain an abrupt rise in prices, here –

notwithstanding the drug manufacturers' obligation to report shortages to the FDA – no such shortage of Tretinoin external cream was reported during the relevant time period.  In addition, there was no significant increase in the demand for Tretinoin external cream or in the drug's production costs that would explain the enormous price increase.  Even if there was such a benign market explanation for the price increase, at no point following the initial spike did the price return to the pre-spike equilibrium price point.

193.   In addition, price increases of this magnitude would have been contrary to each of the Co-Conspirators' economic interest absent the price-fixing scheme.  Without the certainty that all of the Co-Conspirators would raise and maintain the prices for generic Tretinoin external cream, each Co-Conspirator risked getting undercut by the others, leading to a loss of market share and a loss of revenue.  This risk was alleviated by the Co-Conspirators' agreement to raise and maintain their prices for generic Tretinoin.

### c.   The Market for Generic Tretinoin External Cream Was Susceptible to Anticompetitive Conduct

#### (1)   High Level of Market Concentration

194.   In 2014, the market for generic Tretinoin external cream was highly concentrated, as demonstrated by the HHI calculation below:

|                          | 2014 HHI |
|--------------------------|----------|
| **Tretinoin external cream** | 3,977    |

195.   During this period, Allergan and Co-Conspirators combined to account for more than 90% of the total market for generic Tretinoin external cream, as shown in the chart below:



**(2)   Significant Barriers to Entry**

196.   As mentioned above, the barriers to entry into the market for generic Tretinoin external cream included high manufacturing costs as well as certain regulatory and intellectual property barriers.  For example, the requirement that generic drug companies file an ANDA and receive FDA approval can delay entry into the market by an average of 36 months.

**(3)   Lack of Available Substitutes**

197.   As discussed above, pharmacists presented with a prescription for a given drug can only substitute another drug if that drug has an "AB" rating.  Only

generic Tretinoin and brand-name Tretinoin for a given dosage are AB-rated to one another.  Therefore, a pharmacist can only fill a prescription for Tretinoin with the brand-name version or one of the AB-rated generic versions and cannot substitute another drug.

### (4)    Commodity-Like Product

198.   As mentioned above, all generic versions of any given brand-name drug are necessarily interchangeable.  Generic Tretinoin is no exception.  The FDA-approved versions of generic Tretinoin external cream manufactured by the Co-Conspirators each has an "AB" rating.  Thus, pharmacists are able to substitute one manufacturer's generic version of Tretinoin for another.

### (5)    Inelastic Demand

199.   The generic Tretinoin external cream market was characterized by nearly perfect inelastic demand with Ed measured at close to zero.  For example, at the time of the collusive price fixing, the market for generic Tretinoin external cream was so inelastic that the dramatic price increase had negligible effect on sales, with quantities sold declining by a mere 1%.  As a result, the coordinated price hike translated immediately and directly into collusive revenues shared by Allergan and its Co-Conspirators.

### (6)    Absence of Competitive Sellers

200.   In the case of generic Tretinoin external cream, there was no realistic threat that the other small market participants would take market share from

Allergan and the Co-Conspirators. The dominance of Allergan and the Co-Conspirators facilitated their ability to raise prices without losing market share to non-conspirators. Moreover, following the dramatic price increases in early 2014, discussed above, neither Allergan nor the Co-Conspirators were willing to meaningfully undercut prices to gain market share, thereby further demonstrating the absence of a competitive market.

201.   Allergan and its Co-Conspirators' coordinated price hikes left behind a trail of collusive markers which are evidence of anticompetitive behavior. The Tretinoin external cream's price increases by the Co-Conspirators were so uniform that they registered at 82% to 95% correlation between 2013 and 2016. Under the collusion scheme, after the price hike, the volatility of Allergan's price for the drug went from 49.4% in 2014 to 0.5% in 2016, as prices were sustained at heightened levels. Allergan's market shares remained uncharacteristically stable despite the price hike, with an annual standard deviation declining from 2.9% to 0.5% during the Relevant Period.

### d.   Collusive Revenue

202.  As a result of the price hikes in Tretinoin, Allergan improperly recognized over $59 million of collusive revenue between 2014 and 2016:



### 9.    Additional Drugs

203.   In addition to the drugs described above, Allergan colluded with the Co-Conspirators to maintain supracompetitive prices for least two other drugs: Glyburide-Metformin and Verapamil.

#### a.    Glyburide-Metformin

204.   Glyburide-Metformin, also known by the brand name Glucovance, is an oral medication used to treat Type 2 diabetes.  As of April 2014, the manufacturers in the Glyburide-Metformin market were Allergan, Teva, Aurobindo and Heritage.

205.   In preparation for the Amended AG Complaint, the 45 state Attorneys General obtained limited phone and text message records from Allergan and the Co-Conspirators.  These records demonstrate that Allergan finalized an agreement

with Heritage to increase prices of Glyburide-Metformin during a nine-minute telephone call on April 22, 2014.  During this same call, the companies also agreed to increase the prices of other generic drugs, including Verapamil (discussed below).  Information about the agreement spread quickly throughout the sales and pricing teams at Allergan.  On April 28, 2014, the Company circulated an internal email regarding potential price increases for Glyburide-Metformin, Verapamil and several other drugs.

206.   Shortly after reaching this agreement, Allergan and Heritage contacted Teva and Aurobindo, the only other companies in the market, to discuss the deal. On May 1, 2014, an Allergan representative listed as a recipient to the April 28, 2014 email contacted a Teva representative and they spoke for five minutes.  They spoke three more times on May 6, 2014, with one of the calls lasting 15 minutes, and continued to communicate frequently over the next several months.  In all, Allergan and Teva communicated via phone or text message at least 119 times between May 2014 and July 2014.

207.   Phone records also demonstrate that Allergan communicated with Aurobindo, the other manufacturer in the market.  On May 12, 2014, an Allergan representative spoke with the CEO of Aurobindo two separate times.

208.   Although the companies did not increase customer prices for Glyburide-Metformin in July 2014, like they did for many other drugs, they did

increase their WAC prices.  On July 9, 2014, an internal email at Citron Pharma, LLC, a company that had approval to sell Glyburide-Metformin but was not actively doing so, revealed that at least Heritage and Teva had increased their WAC prices as of that date.  On August 20, 2014, a Heritage representative exchanged a text message with a colleague at Sun that described Allergan's agreement to do the same.

### b.    Verapamil

209.   Verapamil, also known by various brand names, is a calcium channel blocker used to treat hypertension, angina and certain heart rhythm disorders.  It works by relaxing the muscles of the heart and blood vessels.  As of April 2014, the manufacturers in the Verapamil market were Allergan, Mylan and Heritage.

210.   On April 22, 2014, during the same call where Allergan and Heritage agreed to raise the price of Glyburide-Metformin, the companies also reached an agreement to raise the price of Verapamil.  And on April 28, 2014, the same internal email that spread word to Allergan's sales and pricing teams about the Glyburide-Metformin agreement also notified them about the Verapamil agreement.

211.   Just over a week later, on May 6, 2014, an Allergan representative who had received the April 28, 2014 email called Mylan – the only other market participant – and left a message.  A Mylan representative returned the call on May 9, 2014 and spoke to the Allergan representative for over three minutes. They spoke

again on May 19, 2014 for almost seven minutes, and continued to communicate frequently over the next several months.

212.   On August 20, 2014, a Heritage representative confirmed Allergan's acquiescence to the agreement in a text message with a colleague at Sun.

### 10.   Government Investigations into Allergan's Anticompetitive Conduct

213.   As discussed above, according to a press release, on October 2, 2014, U.S. Senator Bernie Sanders and U.S. Representative Elijah Cummings launched an investigation into "soaring generic drug prices."   Sen. Sanders and Rep. Cummings sent out letters to various generic pharmaceutical manufacturers, including Allergan (then Actavis), demanding information relating to generic drug price increases.

214.   As part of the letter to Allergan, Sen. Sanders and Rep. Cummings asked defendant Saunders to provide the following information concerning doxycycline hyclate:

> In order to evaluate the underlying causes of recent increases in the price of your company's drug, we request that you provide the following documents and information for the time period covering January 1, 2012, to the present:
>
> (1)   total gross revenues from the company's sales of this drug;
>
> (2)   the dates, quantities, purchasers, and prices paid for all sales of this drug;
>
> (3)   total expenses relating to the sales of this drug, as well as the specific amounts for manufacturing, marketing and

advertising, and purchases of active pharmaceutical ingredients, if applicable;

(4)     sales contracts or purchase agreements for active pharmaceutical ingredients for this drug, including any agreements relating to exclusivity, if applicable;

(5)     a description and valuation of the specific financial and non-financial factors that contributed to your company's decisions to increase the price of this drug;

(6)     any cost estimates, profit projections, or other analyses relating to the company's current and future sales of this drug;

(7)     price of this drug in all foreign countries or markets, including price information for the countries paying the highest and lowest price; and

(8)     the identity of company official(s) responsible for setting the price of the drug over the above time period.

215.   One month later, the DOJ convened a grand jury in the U.S. District Court for the Eastern District of Pennsylvania.  One of Allergan's Co-Conspirators, Lannett, reported that on November 3, 2014, its Senior Vice President of Sales and Marketing had received a subpoena from the DOJ in connection with the federal investigation of the generic pharmaceutical industry requesting information on Lannett's generic drug pricing and communications with competitors.   On December 5, 2014, Lannett itself received a subpoena requesting similar information.  Lannett was the first of at least ten other generic drug manufacturers to receive DOJ subpoenas in connection with the investigation, including Allergan and co-conspirators Heritage, Impax and Mylan – companies which, as shown

above, also raised the prices of some of their generics at or close to the same time as Allergan's price increases.  On August 6, 2015, Allergan disclosed for the first time that its Actavis generic drug unit had received a DOJ subpoena in June 2015. In response to the news, *Bloomberg* noted that Allergan was "the biggest company yet to draw scrutiny in the government's widening antitrust probe of the [generic pharmaceutical] industry."

216.  The fact that the DOJ sent a subpoena to Allergan after sending subpoenas to its competitors strongly suggests that evidence learned through those prior subpoenas led the DOJ to believe that Allergan was also engaged in improper pricing.  Moreover, the DOJ has filed motions to intervene in at least six civil antitrust actions alleging price-fixing in violation of the Sherman Act against Allergan and/or the Actavis generic drug unit sold to Teva in August 2016, including one case in which the district court has already denied the defendants' motion to dismiss.  *See In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712 (S.D.N.Y. 2017).  In these cases, now consolidated into the Generic Drugs MDL, the plaintiffs have requested that the various generic drug-company defendants produce all documents produced to the DOJ in the criminal investigation.  In the DOJ's motion to intervene in *In re Propranolol Antitrust Litig.*, No. 1:16-cv-09901-JSR, ECF No. 72 (S.D.N.Y. Jan. 30, 2017), the DOJ explained that the "action presents a risk to the United States' interest in ensuring the integrity of its on-going

criminal investigation" because, among other reasons, "its ongoing criminal antitrust investigation shares common questions of law and fact with the civil claims" and because the plaintiffs have sought the same documents produced to the federal prosecutors. *Id*. at 5, 7. Subsequently, in a May 1, 2017 motion to stay further discovery in the Generic Drugs MDL, the DOJ explained that "[e]vidence uncovered during the criminal investigation implicates other companies and individuals (including a significant number of the Defendants [in the Generic Drugs MDL]) in collusion with respect to doxycycline hyclate, glyburide, and other drugs (including a significant number of the drugs at issue [in the Generic Drugs MDL])."[13] The DOJ's intervention in these civil actions implicating Allergan's price-fixing activities is a powerful indication that the allegations of price-fixing are supported (at least in part) by documents and other information provided to the DOJ in its investigation.

217. The DOJ filed the first criminal charges in connection with its investigation on December 12 and 13, 2016 against Jeffrey A. Glazer and Jason T. Malek of Heritage in the U.S. District Court for the Eastern District of Pennsylvania. Malek was Heritage's President and Glazer was Heritage's CEO and Chairman during the period covered by the DOJ's investigation. On December 14,

---

[13] *In re Generic Pharm. Pricing Antitrust Litig.*, No. 2:16-md-02724-CMR (E.D. Pa. May 1, 2017), ECF No. 279, at 1-2.

2016, the DOJ released a complaint charging Glazer and Malek with criminal violations of §1 of the Sherman Act (15 U.S.C. §1) for price fixing and other anticompetitive conduct in connection with generic Doxycycline, one of the drugs sold by Allergan at historically high prices during the Relevant Period, and a second drug, Glyburide. The DOJ alleged that Glazer and Malek conspired to:

(a)    Participate in, direct, authorize or consent to subordinate employees discussing the sale of Doxycycline and Glyburide and creating "rig bids" for those drugs in meetings, conversations and ***communications with co-conspirators***;

(b)    Agreed during those meetings to "allocate customers" and not compete against one another for Doxycycline and Glyburide customers in the United States;

(c)    Actually submitted or withheld the discussed bids and issued price proposals in accordance with the agreements reached; and

(d)    Sold and profited from selling Doxycycline and Glyburide in the United States at "collusive and noncompetitive prices."

218.   The DOJ described how Glazer and Malek did not act alone and that "[v]arious corporations and individuals, ***not made defendants in this Count***, participated as co-conspirators in the offenses charged herein and performed acts and made statements in furtherance of."

219.   Glazer and Malek pled guilty to the DOJ charges on January 9 and 10, 2017.

220.   On December 14, 2016, in a *Forbes* article entitled "The Man The Feds Are Using To First Crack Open Their Big Antitrust Case Against Generic Drug Makers," Robert Connolly, former chief of the DOJ's Antitrust Division, stated the following:

> [A] criminal information against an individual for antitrust charges prior to any other government action in an antitrust case suggests the individual is cooperating with the government investigation.   "***It sounds like it can be just the first case and others will follow, it would be unusual for the federal government to charge just one individual so I would assume there is more to come***."

221.   On December 15, 2016, 20 state Attorneys General revealed that they had sued six generic drug companies for their roles in the conspiracy to artificially inflate prices of Doxycycline and Glyburide, including Heritage, Mayne, Mylan and Teva USA. Teva's Actavis unit (part of Allergan prior to July 26, 2015) received a subpoena from the Connecticut Attorney General in connection with its price-fixing investigation which began in June 2014.  Twenty-five other state Attorneys General later joined the action.

222.   The AG Complaint states that the Attorneys General "have uncovered a wide-ranging series of conspiracies implicating numerous different drugs and competitors, which will be acted upon at the appropriate time."  The Attorneys General describe these conspiracies as "schemes to fix and maintain prices, allocate

markets and otherwise thwart competition" and explain that they are carried out by generic drug companies through their senior executives, who "exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements."

223.   According to the AG Complaint, the drug manufacturers attempted to explain the suspicious price hikes through "a myriad of benign factors," however, the plaintiff States "found through their investigation . . . that the reason underlying many of these price increases is much more straightforward, and sinister – collusion among generic drug competitors."   Among other things, the company executives met at "regular 'industry dinners'" and exchanged "numerous and frequent telephone calls, emails and text messages."

224.   The Connecticut Attorney General noted in his December 15, 2016 press release that the price collusion was not the isolated misconduct of a few rogue employees, explaining that "the misconduct was conceived and carried out by senior drug company executives and their subordinate marketing and sales executives."   The Connecticut Attorney General further noted that the states' investigation is still ongoing and has "uncovered evidence of a well-coordinated and long-running conspiracy to fix prices and allocate markets for doxycycline hyclate delayed release and glyburide."   As the Connecticut Attorney General

explained, "[w]hile the principal architect of the conspiracies addressed in this lawsuit was Heritage Pharmaceuticals, ***we have evidence of widespread participation in illegal conspiracies across the generic drug industry*** . . . .  We intend to pursue this and other enforcement actions aggressively, and look forward to working with our colleagues across the country to restore competition and integrity to this important market."

225.   As discussed herein, the Amended AG Complaint, made public on October 31, 2017, contains additional details and cites even more particular evidence about Allergan's price-fixing activities.

### E.   Misleading Statements and Omissions

226.   During the Relevant Period, defendants made a series of materially false or misleading statements and omissions of material fact regarding: (i) the competitive nature of the generic drug market, the reasons for drug price increases and the source of Allergan's revenues; (ii) the Company's compliance with laws and regulations; (iii)  the Company's reported revenues; (iv) the accuracy of the Company's SEC filings; and (v) compliance with the Company's Code of Conduct.

#### 1.   Statements Regarding the Competitive Nature of the Generic Drug Market and Source of Revenues

227.   The Relevant Period begins on October 29, 2013, when Allergan filed a Form 8-K, signed by Joyce, with the SEC (the "3Q 2013 Form 8-K").  In the press release attached to the 3Q 2013 Form 8-K, which announced certain of the

Company's financial and operating results for the quarter ended September 30, 2013, Bisaro stated, in part:

> "***Strong global growth in our Actavis Pharma segment was driven by our ability to capitalize on product opportunities from our industry leading R&D pipeline***.  In the U.S., we launched generic versions of Lidoderm® and Opana® ER and received FDA approval of a generic version of Lamictal® ODT.  We also confirmed that we have initiated U.S. patent challenges on such important products as generic versions of Nucynta ER® and Suboxone® Sublingual Film."

228.  On October 29, 2013, Allergan hosted a conference call to discuss the Company's 3Q 2013 financial results.  During this call, Olafsson stated, in part:

> With regard to the generic pricing outlook at a high level, what has happened probably over the last two years is it has been more common that obviously there is a price erosion in the market due to the consolidation.  ***But there is opportunities [sic] to take pricing increases; and that is what has changed since maybe five years ago when there wasn't an opportunity.  These pricing increases have been in products where there has been manufacturing problems or stock-out situation.***
>
> ***So I think that has been a fact in the US generic market, that there is an opportunity to take price increases***.  But also at the same time with the environment on the consolidation of the customers, clearly there is a pricing pressure overall in the market.

229.  On October 31, 2013, Allergan filed a quarterly report on Form 10-Q with the SEC, reporting certain of the Company's financial and operating results for the quarter ended September 30, 2013 (the "3Q 2013 Form 10-Q"). In the 3Q 2013 Form 10-Q, Allergan stated, in part: "The pharmaceutical industry is highly competitive . . . .  ***We face strong competition in our all of our businesses***."

230.   On February 20, 2014, Allergan filed a Form 8-K, signed by Joyce,

with the SEC (the "4Q 2013 Form 8-K"). In the press release attached to the 4Q

2013 Form 8-K, which announced certain of the Company's financial and operating

results for the year and quarter ended December 31, 2013, Bisaro stated, in part:

"Growth in our U.S. generic business was driven by strong product launches of

generic versions of Suboxone® Sublingual tablets, Lidoderm® and Cymbalta®."

231.   On February 25, 2014, Allergan filed a Form 10-K reporting the

Company's financial results for 2013 (the "2013 Form 10-K").  In the 2013 Form

10-K Allergan stated:

**Competition**

*The pharmaceutical industry is highly competitive*.   In our
Actavis Pharma and Actavis Specialty Brands businesses, we compete
with different companies depending upon product categories, and
within each product category, upon dosage strengths and drug delivery
systems.  Such competitors include the major brand name and generic
manufacturers of pharmaceutical products.  In addition to product
development, other competitive factors in the pharmaceutical industry
include product quality and price, reputation and service and access to
proprietary and technical information. . . .

*We actively compete in the generic pharmaceutical
industry*. . . .  *[T]he level of market share, revenues and gross profit
attributable to a particular generic product normally is related to the
number of competitors in that product's market, pricing* and the
timing of that product's regulatory approval and launch, in relation to
competing approvals and launches. . . .  In addition to competition from
other generic drug manufacturers, *we face competition from brand
name companies in the generic market*.  Many of these companies
seek to participate in sales of generic products by, among other things,
collaborating with other generic pharmaceutical companies or by

marketing their own generic equivalent to their brand products as Authorized Generics.   Our major competitors include Teva Pharmaceutical Industries, Ltd., Mylan Inc. and Sandoz, Inc. (a division of Novartis AG).

232.   On April 30, 2014, Allergan filed a Form 8-K, signed by Joyce, with the SEC (the "1Q 2014 Form 8-K").  In the press release attached to the 1Q 2014 Form 8-K, which announced certain of the Company's financial and operating results for the quarter ended March 31, 2014, Bisaro stated, in part: "'Overall revenue growth of 36 percent in our commercial pharmaceutical business benefitted from the continued strength of our generics business, resulting from the launch of our generic Micardis® in the U.S. and continued strong sales of the generic versions of Lidoderm® and Cymbalta®.'"

233.   In the 1Q 2014 Form 8-K, Allergan stated: "North American Generics revenue increased 7 percent to $1.02 billion for the first quarter 2014, driven by product launches including generic versions of Cymbalta® and Lidoderm® partially offset by generic competition of extended release products including our authorized generic version of Concerta®."

234.   On May 29, 2014, Allergan participated in the Sanford C. Bernstein Strategic Decisions Conference ("Bernstein Conference").  During this conference, Bisaro stated, in part:

> And I guess where that leads to is I think sustainable and longer-term higher pricing in the generic industry than people are generally used to.  *We have also seen in the short term the ability to take price*

> ***increases on older products where the price had gone to a point where companies had to make the decision about whether to continue manufacturing or raise price. And now we are taking those price increases and those price increases are sticking****.*

> So instead of discontinuing a product we are looking to raise the price. And while it may seem like a lot of money, or it is not an insignificant number in a very high percentage, but we are talking about going from $10 a thousand to $20 a thousand. So not enormous numbers when it comes to the patient but important and relevant to us.

235. On August 5, 2014, Allergan filed a Form 8-K, signed by Joyce, with the SEC (the "2Q 2014 Form 8-K"). In the press release attached to the 2Q 2014 Form 8-K, which announced the highlights from the Company's 2Q 2014 financial and operating results, Bisaro stated, in part:

> "Our exceptional performance during the second quarter resulted from double digit revenue growth in both our North American brand and generics businesses and Anda Distribution . . . ."

> . . . We also saw strong growth within our generics business, powered by our strong base business along with continued strong sales of the generic versions of Lidoderm® and Cymbalta®".

236. On August 5, 2014, Allergan hosted a conference call to discuss the Company's 2Q 2014 financial results. During this call, an analyst from Leerink Partners inquired about the "US generic pricing outlook for 2014 and 2015" and also asked whether Allergan had "factored any aggressive pricing increases" into the Company's guidance numbers, specifically noting that "smaller generic players seem to be taking very aggressive pricing increases." In responding to these questions, Saunders stated, in part:

Clearly we think there are more opportunities to take price [increases], particularly as we leverage our strong supply chain and the reliability of high-quality supply that we can offer customers that perhaps you are seeing with some of our competitors not to be as true. And so that always creates opportunity.

237.   Buchen then added:

We have a very broad portfolio and we take pricing opportunities where we can. . . .

That is one of the advantages of having a very diverse portfolio is we can – with our supply chain the way it is, we can react very quickly when there are pricing opportunities and the ability to take more share.

238.   On November 5, 2014, Allergan filed a Form 8-K, signed by Joyce, with the SEC (the "3Q 2014 Form 8-K"). In the press release attached to the 3Q 2014 Form 8-K, which announced certain of the Company's financial and operating results for the quarter ended September 30, 2014, Saunders stated, in part:

*"Our 53 percent year-over-year growth in non-GAAP EPS reflects* the strong contributions of our new brand pharmaceutical portfolios, resulting from the acquisitions of Warner Chilcott and Forest, as well as *the continued strong performance of our U.S. Generics* and International businesses and the Anda Distribution business . . . .   Within our North American Generics business, we capitalized on continued strength across the business."

239.   On December 5, 2014, Allergan filed a Form 8-K, signed by Joyce, superseding portions of the 2013 Form 10-K. In the Form 8-K, Allergan stated, in part:

Our North American Generics and International business is focused on maintaining a leading position within both the North America, and in particular, the U.S. market and our key international

markets and strengthening our global position *by offering a consistent and reliable supply of quality brand and generic products.*

*Our strategy in the U.S. is to develop pharmaceuticals that are difficult to formulate or manufacture or will complement or broaden our existing product lines*.

\*     \*     \*

*[A] small number of large, wholesale distributors and large chain drug stores control a significant share of the market. This concentration may adversely impact pricing and create other competitive pressures on drug manufacturers.*

\*     \*     \*

**Competition**

*The pharmaceutical industry is highly competitive.   In our North American Brands and North American Generics and International businesses, we compete with different companies depending upon product categories, and within each product category, upon dosage strengths and drug delivery systems.*   Such competitors include the major brand name and generic manufacturers of pharmaceutical products.  In addition to product development, *other competitive factors in the pharmaceutical industry include product quality and price*, reputation and service and access to proprietary and technical information. . . .

*We actively compete in the generic pharmaceutical industry. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors. . . .   As competing off-patent manufacturers receive regulatory approvals on similar products, market share, revenues and gross profit typically decline, in some cases dramatically.  Accordingly, the level of market share, revenues and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market pricing* and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches.  Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross profit.  *In*

*addition to competition from other generic drug manufacturers, we face competition from brand name companies in the generic market.* Many of these companies seek to participate in sales of generic products by, among other things, collaborating with other generic pharmaceutical companies or by marketing their own generic equivalent to their brand products as Authorized Generics. ***Our major competitors include Teva Pharmaceutical Industries, Ltd., Mylan Inc. and Sandoz, Inc.***

\*      \*      \*

Our operating results and financial condition may fluctuate from quarter to quarter and year to year for a number of reasons. ***The following events or occurrences, among others, could cause fluctuations in our financial performance from period to period***:

\*      \*      \*

- ***our responses to price competition***

\*      \*      \*

***We face strong competition in our all of our businesses****. . . .* Most of our competitors have been in business for a longer period of time than us, have a greater number of products on the market and have greater financial and other resources than we do. ***Furthermore, recent trends in this industry are toward further market consolidation of large drug companies into a smaller number of very large entities, further concentrating financial, technical and market strength and increasing competitive pressure in the industry****. . . .*

Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors. . . .  As competing manufacturers receive regulatory approvals on similar products or as brand manufacturers launch generic versions of such products (for which no separate regulatory approval is required), market share, revenues and gross profit typically decline, in some cases dramatically. ***Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market*** and the timing of that product's

regulatory approval and launch, in relation to competing approvals and launches. . . .   *Additionally, as new competitors enter the market, there may be increased pricing pressure on certain products, which would result in lower gross margins*. . . . .

. . . *Increased competition in the generic industry as a whole may result in increased price erosion in the pursuit of market share*.

\*     \*     \*

Our principal customers in our brand and generic pharmaceutical operations are wholesale drug distributors and major retail drug store chains. . . .   *We expect that consolidation of drug wholesalers and retailers will increase pricing and other competitive pressures on drug manufacturers, including the Company*.

240.   On January 13, 2015, Allergan participated in the JPMorgan Healthcare Conference ("JPMorgan Conference").   During this conference, a Company representative stated, in part:

We do take appropriate price increases, but not the most aggressive price increases.   And we do that because we need to manage our relationships and treat our customers fairly, so that we don't find ourselves on exclusion lists or other things like that.

241.   On February 18, 2015, Allergan filed a Form 8-K, signed by Hilado, with the SEC (the "4Q 2014 Form 8-K").   In the press release attached to the 4Q 2014 Form 8-K, which announced certain of the Company's financial and operating results for the year and quarter ended December 31, 2014, Saunders stated, in part:

In our North American Generics business, strong results were driven by continued performance of our generic versions of Lidoderm® and Concerta®, and fourth quarter launches of generic versions of Intuniv™ and Celebrex®.

242.   On February 18, 2015, Allergan also filed an Annual Report on Form 10-K with the SEC, reiterating the financial and operating results previously announced in the 4Q 2014 Form 8-K and reporting in full the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 Form 10-K").

243.   In the 2014 Form 10-K, Allergan stated, in part:

Our North American Generics and International business is focused on maintaining a leading position within both the North American, and in particular, the U.S. market and our key international markets and strengthening our global position **by offering a consistent and reliable supply of quality brand and generic products**.

**Our strategy in the U.S. is to develop pharmaceuticals that are difficult to formulate or manufacture or will complement or broaden our existing product lines.**

\*       \*       \*

Our significant customers comprise a large part of the distribution network for pharmaceutical products in North America. As a result, a small number of large, wholesale distributors and large drug store chains control a significant share of the market. Changes in the mix of concentration amongst the Company's largest customers over the last three years are due, in part, to the impact of acquisitions as well as changes in the supply chain of our indirect customers. **This concentration may adversely impact pricing and create other competitive pressures on drug manufacturers.**

\*       \*       \*

**Competition**

The pharmaceutical industry is highly competitive. **In our North American Brands and North American Generics and International businesses, we compete with different companies** depending upon

- 111 -

product categories, and within each product category, upon dosage strengths and drug delivery systems.  Such competitors include the major brand name and generic manufacturers of pharmaceutical products.  In addition to product development, other competitive factors in the pharmaceutical industry include product quality, price, reputation, service and access to proprietary and technical information.

\*     \*     \*

*We actively compete in the generic pharmaceutical industry. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors. . . .   As competing off-patent manufacturers receive regulatory approvals on similar products, market share, revenues and gross profit typically decline, in some cases dramatically.  Accordingly, the level of market share, revenues and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market, pricing* and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches.  Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross profit.  *In addition to competition from other generic drug manufacturers, we face competition from brand name companies in the generic market.* Many of these companies seek to participate in sales of generic products by, among other things, collaborating with other generic pharmaceutical companies or by marketing their own generic equivalent to their brand products as "Authorized Generics".  *Our major competitors include Teva Pharmaceutical Industries, Ltd., Mylan Inc. and Sandoz, Inc. (a division of Novartis AG).*

\*     \*     \*

*We face strong competition in all of our businesses*. . . .  Most of our competitors have been in business for a longer period of time than us, have a greater number of products on the market and have greater financial and other resources than we do.  *Furthermore, recent trends in this industry are toward further market consolidation of large drug companies into a smaller number of very large entities, further concentrating financial, technical and market strength and increasing competitive pressure in the industry*.

\*      \*      \*

Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors. . . .  As competing manufacturers receive regulatory approvals on similar products or as brand manufacturers launch generic versions of such products (for which no separate regulatory approval is required), market share, revenues and gross profit typically decline, in some cases dramatically. ***Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market*** and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. . . . ***Additionally, as new competitors enter the market, there may be increased pricing pressure on certain products, which would result in lower gross margins***. . . .

. . . ***Increased competition in the generic industry as a whole may result in increased price erosion in the pursuit of market share.***

\*      \*      \*

Our principal customers in our brand and generic pharmaceutical operations are wholesale drug distributors and major retail drug store chains. . . .  ***We expect that consolidation of drug wholesalers and retailers will increase pricing and other competitive pressures on drug manufacturers, including the Company.***

244.   On May 11, 2015, Allergan filed a Form 8-K, signed by Hilado, with the SEC (the "1Q 2015 Form 8-K").  In the press release attached to the 1Q 2015 Form 8-K, which announced certain of the Company's financial and operating results for the quarter ended March 31, 2015, Saunders stated, in part:

***Our first quarter performance was highlighted by strong revenue growth*** from Namenda XR®, Linzess®, Bystolic®, Viibryd®/ Fetzima®, LoLoestrin® Fe, Saphris®, Estrace® Cream ***as well as continued growth within our generics business***, powered by strong

- 113 -

sales of the generic versions of Concerta®, Intuniv® and the recent launch of our generic version of OxyContin®.

245.   On May 11, 2015, Allergan hosted a conference call to discuss the Company's 1Q 2015 financial results.   During this call, an analyst from Guggenheim Securities LLC asked for Allergan's thoughts on "**generic drug pricing** given that there have been concerns that it may not be as favorable going forward."  Responding to this question, Saunders stated, in part:

> We haven't seen much of a change despite all the fanfare and publicity around drug pricing and generics.  There are obviously a few products that go up but the model for generics is price decreases as more competitors come into the market.  That is just the way the business works and overall we still model a mid single-digit price decrease in our business.  That being said, the environment has remained pretty stable and favorable.  We don't expect that to change short-term either.

246.   Bisaro added:

> [O]ur pipeline and product line gives us a bit of an advantage because of the uniqueness of it and allows us to be somewhat insulated from the general reduction of prices.  As you know we have worked very hard to create that product line and we are obviously taking advantage of the situation as the situations present themselves.

247.   On August 6, 2015, Allergan filed a Form 8-K, signed by Hilado, with the SEC (the "2Q 2015 Form 8-K").  In the press release attached to the 2Q 2015 Form 8-K, which announced certain of the Company's financial and operating results for the quarter ended June 30, 2015, Saunders stated, in part:

> "In our first full quarter as a combined Company, Allergan delivered exceptional results.  ***Our performance was powered by operational excellence and double-digit growth across our Brands and Global Generics businesses***, while continuing outstanding

momentum on the integration of Actavis and Allergan.   We also achieved important R&D milestones that will help fuel both our branded and generics businesses in the future . . . ."

248.   On August 6, 2015, Allergan hosted a conference call to discuss the Company's 2Q 2015 financial results.   During this call, Saunders stated, in part:

> [O]ur global generics business is doing very well and the units that comprise it are firing on all cylinders as we prepare for the combination with Teva.   Generic sales are up 17% excluding the impact of foreign currency.   Generic profitability is up. . . .   US generic revenues were $1.1 billion in the quarter, and continue to benefit from new product introductions and contribution from high-barrier and semi-exclusive products like generic Concerta.

249.   On August 6, 2015, Saunders appeared on CNBC's *Mad Money* with Jim Cramer to discuss the state of the Company.   During the interview, Cramer asked Saunders about the Company's recent disclosure of a subpoena it received from the DOJ in June regarding price collusion.   Saunders responded:

> ***[T]he DOJ investigation really is a red herring***. . . .   [T]he government in the U.S. has gotten used to drug prices in generics going one way – down.   ***But it's a commodity business, and so they go up and down depending on supply and demand***.   This was a subpoena about three products where ***prices went up because of supply and demand*** and, to be fair, it will play itself out.   But in the context of Allergan, it's not that significant.

250.   On November 4, 2015, Allergan filed a Form 8-K, signed by Hilado, with the SEC (the "3Q 2015 Form 8-K").   In the press release attached to the 3Q 2015 Form 8-K, which announced certain of the Company's financial and operating results for the quarter ended September 30, 2015, Saunders stated, in part:

"Allergan delivered exceptional performance across the board in the third quarter that exceeded expectations.  These strong results were driven by our continued focus on customers, fueling volume-driven year-over-year growth in our U.S. Brands, Medical Aesthetics, International Brands and Anda Distribution segments, while also executing pre-integration activities ahead of the divestiture of the Generics business to Teva, which remains on track to be completed in the first quarter of 2016 . . . ."

251.   On November 4, 2015, Allergan hosted a conference call to discuss the Company's 3Q 2015 financial results.  During this call, Saunders stated, in part:

Pricing has been in the headlines and featured in the presidential debates, but let's not pretend that this is [a] topic that has just appeared in the news, it's been a focus for many years.  We know that cost is a constant concern, so is patient access to medical innovation.  Allergan seeks to strike the right balance between care and cost.

\*      \*      \*

Allergan has a heritage in knowing health-system economics very well, and we want to make sure patients have access to important medicines.  Like many of our peers, we have patient-assistance programs to make sure patients have access to our medicines regardless of their ability to pay. . . .   Our business model does not involve purchasing old products already on the marketplace and taking excessive price increases.  We prefer to acquire mid- to late-stage drugs and invest[] extensively in their development.

252.   On February 22, 2016, Allergan filed a Form 8-K, signed by Hilado, with the SEC (the "4Q 2015 Form 8-K").  In the press release attached to the 4Q 2015 Form 8-K, which announced certain of the Company's financial and operating results for the quarter and year ended December 31, 2015, Allergan stated, in part:

The Global Generics business delivered solid performance during the fourth quarter.

253. On February 23, 2016, certain of the Individual Defendants participated in the RBC Capital Markets Healthcare Conference. During this conference, Saunders stated:

> *We have never been aggressive price takers*. We, in fact, have been criticized or I have been criticized and I think Bill Meury, who's here, has been criticized in forums like this in the past for not taking more price. And we have always explained that this is a customer long-term relationship and to the extent you poke them in the eye over and over again, they are going to poke back.

> You wouldn't do that with any customer regardless of whether it's a PBM or a hospital or a physician buying group or an individual physician. *You just don't treat customers that way. There has to be mutual respect and planning, and so we price our drugs appropriately.*

> *We look to take price increases as we believe we can, but we have never done it in a significant way because our products don't lend themselves to that in large part. But also our business model and our philosophy doesn't lend itself to that.*

> *       *       *

> *And this idea that you can just take price increases as you see fit is really not true*. There are anomalies and there are companies that have figured out how to exploit that system, but the reality is every price increase comes with a reaction. They are highly negotiated and the system does, for the most part, work. There are, again, anomalies to it, but it does work.

254. On February 26, 2016, Allergan filed an Annual Report on Form 10-K with the SEC, reiterating the financial and operating results previously announced in the 4Q 2015 Form 8-K and reporting in full the Company's financial and

operating results for the quarter and year ended December 31, 2015 (the "2015 Form 10-K").

255.   In the 2015 Form 10-K, Allergan stated, in part:

**Competition**

The pharmaceutical industry is highly competitive.

*        *        *

As a result of the Teva Transaction, the Company's global generics business is classified as discontinued operations. ***Our discontinued operations actively competes in the generic pharmaceutical industry***.

*        *        *

Accordingly, ***the level of market share, revenues and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market, pricing*** and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. ***We face competition from other generic drug manufacturers and from brand name companies in the generic market***. Many of these companies seek to participate in sales of generic products by, among other things, collaborating with other generic pharmaceutical companies or by marketing their own generic equivalent to their brand products as "Authorized Generics."

256.   The statements set forth in ¶¶227-255 above were materially false and misleading or omitted material facts about the Company's business, operations, compliance with policies, and financial results.   Specifically, defendants made materially false and/or misleading statements, which had the effect of concealing, and/or failed to disclose, that: (i) Allergan's generics unit and several of its pharmaceutical industry peers colluded to fix generic drug prices; (ii) the foregoing

conduct constituted anticompetitive conduct; and (iii) consequently, Allergan's revenues during the Relevant Period were in part the result of anticompetitive conduct. By electing to speak publicly about Allergan's generic drug business – specifically, pricing and competition for generic drugs and revenues received from those drugs – and thereby putting the subject into play during earnings calls with shareholders and in SEC filings, defendants had a duty to fully, completely and truthfully disclose all material facts regarding generic drug pricing, competition and revenues so as to not mislead investors. As a result of the foregoing, defendants' public statements were materially false and misleading at all relevant times.

### 2. Statements Regarding Compliance with Laws and Regulations

257. During the Relevant Period, Allergan filed: (i) a Form S-4 registration statement and a joint proxy statement/prospectus that formed part of the registration statement on December 23, 2014, signed by Bisaro, Saunders, Hilado and Bailey; (ii) Amendment No. 1 to the Form S-4 registration statement and joint proxy statement/prospectus that formed part of the registration statement on January 26, 2015, signed by Bisaro, Saunders, Hilado and Bailey; and (iii) a Rule 424(b)(3) Joint Proxy Statement/Prospectus on January 27, 2015, which contained materially false and/or misleading statements that the Company complied with laws and regulations:

Allergan's obligation to effect the Merger is conditioned, among other things, upon:

- the accuracy of Actavis' and Merger Sub's representations and warranties, subject to specified materiality standards;

\* \* \*

- the delivery by Actavis of an officer's certificate certifying such accuracy of such representations and warranties and such performance of such obligations and covenants . . . .

\* \* \*

Many of the representations and warranties are reciprocal and apply to Actavis or Allergan, as applicable, and their respective subsidiaries. Some of the more significant representations and warranties relate to:

\* \* \*

- SEC reports and financial statements, including their preparation in accordance with GAAP, filing or furnishing with the SEC, and compliance with the applicable rules and regulations promulgated thereunder, and that *such reports and financial statements fairly present, in all material respects, the relevant financial position and results of operations*;

\* \* \*

- *compliance with laws and government regulations*, including environmental laws . . . .

\* \* \*

Many of the representations and warranties made by each of Actavis and Allergan are qualified by a "material adverse effect" standard . . . . For the purpose of the Merger Agreement, a "material adverse effect" with respect to each of Actavis and Allergan means any change, effect, development, circumstance, condition, state of facts, event or occurrence (each referred to in this section of this joint proxy statement/prospectus as an "Effect") that, individually or in the

aggregate, has a material adverse effect on the assets, liabilities, condition (financial or otherwise), business or results of operations of the relevant party and its subsidiaries, taken as a whole . . . .

\*       \*       \*

REPRESENTATIONS AND WARRANTIES OF PARENT [ACTAVIS PLC] AND MERGER SUB

\*       \*       \*

Section 4.4  <u>Reports and Financial Statements</u>.

(a)     From January 1, 2012 through the date of this Agreement, each of Parent [Actavis plc] and Actavis, Inc. have filed or furnished all forms, documents and reports required to be filed or furnished prior to the date hereof by it with the SEC (the "Parent SEC Documents"). As of their respective dates, or, if amended, as of the date of (and giving effect to) the last such amendment, the Parent [Actavis plc] SEC Documents complied in all material respects with the requirements of the Securities Act and the Exchange Act, as the case may be, and the applicable rules and regulations promulgated thereunder, and ***none of the Parent [Actavis plc] SEC Documents contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading***.

(b)     The consolidated financial statements (including all related notes and schedules) of Parent or Actavis, Inc., as applicable, included in the Parent [Actavis plc] SEC Documents when filed complied as to form in all material respects with the applicable accounting requirements and the published rules and regulations of the SEC with respect thereto in effect at the time of such filing and ***fairly present in all material respects the consolidated financial position of Parent [Actavis plc] or Actavis, Inc., as applicable, and its consolidated Subsidiaries, as at the respective dates thereof***, and the consolidated results of their operations and their consolidated cash flows for the respective periods then ended (subject, in the case of the unaudited statements, to normal year-end audit adjustments and to any other adjustments described therein, including the notes thereto) in

conformity with GAAP (except, in the case of the unaudited statements, to the extent permitted by the SEC) applied on a consistent basis during the periods involved (except as may be indicated therein or in the notes thereto).

*        *        *

Section 4.7  <u>Compliance with Law; Permits</u>.

(a)    ***Parent [Actavis plc] and each of Parent's Subsidiaries are in compliance with and are not in default under or in violation of any Laws***, applicable to Parent, such Subsidiaries or any of their respective properties or assets, except where such non-compliance, default or violation would not reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect.

*        *        *

Section 4.12  <u>Information Supplied</u>. ***The information relating to Parent [Actavis plc] and its Subsidiaries to be contained in the Joint Proxy Statement/Prospectus and the Form S-4 will not***, on the date the Joint Proxy Statement/Prospectus (and any amendment or supplement thereto) is first mailed to shareholders of Parent or at the time the Form S-4 (and any amendment or supplement thereto) is filed and the date it is declared effective or any post-effective amendment thereto is filed or is declared effective, or at the time of the Company Special Meeting or the Parent Special Meeting, ***contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, at the time and in the light of the circumstances under which they were made, not misleading***. The Joint Proxy Statement/Prospectus (other than the portions thereof relating solely to the meeting of the stockholders of the Company) and the Form S-4 will comply as to form in all material respects with the provisions of the Exchange Act, the rules and regulations promulgated thereunder and any other applicable federal securities laws. . . .

Section 4.13  <u>Regulatory Matters</u>.

*        *        *

- 122 -

(b)     Except as would not, individually or in the aggregate, reasonably be expected to have a Parent Material Adverse Effect, ***the businesses of each of Parent [Actavis plc] and each Parent Subsidiary are being conducted in compliance with all applicable Laws*** . . . .

(c)     Except as would not, individually or in the aggregate, reasonably be expected to have a Parent Material Adverse Effect, Parent and the Parent Subsidiaries have not engaged in activities which are, as applicable, cause for false claims liability, civil penalties or mandatory or permissive exclusion from Medicare, Medicaid or any other government healthcare program.

*        *        *

"Parent Material Adverse Effect" means any Effect that, individually or in the aggregate, has a material adverse effect on the assets, liabilities, condition (financial or otherwise), business or results of operations of Parent and the Parent Subsidiaries, taken as a whole . . . .

258.   On March 2, 2015, Allergan filed a Form 8-K, signed by Bailey and Hilado, with underwriting agreements relating to the Ordinary/Preferred Shares Offerings that stated:

The Company represents and warrants to each Underwriter that: . . .

(c)     Issuer Free Writing Prospectus. . . .   ***Each such Issuer Free Writing Prospectus complied in all material respects with the Securities Act***, has been or will be (within the time period specified in Rule 433) filed in accordance with the Securities Act (to the extent required thereby) and, when taken together with the Preliminary Prospectus filed prior to the first use of such Issuer Free Writing Prospectus, did not, and as of the Closing Date and as of the Additional Closing Date, as the case may be, ***will not, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading*** . . . .

(d) *Registration Statement and Prospectus*. . . . ***[A]s of the applicable effective date of the Registration Statement and any post-effective amendment thereto, the Registration Statement and any such post-effective amendment complied and will comply in all material respects with the Securities Act, and did not and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein not misleading; and as of the date of the Prospectus and any amendment or supplement thereto and as of the Closing Date and as of the Additional Closing Date, as the case may be, the Prospectus will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading*** . . . .

(e) *Incorporated Documents*. ***The documents incorporated by reference in the Registration Statement, the Prospectus and the Pricing Disclosure Package***, including, to the knowledge of the Company, the documents filed with the Commission by Allergan, when they were filed with the Commission, conformed in all material respects to the requirements of the Exchange Act, and ***none of such documents, including, to the knowledge of the Company, the documents so filed by Allergan, contained any untrue statement of a material fact or omitted to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; and any further documents so filed by the Company or any of its subsidiaries and incorporated by reference in the Registration Statement, the Prospectus or the Pricing Disclosure Package, when such documents are filed with the Commission, will conform in all material respects to the requirements of the Exchange Act and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.***

(f) *Financial Statements*.

(i) *Preparation of the Financial Statements of the Company*. The financial statements (including the related notes thereto) of the Company and its consolidated subsidiaries included or ***incorporated*** by reference in the Registration Statement, the Pricing Disclosure Package

and the Prospectus present fairly, in all material respects, the financial position of the Company and its consolidated subsidiaries as of and at the dates indicated and the results of their operations and the changes in their cash flows for the periods specified. ***Such financial statements comply in all material respects as to form with the applicable requirements of the Securities Act and the Exchange Act, as applicable, and have been prepared in conformity with generally accepted accounting principles as applied in the United States ("GAAP")*** applied on a consistent basis throughout the periods covered thereby, except as may be expressly stated in the related notes thereto, and any supporting schedules included or incorporated by reference in the Registration Statement present fairly, in all material respects, the information required to be stated therein. The selected financial data and the summary financial information of the Company and its consolidated subsidiaries included or incorporated by reference in the Registration Statement, the Pricing Disclosure Package and the Prospectus presents fairly, in all material respects, the information shown therein and has been compiled on a basis consistent with that of the Company's audited financial statements included or incorporated by reference in the Registration Statement, the Pricing Disclosure Package and the Prospectus.

\*     \*     \*

(o)     *No Violation or Default.*  ***None of the Company, any of the Significant Subsidiaries or, to the knowledge of the Company, any of the Acquired Companies is . . .  (iii) in violation of any law or statute applicable to the Company, any of its subsidiaries or any of the Acquired Companies*** or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority having jurisdiction over the Company, any of its subsidiaries or any of the Acquired Companies, except, in the case of clauses (ii) and (iii) above, for any such default or violation that would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

\*     \*     \*

As used herein, "Material Adverse Effect" means (A) when used in respect of any matter relating to the Company or any of its subsidiaries, any material adverse effect, or any development that would reasonably be expected to result in a material adverse effect, on

the business, properties, management, financial position, stockholders' equity, results of operations or prospects of the Company and its subsidiaries taken as a whole, or on the performance by the Company of its obligations under the Transaction Documents and (B) when used in respect of any matter relating to any of the Acquired Companies, any material adverse effect, or any development that would reasonably be expected to result in a material adverse effect, on the business, properties, management, financial position, stockholders' equity, results of operations or prospects of the Combined Company, or on the performance by the Company of its obligations under the Transaction Documents.

259.    The statements set forth in ¶¶257-258 above were materially false and misleading or omitted material facts.  Allergan's inflation of its sales through illegal price-fixing constituted a violation of U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal authorities along with the attendant negative financial and reputational harm.  In addition, Allergan's failure to make required disclosures regarding the impact of artificial price increases (tied to illegal price-fixing activity) on its reported revenue was in violation of SEC disclosure rules.  As a result, defendants' public statements were materially false and misleading at all relevant times.

### 3.    Financial Statements

260.    During the Relevant Period, Allergan reported the financial results set forth in the table below:

| 3Q 2013 Form 8-K, Filed on Oct. 29, 2013: | | | |
|---|---|---|---|
| | Three Months Ended Sep. 30, 2013 | | |
| | Actavis Pharma (U.S.) | Actavis Pharma (Total) | Consolidated |
| Net Revenue | $942.8 million | $1,552.1 million | $2,013.0 million |

Actavis Pharma net revenue increased 69 percent to $1.55 billion for the third quarter 2013, due to the acquisition of legacy Actavis in late 2012 and new product launches including generic versions of Suboxone® sublingual tablets and Lidoderm®, which more than offset lower sales of our authorized generic version of Concerta® as a result of expected competition. Third quarter international net revenue was $609.3 million, up 208 percent from the prior year quarter as a result of the inclusion of legacy Actavis product sales. Net revenue consists of sales of generics, legacy brands, branded generics and OTC products in the Americas (U.S., Canada and Latin America), Europe (Europe, Russia, CIS and Turkey), and the Middle East, Africa, Australia and Asia Pacific (collectively, MEAAP).

**4Q 2013 Form 8-K, Filed on Feb. 20, 2014:**

| | Three Months Ended Dec. 31, 2013 | | |
|---|---|---|---|
| | Actavis Pharma (U.S.) | Actavis Pharma (Total) | Consolidated |
| Net Revenue | $999.9 million | $1,700.8 million | $2,779.3 million |

Actavis Pharma net revenue increased 20 percent to $1.70 billion for the fourth quarter 2013, due to the acquisition of legacy Actavis in November 2012 and new product launches including generic versions of Suboxone® sublingual tablets, Cymbalta® and Lidoderm®, which more than offset lower sales of our authorized generic version of Concerta® as a result of expected competition. Fourth quarter international net revenue was $700.9 million, up 34 percent from the prior year quarter as a result of the inclusion of legacy Actavis product sales for the full quarter.

**2013 Form 10-K, Filed on Feb. 25, 2014:**

| | Twelve Months Ended Dec. 31, 2013 | | |
|---|---|---|---|
| | Actavis Pharma (U.S.) | Actavis Pharma (Total) | Consolidated |
| Net Revenue | $3,813.5 million | $6,355.9 million | $8,677.6 million |

Our Actavis Pharma business in the U.S. remains the dominant source of revenue for the Company with approximately 60%, 75% and 84% of 2013, 2012 and 2011 segment net revenue coming from our U.S. businesses, respectively. While our U.S. generics business will continue to be the dominant source of revenue for the Company, we expect international generic revenue to represent an increasing percentage of total revenues in future periods due to the Actavis Group Acquisition.

\*       \*       \*

The increase in net revenues is primarily due to the full year net sales resulting from the Actavis Group Acquisition of $2,799.5 million in the year ended December 31, 2013 versus $428.3 million in the year ended December 31, 2012. Also contributing to the increase are higher U.S. unit sales related to new products including lidocaine topical patch 5% ($392.9 million) and mixed

amphetamine (Adderall XR CII) ($145.2 million), offset in part by lower net sales of certain U.S. products including the authorized generic version of Lipitor (atorvastatin) ($403.6 million, of which $24.3 million is due to price and $379.3 million is due to volume) and declines in other international revenues.

**1Q 2014 Form 8-K, Filed on Apr. 30, 2014 and 1Q 2014 Form 10-Q Filed on May 5, 2014:**

| | Three Months Ended March 31, | | Three Months Ended March 31, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| | North American Generics | North American Generics | Consolidated | Consolidated |
| Net Revenue | $1,024.2 million | $956.7 million | $2,655.1 million | $1,895.5 million |

**North American Generics revenue** increased 7 percent to $1.02 billion for the first quarter 2014, driven by product launches including generic versions of Cymbalta® and Lidoderm® partially offset by generic competition of extended release products including our authorized generic version of Concerta®. North American Generics revenue consists of non-branded pharmaceutical revenue in the United States and Canada.

**2Q 2014 Form 10-Q Filed on Aug. 5, 2014:**

| | Three Months Ended Jun. 30, | | Three Months Ended Jun. 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| | North American Generics | North American Generics | Consolidated | Consolidated |
| Net Revenue | $1,031.4 million | $949.8 million | $2,667.2 million | $1,989.8 million |

The increase in North American Generics revenues was primarily the result of period-over-period increases in Lidocaine topical patch 5% (generic of Lidoderm®) of $116.1 million due to the timing of the launch in 2013 and Duloxetine HCI (generic of Cymbalta®), which was not sold in the first six months of 2013, of $47.5 million, offset, in part, by a decline in Methlyphenidate ER (generic of Concerta®) of $78.1 million due primarily to decreased volume. Other movements within this category are due to product mix.

**3Q 2014 Form 10-Q Filed on Nov. 5, 2014:**

| | Three Months Ended Sep. 30, | | Three Months Ended Sep. 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| | North American Generics | North American Generics | Consolidated | Consolidated |
| Net Revenue | $979.9 million | $976.1 million | $3,683.1 million | $2,013.0 million |

The movement in North American Generics revenues was primarily the result of changes in product mix.

**Form 8-K Filed on Dec. 5, 2014, superseding portions of the 2013 Form 10-K:**

| | Years Ended Dec. 31, | | Years Ended Dec. 31, | |
|---|---|---|---|---|
| | 2013 | 2012 | 2013 | 2012 |
| | North American Generics | North American Generics | Consolidated | Consolidated |
| Net Revenue | $3,915.7 million | $3,472.2 million | $8,677.6 million | $5,914.9 million |

The increase in net revenues is primarily due to the full year North American Generic and International net sales resulting from the Actavis Group Acquisition of $2,799.5 million in the year ended December 31, 2013 versus $428.3 million in the year ended December 31, 2012 as well as the Warner Chilcott Acquisition, which contributed three months of sales in 2013 compared to no sales in the prior period ($64.7 million). Also contributing to the movement are higher U.S. unit sales related to new products including lidocaine topical patch 5% ($392.9 million) and mixed amphetamine (Adderall XR® CII) ($145.2 million); offset in part by lower net sales of certain U.S. products including the authorized generic version of Lipitor® (atorvastatin) ($403.6 million, of which $24.3 million is due to price and $379.3 million is due to volume) and declines in other international revenues.

**4Q 2014 Form 8-K filed on Feb. 18, 2015:**

| | Three Months Ended Dec. 31, | | Three Months Ended Dec. 31, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| | North American Generics | North American Generics | Consolidated | Consolidated |
| Net Revenue | $1,140 million | N.A. | $4,056.9 million | $2,779.3 million |

In our North American Generics business, strong results were driven by continued performance of our generic versions of Lidoderm® and Concerta®, and fourth quarter launches of generic versions of Intuniv™ and Celebrex®.

**2014 Form 10-K filed on Feb. 18, 2015:**

| | Years Ended Dec. 31, | | Years Ended Dec. 31, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| | North American Generics | North American Generics | Consolidated | Consolidated |
| Net Revenue | $4,173.6 million | $3,915.7 million | $13,062.3 million | $8,677.6 million |

Within North American Generics, revenue by product moves based on the timing of launches, including an exclusivity period in certain circumstances, and the amount of generic competition in the market. An increase in competition can decrease both volume and the price received for

each product. The increase in North American Generics revenues was primarily the result of changes in product mix including new product launches and competition on existing products.

**1Q 2015 Form 10-Q Filed on May 11, 2015:**

| | Three Months Ended Mar. 31, | | Three Months Ended Mar. 31, | |
|---|---|---|---|---|
| | 2015 | 2014 | 2015 | 2014 |
| | North American Generics | North American Generics | Consolidated | Consolidated |
| Net Revenue | $1,220.2 million | $1,024.2 million | $4,234.2 million | $2,655.1 million |

Within North American Generics, revenue by product moves based on the timing of launches, including an exclusivity period in certain circumstances, and the amount of generic competition in the market. An increase in competition can decrease both volume and the price received for each product. The increase in North American Generics revenues was primarily the result of changes in product mix.

**2Q 2015 Form 10-Q Filed on Aug. 6, 2015:**

| | Three Months Ended Jun. 30, | | Three Months Ended Jun. 30, | |
|---|---|---|---|---|
| | 2015 | 2014 | 2015 | 2014 |
| | U.S. Generics | U.S. Generics | Consolidated | Consolidated |
| Net Revenue | $1,077.1 million | $997.4 million | $5,730.9 million | $2,635.3 million |

Within the Global Generics segment, and in particular the United States market, revenue by product moves based on the timing of launches, including an exclusivity period in certain circumstances, and the amount of generic competition in the market. An increase in competition can decrease both volume and the price received for each product.

The increase in Global Generics revenues was primarily the result of changes in product mix within the United States and the acquisition of Legacy Allergan, offset, in part, by a decline in international revenues due in part to the impact of foreign currency exchange rates of $102.1 million.

**3Q 2015 Form 10-Q Filed on Nov. 6, 2015:**

| | Three Months Ended Sep. 30, | | Three Months Ended Sep. 30, | |
|---|---|---|---|---|
| | 2015 | 2014 | 2015 | 2014 |
| | Global Generics | Global Generics | Consolidated | Consolidated |
| Net Revenue | $1,430.5 million | $1,590.1 million | $4,088.9 million | $2,150.8 million |

On July 27, 2015, the Company announced that it has entered into the Teva Transaction.

\*     \*     \*

- 130 -

> Financial results of the global generics business are presented as "Income from discontinued operations" on the Consolidated Statements of Operations for the three and nine months ended September 30, 2015 and 2014 . . . .

**2015 Form 10-K Filed on Feb. 26, 2016:**

|  | Years Ended Dec. 31, | | Years Ended Dec. 31, | |
|---|---|---|---|---|
|  | 2015 | 2014 | 2015 | 2014 |
|  | Global Generics | Global Generics | Consolidated | Consolidated |
| Net Revenue | $6,375.3 million | $6,578.8 million | $15,071.0 million | $ 6,738.9 million |

> The results of our global generics business operations are dependent on the timing of product launches and competition within the generics market, primarily in the United States. The increase in operating income is the result of continued cost savings initiatives as well as the cessation of depreciation and amortization for assets being divested to Teva once they met the definition of held for sale on July 27, 2015. Offsetting these amounts, is an increase in divestiture related expenses in the year ended December 31, 2015 of $97.2 million.

**1Q 2016 Form 10-Q Filed on May 10, 2016:**

|  | Three Months Ended Mar. 31, | | Three Months Ended Mar. 31, | |
|---|---|---|---|---|
|  | 2016 | 2015 | 2016 | 2015 |
|  | Global Generics | Global Generics | Consolidated | Consolidated |
| Net Revenue | $1,296.6 million | $1,741.1 million | $3,795.9 million | $2,562.6 million |

261.   The financial results set forth in ¶260 above were materially false and misleading because: (i) Allergan's generics unit and several of its pharmaceutical industry peers colluded to fix generic drug prices; (ii) the foregoing conduct constituted anticompetitive conduct; and (iii) consequently, Allergan's revenues during the Relevant Period were in part the result of anticompetitive conduct. None of these facts were disclosed in connection with defendants' issuance of Allergan's financial results and, consequently, defendants concealed the true source of Allergan's revenues.   By electing to speak publicly about Allergan's financial results, including revenues from its generic drug business, and thereby putting the

financial results into play in SEC filings, defendants had a duty to fully, completely and truthfully disclose all material facts regarding such financial results so as to not mislead investors.   As a result of the foregoing, defendants' public statements regarding Allergan's financial results were materially false and misleading at all relevant times.

### 4.   False Certifications

262.   Each of Allergan's Forms 10-Q filed with the SEC during the Relevant Period contained the following SOX certification:

> The undersigned officer of [Allergan] (the "Compan[y]"), hereby certifies, to such officer's knowledge, that:
>
> (i)   the Quarterly Report on Form 10-Q of the Compan[y] for the quarter ended [DATE OF QUARTER END] (the "Report") fully complies with the requirements of Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934, as amended; and
>
> (ii)   the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Compan[y].

263.   This certification was signed by: Bisaro for the Company's 3Q 2013 and 1Q 2014 Forms 10-Q; Saunders for the Company's 2Q 2014, 3Q 2014, 1Q 2015, 2Q 2015, 3Q 2015 and 1Q 2016 Forms 10-Q, as well as the Company's August 8, 2016 Form 10-Q ("2Q 2016 Form 10-Q") and its November 4, 2016 Form 10-Q ("3Q 2016 Form 10-Q"); Joyce for the Company's 3Q 2013, 1Q 2014, 2Q 2014 and 3Q 2014 Forms 10-Q; and Hilado for the Company's 1Q 2015, 2Q 2015, 3Q 2015, 1Q 2016, 2Q 2016, and 3Q 2016 Forms 10-Q.

264.   The certifications referenced in ¶¶262-263 above were materially false and misleading when made because defendants' quarterly and annual reports did not "fairly present[], in all material respects, the financial condition and results of operations of the Compan[y]."   In reality, the filings contained materially false and/or misleading statements and/or failed to disclose material facts about the Company's financial condition and operations.  Specifically, these filings contained materially false and/or misleading statements which had the effect of concealing, and/or failed to disclose, that: (i) Allergan's generics unit and several of its pharmaceutical industry peers colluded to fix generic drug prices; (ii) the foregoing conduct constituted illegal anticompetitive conduct;  and  (iii) consequently, Allergan's revenues during the Relevant Period were in part the result of anticompetitive conduct.  As a result of the foregoing, defendants' public statements were materially false and misleading at all relevant times.

265.   Each of Allergan's Forms 10-K filed with the SEC during the Relevant Period contained the following SOX certification:

> The undersigned officer of [Allergan] . . . (the "Compan[y]"), hereby certifies, to such officer's knowledge, that:
>
>     (i)     the Annual Report on Form 10-K of the Compan[y] for the year ended December 31, [year] (the "Report") fully complies with the requirements of Section 13(a) or Section 15(d), as applicable, of the Securities  Exchange Act of 1934, as amended; and

(ii)    the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Compan[y].

266.   This certification was signed by: Bisaro for the Company's 2013 Form 10-K; Saunders for the Company's 2014 and 2015 Forms 10-K; Joyce for the Company's 2013 Form 10-K; and Hilado for the Company's 2014 and 2015 Forms 10-K.

267.   Each of Allergan's Forms 10-Q filed with the SEC during the Relevant Period also contained the following certification pursuant to Rule 13a-14(a):

I, [EXECUTIVE NAME AND TITLE], certify that:

1.     I have reviewed this quarterly report on Form 10-Q of [Allergan];

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

268.   This certification was signed by: Bisaro for the Company's 3Q 2013 and 1Q 2014 Forms 10-Q; Saunders for the Company's 2Q 2014, 3Q 2014, 1Q 2015, 2Q 2015, 3Q 2015, 1Q 2016, 2Q 2016 and 3Q 2016 Forms 10-Q; Joyce for the Company's 3Q 2013, 1Q 2014, 2Q 2014 and 3Q 2014 Forms 10-Q; and Hilado

for the Company's 1Q 2015, 2Q 2015, 3Q 2015, 1Q 2016, 2Q 2016 and 3Q 2016

Forms 10-Q.

269.   Each of Allergan's Forms 10-K filed with the SEC during the Relevant

Period also contained the following certification pursuant to Rule 13a-14(a):

I, [EXECUTIVE NAME AND TITLE], certify that:

1.      I have reviewed this annual report on Form 10-K of [Allergan];

2.      Based on my knowledge, this report does not contain any untrue
statement of a material fact or omit to state a material fact necessary to
make the statements made, in light of the circumstances under which
such statements were made, not misleading with respect to the period
covered by this report;

3.      Based on my knowledge, the financial statements, and other
financial information included in this report, fairly present in all
material respects the financial condition, results of operations and cash
flows of the registrant as of, and for, the periods presented in this report.

270.   This certification was signed by: Bisaro for the Company's 2013 Form

10-K; Saunders for the Company's 2014 and 2015 Forms 10-K; Joyce for the

Company's 2013 Form 10-K; and Hilado for the Company's 2014 and 2015 Forms

10-K.

271.   The certifications referenced in ¶¶265-270 above were materially false

and misleading when made because – at the time of the certification – defendants

knew that Allergan's quarterly and annual reports contained untrue statements of

material fact and/or omissions of material fact necessary to make the statements

made not misleading.  Defendants also knew that the quarterly and annual reports

did not "fairly present in all material respects the financial condition, results of operations and cash flows" of the Company.  Specifically, the signatories knew the Company's quarterly and annual reports contained materially false and/or misleading statements, which had the effect of concealing, and/or failed to disclose, that: (i) Allergan's generics unit and several of its pharmaceutical industry peers colluded to fix generic drug prices; (ii) the foregoing conduct constituted illegal anticompetitive conduct; and (iii) consequently, Allergan's revenues during the Relevant Period were in part the result of anticompetitive conduct.  As a result of the foregoing, defendants' public statements were materially false and misleading at all relevant times.

### 5.    Code of Conduct

272.    Throughout the Relevant Period, Allergan's Forms 10-K represented that the Company had "adopted a Code of Conduct that applies to our employees, including our principal executive officer, principal financial officer and principal accounting officer."  The version of the referenced Code of Conduct, effective as of August 2014, stated: "No employee may discuss with, or provide information to, any competitor about pricing or related matters, whether the information concerns the Company or Actavis' suppliers, distributors, wholesalers or customers."  The Company's Code of Conduct also provided "[e]xamples of conduct that violates Actavis policy," including "[a]greements or understandings with competitors on

price." This policy further explained: "An 'agreement' or 'understanding' need not be in writing for it to be unlawful.  It can be oral or inferred from the conduct of the parties . . . ."

273.   The statements referenced in ¶272 above were materially false and misleading and/or omitted material facts because Allergan and its representatives did not comply with the Company's stated Code of Conduct, given the anticompetitive and collusive conduct alleged herein, and failed to disclose that: (i) Allergan's generics unit and several of its pharmaceutical industry peers colluded to fix generic drug prices; (ii) the foregoing conduct constituted anticompetitive conduct; and (iii) consequently, Allergan's revenues during the Relevant Period were in part the result of anticompetitive conduct.  Having elected to speak publicly about the Company's adoption of the Code of Conduct which expressly prohibits price collusion, defendants had a duty to fully, completely and truthfully disclose all material facts regarding violations of that Code of Conduct, including the anticompetitive conduct alleged herein.  As a result of the foregoing, defendants' public statements were materially false and misleading at all relevant times.

**F.    Loss Causation**

274.   On August 6, 2015, Allergan revealed to shareholders in its Q2 2015 Form 10-Q that it had "received a subpoena from the [DOJ] seeking information

relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."

275. On the same day, in an article entitled "Allergan Brought into Widening U.S. Probe of Generic Drug Prices," *Bloomberg* reported that Allergan had received a subpoena from the DOJ "seeking information on the marketing and prices of its generic drugs," thus "becoming the biggest company yet to draw scrutiny in the government's widening antitrust probe of the industry." The article further revealed that the Company first received the subpoena on June 25, 2015, and that the subpoena "sought information about communications with competitors regarding the products." Furthermore, the article named Impax, Lannett, Endo International Plc, and Par Pharmaceutical Holdings as having made "similar disclosures" in the past several months.

276. Other media outlets reported on the DOJ investigation into Allergan as well. In an August 6, 2015 article, *The Wall Street Journal*, reported: "Allergan noted that its Actavis business had received a subpoena in June from the Justice Department seeking information relating to the marketing and pricing of certain generic products and the company's communications with competitors about such products." An *MTNewswires* article published the same day noted Allergan's acknowledgement of the June 25, 2015 subpoena in the Company's SEC filing and

also referenced Lannett and Impax as among Allergan's competitors who had made similar disclosures regarding the receipt of subpoenas.

277.   In response to this news, Allergan's common share price fell $17.17 per share, or approximately 5%, from its previous closing price to close at $319.47 per share on August 6, 2015, and its preferred share price fell $39.24 per share, or approximately 3.5%, from its previous closing price to close at $1,084.00 per share on August 6, 2015.

278.   Several articles published on August 7, 2015, including articles from *TheStreet.com*, *Herald Democrat* and *The Buffalo News*, also discussed Allergan's receipt of the DOJ subpoena.  In addition, on August 19, 2015, *Generic Line* cited Jeffrey Loo, an S&P Capital IQ analyst, who described the market's cause for concern: "the request for information about competitors suggests DOJ is looking into whether drugmakers colluded to raise generic prices."

279.   Allergan's stock price remained inflated, however, because defendants continued to conceal the existence and full impact of defendants' price-fixing.

280.   On November 3, 2016, media outlets reported that U.S. prosecutors might file criminal charges against Allergan and several other pharmaceutical companies for unlawfully colluding to fix generic drug prices.  In an article titled "U.S. Charges in Generic-Drug Probe to Be Filed by Year-End," *Bloomberg* reported, in relevant part:

U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion, a fresh challenge for an industry that's already reeling from public outrage over the spiraling costs of some medicines.

The antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter.  The grand jury probe is examining whether some executives agreed with one another to raise prices, and the first charges could emerge by the end of the year, they said.

Though individual companies have made various disclosures about the inquiry, they have identified only a handful of drugs under scrutiny, including a heart treatment and an antibiotic.  Among the drugmakers to have received subpoenas are industry giants Mylan NV and Teva Pharmaceutical Industries Ltd.  ***Other companies include Actavis, which Teva bought from Allergan plc in August***, Lannett Co., Impax Laboratories Inc., Covis Pharma Holdings Sarl, Sun Pharmaceutical Industries Ltd., Mayne Pharma Group Ltd., Endo International Plc's subsidiary Par Pharmaceutical Holdings and Taro Pharmaceutical Industries Ltd.

All of the companies have said they are cooperating except Covis, which said last year it was unable to assess the outcome of the investigation.

281.  On this news, Allergan's common share price fell $9.07 per share, or approximately 4.6%, to close at $188.82 per share on November 3, 2016, and its preferred share price fell $30.03 per share, or approximately 4%, to close at $708.45 per share on November 3, 2016.

282.  Defendants' conduct, as alleged herein, directly and proximately caused Plaintiff's damages.  The disclosures of previously misrepresented and concealed material facts about Allergan's involvement in anticompetitive price

- 140 -

collusion caused the price of Allergan's securities to decline markedly, wiping out billions of dollars in shareholder wealth.

283.   It was entirely foreseeable that concealing from the public the Company's involvement in an illegal anticompetitive price-fixing scheme, which, among other things, vastly inflated the revenues from its generic drugs business and misled investors about the source and sustainability of Allergan's profits, would artificially inflate the prices of Allergan's securities.  It was also foreseeable that the disclosure of this information, and the materialization of concealed risks associated with Allergan's misconduct, would cause the prices of Allergan securities to decline, as the inflation caused by Allergan's earlier misrepresentations and omissions was removed from the prices.   Accordingly, the conduct of defendants, as alleged herein, proximately caused foreseeable losses for Plaintiff, which purchased Allergan securities during the Relevant Period.

### G.   Summary of Scienter Allegations

284.   Allergan and the Individual Defendants were active and culpable participants in the fraud, as evidenced by their knowing or reckless issuance and/or control over Allergan's and the Individual Defendants' materially false and misleading statements and omissions.   Allergan and the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements set forth in Section III.E above were materially false and misleading

when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws.  Allergan's and the Individual Defendants' scienter is evidenced by the following facts, among others:

285.  *First*, there were no material increases in demand or production costs or reported supply shortages for Allergan's generic drugs that would justify or otherwise explain the dramatic and concerted price increases for these drugs and Allergan's competitors' generic drugs during the Relevant Period.  The more compelling explanation for these price increases is price collusion between Allergan and its competitors, as evidenced by: (i) the sudden and astronomical nature of the increases; (ii) the fact that the increases occurred in concert with the Company's competitors; and (iii) the fact that the  increases typically occurred within weeks of the industry conferences or events attended by Allergan executives, including those directly responsible for setting prices at the Company.  Moreover, as the graphs above depict, the drug prices never decreased following the initial price increases to their pre-increase equilibrium price points as one would expect if the sudden price increases reflected temporary supply shortages, cost increases, or other benign market explanations.

286.  *Second*, price increases of the magnitude alleged herein would have been contrary to Allergan's economic interest absent an agreement to fix prices.

Without the certainty that all of the Co-Conspirators would raise and maintain the prices for their generic drugs, each Co-Conspirator risked getting undercut by the others, leading to a loss of market share and revenue.  This risk was alleviated by the Co-Conspirators' agreement to raise and maintain their prices.

287.  **Third**, Allergan and the Individual Defendants had a palpable motive to fix prices with Allergan's competitors, which derives from the nature of the U.S. generic drug market itself.  As discussed above, because federal law requires each generic pharmaceutical to be readily substitutable for another generic of the same brand drug, competition will cause prices to fall until they near generic drugmakers' marginal production costs.  This is confirmed by the graphs of the price movements herein, which show that prior to the alleged price collusion among Allergan and the Co-Conspirators, the prices of Propranolol, Ursodiol, Doxycycline, Tretinoin and Desonide had stabilized.  This stabilization of prices in turn caused Allergan's profits to level off, thus giving Allergan and its Co-Conspirators a common motive to conspire to raise prices.

288.  **Fourth**, Allergan and the Individual Defendants had substantial opportunities at industry conferences and events to collude on prices.  As confirmed by CW1 and CW2, the Allergan representatives who attended the conferences (including Boyer, Falkin, Clark and Rogerson) were in charge of setting prices for the Company's generic drugs.  Moreover, given the frequency and regularity of

these conferences – as well as the fact that several of the attendees for Allergan and its competitors were "repeat attendees" at the conferences and, in some cases, served together on industry boards – there is a strong inference that the various participants in the alleged price-fixing schemes were well acquainted with each other, bolstering the likelihood that these participants entrusted each other to engage in, and jointly conceal, the illicit price fixing.

289.    The level of familiarity between Allergan and the Co-Conspirators is further demonstrated by the flux of executives from one company to another.  For example, in early 2014, G. Frederick Wilkinson, the President of Actavis Global R&D, left the Company to become the CEO of Co-Conspirator Impax.   In commenting on Wilkinson's departure, defendant Bisaro noted during an April 30, 2014 conference call, "it is always good to have a friend in a competitor."  Shortly thereafter, defendant Olafsson left Allergan to become the President and CEO of Teva's Global Generic Medicines Group. In discussing Olafsson's departure for Teva, defendant Saunders stated on June 11, 2014, "it's nice to have a disciplined competitor at a big company."   In addition, Boothe, CEO of Actavis between August 2008 and December 2012, left the Company in 2013 and became the Executive Vice President and General Manager of Co-Conspirator Perrigo's Pharmaceutical business.  In July 2016, Co-Conspirator Impax named Boothe as the President of its Generics Division.

290.   *Fifth*, as described above (at Section III.D), the historic rise in generic drug prices immediately before and during the Relevant Period was well publicized. These price increases led Congress to commence an industry-wide investigation beginning in 2014.  On October 2, 2014, defendant Saunders received a letter from U.S. Senator Bernie Sanders and U.S. Representative Elijah Cummings putting Allergan on notice of an investigation and requesting pricing data and other information regarding the Company's generics business.  This Congressional investigation, the subsequent DOJ subpoena to the Company, and the widespread publicity surrounding the price hikes that spawned these investigations, gave rise to a duty to investigate the existence of price collusion and a duty to monitor changes in the Company's generic drug pricing.  These duties to investigate and monitor fell upon the Individual Defendants as the Company's senior-most executives who were responsible for signing and attesting to the accuracy of the Company's filings with the SEC and addressing market analysts and the investing public during earnings calls. Even without the Congressional – and later, DOJ – investigations, the Individual Defendants' duties to investigate and monitor were triggered by the Company's Code of Conduct, which expressly prohibited price fixing and other anticompetitive conduct.  At a minimum, Allergan's and the Individual Defendants' false and misleading statements were recklessly made, in dereliction of their duty

to investigate perceived anticompetitive behavior and their duty to monitor changes in the pricing of the Company's core products.

291.   **Sixth**, Allergan's production of generic drugs was the Company's core operation during the Relevant Period.  As discussed and demonstrated in the charts above, generic drug sales accounted for a substantial portion of Allergan's revenues and operations during the Relevant Period.  In 2013 and 2014, Allergan's revenues from North American Generics accounted for 45% and 32% of the Company's total revenues, respectively.  In 2015, the percentage of the Company's revenues from its global generics business was 42%.  Further, analysts covering Allergan during the Relevant Period, including JP Morgan and Piper Jaffray, identified "greater-than-expected price erosion/competition for the company's core US generics business" and "pricing pressure for key generics products" as among the risks to achieving the analysts' stated price targets, suggesting that the market considered Allergan's generics business to be a primary determinant of the Company's bottom line.  It is implausible that the Individual Defendants, who were the Company's senior-most executives, were unaware of the historically colossal price increases and the reasons for these increases.  The Individual Defendants had access to information concerning these price increases, including the Company's pricing models described above.  At a minimum, the Individual Defendants were reckless in falsely telling investors that the market for Allergan's generic drugs was truly

competitive without confirming the absence of price collusion, and reckless in certifying the accuracy of the Company's substantial Relevant Period revenues without confirming the true reason for these revenues (*i.e.*, price collusion).

292.  **Seventh**, the fact that the DOJ has intervened in at least six civil antitrust actions against Allergan after subpoenaing and receiving documents from the Company strongly suggests that federal prosecutors have determined that there is evidence of a criminal conspiracy to fix prices in an anticompetitive manner.  At least two former executives of Allergan's co-conspirator, Heritage, have pled guilty to price-fixing charges in connection with one of the drugs (Doxycycline) also sold by Allergan during the Relevant Period.  The Amended AG Complaint describes in detail substantial and particularized evidence of Allergan's collusive activities.

293.  **Eighth**, during the Relevant Period, the Individual Defendants, the Audit and Compliance Committee, the General Counsel, and the Global Chief Compliance Officer of Allergan met frequently to review the Company's actual and potential violations of laws and regulations.  Allergan's Audit and Compliance Committee charter required that the committee "obtain from the Global Chief Compliance Officer, the General Counsel, and/or when necessary, the head of internal audit, no less frequently than quarterly, reports on the Company's Global Compliance Program, including confirmation that the Company and its affiliated entities are in conformity with applicable legal requirements and the Company's

Code of Conduct."   Specifically, the committee must meet with "the General Counsel, the Global Chief Compliance Officer and other appropriate legal staff of the Company and, if appropriate, the Company's outside counsel, to review any legal matters that may have a material impact on the Company's financial statements or the Company's compliance policies."   In addition, at least annually, the committee must "review with management, including the General Counsel and the Global Chief Compliance Officer, the implementation and effectiveness of the Company's Global Compliance Program."   Allergan's Global Compliance Program mandates that "[a]ll colleagues, officers and directors of the Company shall respect and comply with all applicable federal, state, local, and foreign laws and regulations."

294.   The Individual Defendants' scienter is further evidenced by the following facts:

295.   ***Bisaro*** served as Allergan's CEO and President from before the start of the Relevant Period through July 2014 and signed the Registration Statements and SOX certifications and Rule 13a-14(a) certifications for the Company's 3Q 2013 and 1Q 2014 Forms 10-Q and 2013 Form 10-K.  Bisaro was a signatory of: (i) the SOX certification representing that "the information contained in the [SEC filings] fairly presents, in all material respects, the financial condition and results of operations of [Allergan]"; and (ii) the Rule 13a-14(a) certification representing

that the Company's SEC filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading."   In addition, as an executive officer of the registrant, Bisaro met regularly with the audit committee and General Counsel concerning Allergan's actual and potential violations of laws and regulations.   Bisaro had a duty to monitor any conduct that threatened to undermine the veracity of these filings, including the illegal anticompetitive conduct alleged herein.   Furthermore, Bisaro, as Allergan's CEO, had access to pricing data for the Company's generic drugs.   Notwithstanding the certifications signed by Bisaro and his access to pricing data, Bisaro knowingly or recklessly failed to disclose the illegal price-fixing scheme and misrepresented the Company's compliance with laws and regulations.

296.   Bisaro also made a materially false and misleading statement during a Company earnings call on May 11, 2015 in response to a question specifically regarding "generic drug pricing given that there have been concerns that it may not be as favorable going forward," demonstrating that he was in a position to know all material facts regarding the Company's generic drug pricing. Even in the face of this direct question, Bisaro never disclosed the price-fixing scheme, opting instead to project a false picture of a highly competitive generic pharmaceutical market.

297. Among other industry events, Bisaro attended the NACDS 2013 Annual Meeting that was also attended by representatives from a number of the Co-

Conspirators.  This meeting accompanied the dramatic and historic increase in the price of doxycycline hyclate manufactured by Allergan and certain of the Co-Conspirators, as well as Allergan's entrance into the market for generic Desonide at inflated prices.

298.   Bisaro sold 40,921 shares of Allergan stock, amounting to 8% of his holdings, for proceeds of almost $6.5 million on November 11, 2013.

299.   **Saunders** served as Allergan's CEO from July 2014 through the end of the Relevant Period and signed the Registration Statements and SOX certifications and Rule 13a-14(a) certifications for the Company's 2Q 2014, 3Q 2014, 1Q 2015, 2Q 2015, 3Q 2015, 1Q 2016, 2Q 2016 and 3Q 2016 Forms 10-Q and 2014 and 2015 Forms 10-K.   Saunders was a signatory of: (i) the SOX certification representing that "the information contained in the [SEC filings] fairly presents, in all material respects, the financial condition and results of operations of [Allergan]"; and (ii) the Rule 13a-14(a) certification representing that the Company's SEC filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading."  In addition, as an executive officer of the registrant, Saunders met regularly with the audit committee and General Counsel concerning Allergan's actual and potential violations of laws and regulations.  Saunders had a duty to monitor any conduct that threatened to undermine the veracity of these filings,

including the illegal anticompetitive conduct alleged herein. Furthermore, Saunders, as Allergan's CEO, had access to pricing data for the Company's generic drugs. Notwithstanding the certifications signed by Saunders and his access to pricing data, Saunders knowingly or recklessly failed to disclose the price-fixing scheme and misrepresented the Company's compliance with laws and regulations.

300. Saunders also made false and misleading statements on the Company's earnings calls on August 5, 2014 and May 11, 2015 and during an interview with Jim Cramer on August 7, 2015 – in response to questions specifically inquiring about the "US generic pricing outlook for 2014 and 2015," "aggressive pricing increases" and the DOJ's subpoena – demonstrating that he was in a position to know all material facts regarding the Company's generic drug pricing. Even in the face of these direct questions, Saunders never disclosed the price-fixing scheme, opting instead to project a false picture of a highly competitive generic pharmaceutical market.

301. *Joyce* served as Allergan's CFO from before the start of the Relevant Period through December 2014 and signed SOX certifications and Rule 13a-14(a) certifications for the Company's 3Q 2013, 1Q 2014, 2Q 2014 and 3Q 2014 Forms 10-Q and 2013 Form 10-K. Joyce was a signatory of: (i) the SOX certification representing that "the information contained in the [SEC filings] fairly presents, in all material respects, the financial condition and results of operations of [Allergan]";

and (ii) the Rule 13a-14(a) certification representing that the Company's SEC filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading."  In addition, as an executive officer of the registrant, Joyce met regularly with the audit committee and General Counsel concerning Allergan's actual and potential violations of laws and regulations.  Joyce had a duty to monitor any conduct that threatened to undermine the veracity of these filings, including the illegal anticompetitive conduct alleged herein.  Furthermore, Joyce, as Allergan's CFO, had access to pricing data for the Company's generic drugs.  Notwithstanding the certifications signed by Joyce and his access to pricing data, Joyce knowingly or recklessly failed to disclose the price-fixing scheme and misrepresented the Company's compliance with laws and regulations.  Joyce also signed Allergan's 3Q 2013, 4Q 2013, 1Q 2014, 2Q 2014 and 3Q 2014 Forms 8-K and the December 5, 2014 Form 8-K, each of which contained material misstatements.

302.  Joyce sold 15,000 shares of Allergan stock on November 5, 2013, 7,500 shares on November 6, 2013, and 14,600 shares on December 6, 2013, amounting to more than 48% of his total holdings, for proceeds of almost $6 million.

303.  *Hilado* served as Allergan's CFO from December 2014 through the end of the Relevant Period and signed the Registration Statements and SOX

certifications and Rule 13a-14(a) certifications for the Company's 1Q 2015, 2Q 2015, 3Q 2015, 1Q 2016, 2Q 2016 and 3Q 2016 Forms 10-Q and 2014 and 2015 Forms 10-K.  Hilado was a signatory of: (i) the SOX certification representing that "the information contained in the [SEC filings] fairly presents, in all material respects, the financial condition and results of operations of [Allergan]"; and (ii) the Rule 13a-14(a) certification representing that the Company's SEC filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading."  In addition, as an executive officer of the registrant, Hilado met regularly with the audit committee and General Counsel concerning Allergan's actual and potential violations of laws and regulations.  Hilado had a duty to monitor any conduct that threatened to undermine the veracity of these filings, including the illegal anticompetitive conduct alleged herein.  Furthermore, Hilado, as Allergan's CFO, had access to pricing data for the Company's generic drugs.  Notwithstanding the certifications signed by Hilado and her access to pricing data, Hilado knowingly or recklessly failed to disclose the price-fixing scheme and misrepresented the Company's compliance with laws and regulations.  Hilado also signed Allergan's 4Q 2014, 1Q 2015, 2Q 2015, 3Q 2015 and 4Q 2015 Forms 8-K and the March 2, 2015 Form 8-K underwriting agreements relating to the Ordinary/Preferred Shares Offerings, each of which contained material misstatements.

304.  *Olafsson* served as a director of Allergan and the President of Actavis Pharma, the Allergan segment that included the Company's generics business, from April 2012 to June 2014.  As the highest-ranking officer of Actavis Pharma, Olafsson had access to pricing data for the Company's generic drugs.  Olafsson knowingly or recklessly made a materially false and misleading statement regarding generic pricing during an October 29, 2013 Company earnings call and also signed the Company's 2013 Form 10-K.  He also knowingly or recklessly failed to disclose the price-fixing scheme.

305.  Among other industry events, Olafsson attended the GPhA 2013 Annual Meeting in Orlando, Florida that was also attended by representatives from a number of the Co-Conspirators.  This meeting preceded a dramatic and historic increase in the price of doxycycline hyclate manufactured by Allergan and certain of the Co-Conspirators.

306.  Olafsson sold 25,000 shares of Allergan stock on November 11, 2013, amounting to more than 25% of his total holdings, for proceeds of almost $4 million.

307.  *Buchen* served as the Executive Vice President, Commercial, North American Generics and International from July 2014 to March 21, 2015. Buchen knowingly or recklessly made a false and misleading statement during the Company's August 5, 2014 earnings call in response to questions from analysts

specifically inquiring about the "US generic pricing outlook for 2014 and 2015" and "aggressive pricing increases," demonstrating that he was in a position to know all material facts regarding the Company's generic drug pricing.  Even in the face of these direct questions, Buchen never disclosed the price-fixing scheme, opting instead to project a false picture of a highly competitive generic pharmaceutical market.

308.   Buchen sold 30,000 shares of Allergan stock on November 11, 2013, amounting to more than 33% of his total holdings, for proceeds of almost $4.8 million.

309.   **Bailey** has served as Allergan's Executive Vice President, Chief Legal Officer, and Secretary since July 2014, and signed the Registration Statements and the March 2, 2015 Form 8-K containing underwriting agreements relating to the Ordinary/Preferred Shares Offerings.  As an executive officer and General Counsel, he met regularly with the audit committee and management concerning Allergan's actual and potential violations of laws and regulations.  Despite his responsibility for overseeing Allergan's legal department, Bailey repeatedly stated without qualification that the Company complied with laws and regulations.  Bailey knowingly and recklessly failed to disclose the illegal price-fixing scheme and misrepresented the Company's compliance with laws and regulations.

## H.   No Safe Harbor

310.   Allergan's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements issued during the Relevant Period were ineffective to shield those statements from liability.

311.   The defendants are also liable for any false or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Allergan who knew that the forward-looking statement was false.

## I.   Applicability of the Presumption of Reliance: Fraud on the Market

312.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Relevant Period;

- the omissions and misrepresentations were material;

- Allergan securities are traded in an efficient market and were liquid and traded with moderate to heavy volume during the Relevant Period;

- the Company's common stock was traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff purchased, acquired and/or sold Allergan securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

313.   Based upon the foregoing, Plaintiff is entitled to a presumption of reliance upon the integrity of the market.

314.   Alternatively, Plaintiff is entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), as defendants omitted material information in their Relevant Period statements in violation of a duty to disclose such information, as detailed above.

## IV.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Allergan, Bisaro, Saunders, Joyce, Hilado, Olafsson, Buchen and Bailey**

315.   Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

316.   This Count is asserted pursuant to §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, against Allergan and the Individual Defendants.

317.   As alleged herein, throughout the Relevant Period, Allergan and the Individual Defendants, individually and in concert, directly and indirectly, by use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made materially untrue statements of

material fact and/or omitted to state material facts necessary to make the statements made not misleading and carried out a plan, scheme and course of conduct, in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Allergan and the Individual Defendants intended to and did, as alleged herein: (i) deceive the investing public, including Plaintiff; (ii) artificially inflate and maintain the prices of Allergan's common and preferred stock; and (iii) cause Plaintiff to acquire the Company's common stock at artificially inflated prices.

318. The Individual Defendants were individually and collectively responsible for making the materially false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Plaintiff by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements made therein not misleading.

319. As set forth above, Allergan and the Individual Defendants made the materially false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiff, which acquired the Company's common stock during the Relevant Period.

320.  In ignorance of the materially false and misleading nature of Allergan's and the Individual Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for Allergan's common and preferred stock, Plaintiff acquired the Company's common stock at artificially inflated prices during the Relevant Period.  But for the fraud, Plaintiff would not have acquired the Company's common stock at such artificially inflated prices.   As set forth herein, when the true facts were subsequently disclosed, the price of Allergan's common and preferred stock declined precipitously, and Plaintiff was harmed and damaged as a direct and proximate result of its acquisition of the Company's common stock at artificially inflated prices and the subsequent decline in the prices of the stock when the truth was disclosed.

321.  By virtue of the foregoing, Allergan and the Individual Defendants are liable to Plaintiff for violations of §10(b) of the Exchange Act and Rule 10b-5.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against Bisaro, Saunders, Joyce, Hilado, Olafsson, Buchen and Bailey

322.  Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

323.  This Count is asserted pursuant to §20(a) of the Exchange Act against each of the Individual Defendants.

324.   As alleged above, the Company violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making materially false and misleading statements and omissions in connection with the purchase or sale of its common and preferred stock and by participating in a fraudulent scheme and course of business or conduct throughout the Relevant Period.  This fraudulent conduct was undertaken with scienter and Allergan is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate reckless disregard of the falsity of the Company's statements and the fraudulent nature of its scheme during the Relevant Period.

325.   As set forth above, the Individual Defendants were controlling persons of the Company during the Relevant Period, due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations, including their power to control or influence the policies and practices giving rise to the securities violations alleged herein, and exercised the same.

326.   By virtue of the foregoing, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making  of the Company, including the content of its public statements with respect to its operations, corporate governance and compliance with regulators.

327.   The Individual Defendants were culpable participants in Allergan's fraud alleged herein by acting acted knowingly and intentionally, or in such a

deliberately reckless manner as to constitute willful fraud and deceit upon Plaintiff, which acquired the Company's common stock during the Relevant Period.

328.   By reason of the foregoing, the Individual Defendants are liable to Plaintiff as controlling persons of the Company in violation of Section 20(a) of the Exchange Act.

## COUNT III

**For Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder Against Allergan, Saunders, Bisaro, Olafsson, Bloem, Bodine, Howson, King, Klema, Michal, Michelson, O'Sullivan, Taylor, Turner and Weiss**

329.   This Count is asserted pursuant to §14(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder, in connection with the Forest Merger.  This claim is asserted against Allergan, Saunders and the 2014 Board of Directors.

330.   Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

331.   The May 6, 2014 Proxy and the documents attached to the May 6, 2014 Proxy or incorporated by reference therein misrepresented material facts or omitted material facts required to be stated to make the statements contained in those documents not misleading.

332.   The defendants named in this Count failed to update the May 6, 2014 Proxy when material information arose between the dissemination of the document or related statements and the June 17, 2014 shareholder vote.

333.   The defendants named in this Count, jointly and severally, solicited and permitted the use of their names in solicitations contained in the May 6, 2014 Proxy.

334.   Allergan was an issuer of the May 6, 2014 Proxy.  Allergan also permitted the use of its name in the May 6, 2014 Proxy by allowing the document to represent, among other things, its operating results and financial condition.

335.   Defendants Bisaro and Saunders signed the cover letters for the May 6, 2014 Proxy and permitted the use of their names in connection with the May 6, 2014 Proxy.

336.   Defendant Buchen signed the Notice of the Extraordinary General Meeting of Shareholders to be held on June 17, 2014, and permitted the use of his name in connection with the May 6, 2014 Proxy.

337.   Defendants Bloem, Bodine, Howson, King, Klema, Michal, Michelson, O'Sullivan, Taylor, Turner and Weiss permitted the use of their names in connection with the May 6, 2014 Proxy by, among other things, allowing the May 6, 2014 Proxy to represent that they recommended a vote to approve the Forest Merger.

338.   By means of the May 6, 2014 Proxy and the documents attached to or incorporated by reference therein, the defendants named in this Count sought to

secure the approval of the Forest Merger from Plaintiff, which was a Forest shareholder, and solicited proxies from Plaintiff, which was a Forest shareholder.

339.   Each defendant named in this Count acted negligently in making false or misleading statements of material fact, omitting material facts required to be stated to make the statements contained in the May 6, 2014 Proxy not misleading, and failing to update statements that were rendered misleading by material information that arose after the dissemination of these statements and before the June 17, 2014 shareholder vote.

340.   The May 6, 2014 Proxy described in this Count was an essential link in the accomplishment of the Forest Merger.  As a result of the May 6, 2014 Proxy, Allergan and Forest shareholders approved the Forest Merger.

341.   Plaintiff, which was a Forest shareholder and was eligible to vote on the Forest Merger, was denied the opportunity to make an informed decision in voting on the Forest Merger as a result, and was damaged as a direct and proximate result of the materially false or misleading statements and omissions as alleged in this Count.

342.   As a result of its acquisition of Allergan stock in the Forest Merger in exchange for its Forest stock at an artificially inflated price, and the corrections removing the artificial inflation in the price of those Allergan shares, Plaintiff suffered economic harm under §14(a) of the Exchange Act.  Alternatively, Plaintiff

also received Allergan shares and is entitled to a rescissory measure of damages sufficient to put it back in the economic position it was in before the consummation of the Forest Merger.

343.   By reason of the foregoing, the defendants named in this Count violated §14(a) of the Exchange Act and Rule 14a-9.

## COUNT IV

**For Violations of Section 14(a) of the Exchange Act and Rule 14a-9
Promulgated Thereunder Against Allergan, Saunders, Bisaro, Bloem,
Bodine, Howson, King, Klema, Michal, O'Sullivan, Taylor, Turner,
Weiss, Basgoz, Coughlin and Bailey**

344.   This Count is asserted pursuant to §14(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder, in connection with the Actavis Merger.  This claim is asserted against Allergan, Saunders and the 2015 Board of Directors.

345.   Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

346.   For purposes of this Count, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence.

347.   The January 27, 2015 Proxy and the documents attached to the January 27, 2015 Proxy or incorporated by reference therein misrepresented material facts or omitted material facts required to be stated to make the statements contained in those documents not misleading.

348.   The defendants named in this Count failed to update the January 27, 2015 Proxy when material information arose between the dissemination of the document or related statements and the March 10, 2015 shareholder vote.

349.   The defendants named in this Count, jointly and severally, solicited and permitted the use of their names in solicitations contained in the January 27, 2015 Proxy.

350.   Allergan was an issuer of the January 27, 2015 Proxy.  Allergan also permitted the use of its name in the January 27, 2015 Proxy by allowing the document to represent, among other things, its operating results and financial condition.

351.   Defendants Bisaro and Saunders signed the cover letters for the January 27, 2015 Proxy and permitted the use of their names in connection with the January 27, 2015 Proxy.

352.   Defendants Bloem, Bodine, Howson, King, Klema, Michal, O'Sullivan, Taylor, Turner, Weiss, Basgoz, Coughlin and Bailey permitted the use of their names in connection with the January 27, 2015 Proxy by, among other things, allowing the January 27, 2015 Proxy to represent that they recommended a vote to approve the Actavis Merger.

353.   By means of the January 27, 2015 Proxy and the documents attached to or incorporated by reference therein, the defendants named in this Count sought

to secure the approval of the Actavis Merger from Plaintiff, which was an Allergan Inc. shareholder, and solicited proxies from Plaintiff.

354.   Each defendant named in this Count acted negligently in making false or misleading statements of material fact, omitting material facts required to be stated to make the statements contained in the January 27, 2015 Proxy not misleading, and failing to update statements that were rendered misleading by material information that arose after the dissemination of these statements and before the March 10, 2015 shareholder vote.

355.   The January 27, 2015 Proxy described in this Count was an essential link in the accomplishment of the Actavis Merger.  As a result of the January 27, 2015 Proxy, Allergan and Actavis shareholders approved the Actavis Merger.

356.   Plaintiff, which was an Allergan Inc. shareholder eligible to vote on the Actavis Merger, was denied the opportunity to make an informed decision in voting on the Actavis Merger as a result and was damaged as a direct and proximate result of the materially false or misleading statements and omissions as alleged in this Count.

357.   As a result of their acquisition of Allergan plc stock in the Actavis Merger in exchange for their Allergan Inc. stock at an artificially inflated price, and the corrections removing the artificial inflation in the price of those Allergan plc shares, Plaintiff, which was entitled to vote on the Actavis Merger, suffered

economic harm under §14(a) of the Exchange Act.  Alternatively, Plaintiff, which was entitled to vote on the Actavis Merger, received Allergan shares and is entitled to a rescissory measure of damages sufficient to put it back in the economic position it was in before the consummation of the Actavis Merger.

358.  By reason of the foregoing, the defendants named in this Count violated §14(a) of the Exchange Act and Rule 14a-9.

## V.   SECURITIES ACT ALLEGATIONS

### A.   Securities Act Parties

#### 1.   Plaintiff

359.   Plaintiff purchased or otherwise acquired Allergan ordinary shares in Allergan's public offering of 14,513,889 ordinary shares issued to finance the acquisition of Allergan, which closed on March 2, 2015, and was damaged thereby. These shares were purchased or otherwise acquired in, pursuant to and/or traceable to the Ordinary/Preferred Shares Offerings Materials (defined below), including the Form S-3 shelf registration statement and prospectus filed on February 19, 2015 and prospectus supplement dated February 25, 2015.  Plaintiff also acquired Allergan ordinary shares in connection with Actavis plc's March 17, 2015 acquisition of Allergan Inc. and was damaged thereby.  Those shares were acquired in, pursuant to and/or traceable to the Merger Offering Materials (defined below), including the Form S-4 registration statement, the amendments thereto, and the joint

proxy statement/prospectus that forms a part of the registration statement filed on January 27, 2015.

### 2.   Securities Act Defendants

360.   Defendant Allergan was the issuer of the ordinary shares in partial exchange for the outstanding shares of Allergan Inc. common stock and the issuer of ordinary shares and preferred shares to finance the acquisition of Allergan Inc.

### a.   Officer Defendants

361.   Defendant Bailey signed: (i) the Form S-4 registration statement and the joint proxy statement/prospectus that formed part of the registration statement, filed with the SEC on December 23, 2014 (Registration No. 333-201242); (ii) Amendment No. 1 to the Form S-4 registration statement and the joint proxy statement/prospectus that formed part of the registration statement, filed with the SEC on January 26, 2015 (Registration No. 333-201242) (together, Amendment No. 1 filed on January 26, 2015 and the Form S-4 registration statement and the joint proxy statement/prospectus filed on December 23, 2014 are referred to herein as the "Form S-4 Registration Statement"); (iii) the Form S-3 registration statement and the prospectus that formed part of the registration statement, filed with the SEC on February 19, 2015 (Registration No. 333-202168) (the "Form S-3 Registration Statement" and, together with the Form S-4 Registration Statement, the "Registration Statements"); and (iv) the March 2, 2015 Form 8-K containing

underwriting agreements relating to the Ordinary/Preferred Shares Offerings. Bailey was the Chief Legal Officer and Corporate Secretary of Allergan at the time of the Offerings.

362.   Defendant Bisaro signed the Registration Statements, the 2013 Form 10-K incorporated by reference into the Form S-4 Registration Statement, and the 2014 Form 10-K incorporated by reference into the Registration Statements.  He also certified the 2013 Form 10-K and served on Allergan's Board as Executive Chairman and director at the time of the Offerings.

363.   Defendant Saunders signed the Registration Statements and the 2014 Form 10-K incorporated by reference into the Registration Statements.  He also certified the 2014 Form 10-K and served as Allergan's CEO, President, a director and Principal Executive Officer at the time of the Offerings.

364.   Defendant Hilado signed the Registration Statements and the 2014 Form 10-K and the Form 8-K underwriting agreements relating to the Ordinary/Preferred Shares Offerings incorporated by reference into the Registration Statements.  She also certified the 2014 Form 10-K and served as Allergan's CFO and Principal Financial Officer at the time of the Offerings.

365.  Defendant James D'Arecca ("D'Arecca") signed the Registration Statements, the 2013 Form 10-K incorporated by reference into the Form S-4 Registration Statement, and the 2014 Form 10-K incorporated by reference into the

Registration Statements.  D'Arecca served as Allergan's Chief Accounting Officer and Principal Financial Officer at the time of the Offerings.

366.   Defendant Joyce signed the 2013 Form 10-K and the Form 8-K filed with the SEC on December 5, 2014, which superseded portions of the 2013 Form 10-K.   Both documents were incorporated by reference into the Form S-4 Registration Statement.   He also certified the 2013 Form 10-K and served as Allergan's CFO and Principal Financial Officer during the Relevant Period.

367.   Defendant Olafsson signed the 2013 Form 10-K, which was incorporated by reference into the Form S-4 Registration Statement.   He served as a director and President of Actavis Pharma during the Relevant Period.

368.   Defendants Bailey, Bisaro, Saunders, Hilado, D'Arecca, Joyce and Olafsson are referred to as the "Officer Defendants."

### b.   Director Defendants

369.   Defendant Basgoz signed the Registration Statements and the 2014 Form 10-K incorporated by reference into the Registration Statements.  He served as a director on Allergan's Board at the time of the Offerings.

370.   Defendant Bloem signed the Registration Statements, the 2013 Form 10-K incorporated by reference into the Form S-4 Registration Statement, and the 2014 Form 10-K incorporated by reference into the Registration Statements.  He served as a director on Allergan's Board at the time of the Offerings.

371.   Defendant Bodine signed the Registration Statements, the 2013 Form 10-K incorporated by reference into the Form S-4 Registration Statement, and the 2014 Form 10-K incorporated by reference into the Registration Statements.  He served as a director on Allergan's Board at the time of the Offerings.

372.   Defendant Coughlin signed the Registration Statements and the 2014 Form 10-K incorporated by reference into the Registration Statements.  He served as a director on Allergan's Board at the time of the Offerings.

373.   Defendant Howson signed the Registration Statements, the 2013 Form 10-K incorporated by reference into the Form S-4 Registration Statement, and the 2014 Form 10-K incorporated by reference into the Registration Statements.  She served as a director on Allergan's Board at the time of the Offerings.

374.   Defendant King signed the Registration Statements, the 2013 Form 10-K incorporated by reference into the Form S-4 Registration Statement, and the 2014 Form 10-K incorporated by reference into the Registration Statements.  He served as a director on Allergan's Board at the time of the Offerings.

375.   Defendant Klema signed the Registration Statements, the 2013 Form 10-K incorporated by reference into the Form S-4 Registration Statement, and the 2014 Form 10-K incorporated by reference into the Registration Statements.  She served as a director on Allergan's Board at the time of the Offerings.

376.   Defendant Michal signed the Registration Statements, the 2013 Form 10-K incorporated by reference into the Form S-4 Registration Statement, and the 2014 Form 10-K incorporated by reference into the Registration Statements.  He served as a director on Allergan's Board at the time of the Offerings.

377.   Defendant O'Sullivan signed the Registration Statements, the 2013 Form 10-K incorporated by reference into the Form S-4 Registration Statement, and the 2014 Form 10-K incorporated by reference into the Registration Statements.  He served as a director on Allergan's Board at the time of the Offerings.

378.   Defendant Taylor signed the Registration Statements, the 2013 Form 10-K incorporated by reference into the Form S-4 Registration Statement, and the 2014 Form 10-K incorporated by reference into the Registration Statements.  He served as a director on Allergan's Board at the time of the Offerings.

379.   Defendant Turner signed the Registration Statements, the 2013 Form 10-K incorporated by reference into the Form S-4 Registration Statement, and the 2014 Form 10-K incorporated by reference into the Registration Statements.  He served as a director on Allergan's Board at the time of the Offerings.

380.   Defendant Weiss signed the Registration Statements, the 2013 Form 10-K incorporated by reference into the Form S-4 Registration Statement, and the 2014 Form 10-K incorporated by reference into the Registration Statements.  He served as a director on Allergan's Board at the time of the Offerings.

381.   Defendants Basgoz, Bloem, Bodine, Coughlin, Howson, King, Klema, Michal, O'Sullivan, Taylor, Turner and Weiss are referred to as the "Director Defendants."

## B.   Additional Background Allegations

382.   Plaintiff's claims under the Securities Act do not sound in fraud and Plaintiff expressly disavows and disclaims any allegations of fraud, scheme or intentional conduct as part of its claims under the Securities Act.  Any allegations of fraud, fraudulent conduct or motive are specifically disclaimed from the following allegations for the purposes of Plaintiff's claims under the Securities Act, which do not require allegations of scienter, fraudulent intent or motive.  To the extent that these allegations incorporate factual allegations elsewhere in this complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scienter or intent of the defendants to defraud Plaintiff.

383.   As set forth below, Allergan and other defendants made a series of materially untrue statements and omissions of material facts in the offering materials issued in connection with the Offerings during the Relevant Period.  The Offering Materials are defined collectively as the materials described in the table below:

| Defined Term | Included Filings | Date Filed |
|---|---|---|
| "Merger Offering Materials" | Form S-4 registration statement and the joint proxy statement/prospectus that formed part of the registration statement, Registration No. 333-201242 | December 23, 2014 |
| | Amendment No. 1 to Form S-4 registration statement and the joint proxy statement/prospectus that formed part of the registration statement, Registration No. 333-201242 | January 26, 2015 |
| | Rule 424(b)(3) joint proxy statement/prospectus, Registration No. 333-201242 | January 27, 2015 |
| | Documents incorporated by reference by the Form S-4 registration statement and Rule 424(b)(3) joint proxy statement/prospectus, including:<br>(1) 2013 Form 10-K,<br>(2) Form 8-K superseding portions of the 2013 Form 10-K,<br>(3) 2014 Form 10-K, and<br>(4) Form 8-K underwriting agreements relating to the Ordinary/Preferred Shares Offerings | (1) February 25, 2014<br>(2) December 5, 2014<br><br>(3) February 18, 2015<br>(4) March 2, 2015 |
| "Ordinary/Preferred Shares Offerings Materials" | Form S-3 registration statement and the prospectus that formed part of the registration statement, Registration No. 333-202168 | February 19, 2015 |
| | Rule 424(b)(5) prospectus for ordinary shares, Registration No. 333-202168 | February 19, 2015 |

| Defined Term | Included Filings | Date Filed |
|---|---|---|
| | Rule 424(b)(5) prospectus for mandatory convertible preferred shares, Registration No. 333-202168 | February 19, 2015 |
| | Rule 424(b)(2) prospectus for ordinary shares, Registration No. 333-202168 | February 26, 2015 |
| | Rule 424(b)(2) prospectus for mandatory convertible preferred shares, Registration No. 333-202168 | February 26, 2015 |
| | Documents incorporated by reference by the Form S-3 registration statement and the Rule 424(b)(5) and 424(b)(2) prospectuses for ordinary shares and mandatory convertible preferred shares, including: (1) 2014 Form 10-K, and (2) Form 8-K underwriting agreements relating to the Ordinary/Preferred Shares Offerings | (1) February 18, 2015 (2) March 2, 2015 |

## C.     Actionable False and Misleading Statements in the Offering Materials

384.   Specifically, during the Relevant Period, Allergan conducted three registered securities offerings.  These offerings included Allergan's public offering of: (i) 14,513,889 ordinary shares, closed on March 2, 2015, which raised approximately $4.18 billion; (ii) 5,060,000 5.00% mandatory convertible preferred shares, closed on March 2, 2015, which raised approximately $5.06 billion; and

(iii) approximately 111.2 million ordinary shares in partial exchange for the outstanding shares of Allergan Inc. common stock in connection with the March 17, 2015 merger.

385.   As set forth herein, the Offering Materials that Allergan filed with the SEC for each of the Offerings contained untrue statements of material fact and omitted material facts required to be stated therein or necessary to make the statements therein not misleading, concerning: (i) competition in the generic drug marketplace, including that the marketplace for generic drugs was highly competitive; (ii) the Company's reported revenues and profitability; (iii) price reductions due to competitor actions and entry; (iv) pricing pressures due to industry consolidation and third-party payers' price challenges; (v) competition with Teva, Mylan, Sandoz, Inc., and others, which were characterized as "major competitors"; and (vi) compliance with laws and regulations governing the Company's business.

### 1.   The Form S-4 Registration Statements and Joint Proxy Statement/Prospectus

386.   During the Relevant Period, Allergan's inflation of sales through illegal price-fixing constituted a violation of U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal authorities, along with the attendant negative financial and reputational harm, and its failure to make required disclosures regarding the impact of artificial price increases (tied to illegal

price-fixing activity) on its reported revenue was in violation of SEC disclosure rules. Nevertheless, Allergan, the Officer Defendants, and the Director Defendants represented falsely and/or misleadingly that the Company complied with laws and regulations in the Merger Offering Materials:

> Allergan's obligation to effect the Merger is conditioned, among other things, upon:
>
> - the accuracy of Actavis' and Merger Sub's representations and warranties, subject to specified materiality standards;
>
> *       *       *
>
> - the delivery by Actavis of an officer's certificate certifying such accuracy of such representations and warranties and such performance of such obligations and covenants;
>
> *       *       *
>
> Many of the representations and warranties are reciprocal and apply to Actavis or Allergan, as applicable, and their respective subsidiaries. Some of the more significant representations and warranties relate to:
>
> *       *       *
>
> - SEC reports and financial statements, including their preparation in accordance with GAAP, filing or furnishing with the SEC, and compliance with the applicable rules and regulations promulgated thereunder, and that *such reports and financial statements fairly present, in all material respects, the relevant financial position and results of operations*;
>
> *       *       *
>
> - *compliance with laws and government regulations*, including environmental laws;
>
> *       *       *

- 177 -

Many of the representations and warranties made by each of Actavis and Allergan are qualified by a "material adverse effect" standard. . . .  For the purpose of the Merger Agreement, a "material adverse effect" with respect to each of Actavis and Allergan means any change, effect, development, circumstance, condition, state of facts, event or occurrence (each referred to in this section of this joint proxy statement/prospectus as an "Effect") that, individually or in the aggregate, has a material adverse effect on the assets, liabilities, condition (financial or otherwise), business or results of operations of the relevant party and its subsidiaries, taken as a whole.

\*     \*     \*

## REPRESENTATIONS AND WARRANTIES OF PARENT [ACTAVIS PLC] AND MERGER SUB

\*     \*     \*

Section 4.4     Reports and Financial Statements.

(a)     From January 1, 2012 through the date of this Agreement, each of Parent [Actavis plc] and Actavis, Inc. have filed or furnished all forms, documents and reports required to be filed or furnished prior to the date hereof by it with the SEC (the "Parent SEC Documents"). As of their respective dates, or, if amended, as of the date of (and giving effect to) the last such amendment, the Parent [Actavis plc] SEC Documents complied in all material respects with the requirements of the Securities Act and the Exchange Act, as the case may be, and the applicable rules and regulations promulgated thereunder, and ***none of the Parent [Actavis plc] SEC Documents contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading***.

(b)     The consolidated financial statements (including all related notes and schedules) of Parent or Actavis, Inc., as applicable, included in the Parent [Actavis plc] SEC Documents when filed complied as to form in all material respects with the applicable accounting requirements and the published rules and regulations of the SEC with respect thereto in effect at the time of such filing and ***fairly present in all material***

*respects the consolidated financial position of Parent [Actavis plc] or Actavis, Inc., as applicable, and its consolidated Subsidiaries, as at the respective dates thereof*, and the consolidated results of their operations and their consolidated cash flows for the respective periods then ended (subject, in the case of the unaudited statements, to normal year-end audit adjustments and to any other adjustments described therein, including the notes thereto) in conformity with GAAP (except, in the case of the unaudited statements, to the extent permitted by the SEC) applied on a consistent basis during the periods involved (except as may be indicated therein or in the notes thereto).

*       *       *

Section 4.7    Compliance with Law; Permits.

(a)    *Parent [Actavis plc] and each of Parent's Subsidiaries are in compliance with and are not in default under or in violation of any Laws*, applicable to Parent, such Subsidiaries or any of their respective properties or assets, except where such non-compliance, default or violation would not reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect.

*       *       *

Section 4.12  Information Supplied.   *The information relating to Parent [Actavis plc] and its Subsidiaries to be contained in the Joint Proxy Statement/Prospectus and the Form S-4 will not*, on the date the Joint Proxy Statement/Prospectus (and any amendment or supplement thereto) is first mailed to shareholders of Parent or at the time the Form S-4 (and any amendment or supplement thereto) is filed and the date it is declared effective or any post-effective amendment thereto is filed or is declared effective, or at the time of the Company Special Meeting or the Parent Special Meeting, *contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, at the time and in the light of the circumstances under which they were made, not misleading*. The Joint Proxy Statement/Prospectus (other than the portions thereof relating solely to the meeting of the stockholders of the Company) and the Form S-4 will comply as to form in all material respects with the provisions of the Exchange Act, the

rules and regulations promulgated thereunder and any other applicable federal securities laws.

\*       \*       \*

Section 4.13   Regulatory Matters.

\*       \*       \*

(b)     Except as would not, individually or in the aggregate, reasonably be expected to have a Parent Material Adverse Effect, ***the businesses of each of Parent [Actavis plc] and each Parent Subsidiary are being conducted in compliance with all applicable Laws***. . . .

(c)     Except as would not, individually or in the aggregate, reasonably be expected to have a Parent Material Adverse Effect, Parent and the Parent Subsidiaries have not engaged in activities which are, as applicable, cause for false claims liability, civil penalties or mandatory or permissive exclusion from Medicare, Medicaid or any other government healthcare program.

\*       \*       \*

"Parent Material Adverse Effect" means any Effect that, individually or in the aggregate, has a material adverse effect on the assets, liabilities, condition (financial or otherwise), business or results of operations of Parent and the Parent Subsidiaries, taken as a whole.

387.   In addition to misrepresentations concerning compliance with laws and regulations, the Merger Offering Materials also reported the Company's net revenue increase for the fiscal year 2013 and year-to-date 2014 and failed to disclosed that the revenues were inflated in part as a result of illegal price-fixing and artificially inflated generic drug prices: Actavis' net revenues for the years ended December 31, 2013 vs. December 31, 2012 were $8,677.6 million and $5,914.9 million, respectively.   Net revenues for the nine months ended

September 30, 2014 vs. September 30, 2013 were $9,005.4 million and $5,898.3 million, respectively.

388.   The Form S-4 registration statement and the joint proxy statement/prospectus that formed part of the registration statement filed on December 23, 2014 and the Amendment No. 1 filed on January 26, 2015 were signed by defendants Bailey, Bisaro, Saunders, Hilado, D'Arecca, Basgoz, Bloem, Bodine, Coughlin, Howson, King, Klema, Michal, O'Sullivan, Taylor, Turner and Weiss.

## 2.   The Form 8-K Superseding Portions of the 2013 Form 10-K

389.   On December 5, 2014, Allergan filed a Form 8-K superseding portions of the 2013 Form 10-K, which was incorporated by reference into the Merger Offering Materials and signed by defendant Joyce.  Despite the fact that the market for the Company's generic drugs was collusive and lacked true competition, the Form 8-K contained untrue statements of material fact and omitted material facts required to be stated therein or necessary to make the statements therein not misleading, concerning: (i) competition in the generic drug marketplace, including that the marketplace for generic drugs was highly competitive; (ii) price reductions due to competitor actions and entry; (iii) pricing pressures due to industry consolidation and third-party payers' price challenges; and (iv) competition with

Teva, Mylan, Sandoz, Inc., and others, which were characterized as "major competitors":

> Our North American Generics and International business is focused on maintaining a leading position within both the North America, and in particular, the U.S. market and our key international markets and strengthening our global position **by offering a consistent and reliable supply of quality brand and generic products.**
>
> **Our strategy in the U.S. is to develop pharmaceuticals that are difficult to formulate or manufacture or will complement or broaden our existing product lines.**
>
> \*     \*     \*
>
> **[A] small number of large, wholesale distributors and large chain drug stores control a significant share of the market. This concentration may adversely impact pricing and create other competitive pressures on drug manufacturers.**
>
> \*     \*     \*

**Competition**

> **The pharmaceutical industry is highly competitive. In our North American Brands and North American Generics and International businesses, we compete with different companies depending upon product categories, and within each product category, upon dosage strengths and drug delivery systems.** Such competitors include the major brand name and generic manufacturers of pharmaceutical products. In addition to product development, **other competitive factors in the pharmaceutical industry include product quality and price**, reputation and service and access to proprietary and technical information. . . .
>
> **We actively compete in the generic pharmaceutical industry. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors. . . . As competing off-patent manufacturers receive regulatory approvals on similar products, market share, revenues and gross profit typically decline, in some**

*cases dramatically*.  ***Accordingly, the level of market share, revenues and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market pricing*** and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches.  Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross profit.  ***In addition to competition from other generic drug manufacturers, we face competition from brand name companies in the generic market.***  Many of these companies seek to participate in sales of generic products by, among other things, collaborating with other generic pharmaceutical companies or by marketing their own generic equivalent to their brand products as Authorized Generics.  ***Our major competitors include Teva Pharmaceutical Industries, Ltd., Mylan Inc. and Sandoz, Inc.***

\*       \*       \*

Our operating results and financial condition may fluctuate from quarter to quarter and year to year for a number of reasons.  ***The following events or occurrences, among others, could cause fluctuations in our financial performance from period to period***:

\*       \*       \*

- ***our responses to price competition***

\*       \*       \*

***We face strong competition in our all of our businesses***. . . . Most of our competitors have been in business for a longer period of time than us, have a greater number of products on the market and have greater financial and other resources than we do.  ***Furthermore, recent trends in this industry are toward further market consolidation of large drug companies into a smaller number of very large entities, further concentrating financial, technical and market strength and increasing competitive pressure in the industry***. . . .

Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors. . . .  As competing manufacturers

receive regulatory approvals on similar products or as brand manufacturers launch generic versions of such products (for which no separate regulatory approval is required), market share, revenues and gross profit typically decline, in some cases dramatically. ***Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market*** and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. . . . ***Additionally, as new competitors enter the market, there may be increased pricing pressure on certain products, which would result in lower gross margins***. . . .

 . . . ***Increased competition in the generic industry as a whole may result in increased price erosion in the pursuit of market share.***

*  *  *

 Our principal customers in our brand and generic pharmaceutical operations are wholesale drug distributors and major retail drug store chains. . . . ***We expect that consolidation of drug wholesalers and retailers will increase pricing and other competitive pressures on drug manufacturers, including the Company***.

 390. In addition to the above misrepresentations, the Form 8-K also reported the Company's net revenue increase for the fiscal year 2013 relating to the North American Generics business and failed to disclosed that the revenues were inflated in part as a result of illegal price-fixing and artificially-inflated generic drug prices:

*Net Revenues*

The following table presents net revenues for the reporting units in the North American Generics and International segment for the years ended December 31, 2013 and 2012 (in millions):

|  | Years Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
|  | 2013 | 2012 | Dollars | % |
| **North American Generics** | 3,915.7 | 3,472.2 | 443.5 | 12.8% |

*  *  *

The increase in net revenues is primarily due to the full year North American Generic and International net sales resulting from the Actavis Group Acquisition of $2,799.5 million in the year ended December 31, 2013 versus $428.3 million in the year ended December 31, 2012 as well as the Warner Chilcott Acquisition, which contributed three months of sales in 2013 compared to no sales in the prior period ($64.7 million). Also contributing to the movement are higher U.S. unit sales related to new products including lidocaine topical patch 5% ($392.9 million) and mixed amphetamine (Adderall XR ® CII) ($145.2 million).

### 3.    The 2014 Form 10-K

391. On February 18, 2015, Allergan filed the 2014 Form 10-K, incorporated by reference into the Offering Materials. Despite the fact that the market for the Company's generic drugs was collusive and lacked true competition, the 2014 Form 10-K contained untrue statements of material fact and omitted material facts required to be stated therein or necessary to make the statements therein not misleading, concerning: (i) competition in the generic drug marketplace, including that the marketplace for generic drugs was highly competitive; (ii) price reductions due to competitor actions and entry; (iii) pricing pressures due to industry consolidation and third-party payers' price challenges; and (iv) competition with Teva, Mylan, Sandoz, Inc., and others, which were characterized as "major competitors":

Our North American Generics and International business is focused on maintaining a leading position within both the North American, and in particular, the U.S. market and our key international markets and strengthening our global position *by offering a consistent and reliable supply of quality brand and generic products*.

*Our strategy in the U.S. is to develop pharmaceuticals that are difficult to formulate or manufacture or will complement or broaden our existing product lines.*

\*     \*     \*

Our significant customers comprise a large part of the distribution network for pharmaceutical products in North America. As a result, a small number of large, wholesale distributors and large drug store chains control a significant share of the market.  Changes in the mix of concentration amongst the Company's largest customers over the last three years are due, in part, to the impact of acquisitions as well as changes in the supply chain of our indirect customers. ***This concentration may adversely impact pricing and create other competitive pressures on drug manufacturers.***

\*     \*     \*

## Competition

***The pharmaceutical industry is highly competitive. In our North American Brands and North American Generics and International businesses, we compete with different companies depending upon product categories, and within each product category, upon dosage strengths and drug delivery systems.***  Such competitors include the major brand name and generic manufacturers of pharmaceutical products. In addition to product development, ***other competitive factors in the pharmaceutical industry include product quality, price, reputation, service and access to proprietary and technical information***.

\*     \*     \*

***We actively compete in the generic pharmaceutical industry. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors*** . . . . ***As competing off-patent manufacturers receive regulatory approvals on similar products, market share, revenues and gross profit typically decline, in some cases dramatically.  Accordingly, the level of market share, revenues and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market,***

*pricing* and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross profit. *In addition to competition from other generic drug manufacturers, we face competition from brand name companies in the generic market.* Many of these companies seek to participate in sales of generic products by, among other things, collaborating with other generic pharmaceutical companies or by marketing their own generic equivalent to their brand products as "Authorized Generics". *Our major competitors include Teva Pharmaceutical Industries, Ltd., Mylan Inc. and Sandoz, Inc. (a division of Novartis AG).*

\*     \*     \*

*We face strong competition in all of our businesses*. . . . Most of our competitors have been in business for a longer period of time than us, have a greater number of products on the market and have greater financial and other resources than we do. *Furthermore, recent trends in this industry are toward further market consolidation of large drug companies into a smaller number of very large entities, further concentrating financial, technical and market strength and increasing competitive pressure in the industry*.

\*     \*     \*

Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors. . . . As competing manufacturers receive regulatory approvals on similar products or as brand manufacturers launch generic versions of such products (for which no separate regulatory approval is required), market share, revenues and gross profit typically decline, in some cases dramatically. *Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market* and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. . . . *Additionally, as new competitors enter the market, there may be increased pricing pressure on certain products, which would result in lower gross margins*. . . .

*. . . Increased competition in the generic industry as a whole may result in increased price erosion in the pursuit of market share.*

\*        \*        \*

Our principal customers in our brand and generic pharmaceutical operations are wholesale drug distributors and major retail drug store chains. . . .  *We expect that consolidation of drug wholesalers and retailers will increase pricing and other competitive pressures on drug manufacturers, including the Company.*

392.   In addition to the above misrepresentations, the 2014 Form 10-K also reported the Company's net revenue increase for fiscal years 2013 and 2014 relating to the North American Generics business and failed to disclosed that the revenues were inflated in part as a result of illegal price-fixing and artificially inflated generic drug prices:

Net revenues in our North American Generics and International segment consisted of the following ($ in millions):

| | Years Ended December 31, | | Change | |
|---|---|---|---|---|
| | 2014 | 2013 | Dollars | % |
| North American Generics | $   4,173.6 | $   3,915.7 | $   257.9 | 6.6% |

\*        \*        \*

An increase in competition can decrease both volume and the price received for each product.  The increase in North American Generics revenues was primarily the result of changes in product mix including new product launches and competition on existing products.

\*        \*        \*

*Net Revenues*

The following table presents net revenues for the reporting units in the North American Generics and International segment for the years ended December 31, 2013 and 2012 ($ in millions):

| | Years Ended December 31, | | Change | |
|---|---|---|---|---|
| | 2013 | 2012 | Dollars | % |
| North American Generics | $ 3,915.7 | $ 3,472.2 | $   443.5 | 12.8% |

\*        \*        \*

The increase in net revenues is primarily due to the full year net sales from the Actavis Group Acquisition of $2,799.5 million in the year ended December 31, 2013 versus $428.3 million in the year ended December 31, 2012 as well as the Warner Chilcott Acquisition, which contributed three months of sales in 2013 compared to no sales in the prior period ($64.7 million). Also contributing to the movement are higher U.S. unit sales related to new products including lidocaine topical patch 5% ($392.9 million) and mixed amphetamine (Adderall XR® CII) ($145.2 million).

393.   The 2014 Form 10-K contained signed certifications pursuant to SOX by defendants Saunders and Hilado, stating that the financial information contained in the 2014 Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.  The 2014 Form 10-K was also signed by defendants Bisaro, D'Arecca, Basgoz, Bloem, Bodine, Coughlin, Howson, King, Klema, Michal, O'Sullivan, Taylor, Turner and Weiss.

### 4.    The Form 8-K Underwriting Agreements

394.   Allergan's inflation of sales through illegal price-fixing constituted a violation of U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal authorities, along with the attendant negative financial and reputational harm, and its failure to make required disclosures regarding the impact of artificial price increases (tied to illegal price-fixing activity) on its reported revenue was in violation of SEC disclosure rules.  Nevertheless, on March 2, 2015, Allergan and defendants Bailey and Hilado represented falsely and/or misleadingly that the Company complied with laws and regulations in a

Form 8-K that attached the underwriting agreements relating to the Ordinary/ Preferred Shares Offerings:

The Company represents and warrants to each Underwriter that:

\*       \*       \*

(c)     *Issuer Free Writing Prospectus.* . . .  **Each such Issuer Free Writing Prospectus complied in all material respects with the Securities Act**, has been or will be (within the time period specified in Rule 433) filed in accordance with the Securities Act (to the extent required thereby) and, when taken together with the Preliminary Prospectus filed prior to the first use of such Issuer Free Writing Prospectus, did not, and as of the Closing Date and as of the Additional Closing Date, as the case may be, **will not, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading**. . . .

(d)     *Registration Statement and Prospectus* . . . **as of the applicable effective date of the Registration Statement and any post-effective amendment thereto, the Registration Statement and any such post-effective amendment complied and will comply in all material respects with the Securities Act, and did not and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein not misleading; and as of the date of the Prospectus and any amendment or supplement thereto and as of the Closing Date and as of the Additional Closing Date, as the case may be, the Prospectus will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading**. . . .

(e)     *Incorporated Documents.*  **The documents incorporated by reference in the Registration Statement, the Prospectus and the Pricing Disclosure Package**, including, to the knowledge of the Company, the documents filed with the Commission by Allergan, when they were filed with the Commission, conformed in all material respects to the requirements of the Exchange Act, and **none of such documents,**

*including, to the knowledge of the Company, the documents so filed by Allergan, contained any untrue statement of a material fact or omitted to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; and any further documents so filed by the Company or any of its subsidiaries and incorporated by reference in the Registration Statement, the Prospectus or the Pricing Disclosure Package, when such documents are filed with the Commission, will conform in all material respects to the requirements of the Exchange Act and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.*

(f)     *Financial Statements.*

(i)     *Preparation of the Financial Statements of the Company.* The financial statements (including the related notes thereto) of the Company and its consolidated subsidiaries included or incorporated by reference in the Registration Statement, the Pricing Disclosure Package and the Prospectus present fairly, in all material respects, the financial position of the Company and its consolidated subsidiaries as of and at the dates indicated and the results of their operations and the changes in their cash flows for the periods specified. *Such financial statements comply in all material respects as to form with the applicable requirements of the Securities Act and the Exchange Act, as applicable, and have been prepared in conformity with generally accepted accounting principles as applied in the United States ("GAAP")* applied on a consistent basis throughout the periods covered thereby, except as may be expressly stated in the related notes thereto, and any supporting schedules included or incorporated by reference in the Registration Statement present fairly, in all material respects, the information required to be stated therein. The selected financial data and the summary financial information of the Company and its consolidated subsidiaries included or incorporated by reference in the Registration Statement, the Pricing Disclosure Package and the Prospectus presents fairly, in all material respects, the information shown therein and has been compiled on a basis consistent with that of the Company's audited financial statements included or incorporated

by reference in the Registration Statement, the Pricing Disclosure Package and the Prospectus. . . .

(o)  *No Violation or Default.*  **None of the Company, any of the Significant Subsidiaries or, to the knowledge of the Company, any of the Acquired Companies is . . . (iii) in violation of any law or statute applicable to the Company, any of its subsidiaries or any of the Acquired Companies** or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority having jurisdiction over the Company, any of its subsidiaries or any of the Acquired Companies, except, in the case of clauses (ii) and (iii) above, for any such default or violation that would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

\*     \*     \*

As used herein, "Material Adverse Effect" means (A) when used in respect of any matter relating to the Company or any of its subsidiaries, any material adverse effect, or any development that would reasonably be expected to result in a material adverse effect, on the business, properties, management, financial position, stockholders' equity, results of operations or prospects of the Company and its subsidiaries taken as a whole, or on the performance by the Company of its obligations under the Transaction Documents and (B) when used in respect of any matter relating to any of the Acquired Companies, any material adverse effect, or any development that would reasonably be expected to result in a material adverse effect, on the business, properties, management, financial position, stockholders' equity, results of operations or prospects of the Combined Company, or on the performance by the Company of its obligations under the Transaction Documents.

395.  The March 2, 2015 Form 8-K was signed by Bailey and each of the underwriting agreements therein was signed by Hilado.

**D.     No Safe Harbor**

396.  Allergan's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Relevant Period were ineffective to shield those

- 192 -

statements from liability.   First, the statements complained of herein concerned present or historical facts or conditions that were existing or purported to exist at the time they were made.   Second, the statutory safe harbor does not apply to statements included in the financial statements that purport to have been prepared in accordance with Generally Accepted Accounting Principles.   Further, to the extent that any of the untrue of misleading statements alleged herein were identified as forward-looking, and can be construed as forward-looking, the statements were not accompanied by meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those statements, and the generalized disclosures made by defendants were not sufficient to shield them from liability.

## VI.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT V

**Violations of §11 of the Securities Act Against
All Securities Act Defendants**

397.   This Count is brought by Plaintiff pursuant to §11 of the Securities Act, 15 U.S.C. §77k.   Plaintiff purchased or otherwise acquired securities sold pursuant or traceable to the Registration Statements and was damaged thereby.

398.   Plaintiff repeats and realleges each and every allegation contained above in Sections I-III and V.

399.   This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiff does not allege that defendants acted with scienter or fraudulent intent, which are not elements of a §11 claim.

400.   Liability under this Count is predicated on the Officer Defendants' and the Director Defendants' signing of the Registration Statements and the filings incorporated by reference therein for the Offerings and all Securities Act Defendants' respective participation in the Offerings, which were conducted pursuant to the Offering Materials.   The Offering Materials were false and misleading, contained untrue statements of material fact, omitted to state facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

401.   Less than one year has elapsed since the time that Plaintiff discovered, or could reasonably have discovered, the facts upon which this complaint is based. Less than three years has elapsed since the time that the securities at issue in this complaint were bona fide offered to the public.

402.   By reason of the foregoing, the defendants named in this Count are each jointly and severally liable for violations of §11 of the Securities Act to Plaintiff pursuant to §11(e).

## COUNT VI

### Violation of §12(a)(2) of the Securities Act
### Against Allergan

403.   This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77(l)(a)(2).   Plaintiff purchased or otherwise acquired ordinary shares in the Offerings and was damaged thereby.

404.   Plaintiff repeats and realleges each and every allegation contained above in Sections I-III and V.

405.   This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiff does not allege that defendants acted with scienter or fraudulent intent, which are not elements of a §12(a)(2) claim.

406.   By means of the Offering Materials, Allergan sold the Offerings to Plaintiff.   Allergan was a statutory seller of securities offered and sold pursuant to the Offering Materials and solicited sales thereof for financial gain, as it benefitted financially from the sale of the securities.

407.   The Offering Materials contained untrue statements of material fact and failed to disclose material facts.   Allergan owed Plaintiff, which acquired the ordinary shares pursuant to the Offering Materials, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials to

ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Allergan, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Offering Materials, as set forth above.

408.   Plaintiff did not know, nor in the exercise of reasonable diligence could it have known, of the untruths and omissions contained in the Offering Materials at the time it acquired the ordinary shares.

409.   By reason of the conduct alleged herein, Allergan violated §12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiff, which acquired the ordinary shares pursuant to the Offering Materials, sustained substantial damages in connection with its acquisition of the securities. Accordingly, for the securities held by Plaintiff and issued pursuant to the Offering Materials, Plaintiff has the right to rescind and recover the consideration paid for its shares, with interest thereon, and hereby tenders its securities to Allergan.  For securities sold, Plaintiff seeks damages to the extent permitted by law.

## COUNT VII

### Violations of §15 of the Securities Act Against
### Allergan, the Officer Defendants and the Director Defendants

410.   This Count is asserted against Allergan, the Officer Defendants and the Director Defendants for violations of §15 of the Securities Act, 15 U.S.C. §77o.

Plaintiff purchased or otherwise acquired securities sold pursuant and traceable to the Offerings.

411.   Plaintiff repeats and realleges each and every allegation contained above in Sections I-III and V.

412.   This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiff does not allege that defendants acted with scienter or fraudulent intent, which are not elements of a §15 claim

413.   At times relevant hereto, the Officer Defendants and the Director Defendants were controlling persons of Allergan within the meaning of §15 of the Securities Act.

414.   The Officer Defendants and the Director Defendants at times relevant hereto participated in the operation and management of Allergan, and conducted and participated, directly and indirectly, in the conduct of Allergan's business affairs.

415.   The Officer Defendants and Director Defendants, as officers and directors of a publicly owned company, had a duty to disseminate accurate and truthful information with respect to Allergan's financial condition and results of operations.   Because of their positions of control and authority as officers or

directors of Allergan, the Officer Defendants and Director Defendants were able to, and did, control the contents of the Offering Materials, which contained materially untrue information.

416.   Allergan controlled the Officer Defendants and Director Defendants and all of its other employees.

417.   By reason of the foregoing, Allergan, the Officer Defendants and the Director Defendants are liable under §15 of the Securities Act, to the same extent that they are liable under §§11 and 12(a)(2) of the Securities Act, to Plaintiff, which acquired securities pursuant and/or traceable to the Offerings pursuant to the Registration Statements and/or the applicable Offering Materials.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for judgment as follows:

A.   Declaring and determining that defendants violated the Exchange Act and Securities Act by reason of the acts and omissions alleged herein;

B.   Awarding Plaintiff compensatory damages against all defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

C.   Awarding Plaintiff reasonable costs and expenses incurred in this action, including but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses;

D.     Awarding rescission or a rescissory measure of damages; and

E.     Granting such other and further relief as the Court deems just and
proper.

## VIII.  JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  November 3, 2017            SEEGER WEISS LLP
                                    CHRISTOPHER A. SEEGER
                                    DAVID R. BUCHANAN


                                     s/  Christopher A. Seeger
                                    _____
                                        CHRISTOPHER A. SEEGER

                                    550 Broad Street, Suite 920
                                    Newark, NJ  07102
                                    Telephone:  973/639-9100
                                    973/639-9393 (fax)

                                    SEEGER WEISS LLP
                                    JENNIFER R. SCULLION
                                    CHRISTOPHER AYERS
                                    77 Water Street, 26th Floor
                                    New York, NY  10005
                                    Telephone:  212/584-0700
                                    212/584-0799 (fax)

ROBBINS GELLER RUDMAN
 & DOWD LLP
DARREN J. ROBBINS
LUKE O. BROOKS
RYAN A. LLORENS
ERIC I. NIEHAUS
ANGEL P. LAU
JEFFREY J. STEIN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

I:\Admin\CptDraft\Securities\CPT Allergan TIAA.docx