SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
DAVID R. BUCHANAN
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  973/639-9100
713/639-9393 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
LUKE O. BROOKS
RYAN A. LLORENS
ERIC I. NIEHAUS
ANGEL P. LAU
JEFFREY J. STEIN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiffs

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TIAA-CREF LARGE-CAP GROWTH FUND, TIAA-CREF LARGE-CAP VALUE FUND, TIAA-CREF EQUITY INDEX FUND, TIAA-CREF LARGE-CAP VALUE INDEX FUND, TIAA-CREF GROWTH & INCOME FUND, TIAA-CREF S&P 500 INDEX FUND, TIAA-CREF LARGE-CAP GROWTH | No. 2:17-cv-11089-KSH-CLW <br><br> AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br><br> DEMAND FOR JURY TRIAL |

[Caption continued on following page.]

INDEX FUND, TIAA-CREF                )
ENHANCED LARGE-CAP VALUE       )
INDEX FUND, TIAA-CREF                )
ENHANCED LARGE-CAP GROWTH   )
INDEX FUND, TIAA-CREF LIFE        )
GROWTH EQUITY FUND, TIAA-        )
CREF LIFE STOCK INDEX FUND,      )
TIAA-CREF LIFE GROWTH &           )
INCOME FUND, TIAA-CREF LIFE      )
LARGE-CAP VALUE FUND, TIAA-     )
CREF SEPARATE ACCOUNT VA-1,    )
COLLEGE RETIREMENT EQUITIES    )
FUND, TIAA-CREF INVESTMENT       )
MANAGEMENT, LLC and                )
TEACHERS ADVISORS, LLC,            )
                                                              )
                                     Plaintiffs,          )
                                                              )
            vs.                                              )
                                                              )
ALLERGAN PLC, PAUL M. BISARO,   )
BRENTON L. SAUNDERS, R. TODD    )
JOYCE, MARIA TERESA HILADO,     )
SIGURDUR O. OLAFSSON, DAVID A.)
BUCHEN, A. ROBERT D. BAILEY,     )
JAMES H. BLOEM, CHRISTOPHER    )
W. BODINE, TAMAR D. HOWSON,     )
JOHN A. KING, CATHERINE M.        )
KLEMA, JIRI MICHAL, JACK           )
MICHELSON, PATRICK J.               )
O'SULLIVAN, RONALD R. TAYLOR, )
ANDREW L. TURNER, FRED G.         )
WEISS, NESLI BASGOZ,                  )
CHRISTOPHER J. COUGHLIN and    )
JAMES D'ARECCA,                        )
                                                              )
                                     Defendants.        )
_____ )

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................2

II.     JURISDICTION AND VENUE ...........................................24

III.    EXCHANGE ACT ALLEGATIONS ...................................25

    A.    Plaintiff ....................................................................25

    B.    Defendants ...............................................................26

        1.    Allergan plc ...................................................26

        2.    The Individual Defendants .............................28

        3.    The Director Defendants .................................31

    C.    The Co-Conspirators ...............................................32

    D.    Factual Allegations .................................................33

        1.    A Brief Overview of the Generic Pharmaceutical Market .......33

        2.    The Distribution and Manufacture of Generic Drugs ..............39

        3.    The Markets for Allergan's Generic Drugs Were Susceptible to Price Fixing .......................40

            a.    High Level of Market Concentration .............................41

            b.    Significant Barriers to Entry ...........................................42

            c.    Lack of Available Substitutes ........................................43

            d.    Commodity-Like Product ...............................................44

            e.    Inelastic Demand ...........................................................44

            f.    Absence of Competitive Sellers .....................................45

**Page**

g.    Inter-Competitor Contacts and Communications at Trade Association Events ...............................................45

    (1)    The Generic Pharmaceutical Association ...........48

    (2)    The Healthcare Distribution Alliance .................51

    (3)    The National Association of Chain Drug Stores .................................................................53

h.    Inter-Competitor Communications Via Phone Calls and Text Messages ................................................57

4.    Propranolol ...................................................................................61

    a.    The Co-Conspirators' Price Hikes ..................................61

    b.    No Commercial Justification for Price Hikes.................64

    c.    The Market for Generic Propranolol HCL Was Susceptible to Anticompetitive Conduct ......................65

    (1)    Market Concentration ...........................................65

    (2)    Significant Barriers to Entry ................................66

    (3)    Lack of Available Substitutes ..............................66

    (4)    Commodity-Like Product......................................67

    (5)    Inelastic Demand..................................................67

    (6)    Absence of Competitive Sellers ...........................67

    d.    Collusive Revenue ..........................................................68

5.    Ursodiol ........................................................................................69

Page

a. The Co-Conspirators' Price Hikes..................................70

b. No Commercial Justification for Price Hikes................71

c. The Market for Generic Ursodiol Capsules Was
Susceptible to Anticompetitive Conduct.......................72

(1) Market Concentration..........................................72

(2) Significant Barriers to Entry ................................73

(3) Lack of Available Substitutes .............................73

(4) Commodity-Like Product....................................73

(5) Inelastic Demand...................................................74

(6) Absence of Competitive Sellers ..........................74

d. Collusive Revenue ........................................................75

6. Doxycycline ................................................................................75

a. The Co-Conspirators' Price Hikes..................................76

b. No Commercial Justification for Price Hikes................77

c. The Market for Generic Doxycycline Was
Susceptible to Anticompetitive Conduct.......................78

(1) High Level of Market Concentration ..................78

(2) Significant Barriers to Entry ................................78

(3) Lack of Available Substitutes .............................79

(4) Commodity-Like Product....................................79

**Page**

(5)    Inelastic Demand .................................................. 79

(6)    Absence of Competitive Sellers ........................... 80

d.    Collusive Revenue ......................................................... 81

7.    Desonide ................................................................................ 81

a.    The Co-Conspirators' Price Hikes .................................. 82

b.    No Commercial Justification for Price Hikes ................ 83

c.    The Market for Generic Desonide Was Susceptible to Anticompetitive Conduct .......................................... 84

(1)    High Level of Market Concentration ................... 84

(2)    Significant Barriers to Entry ................................ 85

(3)    Lack of Available Substitutes ............................. 85

(4)    Commodity-Like Product ..................................... 85

(5)    Inelastic Demand .................................................. 85

(6)    Absence of Competitive Sellers ........................... 86

d.    Collusive Revenue ......................................................... 87

8.    Tretinoin ................................................................................ 87

a.    The Co-Conspirators' Price Hikes .................................. 87

b.    No Commercial Justification for Price Hikes ................ 88

c.    The Market for Generic Tretinoin External Cream Was Susceptible to Anticompetitive Conduct ............... 89

**Page**

(1) High Level of Market Concentration ..................89

(2) Significant Barriers to Entry ................................90

(3) Lack of  Available Substitutes ...........................90

(4) Commodity-Like Product....................................91

(5) Inelastic Demand.................................................91

(6) Absence of Competitive Sellers ...........................91

d. Collusive Revenue ........................................................92

9. Clobetasol Propionate Topical Cream ......................................93

a. The Co-Conspirators' Price Hikes.................................93

b. No Commercial Justification for Price Hikes................96

c. The Market for Clobetasol Topical Cream Was Susceptible to Anticompetitive Conduct......................97

(1) High Level of Market Concentration ..................97

(2) Significant Barriers to Entry ...............................97

(3) Lack of Available Substitutes ..............................97

(4) Commodity-Like Product....................................98

(5) Inelastic Demand.................................................98

(6) Absence of Competitive Sellers ...........................98

d. Collusive Revenue ........................................................99

10. Nystatin External Cream and Ointment.................................100

- v -

**Page**

a. The Co-Conspirators' Price Hikes.................................100

b. No Commercial Justification for Price Hikes..............103

c. The Markets for Nystatin Cream and Ointment Were Susceptible to Anticompetitive Conduct ...........104

    (1) High Level of Market Concentration ................104

    (2) Significant Barriers to Entry ..............................105

    (3) Lack of Available Substitutes ............................105

    (4) Commodity-Like Product...................................105

    (5) Inelastic Demand.................................................106

    (6) Absence of Competitive Sellers .........................106

d. Collusive Revenue.......................................................107

11. Additional Drugs from the Amended AG Complaint............108

a. Glyburide-Metformin ..................................................108

b. Verapamil ....................................................................109

12. Additional Collusive Price-Hike Drugs from the May 2019 AG Complaint.........................................................110

a. Ciprofloxacin HCL ......................................................111

b. Labetalol HCL Tablets ................................................116

c. Fluocinonide 0.5% Cream ...........................................121

d. Griseofulvin Microsize Oral Suspension.....................129

**Page**

    e.  Estradiol ..................................................................134

    f.  Clarithromycin ER, Estazolam, Tamoxifen Citrate, and Hydroxyzine Pamoate ............................................139

    g.  Desmopressin Acetate Tablets, Disopyramide Phosphate Capsules, Flutamide Capsules, and Topiramate Sprinkle Capsules .....................................152

   13.  Additional Market Allocation Drugs from the May 2019 AG Complaint .........................................................161

    a.  Amphetamine/Dextroamphetamine Extended Release ...................................................................162

    b.  Budesonide Inhalation ................................167

    c.  Drospirenone and Ethinyl Estradiol ............................172

    d.  Nortriptyline Hydrochloride ........................................177

    e.  Amphetamine/Dextroamphetamine Immediate Release ...................................................................183

    f.  Clonidine-TTS Patch ....................................................187

    g.  Dextroamphetamine Sulfate Extended Release ...........192

    h.  Raloxifene HCL Tablets ...............................................195

    i.  Celecoxib ......................................................................200

   14.  Government Investigations into Allergan's Anticompetitive Conduct ........................................................204

 E.  Misleading Statements and Omissions..............................................211

**Page**

|  | 1. | Statements Regarding the Competitive Nature of the Generic Drug Market and Source of Revenues | 211 |

|  | 2. | Statements Regarding Compliance with Laws and Regulations | 226 |

|  | 3. | Financial Statements | 233 |

|  | 4. | False Certifications | 237 |

|  | 5. | Code of Conduct | 242 |

| F. | Loss Causation | | 243 |
| G. | Summary of Scienter Allegations | | 247 |
| H. | No Safe Harbor | | 262 |
| I. | Applicability of the Presumption of Reliance: Fraud on the Market | | 263 |

| IV. | CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT | | 264 |
|  | COUNT I | | 264 |
|  | COUNT II | | 266 |
|  | COUNT III | | 268 |
|  | COUNT IV | | 271 |

| V. | SECURITIES ACT ALLEGATIONS | | 274 |
| A. | Securities Act Parties | | 274 |
|  | 1. | Plaintiff | 274 |
|  | 2. | Securities Act Defendants | 275 |

**Page**

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  |  | a. | Officer Defendants | .......................... | 275 |
|  |  | b. | Director Defendants | ....................... | 277 |
|  | B. | Additional Background Allegations | .................................. | 280 |
|  | C. | Actionable False and Misleading Statements in the Offering Materials | ....................... | 282 |
|  |  | 1. | The Form S-4 Registration Statements and Joint Proxy Statement/Prospectus | .......................... | 283 |
|  |  | 2. | The Form 8-K Superseding Portions of the 2013 Form 10-K | ......................... | 287 |
|  |  | 3. | The 2014 Form 10-K | ....................... | 290 |
|  |  | 4. | The Form 8-K Underwriting Agreements | .......................... | 294 |
|  | D. | No Safe Harbor | ............................ | 297 |
| VI. | CLAIMS FOR RELIEF UNDER THE SECURITIES ACT | .................... | 298 |
|  | COUNT V | .................................. | 298 |
|  | COUNT VI | .................................. | 299 |
|  | COUNT VII | .................................. | 301 |
| VII. | PRAYER FOR RELIEF | ............................. | 303 |
| VIII. | JURY TRIAL DEMANDED | .......................... | 303 |

TIAA-CREF Large-Cap Growth Fund, TIAA-CREF Large-Cap Value Fund, TIAA-CREF Equity Index Fund, TIAA-CREF Large-Cap Value Index Fund, TIAA-CREF Growth & Income Fund, TIAA-CREF S&P 500 Index Fund, TIAA-CREF Large-Cap Growth Index Fund, TIAA-CREF Enhanced Large-Cap Value Index Fund, TIAA-CREF Enhanced Large-Cap Growth Index Fund,  TIAA-CREF Life Growth Equity Fund, TIAA-CREF Life Stock Index Fund, TIAA-CREF Life Growth & Income Fund, TIAA-CREF Life Large-Cap Value Fund, TIAA-CREF Separate Account VA-1, College Retirement Equities Fund, TIAA-CREF Investment Management, LLC and Teachers Advisors, LLC (collectively, "Plaintiff") by the undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and on information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of defendants' public documents, conference calls and announcements made by defendants, U.S. Securities and Exchange Commission ("SEC") filings made by Allergan and Actavis,[1] wire and press releases published by and regarding analysts' reports and advisories about Allergan, information obtainable on the Internet, court filings, drug pricing and market share information from proprietary databases, and consultation with industry experts.

---

[1]   Before June 15, 2015, Allergan plc was known as Actavis plc.  Allergan plc and Actavis plc are collectively referred to herein as "Allergan" or the "Company."

- 1 -

Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   INTRODUCTION

1.      Plaintiff brings this federal securities action under the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the "Securities Act") against Allergan and certain of its former and current officers and directors to recover damages for losses Plaintiff has suffered in connection with its acquisition of Allergan securities between October 29, 2013 and November 3, 2016, both dates inclusive (the "Relevant Period").   Plaintiff purchased or otherwise acquired Allergan securities at artificially inflated prices during the Relevant Period and suffered damages as a result of the violations of the securities laws alleged herein. In particular, Plaintiff seeks to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under §§11, 12(a)(2) and 15 of the Securities Act, §§10(b), 14(a), and 20(a) of the Exchange Act and SEC Rules 10b-5 and 14a-9 of the Exchange Act.

2.      Plaintiff's Securities Act claims seek to recover damages arising from its purchase and/or acquisition of securities in or traceable to the Company's public offering of (i) approximately 111.2 million Actavis plc ordinary shares (the "Ordinary Shares Offering") in partial exchange for the outstanding shares of Allergan Inc. common stock in the March 17, 2015 merger, and (ii) 14,513,889 Actavis plc ordinary

- 2 -

shares and 5,060,000 5.500% mandatory convertible preferred shares (the "Ordinary/ Preferred Shares Offerings") to finance the acquisition of Allergan Inc. (together, the Ordinary Shares Offering and the Ordinary/Preferred Shares Offerings are referred to herein as the "Offerings").

3.    Allergan is a specialty pharmaceutical company that develops, manufactures, markets and distributes medical aesthetics, biosimilar and over-the-counter pharmaceutical products worldwide.  Allergan has operations in more than 100 countries.  Founded in 1983, the Company was formerly known as Actavis plc. In November 2014, Actavis plc announced its intention to acquire Allergan Inc.  On March 17, 2015, Actavis plc completed its acquisition of Allergan Inc., changing its name to Allergan plc on June 15, 2015.  Allergan is headquartered in Dublin, Ireland, and its administrative headquarters are located in Parsippany, New Jersey.  The Company's common stock has traded on the New York Stock Exchange ("NYSE") under the ticker symbol "AGN" since June 15, 2015 and its preferred stock trades on the NYSE under the ticker symbol "AGN.PA."  Before June 15, 2015, the common stock of Actavis plc traded on the NYSE under the ticker symbol "ACT."

4.    On July 26, 2015, Allergan entered into a Master Purchase Agreement, under which Teva Pharmaceutical Industries Ltd. ("Teva") agreed to acquire the Company's global generic pharmaceuticals business unit.  On August 2, 2016, the companies announced the completion of the acquisition.

5.     This action arises out of Allergan's participation in a generic drug price-fixing conspiracy that is the focus of investigations by Congress, the U.S. Department of Justice's Antitrust Division ("DOJ"), and 45 state Attorneys General.  Beginning in 2012, Allergan entered into anticompetitive agreements with its competitors in the generic drug market.  In particular, Allergan entered into agreements to fix the prices of or allocate the market for at least 32 generic drugs: (1) Propranolol, (2) Ursodiol, (3) Doxycycline, (4) Desonide, (5) Tretinoin, (6) Glyburide-Metformin, (7) Verapamil, (8) Ciprofloxacin HCL, (9) Labetalol HCL, (10) Fluocinonide 0.5% Cream, (11) Griseofulvin, (12) Clarithromycin ER, (13) Estazolam, (14) Tamoxifen Citrate, (15) Hydroxyzine Pamoate, (16) Desmopressin Acetate, (17) Disopyramide Phosphate, (18) Flutamide, (19) Topiramate Sprinkle, (20) Amphetamine/ Dextroamphetamine ER, (21) Budesonide Inhalation, (22) Drospirenone and Ethinyl Estradiol, (23) Amphetamine/Dextroamphetamine IR, (24) Clonidine-TTS Patch, (25) Dextroamphetamine Sulfate ER, (26) Raloxifene HCL, (27) Celecoxib, (28) Clobetasol, (29) Nystatin Cream, (30) Nystatin Ointment, (31) Estradiol, and (32) Nortriptyline HCL.  Five of the thirty-two drugs – Desonide, Doxycycline, Ursodiol, Amphetamine/Dextroamphetamine ER, and Celecoxib – were "key products which comprised a majority of product sales for North American Generic" for the year-ended December 31, 2014, according to the 2014 Form 10-K.

6.    Substantial facts support the allegations that Allergan colluded to fix the prices and allocate markets of these drugs.  The drugs' prices moved in near-perfect unison, and increased suddenly and simultaneously at each drug company.  The price increases were exponential.  There is a clear pattern of an industry conference attendance by Allergan and its competitors, followed by an abrupt and unprecedented spike in Allergan's prices, closely timed with spikes in Allergan's competitors' prices.

7.    There is no non-collusive explanation for these sudden, synchronized price increases – there was no supply shortage, production problem, or sudden increase in demand for these drugs during this period.  The price hikes were not precipitated by competitors leaving the market.  Moreover, the markets for these drugs are highly susceptible to collusion – they are dominated by only a few companies and this market concentration lends itself to collusion.  The market for these drugs featured several other characteristics that facilitated collusion: demand for the drugs was inelastic, with increases or miniscule reductions in the quantities sold even after massive and sudden price hikes; the drugs were commodity-like products – generic drugs whose only distinguishing factor for purchasers was price; the drugs lacked a viable substitute; they had high barriers to entry; and information sharing and price discovery were common.  Finally, the drug prices did not decrease following the initial price increases as one would expect if the sudden price increases reflected temporary supply shortages, cost increases or other benign market explanations.

8.      Allergan's extraordinary and historic price increases for these generic drugs would have been against Allergan's economic self-interest absent the existence of a price-fixing scheme.  Generic drugs are commodity products.  Absent price collusion, if one manufacturer raises the price of a given drug, its competitors will seek to increase their own market share by selling the drug to the first manufacturer's customers at lower prices.  Indeed, under the "maximum allowable cost" ("MAC") pricing regime that governs much of the U.S. generic pharmaceutical market, drug cost reimbursements from insurance companies are capped at a certain price, and if a drug manufacturer raises its prices above this cap while its competitors do not, the reimbursements for the higher priced drug will cease.  Thus, it would not be in any drug manufacturer's interest to increase the prices of its generic drugs unless it had an agreement with the other manufacturers that they would do the same.

9.      The suspicious price increases by Allergan and other drug manufacturers have spawned investigations by Congress, the DOJ, and at least 45 state Attorneys General.  These investigations have begun to reveal a broad, well-coordinated and long-running series of schemes to fix prices or allocate markets for a number of generic drugs.  They have also revealed that collusion on generic drug prices was centered around meetings of trade associations, such as the Generic Pharmaceutical Association ("GPhA"), and other industry gatherings attended by senior Allergan officials, including some of the Individual Defendants (as defined below).

- 6 -

10.     As discussed below, Allergan's former Associate Director of Finance confirmed that Allergan officials who attended the industry conferences preceding these historic and stratospheric price increases were responsible for generic drug pricing at the Company during the Relevant Period.

11.     The government investigations trace back to late 2013, when a survey of over 1,000 pharmacists conducted by the National Community Pharmacist Association ("NCPA") revealed that prices of various generic drugs had skyrocketed. Many of these drugs were essential to senior citizens, and the dramatic price increases forced many elderly people to either pay significantly higher out-of-pocket costs due to Medicare's coverage gap or forsake their medications altogether.  In light of these concerns, the Chief Executive Officer ("CEO") of the NCPA wrote a letter to Congress on January 8, 2014 requesting an oversight hearing to determine the causes of the price jumps.

12.     In July 2014, the State of Connecticut began issuing subpoenas to drug manufacturers requesting documents relating to anticompetitive generic drug pricing. In October 2014, Senator Bernie Sanders and Representative Elijah E. Cummings sent letters to 14 generic drug manufacturers demanding information relating to ten drugs that had experienced average price increases ranging from 388% to 8,281% between 2012 and 2014.

13.     In November 2014, the DOJ, as part of its ongoing investigation, convened a grand jury in the Eastern District of Pennsylvania.  On November 3, 2014, Lannett Co. Inc. ("Lannett") – one of the companies that hiked the prices of their generic drugs at or close to the same time that Allergan raised its prices – reported that its Senior Vice President of Sales and Marketing had received a subpoena from the DOJ in connection with the federal investigation of the generic pharmaceutical industry requesting information on Lannett's generic drug pricing and its communications with competitors.  On December 5, 2014, Lannett itself received a subpoena requesting similar information.  This grand jury has issued subpoenas and requests for information to at least ten other generic drug manufacturers as well, including Heritage Pharmaceuticals Inc. ("Heritage"), Impax Laboratories, Inc. ("Impax"), and Mylan Pharmaceuticals Inc. ("Mylan") – companies that also raised the prices of some of their generics at or close to the same time as Allergan's price increases.  On May 2, 2017, the FBI raided another co-conspirator Perrigo Company plc's ("Perrigo") offices as part of the criminal price-fixing probe.

14.     According to media reports in July 2015, citing a June 26, 2015 article by Policy and Regulatory Report ("PaRR"), the DOJ's investigation is wide-ranging: "A PaRR source says prosecutors see the case much like its antitrust probe of the auto parts industry, which has gone on for years and morphed into the department's largest

criminal antitrust probe ever.  Like in that case, prosecutors expect to 'move from one drug to another in a similar cascading fashion.'"

15.     On August 6, 2015, media outlets reported that Allergan disclosed in a filing with the SEC that it had received a subpoena from the DOJ in June 2015, stating that "Allergan Plc's Actavis unit got a subpoena from the U.S. Justice Department seeking information on the marketing and prices of its generic drugs, becoming the biggest company yet to draw scrutiny in the government's widening antitrust probe of the industry," and noting that Allergan joined other companies that "have made similar disclosures in the past several months."  On this news, Allergan's common share price fell $17.17 per share, or approximately 5%, from its previous closing price to close at $319.47 per share on August 6, 2015, and its preferred share price fell $39.24 per share, or approximately 3.5%, from its previous closing price to close at $1,084.00 per share on August 6, 2015.

16.     The fact that the DOJ sent a subpoena to Allergan after sending subpoenas to certain of its competitors strongly suggests that discovery from those other investigations led the DOJ to believe that Allergan was also participating in a price-fixing conspiracy.  Moreover, the DOJ has filed motions to intervene in at least six civil antitrust actions alleging price-fixing in violation of the Sherman Antitrust Act ("Sherman Act") against Allergan and/or the Actavis generic drug unit sold to Teva in August 2016, as well as other sellers of the generic drugs mentioned above.

In these cases, the plaintiffs have requested that the various generic drug-company defendants produce all documents produced to the DOJ in the criminal investigation. In one such motion to intervene, the DOJ explained that the "action presents a risk to the United States' interest in ensuring the integrity of its ongoing criminal investigation" because, among other reasons, "its ongoing criminal antitrust investigation shares common questions of law and fact with the civil claims" and because the plaintiffs have sought the same documents produced to the federal prosecutors.[2]  The civil antitrust cases are now consolidated into 18 multidistrict lawsuits, including the Attorneys General lawsuit, alleging civil antitrust claims (the "Generic Drugs MDL").  The DOJ moved to stay discovery in the Generic Drugs MDL, explaining that "[e]vidence uncovered during the criminal investigation implicates other companies and individuals (including a significant number of the Defendants [in the Generic Drugs MDL]) in collusion with respect to doxycycline hyclate, glyburide, and other drugs (including a significant number of the drugs at issue [in the Generic Drugs MDL])."[3]  The DOJ's intervention in these civil actions

---

[2]  *In re Propranolol Antitrust Litig.*, No. 1:16-cv-09901-JSR (S.D.N.Y. Jan. 30, 2017), ECF No. 72, at 5, 7.  The district court in this action denied the defendants' motion to dismiss the complaint on April 6, 2017.  *See In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712 (S.D.N.Y. 2017) (now consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litig. – Propranolol Cases*, No. 2:16-md-02724-CMR (E.D. Pa.)).

[3]  *In re Generic Pharm. Pricing Antitrust Litig.*, No. 2:16-md-02724-CMR (ED. Pa. May 1, 2017), ECF No. 279, at 1-2.

implicating Allergan's price-fixing activities gives rise to a strong and credible inference that the allegations of price-fixing are supported (at least in part) by documents and other information provided to the DOJ.

17.     On November 3, 2016, media outlets reported that U.S. prosecutors might file criminal charges against Allergan and several other pharmaceutical companies for unlawfully colluding to fix generic drug prices.  In an article titled "U.S. Charges in Generic-Drug Probe to Be Filed by Year-End," *Bloomberg* reported, in relevant part:

> U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion, a fresh challenge for an industry that's already reeling from public outrage over the spiraling costs of some medicines.
>
> The antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter.  The grand jury probe is examining whether some executives agreed with one another to raise prices, and the first charges could emerge by the end of the year, they said.
>
> Though individual companies have made various disclosures about the inquiry, they have identified only a handful of drugs under scrutiny, including a heart treatment and an antibiotic.  Among the drugmakers to have received subpoenas are industry giants Mylan NV and Teva Pharmaceutical Industries Ltd.  ***Other companies include Actavis, which Teva bought from Allergan plc in August***, Lannett Co., Impax Laboratories Inc., Covis Pharma Holdings Sarl, Sun Pharmaceutical Industries Ltd., Mayne Pharma Group Ltd., Endo International Plc's subsidiary Par Pharmaceutical Holdings and Taro Pharmaceutical Industries Ltd.

All of the companies have said they are cooperating except Covis, which said last year it was unable to assess the outcome of the investigation.[4]

18.     On this news, Allergan's common share price fell $9.07 per share, or 4.58%, to close at $188.82 per share on November 3, 2016, and its preferred share price fell $30.03 per share, or approximately 4%, to close at $708.45 per share on November 3, 2016.

19.     On December 12 and December 13, 2016, the DOJ filed the first criminal charges stemming from its ongoing investigation (the "Heritage Indictments"). *See United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016); *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 13, 2016). These cases allege that two former senior executives of generic drugmaker Heritage violated the Sherman Act by participating in conspiracies to fix prices, rig bids and allocate customers for, among other generic pharmaceuticals, doxycycline hyclate, which was one of the drugs sold by Allergan at historically high prices during the Relevant Period.

20.     According to Count One of the Heritage Indictments, "[t]he charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among the defendant and co-conspirators, the substantial terms of which were to allocate customers, rig bids, and fix and maintain prices for doxycycline hyclate sold in the United States." The Heritage Indictments allege that

---

[4]    Unless otherwise noted herein, all emphasis is added.

Glazer and Malek, along with co-conspirators, carried out the conspiracy by engaging in anticompetitive conduct, including the participation of subordinate employees in meetings, conversations and communications with co-conspirators to allocate customers, fix prices or rig bids for doxycycline hyclate sold in the United States.

21.     On January 9, 2017, Glazer and Malek pleaded guilty to conspiring to manipulate prices of doxycycline hyclate, as well as other generic drugs, between April 2013 and December 2015.  At the plea hearing, DOJ prosecutors stated that the conspiracy also involved rival companies.

22.     While federal and state investigations were still ongoing, the State of Connecticut and 19 other states filed an "initial civil action" in December 2016 against six generic drug manufacturers – including Teva Pharmaceuticals USA, Inc. ("Teva USA"), Mayne Pharma (USA) Inc. ("Mayne") and Mylan, also alleging price fixing, market allocation and bid rigging of generic pharmaceuticals (the "AG Complaint") – for illegal schemes involving market share allocation and anticompetitive price inflation.  Twenty-five more state attorneys general later joined the case.  As reported by *The New York Times* on December 15, 2016, in an interview about the AG Complaint, Connecticut's Attorney General George Jepsen stated that there was more to come:

> "We believe that this is just the tip of the iceberg," George C. Jepsen, Connecticut's attorney general, whose office started the inquiry that led to the charges, said in an interview on Thursday.  "I stress that our investigation is continuing, and it goes way beyond the two drugs in

this lawsuit, and it involves many more companies than are in this lawsuit."

23.    Teva's Actavis unit (part of Allergan before August 2, 2016) received a subpoena from the Connecticut Attorney General in connection with its price-fixing investigation.  The AG Complaint states that the Attorneys General "have uncovered a wide-ranging series of conspiracies implicating numerous different drugs and competitors, which will be acted upon at the appropriate time."  AG Complaint, ¶9. The Attorneys General describe these conspiracies as "schemes to fix and maintain prices, allocate markets and otherwise thwart competition" and explain that they are carried out by generic drug companies through their senior executives who "exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements."  *Id.*, ¶¶7, 8.

24.    The Connecticut Attorney General's December 15, 2016 press release regarding the AG Complaint states that the Connecticut Attorney General "'has dedicated significant resources to this investigation for more than two years and has developed compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States.'"  The Connecticut Attorney General's press release further states that "'*[w]e have evidence of widespread participation in illegal conspiracies across the generic-drug industry*.'"

25.    On October 31, 2017, the state Attorneys General ("StateAGs") made public their [Proposed] Consolidated Amended Complaint ("Amended AG Complaint"), which contained additional details about Allergan's price-fixing activities.  For example, the StateAGs describe how, when necessary, collusive agreements reached at trade meetings and industry dinners were reinforced through phone calls and text messages between executives and sales people from Allergan and the Co-Conspirators (as defined below).  On these calls, the companies' representatives discussed, among other things, their desire to maintain or raise prices with respect to specific drugs.  Phone records referenced in the AG Complaint demonstrate that these types of communications occurred with great frequency across the industry.  For example, the records revealed at least 334 separate communications between Allergan and its co-conspirator Teva from July 2013 to July 2014, the period when most of the collusive price hikes occurred.

26.    The Amended AG Complaint also details records demonstrating that Allergan finalized an agreement with Heritage to increase prices of Glyburide-Metformin, Verapamil and other generic drugs during a nine-minute telephone call on April 22, 2014.  Information about the agreement spread quickly throughout the sales and pricing teams at Allergan.  On April 28, 2014, the Company circulated an internal email regarding potential price increases for Glyburide-Metformin, Verapamil and several other drugs.  Shortly after reaching this agreement, Allergan and Heritage

- 15 -

contacted Teva and Aurobindo Pharma USA, Inc. ("Aurobindo"), the only other companies in the market, to discuss the deal.  On May 1, 2014, an Allergan representative listed as a recipient to the April 28 email contacted a Teva representative and they spoke for five minutes.  They spoke three more times on May 6, 2014, with one of the calls lasting 15 minutes, and continued to communicate frequently over the next several months.  In all, Allergan and Teva communicated via phone or text message at least 119 times between May 2014 and July 2014.

27.     According to the Amended AG Complaint, phone records also demonstrate that Allergan communicated with Aurobindo, the other manufacturer in the market.  On May 12, 2014, an Allergan representative spoke with the CEO of Aurobindo two separate times.  As alleged in the Amended AG Complaint, although the companies did not increase customer prices for Glyburide-Metformin in July 2014, like they did for many other drugs, they did increase their wholesale acquisition cost ("WAC") prices.[5]

28.     Through their investigations, the State AGs found that the conspiratorial conduct in the generic drug market was "pervasive and industry-wide and the schemes identified herein are part of a larger, overarching understanding about how generic manufacturers fix prices and allocate markets to suppress competition."  Amended AG

---

[5]   "WAC price" refers to the amount a manufacturer charges wholesalers or direct purchasers before discounts and rebates.

Complaint, ¶11.  The overarching understanding applied whether the scheme involved allocation of market share or an agreement to fix prices.  *Id.*, ¶¶8, 14.  According to the Amended AG Complaint, "[t]his overarching agreement is widespread across the generic drug industry and is broader than the Defendants named in this Complaint." *Id*., ¶92.

29.    The overarching conspiracy rested on "general rules of the road" that were put in place over a decade ago – that each competitor was entitled to a certain percentage of market share "based on the number of competitors in the particular drug market, with a potential adjustment based on the timing of their entry."  *Id*., ¶¶90-91. In general, the earlier entrant was entitled to additional market share.  *Id.*  In practice, a generic manufacturer with more than its fair share of the market would walk away from a customer by instigating a price increase to allow its competitor seeking to obtain its fair share to bid slightly below the increased pricing.  *Id*., ¶99.  After the market reached an equilibrium, the manufacturers then agreed on not competing on prices or significantly raising prices in coordination.  *Id.*  At the equilibrium state, manufacturers did not take advantage of another competitor's price increase by bidding lower prices, as doing so would be "viewed as 'punishing' a competitor for raising prices – which [was] against the rules."  *Id*., ¶106.

30.    Adherence to the "general rules of the road" by all competitors was crucial to maintaining high prices, because even a single deviant could lead to

competition and lower prices.  *Id.*, ¶107.  Even for a new entrant to the market seeking to attain market share, "an underlying code of conduct," widespread in the industry, was adhered to that allowed the new entrant and existing manufacturers to determine "a generally agreed-upon standard of 'fair share' in order to avoid competing and keep prices high."  *Id.*, ¶¶14, 100.

31.     On May 10, 2019, the Attorneys General of 44 states filed a second complaint ("May 2019 AG Complaint") against 20 generic drugs manufacturers – including Allergan's subsidiaries Actavis Holdco and Actavis Pharma – and 15 individual defendants, including Allergan senior executives Marc Falkin and Richard (Rick) Rogerson.  The complaint acknowledges that the overarching conspiracy "is widespread across the generic drug industry and is broader than the Defendant manufacturers named in this Complaint."   May 2019 AG Complaint, ¶116. Nevertheless, the complaint alleges that Teva colluded with "High Quality" co-conspirators on close to 112 generic drugs, of which Allergan was one of the highest-quality co-conspirators and implicated in at least 25 drugs.  *Id.*, ¶¶3, 1110.

32.     Teva defined the quality of a co-conspirator based on its "strength" as a leader or follower of price hikes, with a score of "3" awarded to the highest quality co-conspirator.  *Id.*, ¶¶576-577.  Allergan was among one of the five top quality co-conspirators:

| Strong Leader/Follower | Point Scale |
|---|---|
| Mylan | 3 |
| Mylan Institution | 3 |
| Watson/Actavis | 3 |
| Sandoz/Fougera | 3 |
| Glenmark | 3 |
| Taro | 3 |

33. According to the StateAGs, allegations in the May 2019 AG Complaint are supported by evidence and information obtained from the ongoing investigation, including:

> (1) the review of many thousands of documents produced by dozens of companies and individuals throughout the generic pharmaceutical industry, (2) an industry-wide phone call database consisting of more than 11 million phone call records from hundreds of individuals at various levels of the Defendant companies and other generic manufacturers, and (3) information provided by several as-of-yet unidentified cooperating witnesses who were directly involved in the conduct alleged herein.

*Id.*, ¶¶4-5.

34. Throughout the Relevant Period, defendants fraudulently concealed their illegal conduct, misrepresented the generic drug market's competitiveness, misled investors about the true cause of Allergan's growth, revenues, profits and improved product pricing, and falsely claimed competitive advantages based on expertise and execution, when in reality they were derived from illegal price-fixing. As a result, Allergan's public statements were materially false and misleading at all relevant times. Defendants' false and misleading statements led investors to believe that Allergan's results were an accurate representation of its products' success in a

competitive market.  In fact, the reported sales figures were inflated by almost ***$1 billion*** as a result of anticompetitive conduct and did not reflect sales that would have been achieved absent the price-fixing activities.  Furthermore, Allergan's sales inflation through illegal price-fixing carried the significant risk of state and federal prosecution along with the attendant negative financial and reputational harm. Defendants downplayed that risk, falsely assured investors that they had done nothing wrong, and offered false and misleading explanations of Allergan's price increases. Truthful disclosure of their participation in patently illegal schemes would have altered the mix of information about the Company.  The materiality of this information is further exemplified by the dramatic drops in Allergan's stock price when investors learned the truth.

35.     During the Relevant Period, revenue from the manufacture and sale of generic pharmaceuticals was vital to Allergan.  In its Form 8-K filed on December 5, 2014, Allergan reported that North American Generics generated $3.9 billion in revenues in 2013, or approximately ***45% of the Company's total revenues***.  The Company also told its investors that "market share, revenues and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market [and] ***pricing***" and emphasized that Allergan "***actively compete[s]*** in the generic pharmaceutical industry."

36.     Allergan reiterated statements about the Company's success in the generics market in its 2014 Annual Report dated February 18, 2015, and in its 2015 Annual Report dated February 26, 2016.  In each of these annual reports, Allergan also reported sustained revenues attributable to its generic pharmaceutical business, with revenues for the North American Generics increasing to approximately $4.2 billion in 2014.

|  | **2013** | **2014** | **2015** |
|---|---|---|---|
| **Revenues from North American Generics** | $3.9 billion (45% of total revenues) | $4.2 billion (32% of total revenues) | $6.37 billion (42.2% of total revenues)[6] |

37.     During this period of significant sustained revenues, Allergan's cost of sales for the generic drug segment actually ***declined***.  According to the 2015 Form 10-K, in 2014, for example, the Company's revenues increased by $230 million over the prior year, but the cost of sales declined by $213.5 million.

|  | **2013** | **2014** | **2015** |
|---|---|---|---|
| **Cost of Sales for Segment Including Generics Business** | $3.32 billion | $3.11 billion | $3.05 billion |

38.     During the Relevant Period, Allergan also touted its ability to both raise and maintain generic drug prices, without ever mentioning the price fixing it was engaged in with its rival drugmakers.  For example, during an analyst conference on

---

[6]   As a result of Allergan's July 27, 2015 announcement that the Company had agreed to sell its global generics business to Teva, Allergan only reported net revenues from its global generics business in the "Income from discontinued operations" portion of the Company's February 26, 2016 Form 10-K.

May 29, 2014, defendant Paul M. Bisaro, the Company's then-CEO, explained that Allergan is seeing more "sustainable and longer-term higher pricing in the generic industry than people are generally used to," as companies are increasingly "taking those price increases and those price increases are sticking."  Similarly, during Allergan's August 5, 2014 conference call with analysts and investors, defendant Brenton L. Saunders, the Company's current CEO, stated that "there are more opportunities to take price [increases], particularly as we leverage our strong supply chain and the reliability of high-quality supply that we can offer customers."  During the Company's second quarter 2015 conference call on May 11, 2015, Saunders similarly explained that while "the model for generics is price decreases as more competitors come into the market . . . the environment has remained pretty stable and favorable."

39.     During the Relevant Period, defendants denied outright that they were engaged in any improper market practices.  On the same day Allergan announced it had been subpoenaed by the DOJ, Allergan CEO Saunders appeared on *Mad Money* with Jim Cramer to quell market concerns.  He revealed that the subpoena concerned three Allergan products, but assured the market that the suspicious price increases were caused purely by "supply and demand" rather than illegal collusion.

40.     In February 2016 at the RBC Capital Markets Healthcare Conference, defendants continued to falsely assure investors that "[w]e have never been aggressive

price takers." Instead, defendants told investors that Allergan's practice and philosophy was to always look out for its customers:

> [W]e have always explained that this is a customer long-term relationship and to the extent you poke them in the eye over and over again, they are going to poke back.
>
> . . . You just don't treat customers that way. There has to be mutual respect and planning, and so we price our drugs appropriately.
>
> We look to take price increases as we believe we can, but we have never done it in a significant way because our products don't lend themselves to that in large part. But also our business model and our philosophy doesn't lend itself to that.

41.    Through these representations, defendants led investors to falsely believe that higher generic drug pricing was sustainable and that the Company's success was the result of its active competition in the industry. Defendants' misleading statements voluntarily put the source of Allergan's revenue from generic drugs at issue while concealing the use of illegal anticompetitive conduct to drive that revenue. The Company's income statements were also misleading, because they conveyed a sense of strong profitability without mentioning the price-fixing collusion that fueled that profitability.

42.    As Allergan and the Individual Defendants made these false statements and omissions throughout the Relevant Period – during a time in which they had knowledge of (or recklessly disregarded) the Company's price-fixing conduct – some of them, including defendants Bisaro, David A. Buchen, R. Todd Joyce and Sigurdur

O. Olafsson, made substantial sales of their Allergan stock totaling millions of dollars. These insider sales further evidence defendants' intent to defraud the investing public.

43.     As a result of defendants' acts and omissions, and the precipitous decline in the market value of Allergan's securities, Plaintiff has suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

44.     The claims asserted herein arise under §§11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2), and 77o, and §§10(b), 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), 78n(a), and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. §240.10b-5, and SEC Rule 14a-9, 17 C.F.R. §240.14a-9.

45.     This Court has jurisdiction over the subject matter of this action pursuant to §22(a) of the Securities Act, §27 of the Exchange Act, 15 U.S.C. §78aa, and under 28 U.S.C. §1331, because this is a civil action arising under the laws of the United States.

46.     Venue is proper in this District pursuant to §22(a) of the Securities Act, 15 U.S.C. § 77v(a), §27 of the Exchange Act and 28 U.S.C. §1391(b), because defendant Allergan conducts business in this District and also maintains its administrative headquarters in this District.

47.    In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mail, interstate telephone communications, and the facilities of the national securities exchange.

## III.    EXCHANGE ACT ALLEGATIONS

### A.    Plaintiff

48.    Plaintiff includes funds and accounts managed by TIAA-CREF Investment Management, LLC and Teachers Advisors, LLC.    TIAA-CREF Investment Management, LLC and Teachers Advisors, LLC are wholly-owned subsidiaries of Teachers Insurance and Annuity Association of America ("TIAA"). TIAA was founded in 1918 and is a joint stock life insurance company incorporated in New York with its headquarters in New York.  TIAA offers traditional annuities, as well as variable annuities that invest, among other things, in real estate and in mutual funds that invest in equities and fixed income investments.  CREF, a companion organization to TIAA, is a not-for-profit membership corporation incorporated in New York with its principal place of business in New York.  Together, TIAA and CREF constitute a Fortune 100 financial services organization that forms the principal retirement system for the nation's education and research communities and one of the largest retirement systems in the world based on assets under management.  As of December 31, 2016, TIAA served over five million individuals overall (with more

than 3.9 million clients in institutional retirement plans) and managed in excess of $907 billion in assets. Plaintiff purchased or otherwise acquired Allergan securities at artificially inflated prices during the Relevant Period and suffered damages as a result of the violations of the Exchange Act alleged herein.

### B.    Defendants

#### 1.    Allergan plc

49.    Defendant Allergan is incorporated in Ireland, and the Company's principal executive offices are located at Clonshaugh Business and Technology Park, Coolock, Dublin, D17 E400, Ireland. The Company's administrative headquarters are located at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey. Allergan's common stock trades on the NYSE under the ticker symbol "AGN" and its preferred stock trades on the NYSE under the ticker symbol "AGN.PA."

50.    On February 17, 2014 Allergan entered into an Agreement and Plan of Merger with Forest Laboratories (the "Forest Merger Agreement"). Pursuant to the Forest Merger Agreement, Allergan acquired Forest Laboratories through a series of merger transactions (the "Forest Merger"). Allergan solicited and received shareholder approval of the Forest Merger through a joint proxy statement and prospectus filed on Form 424B3 with the SEC on May 6, 2014 (the "May 6, 2014

Proxy").  Allergan announced the completion of its acquisition of Forest Laboratories on July 1, 2014.

51.     Actavis plc and Allergan Inc. announced on November 17, 2014 that they had entered into a definitive agreement under which Actavis plc would acquire Allergan Inc. for a combination of cash and stock in a transaction valued at approximately $66 billion (the "Actavis Merger").  Actavis plc solicited and received shareholder approval of the Actavis Merger through a joint proxy statement and prospectus filed with the SEC on January 27, 2015 (the "January 27, 2015 Proxy"). On March 17, 2015, Actavis plc announced the completion of the Actavis Merger.  On June 15, 2015, Actavis plc announced that the Company had adopted Allergan plc as its new global name and would begin trading on the NYSE under the "AGN" ticker, abandoning the Company's prior "ACT" ticker.

52.     On July 27, 2015, Teva announced that it had entered into a definitive agreement with Allergan to acquire Allergan's generics business in exchange for $33.75 billion in cash and $6.75 billion in Teva stock, amounting to just under a 10% ownership.  In connection with this deal, Teva agreed to sell the rights and assets related to 79 pharmaceutical products following Federal Trade Commission ("FTC") charges that Teva's acquisition of Allergan's generics business would be anticompetitive.  On August 2, 2016, Teva announced that the acquisition was complete.

## 2.      The Individual Defendants

53.      Defendant Paul M. Bisaro ("Bisaro") served as Allergan's CEO and President between October 2013 and July 2014.  Bisaro also served on Allergan's Board of Directors ("Board") when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.  On March 27, 2017, Bisaro was appointed as President and CEO of Impax.  Bisaro signed certifications pursuant to the Sarbanes-Oxley Act ("SOX") and Rule 13a-14(a) under the Exchange Act ("Rule 13a-14(a)") for the Company's 3Q 2013 and 1Q 2014 Forms 10-Q and 2013 Form 10-K, and signed the Registration Statements  and 2014 Form 10-K – all of which contained false and misleading statements and omissions; he also made false and misleading statements and omissions in the Company's 3Q 2013, 4Q 2013, 1Q 2014 and 2Q 2014 Forms 8-K, at a healthcare conference, and during a Company earnings call.[7]

54.      Defendant Brenton L. Saunders ("Saunders") has served as Allergan's CEO and President since July 2014.  Saunders also served on Allergan's Board when the January 27, 2015 Proxy was issued.  Saunders signed certifications pursuant to SOX and Rule 13a-14(a) for the Company's 2Q 2014, 3Q 2014, 1Q 2015, 2Q 2015, 3Q 2015, 1Q 2016, 2Q 2016 and 3Q 2016 Forms 10-Q and 2014 and 2015 Forms 10-K, and signed the Registration Statements – all of which contained false and

---

[7]   Each of the Company's Relevant Period SEC filings is defined below.

misleading statements and omissions; he also made false and misleading statements and omissions during the Company's earnings calls.

55.      Defendant R. Todd Joyce ("Joyce") served as Allergan's Chief Financial Officer ("CFO") from October 2009 to December 2014. Joyce signed certifications pursuant to SOX and Rule 13a-14(a) for the Company's 3Q 2013, 1Q 2014, 2Q 2014 and 3Q 2014 Forms 10-Q and 2013 Form 10-K, which contained false and misleading statements and omissions. Joyce also signed Allergan's 3Q 2013, 4Q 2013, 1Q 2014, 2Q 2014 and 3Q 2014 Forms 8-K, and the December 5, 2014 Form 8-K, which contained false and misleading statements and omissions.

56.      Defendant Maria Teresa Hilado ("Hilado") has served as Allergan's CFO since December 2014. Hilado signed certifications pursuant to SOX and Rule 13a-14(a) for the Company's 1Q 2015, 2Q 2015, 3Q 2015, 1Q 2016, 2Q 2016 and 3Q 2016 Forms 10-Q and 2014 and 2015 Forms 10-K, which contained false and misleading statements and omissions. Hilado also signed Allergan's 4Q 2014, 1Q 2015, 2Q 2015, 3Q 2015, 4Q 2015 Forms 8-K and the March 2, 2015 Form 8-K underwriting agreements relating to the Ordinary/Preferred Shares Offerings, all of which contained false and misleading statements and omissions. Hilado announced her resignation on September 25, 2017.

57.      Defendant Sigurdur O. Olafsson ("Olafsson") served as a director of Allergan and the President of Actavis Pharma, the Allergan segment that included the

Company's generics business, between April 2012 and June 2014.  Olafsson also served on Allergan's Board when the May 6, 2014 Proxy was issued.  Olafsson subsequently served as the President and CEO of the Global Generic Medicines Group at Teva before stepping down in early 2017.  Olafsson made a false and misleading statement and omission during a Company earnings call and also signed the Company's 2013 Form 10-K.

58.   Defendant David A. Buchen ("Buchen") served as Allergan's Chief Legal Officer (Global) and Secretary from April 2012 to July 2014 and then served as the Executive Vice President Commercial, North American Generics and International, from July 2014 to May 1, 2015.  Upon his termination, Buchen served as a consultant for the Company until May 1, 2016.  Buchen made a false and misleading statement and omission on one of the Company's earnings calls.

59.   Defendant A. Robert D. Bailey ("Bailey") was an Executive Vice President and has served as Allergan's Chief Legal Officer and Secretary since July 2014.  Bailey signed the Registration Statements and the March 2, 2015 Form 8-K containing underwriting agreements relating to the Ordinary/Preferred Shares Offerings – all of which contained false and misleading statements and omissions.

60.   The defendants referenced in this section are referred to herein as the "Individual Defendants."

### 3. The Director Defendants

61.     Defendant James H. Bloem ("Bloem") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

62.     Christopher W. Bodine ("Bodine") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

63.     Tamar D. Howson ("Howson") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

64.     John A. King ("King") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

65.     Catherine M. Klema ("Klema") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

66.     Jiri Michal ("Michal") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

67.     Jack Michelson ("Michelson") served on Allergan's Board when the May 6, 2014 Proxy was issued.

68.     Patrick J. O'Sullivan ("O'Sullivan") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

69.     Ronald R. Taylor ("Taylor") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

70.     Andrew L. Turner ("Turner") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

71.     Fred G. Weiss ("Weiss") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

72.     Bisaro, Olafsson, Bloem, Bodine, Howson, King, Klema, Michal, Michelson, O'Sullivan, Taylor, Turner and Weiss are referred to herein as the "2014 Board of Directors."

73.     Nesli Basgoz ("Basgoz") served on Allergan's Board when the January 27, 2015 Proxy was issued.

74.     Christopher J. Coughlin ("Coughlin") served on Allergan's Board when the January 27, 2015 Proxy was issued.

75.     Bisaro, Bloem, Bodine, Howson, King, Klema, Michal, O'Sullivan, Taylor, Turner, Weiss, Basgoz and Coughlin are referred to herein as the "2015 Board of Directors."

### C.     The Co-Conspirators

76.     Various other persons, firms, corporations, and entities participated as Co-Conspirators (the "Co-Conspirators") with Allergan in the anticompetitive conduct alleged herein. The Co-Conspirators include, but are not limited to: Lannett; Impax; Heritage; Mylan; Teva; Aurobindo; Epic Pharma, LLC ("Epic"); West-Ward Pharmaceutical Corporation ("West-Ward"); Akorn, Inc. ("Akorn"); Camber

Pharmaceuticals, Inc. ("Camber"); Lupin Pharmaceuticals, Inc. ("Lupin"); Mutual Pharmaceutical ("Mutual"); Par Pharmaceutical Companies, Inc. ("Par"); Perrigo; Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's"); Sandoz, Inc. ("Sandoz"); Taro Pharmaceutical Industries Ltd. ("Taro"); and Zydus Pharmaceuticals (USA), Inc. ("Zydus").  To engage in this anticompetitive conduct, the Co-Conspirators performed acts in furtherance of the anticompetitive practices and conspiracies alleged herein.

> ### D.     Factual Allegations

> #### 1.     A Brief Overview of the Generic Pharmaceutical Market

77.     Generic pharmaceutical drugs – drugs that are pharmaceutically equivalent in dosage, form, route of administration, strength or concentration and have the same active ingredients as the reference-listed brand name drug – save consumers and our healthcare system tens of billions of dollars annually because they introduce competition into a market where none previously existed.  When a high-priced branded drug comes off patent, generic drugs offer the prospect of lower prices and greater access to healthcare for all consumers in the United States.  In a January 31, 2012 report, the Government Accounting Office ("GAO") noted that "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."

78.     Generic drugs have long been referred to as one of the few "bargains" in the U.S. healthcare system and historically healthcare experts have said that cost

savings from the growing number of generic drugs have gone a long way toward keeping the lid on overall increasing healthcare costs.  This was the way the generic drug market was intended to work, and has generally worked, since the implementation of the Hatch-Waxman Act in 1984.

79.     The Hatch-Waxman Act, formally titled the Drug Price Competition and Patent Term Restoration Act, was intended to balance two interests: encouraging drug innovation and promoting competition between brand and generic drugs in order to lower drug prices.  To encourage innovation, the Hatch-Waxman Act gave branded drug manufacturers longer periods of market exclusivity.  To promote competition, the law simplified the regulatory hurdles for bringing generic drugs to market and eliminated the prior requirement that generic drug companies file costly New Drug Applications ("NDA") to obtain U.S. Food and Drug Administration ("FDA") approval.  Under the revised process, generic drug companies can instead file an Abbreviated New Drug Application ("ANDA"). A generic drug company that submits an ANDA generally is not required to include clinical trial data to establish the safety and efficacy of the drug.  Instead, the generic drug company can rely on the safety and efficacy data supplied by the original NDA holder for a given drug.

80.     A generic drug must meet certain bioequivalence and pharmaceutical equivalence standards set by the FDA to ensure that the generic drug is essentially an exact substitute for the brand-name drug.  To receive FDA approval through an

ANDA, a generic drug must contain the same active ingredient, in the same dosage form, in the same strength, to be bioequivalent to the reference listed drug (*i.e.*, the original brand-name version approved by the FDA through an NDA). The FDA uses a review process to ensure that brand-name and generic drugs that are rated "therapeutically equivalent" have the same clinical effect and safety profile. According to the FDA: "Products classified as therapeutically equivalent can be substituted with the full expectation that the substituted product will produce the same clinical effect and safety profile as the prescribed product."[8]  The FDA assigns generics that are deemed to be therapeutically equivalent to their brand-name counterparts an "AB" rating. Even drugs that are bioequivalent, but that do not share the same dosage form, are not AB-rated.

81.    The Hatch-Waxman Act also provides a 180-day exclusivity period for the first generic drug company that files an ANDA and simultaneously challenges the validity of the patent for a brand-name drug. This exclusivity period, which allows the generic drug company to market its generic version free from competition, is intended to spur generic drug companies to provide alternatives to brand-name drugs. When generic drugs enter the market, they are often priced well below the brand-name drugs and quickly take a large market share from the brand-name drug company. The

---

[8]  *See* U.S. Department of Health and Human Services – Food and Drug Administration ("Orange Book"), *Approved Drug Products with Therapeutic Equivalence Evaluations* vii (37th ed. 2017).

first generic drug will generally be priced 15% to 20% below the brand-name drug. Once the exclusivity period ends and more generic versions enter the market, the price of the generic drugs continues to fall and their combined share of the market for that drug, relative to the brand-name equivalent, continues to grow.  The price of the generic versions of a given drug can fall to as little as 10% to 20% of the original price for the brand-name drug.  This competition allows purchasers to buy the generic equivalent of a brand-name drug at substantially lower prices.  As Stephen W. Schondelmeyer, Professor of Pharmaceutical Care & Health Systems at the University of Minnesota, College of Pharmacy, explained in his testimony before the Senate HELP Committee:

> The Congressional Budget Office has credited the Hatch-Waxman Act and, importantly, the process for easy and routine A-rated generic substitution by pharmacists with providing meaningful economic competition from generic drugs, and with achieving billions of dollars of savings for drug purchasers such as consumers and employers.[9]

82.    The price differential between a brand-name drug and the generic equivalents, and the proportion of the market captured by the brand-name versus the generics, generally follows a predictable pattern.  Specifically, as mentioned above, the first generic to enter the market is generally priced 15% to 20% lower than the brand-name drug.  As more approved generics enter the market, the price of the

---

[9]   Why Are Some Generic Drugs Skyrocketing in Price?: Hearing Before the S. Comm. on Health, Education, Labor and Pensions, 113th Cong. 7 (Nov. 20, 2014) (statement of Stephen W. Schondelmeyer).

generics generally declines in both absolute terms and in relation to the brand-name drug for around five years.  Eventually, the price of the generic drugs reaches an equilibrium price point, at or close to the manufacturers' marginal production costs, resulting in significant savings for consumers, insurers and employers.

83.    Between 2005 and 2014, generic drugs saved the U.S. healthcare system more than $1.6 trillion dollars.  Since the Hatch-Waxman Act was passed, generic drugs have moved from being less than 20% of prescriptions filled in the United States to 80% of prescriptions filled.  In their complaint, the StateAGs cite a study that found that in 2011 alone, generic drugs saved $193 billion for consumers.

84.    The MAC pricing regime also serves to control drug prices.  Under this regime, individual states or pharmacy benefits managers ("PBMs") – third party administrators of prescription drug programs – establish an MAC for drug products using a variety of different inputs and formulas.  If the cost for a pharmacy to dispense a given drug exceeds the MAC, the pharmacy will either opt to substitute a less expensive version, if available, or sell the drug at a loss to service the patient.  This MAC framework incentivizes pharmacies to fill prescriptions with the least expensive, therapeutically equivalent version of a drug to maximize their potential profits.

85.    Over the last several years, however, that price dynamic has changed for a large number of generic drugs.  Prices for dozens of generic drugs have uncharacteristically risen – some have skyrocketed – for no apparent reason, sparking

- 37 -

outrage from public officials, payers and consumers across the country whose costs have doubled, tripled or in some cases increased a 1,000% or more. A December 2016 analysis conducted by the GAO found that more than 300 of the 1,441 established generic drugs examined by the study had one or more instances of "'extraordinary price increases'" – *i.e.*, "periods of prices at least doubling over the five-year study period." In 2014 alone, more than 100 generic drugs experienced these extraordinary price increases. For 48 of these 100 drugs, the price increases were 500% or higher.

86.     The growing outrage and public reports of unexplained price increases caused the State of Connecticut to commence an investigation in July of 2014, which was followed shortly thereafter by a Congressional inquiry and a reported criminal grand jury investigation by the DOJ.

87.     Generic drug manufacturers have argued publicly that the significant price increases were due to a myriad of benign factors, such as industry consolidation, FDA-mandated plant closures, or elimination of unprofitable generic drug product lines. What regulators have found through their investigations, however, is that the reason underlying many of these price increases is much more straightforward, and nefarious – collusion among generic drug competitors.

88.     As detailed in the AG Complaint, *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-02056 (D. Conn. Dec. 14, 2016), a joint complaint filed by the

Attorneys General of 20 states following a lengthy investigation into generic drug price increases, generic drug manufacturers operate through their respective senior leadership and marketing and sales executives in a manner that fosters and promotes routine and direct interaction among their competitors. *Id.*, ¶7. The companies exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements. *Id.* The anticompetitive agreements are further refined and coordinated at regular "industry dinners," "girls nights out," lunches, parties and numerous and frequent telephone calls, emails and text messages. *Id.*, ¶¶7, 55.

## 2.    The Distribution and Manufacture of Generic Drugs

89.    Generic drug manufacturers control the sale of drugs to many different drug wholesalers, distributors, retailers and group purchasing organizations ("GPOs"). Wholesalers and distributors purchase drugs from the manufacturers and distribute them to customers such as pharmacies, hospitals and medical facilities. Some of the larger wholesalers and distributors of generic drugs include Cardinal Health, Inc. and AmerisourceBergen Corporation. Retailers of generic drugs include retail or supermarket chain pharmacies (such as Walgreens and Walmart), mail-order or specialty pharmacies, hospitals, healthcare plans and GPOs. GPOs are membership-based entities that negotiate with manufacturers, wholesalers and distributors on behalf of a group of purchasers to obtain optimal prices and terms for their members.

GPOs can represent retail, governmental or healthcare groups.  Some of the larger GPOs include Vizient and Premier, Inc.

90.    Because the various generic drugs produced by different drug manufacturers are all therapeutically equivalent, the competition between manufacturers to sell generic drugs to wholesalers, distributors, retailers and GPOs is largely based on each manufacturer's price and ability to provide a supply of that drug.  Allergan and the Co-Conspirators are all drug manufacturers and/or suppliers such that they should be competing directly with each other for the sale of the generic drugs discussed herein to U.S. consumers.

### 3.    The Markets for Allergan's Generic Drugs Were Susceptible to Price Fixing

91.    The markets discussed herein were highly conducive to collusion. Characteristics that facilitated collusion include: (i) a high level of market concentration, (ii) significant barriers to entry, (iii) lack of available substitutes, (iv) the commoditized-nature of the products, (v) inelastic demand, (vi) the absence of a competitive fringe of sellers, and (vii) the ease of information sharing, including inter-competitor contacts and communications.  As discussed in more detail below, each of these factors was present in the markets for certain dosages of price-hiked drugs such as Propranolol, Ursodiol, Doxycycline, Desonide, Tretinoin, Clobetasol, Nystatin Cream, Nystatin Ointment, Glyburide-Metformin, Verapamil, Ciprofloxacin HCL, Labetalol HCL, Fluocinonide 0.5% Cream, Griseofulvin, Estradiol,

Clarithromycin ER, Estazolam, Tamoxifen Citrate, Hydroxyzine Pamoate, Desmopressin Acetate, Disopyramide Phosphate, Flutamide, and Topiramate Sprinkle.  These factors were also present for market allocation drugs such as Amphetamine/Dextroamphetamine ER, Budesonide Inhalation, Drospirenone and Ethinyl Estradiol, Nortriptyline HCL, Amphetamine/Dextroamphetamine IR, Clonidine-TTS Patch, Dextroamphetamine Sulfate ER, Raloxifene HCL, and Celecoxib.  The anticompetitive behaviors by Allergan and its Co-Conspirators left behind a series of collusive markers in the market for the drugs, as evidenced by uniform price hikes within close timeframes marked by high correlations, the low volatility of drug prices post-collusion, and the high stability of market shares inconsistent with competitive markets.

### a.      High Level of Market Concentration

92.     The Herfindahl-Hirschman Index ("HHI") is a widely accepted market concentration measurement and is used by antitrust enforcement agencies, such as the FTC and the DOJ, for assessing market competitiveness.  An HHI of 0 is indicative of perfect competition and an HHI of 10,000 is indicative of a monopoly.  The DOJ and FTC's Horizontal Merger Guidelines classify a market as unconcentrated when HHI is below 1,500, moderately concentrated when HHI is between 1,500 and 2,500, and highly concentrated when HHI exceeds 2,500.

93.     The score is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers.  For example, in a market consisting of three companies with market shares of 10%, 40% and 50%, the HHI is 4,200 (100 + 1,600 + 2,500).

94.     A highly concentrated market is vulnerable to coordinated activities because fewer firms are involved in the negotiation, collusive revenues are high for each firm, and the cartel tends to be stable with the absence of cheating.  In addition, in a highly concentrated market, there is a lower probability that each firm has different production costs, which facilitates the formation and maintenance of a price-fixing scheme.

### b.     Significant Barriers to Entry

95.     Collusion is more effective in markets with high barriers to entry because new competitors cannot easily enter the market and undercut the agreed-upon price.

96.     Barriers to entry into a market can delay, diminish or even prevent the attraction and arrival of new market participants, which is the usual mechanism for checking the market power – *i.e.*, the ability to set prices above market costs – of existing participants.  Entry barriers include things like: trade secrets, patents, licenses, capital outlays required to start a new business, pricing elasticity and difficulties buyers may have in changing suppliers.  If there is no significant threat that new firms will enter a market, a combination of firms with a significant

percentage of the market is able to engage in anticompetitive conduct, such as restricting output and raising prices to the detriment of consumers.

97.     A competitor attempting to enter the generic drug market faces numerous barriers, including high manufacturing costs and regulatory and intellectual property requirements.  For example, an ANDA approval by the FDA takes an average of 36 months.  Upon approval, the manufacturing facility is subject to regulatory oversight, compliance expenses and other significant costs.

### c.     Lack of Available Substitutes

98.     The lack of a viable substitute encourages collusive behavior because consumers cannot replace the product after significant price hikes.

99.     In the context of prescription drugs, a pharmacist presented with a prescription for a given drug can only substitute another drug if that drug has an "AB" rating.  Only generic and brand-name versions of a drug are AB-rated to one another. Therefore, a pharmacist can only fill a prescription for a given drug with the brand-name version or one of the AB-rated generic versions and cannot substitute another drug.

100.   Additional barriers in the medical field also serve to promote the resistance to prescription changes.  These barriers include doctors' reluctance to change well-known prescriptions, insurance and Medicare's absorption of most of the

price shock, lags in co-payment tiering changes, and the restriction on Medicare from negotiating drug prices with pharmaceutical companies.

### d.    Commodity-Like Product

101.   A commodity-like product is a standardized product where price is the distinguishing factor for purchasers.  Such products increase the susceptibility of a given market to anticompetitive conduct.  By their very nature, all generic versions of a given drug are interchangeable, as every generic version of a drug must be bioequivalent to the original brand-name drug.

102.   For commodity-like products, price hikes are only sustainable through collusion if the dominant manufacturers participate.  Price hikes by Allergan without the Co-Conspirators' agreement to join the heightened price levels would enable competitors to take market share away by simply setting prices below Allergan's price point.  Thus, the coordinated massive price hikes could only be sustainable with the cooperation and agreement among the Co-Conspirators.

### e.    Inelastic Demand

103.   Elasticity of demand ("Ed") is measured by the change in quantity of goods sold relative to the change in price.  When Ed is zero, demand is perfectly inelastic, as there is no change in the quantity of goods sold despite a large increase in price.  Inelastic demand encourages cartel behavior, as a significant increase in price

has minimal effect on quantity demanded by consumers.  As such, the cartel can maximize profit because price increases will directly translate into revenues.

### f.      Absence of Competitive Sellers

104.   The presence of firms that manufacture the same product but are not part of the anticompetitive conspiracy – also called fringe sellers – can erode the conspirators' market share by offering the product at lower, more competitive prices. This reduces the conspirators' revenue and makes it more difficult to sustain the conspiracy.  By contrast, the absence of fringe sellers can increase the susceptibility of a given market to anticompetitive conduct.

### g.      Inter-Competitor Contacts and Communications at Trade Association Events

105.   Information sharing is important in a conspiracy to enable the cartel to come to an agreement and monitor pricing decisions and compliance.

106.   Representatives from Allergan and the Co-Conspirators routinely attended conferences, meetings and trade shows sponsored by various pharmaceutical trade associations.  These events provided frequent opportunities for individuals from Allergan and the Co-Conspirators to interact with each other and discuss their respective businesses and customers.  Social events and other recreational activities – including golf outings, lunches, cocktail parties and dinners – were also organized in conjunction with the trade association events and provided further opportunities for representatives from the drug manufacturers to meet outside of the traditional business

setting. These trade associations and the related formal and informal events, discussed in more detail below, provided representatives from Allergan and the Co-Conspirators with ample opportunities to meet, discuss, devise and implement the price-fixing schemes set forth herein.

107.   The 45 state Attorneys General stated that "these trade shows and customer conferences provide generic drug manufacturers, including but not limited to the Defendants, with ample opportunity to meet, discuss, devise and implement a host of anticompetitive schemes that unreasonably restrain competition in the United States' market for generic drugs."   AG Complaint, ¶52.   As such, the DOJ is scrutinizing "'trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers.'"

108.   The Allergan representatives who attended the majority of these trade meetings were Andrew Boyer ("Boyer"), Senior Vice President of Generic Sales, Marketing, and National Accounts; Marc Falkin ("Falkin"), Vice President of Marketing, Pricing, and Contracts; and Richard Rogerson ("Rogerson"), Executive Director of Pricing & Business Analytics.   Boyer, Falkin and Rogerson comprised the management team for Allergan's generics business during the Relevant Period.

109.   Confidential Witness No. 1 ("CW1"), an Associate Director of Finance at Allergan from March 2011 to March 2016, confirmed that Boyer was responsible for

the Company's pricing decisions and that Falkin and Rogerson were members of Boyer's management team.  According to CW1, Boyer ran the generics business at Allergan and made all decisions regarding generic drugs, including pricing decisions.

110.   Confidential Witness No. 2 ("CW2"), a former Global VP of Finance and Operations at Allergan between 2011 and August 2016, corroborated CW1's account. CW2 stated that the key people involved with Allergan's generic pricing were Boyer, Falkin, Napoleon Clark ("Clark") and Rogerson.  Rogerson reported to Clark, who reported to Falkin, who reported to Boyer.  CW2 further stated that Clark was responsible for a lot of the detailed analytics used to make pricing decisions. Rogerson "blessed" all pricing decisions and his team maintained all of the pricing models.  All generic pricing was generated using the analytics maintained by Rogerson's team, but Boyer had final authority over both Falkin and Rogerson in terms of final pricing decisions.  According to CW2, Bisaro and Olafsson also attended the pricing meetings, weighing in and exerting influence on pricing decisions.  CW2 was aware of these details because he/she attended the pricing meetings during which the data used for pricing decisions was evaluated and received the pricing models that were used to determine the prices.

111.   CW2 also indicated that Boyer, Falkin, Clark and Rogerson frequently attended industry events, such as meetings of the National Association of Chain Drug Stores, and socialized with competitors at these events.  He/she knew that Boyer's

team attended the industry conferences because there was typically an agenda of who went and what was discussed. According to CW2, the industry was so small that personnel from the various companies knew each other and spoke to one another outside of the trade shows.

112. CW2 said that during his/her tenure as Global VP of Finance and Operations, only rarely was a supplier's increased costs the reason for pricing increases. According to CW2, pricing stayed flat for the most part. In fact, CW2 could not recall any supply, manufacturing or other operational factor that had any influence on pricing during her/his tenure as Global VP of Finance and Operations.

113. The generics management team of Boyer, Falkin, Clark and Rogerson reported to Olafsson, as President of Actavis Pharma, the Allergan segment that included the Company's generics business. Olafsson in turn reported to CEO Bisaro. When Olafsson left the Company, Boyer, Falkin and Rogerson began reporting to Buchen, who reported to Bisaro and then Saunders when Saunders became CEO and Bisaro became Executive Chairman in July 2014.

### (1)    The Generic Pharmaceutical Association

114. The Association for Accessible Medicines (formerly known as the Generic Pharmaceutical Association) ("GPhA") is, according to its website, "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and

suppliers of other goods and services to the generic industry."  The GPhA's website describes itself as "the unifying and organizing force" for generic drug companies, and touts its members' ability to "[n]etwork with other members and professionals across the industry."  It claims that GPhA members supply "9 out of every 10" generic prescription drugs dispensed in the U.S. and "form an integral, and powerful, part of the healthcare system."

115.   Senior executives and corporate officers from Allergan and the Co-Conspirators served on the GPhA's Board of Directors before the Relevant Period. For example, the 2012 Board of Directors included Tony Mauro ("Mauro"), President of Mylan North America; Douglas Boothe ("Boothe"), CEO of Actavis; and Jeffrey Glazer ("Glazer"), CEO of Heritage.  The 2013 Board of Directors included Mauro, President of Mylan North America; Glazer, President and CEO of Heritage; and Charlie Mayr, Chief Communications Officer at Actavis.

116.   Representatives from Allergan and the Co-Conspirators regularly attended GPhA meetings before and during the Relevant Period, including the following meetings:

- October 1-3, 2012 GPhA 2012 Fall Technical Conference in Bethesda, Maryland, attended by representatives from Allergan, Heritage, Impax, Lannett, Mylan, Perrigo, Sun[10] and Taro.

---

[10]   Sun Pharmaceutical Industries, Inc. ("Sun") purchased URL Pharma, Inc. ("URL") from Takeda Pharmaceuticals USA Inc. in 2012, and Mutual Pharma is a subsidiary of URL.

- February 20-22, 2013 GPhA 2013 Annual Meeting in Orlando, Florida, attended by representatives from Allergan (including Olafsson), Heritage, Impax, Mylan, Perrigo, Taro and URL.

- June 4-5, 2013 GPhA 2013 CMC Workshop in Bethesda, Maryland, attended by representatives from Allergan, Heritage, Impax, Lannett, Mylan, Perrigo, Sun and Taro.

- October 28-30, 2013 GPhA 2013 Fall Technical Conference in Bethesda, Maryland, attended by representatives from Allergan, Heritage, Impax, Lannett, Mylan, Perrigo, Sun and Taro.

- December 9-11, 2013 16th Annual IGPA Conference in Brussels, Belgium, attended by representatives from Allergan, Hikma[11] and Mylan.

- February 19-21, 2014 GPhA 2014 Annual Meeting in Orlando, Florida, attended by representatives from Allergan, Epic, Heritage, Impax, Mylan, Perrigo, Sun and Taro.

- June 3-4, 2014 GPhA 2014 CMC Workshop in Bethesda, Maryland, attended by representatives from Allergan, Heritage, Impax, Lannett, Mylan, Perrigo, Sun and Taro.

- October 27-29, 2014 GPhA 2014 Fall Technical Conference in Bethesda, Maryland, attended by representatives from Allergan, Heritage, Lannett, Mylan, Perrigo, Sun, Taro and West-Ward.

- November 19-21 2014, 17th Annual IGPA Conference in Miami, Florida, attended by representatives from Allergan (including Buchen), Hikma and Mylan.

- February 9-11, 2015 GPhA 2015 Annual Meeting in Miami Beach, Florida, attended by representatives from Allergan, Epic, Heritage, Mylan, Perrigo, Taro and West-Ward.

- June 9-10, 2015 GPhA 2015 CMC Workshop in Bethesda, Maryland, attended by representatives from Allergan, Heritage, Impax, Lannett, Mylan, Perrigo, Sun, Taro and West-Ward.

---

[11] Hikma Pharmaceuticals PLC ("Hikma") is the parent company of West-Ward.

- • November 2-4, 2015 GPhA 2015 Fall Technical Conference in Bethesda, Maryland, attended by representatives from Allergan, Heritage, Impax, Lannett, Mylan, Perrigo, Sun, Taro and West-Ward.

### (2)    The Healthcare Distribution Alliance

117.    The Healthcare Distribution Alliance ("HDA") was originally founded as the Western Wholesale Druggists' Association in 1876.   After a series of name changes, the association became known as the HDA.   As the HDA's website explains, the association "represents 34 distribution companies – national, regional, and specialty – as well as more than 145 manufacturer and more than 50 service provider/international members, respectively."   The HDA's mission "is to protect patient safety and access to medicines through safe and efficient distribution; advocate for standards, public policies and business processes that enhance the safety, efficiency and value of the healthcare supply chain; and, create and exchange industry knowledge and best practices."

118.    The HDA's website states that HDA "membership provides access to networking opportunities, research, member-developed education and resources for the healthcare supply chain."   The association's membership includes domestic and international drug distributors, drug manufacturers, service providers and health, beauty and wellness/consumer manufacturers.

119.    The HDA describes its Business and Leadership Conference ("BLC") as "the healthcare distribution industry's signature annual conference, developed by and

for healthcare supply chain leaders and innovators." The HDA further states: "Exclusive to HDA member companies, the conference brings together high-level executives, thought leaders and influential managers from across the healthcare supply chain to hold strategic business discussions on the most pressing industry issues. This forum offers unmatched opportunities to network with your peers and trading partners at all levels of the healthcare distribution industry." The BLC events provided Allergan and the Co-Conspirators with opportunities to meet one-on-one and engage in collusive conduct.

120. As described in other public pleadings, representatives from Allergan and the Co-Conspirators attended the HDA's BLC events set forth below:

| Date | Meeting | Allergan Attendees | Co-Conspirator Attendees |
|------|---------|--------------------|--------------------------|
| June 1-4, 2014 | HDA 2014 BLC in Phoenix, AZ | Anthony Giannone (Executive Director, Sales); Falkin (Sr. VP Sales, U.S. Generics) | **Mylan**: Richard Isaac (Sr. Manager, Strategic Accounts); Lance Wyatt (Director, National Accounts) |
| | | | **Heritage**: Neal O'Mara (Sr. Director, National Accounts); Anne Sather (Sr. Director, National Accounts) |
| June 7-10, 2015 | HDA 2015 BLC in San Antonio, TX | Boyer (Sr. VP, Generic Sales, Marketing, National Accounts); Falkin (VP Marketing, Pricing and Contracts); Rogerson (Executive Director Pricing & Business Analytics) | **Mylan**: Todd Bebout (VP NA Supply Chain Management); Janet Bell (Director, National Accounts); Richard Isaac (Sr. Manager, Strategic Accounts); Stephen Krinke (National Account Manager); Robert O'Neill (Head of Sales Generic, NA); Sean Reilly (National Account Manager); John Shane (Trade Relations); Erik Williams (VP NA Pricing & Contracts); Lance Wyatt (Director, National Accounts) |
| | | | **Heritage:** Glazer (CEO and Chairman); Jason Malek (Sr. VP, Commercial Operations); Neal O'Mara (Sr. Director, National Accounts); Anne Sather (Sr. Director, National Accounts); Matthew |

| Date | Meeting | Allergan Attendees | Co-Conspirator Attendees |
|------|---------|--------------------|--------------------------|
|      |         |                    | Edelson (Associate Director, National Accounts) |

### (3)     The National Association of Chain Drug Stores

121.   According to its website, the NACDS states that its four strategic goals are to: (i) "Foster an advantageous business and political environment in which NACDS chain member companies are better able to achieve their business objectives"; (ii) "Promote the role and value of chain community pharmacy as an integral component of the healthcare system, thus helping to preserve its viability"; (iii) "Provide effective channels of communication, involvement and forums for members and other stakeholders"; and (iv) "Ensure that NACDS internally operates as a cutting edge association, effectively meeting the needs of its membership."

122.   The NACDS describes the membership benefits for suppliers as including: "Access to the NACDS Annual Meeting, NACDS Regional Chain Conference and NACDS Total Store Expo"; "Online Membership Directory listing and access chain member, sales and marketing, peer, and other B2B solution contacts"; and "Popular 'Meet the Retailer' and 'Meet the Market' programming at NACDS events with preparatory webinars throughout the meeting cycle."   The NACDS lists as another benefit for supplier members the "NACDS-Nielsen Company Syndicated Data Program," which it describes as providing "syndicated data to help

those members gain a better understanding of the competitive marketplace and to position their products accordingly."

123.   The NACDS holds several events, including an Annual Meeting and Total Store Expo.  The NACDS describes its Annual Meeting as the association's "signature event," highlighting "results . . . relationships . . . [and] member service." According to the NACDS's website, "[p]articipants at the Annual Meeting include Retail Chairmen, CEOs, Presidents, and Senior Vice Presidents of Marketing, Merchandising, Operations, and Pharmacy and their executive-level counterparts and decision makers from supplier companies."  In addition, the NACDS represents that the "Annual Meeting provides numerous opportunities to meet and discuss strategic issues with key trading partners."

124.   The NACDS describes its Total Store Expo as "the industry's largest gathering of its most influential leaders."  The NACDS further states: "It is a combination of both strategic and tactical business meetings between existing and new trading partners and is attended by industry decision makers.  It will give you and your company a unique opportunity to gain new insights into today's evolving marketplace and set your course for the future."

125.   The NACDS describes its Foundation Dinner as "a premier event that brings together the NACDS Board of Directors and senior executives of NACDS Chain and Associate Members, as well as many friends."

126.   Before and during the Relevant Period, representatives from Allergan and the Co-Conspirators attended the NACDS events, which provided opportunities for these representatives to meet in person, in furtherance of the collusive conduct alleged herein.  As described in other public pleadings, representatives from Allergan and the Co-Conspirators attended the NACDS events set forth below:

| Date | Meeting | Allergan Attendees | Co-Conspirator Attendees |
|------|---------|--------------------|--------------------------|
| April 20-23, 2013 | NACDS 2013 Annual Meeting in Palm Beach, FL | Bisaro (Board Member); Boyer (Sr. VP, Generic Sales, Marketing, National Accounts); Olafsson (Board Member, President, Actavis Pharma); Michael Reed (Executive Director of Trade Relations); Michael Baker (Executive VP of Trade Sales and Development); Paul Reed (Sr. Director of Trade Sales and Development); Robert Stewart (Chief Operating Officer) | **Mylan**: Joe Duda (President); Mauro (Chief Commercial Officer); Robert Potter (Sr. VP of North America National Accounts and Channel Development); Jeffrey May (VP of North America Product Strategy); Jim Nesta (VP of Sales) |
| August 10 -13, 2013 | NACDS 2013 Total Store Expo in Las Vegas, NV | Boyer (Sr. VP, Generic Sales, Marketing, National Accounts); Falkin (VP Marketing, Pricing and Contracts); Rogerson (Executive Director, Pricing & Business Analytics) | **Mylan**: Mike Aigner (Director National Accounts); Kevin McElfresh (Executive Director National Accounts); Joe Duda (President); Robert Potter (Sr. VP North America National Accounts and Channel Development); Rob O'Neill (Head of Sales); Lance Wyatt (Director National Accounts) |
| | | | **Heritage**: Glazer (CEO and Chairman); Matthew Edelson (Sr. Director of Sales); Jason Malek (Sr. VP, Commercial Operations); Gina Gramuglia (Commercial Operations); Neal O'Mara (Sr. Director, National Accounts); Anne Sather (Sr. Director, National Accounts) |
| December 3, 2013 | NACDS 2013 NYC Week and Annual Foundation | Boyer (Sr. VP, Generic Sales, Marketing, National Accounts); Falkin (VP Marketing, Pricing and | **Mylan**: Joe Duda (President); Mauro (Chief Operating Officer); Robert Potter (Sr. VP of North America National Accounts and Channel |

| Date | Meeting | Allergan Attendees | Co-Conspirator Attendees |
|------|---------|--------------------|--------------------------|
| | Dinner in New York, NY | Contracts) | Development); Rob O'Neill (Head of Sales) |
| April 26-29, 2014 | NACDS 2014 Annual Meeting in Scottsdale, AZ | Bisaro (Board Member); Boyer (Sr. VP, Generic Sales, Marketing, National Accounts); Olafsson (Board Member, President, Actavis Pharma); Paul Reed (Sr. Director of Trade Sales and Development); Robert Stewart (Chief Operating Officer); Falkin (VP Marketing, Pricing and Contracts) | **Mylan**: Joe Duda (President); Mauro (President); Robert Potter (Sr. VP of North America National Accounts and Channel Development); Rob O'Neill (Head of Sales) |
| | | | **Heritage**: Glazer (CEO and Chairman) |
| August 23 -26, 2014 | NACDS 2014 Total Store Expo in Boston, MA | Boyer (Sr. VP, Generic Sales, Marketing, National Accounts); Falkin (VP Marketing, Pricing and Contracts); Rogerson (Executive Director of Pricing & Business Analytics) | **Mylan**: Joe Duda (President); Mauro (President); Robert Potter (Sr. VP of North America National Accounts and Channel Manager); Mike Aigner (Director, National Accounts); Kevin McElfresh (Executive Director, National Accounts); Gary Tighe (Director, National Accounts); Lance Wyatt (Director, National Accounts) |
| | | | **Heritage**: Glazer (CEO and Chairman); Jason Malek (Sr. VP, Commercial Operations); Heather Beem (National Account Manager, Institutional); Katie Brodowski (Associate Director Institutional Sales); Matthew Edelson (Senior Director of Sales); Gina Gramuglia (Commercial Operations); Neal O'Mara (Sr. Director, National Accounts); Anne Sather (Sr. Director, National Accounts) |
| December 3, 2014 | NACDS 2014 NYC Week and Annual Foundation Dinner in New York, NY | Saunders (President, CEO and Chairman); Boyer (Sr. VP, Generic Sales, Marketing, National Accounts); Falkin (VP Marketing, Pricing and Contracts) | **Mylan**: Mike Aigner (Director National Accounts); Mauro (Chief Operating Officer); Robert Potter (Sr. VP of North America National Accounts and Channel Development) |
| April 25-28, 2015 | NACDS 2015 Annual Meeting in Palm Beach, | Boyer (Sr. VP, Generic Sales, Marketing, National Accounts); Falkin (VP Marketing, Pricing and | **Mylan**: Mauro (President); Robert Potter (Sr. VP of North America National Accounts); Rob O'Neill (Head of Sales); Gary |

| Date | Meeting | Allergan Attendees | Co-Conspirator Attendees |
|---|---|---|---|
| | FL | Contracts) | Tighe (Director National Accounts) |
| August 22 -25, 2015 | NACDS 2015 Total Store Expo in Denver, CO | Boyer (Sr. VP, Generic Sales, Marketing, National Accounts); Falkin (VP Marketing, Pricing and Contracts); Rogerson (Executive Director Pricing & Business Analytics) | **Mylan**: Mike Aigner (Director National Accounts); Mauro (President); Robert Potter (Sr. VP of North America National Accounts); Kevin McElfresh (Executive Director, National Accounts); Robert O'Neill (Head of Sales) |
| | | | **Heritage:** Glazer (CEO and Chairman); Jason Malek (Sr. VP, Commercial Operations); Neal O'Mara (Sr. Director, National Accounts); Anne Sather (Sr. Director, National Accounts); Matthew Edelson (Sr. Director of Sales); Gina Gramuglia (Commercial Operations) |

127.   In addition, representatives from Allergan and the Co-Conspirators also attended the NACDS 2016 Total Store Expo on August 19-22, 2016 in San Diego, California.

### h.   Inter-Competitor Communications Via Phone Calls and Text Messages

128.   When necessary, the agreements reached at trade meetings and industry dinners were reinforced through phone calls and text messages between executives and sales people from Allergan and the Co-Conspirators.   On these calls, the companies' representatives discussed, among other things, their desire to maintain or raise prices with respect to specific drugs.   Phone records referenced in the Amended AG Complaint demonstrate that these types of communications occurred with great frequency across the industry.   For example, the records revealed at least 334 separate

communications between Allergan and its co-conspirator Teva from July 2013 to July 2014, the period when most of the collusive price hikes occurred.

129.   The May 2019 AG Complaint tabulates the text messages and phone calls of selected co-conspirators, including Allergan, with Teva for 2013 and 2014:

**Table 1**
**Teva phone/text communications with other Defendants (by month)**
**January 1, 2013 – December 31, 2013**

|  | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | 2 | 2 | 0 | 7 | 27 | 1 | 17 | 12 | 15 | 40 | 13 | 47 | 183 |
| Glenmark | 0 | 3 | 0 | 0 | 26 | 9 | 6 | 8 | 1 | 12 | 14 | 16 | 95 |
| Greenstone | 2 | 0 | 20 | 1 | 4 | 5 | 6 | 1 | 0 | 2 | 7 | 11 | 59 |
| Lupin | 10 | 5 | 9 | 3 | 33 | 9 | 19 | 9 | 5 | 13 | 6 | 0 | 121 |
| Mylan | 31 | 47 | 32 | 37 | 33 | 26 | 26 | 16 | 1 | 1 | 0 | 11 | 261 |
| Sandoz | 17 | 5 | 4 | 4 | 12 | 16 | 18 | 14 | 3 | 0 | 9 | 2 | 104 |
| Taro | 0 | 0 | 0 | 0 | 2 | 1 | 8 | 11 | 0 | 11 | 1 | 1 | 35 |
| Zydus | 13 | 23 | 42 | 20 | 30 | 40 | 59 | 21 | 34 | 148 | 58 | 43 | 531 |
| Totals | 75 | 85 | 107 | 72 | 167 | 107 | 159 | 92 | 59 | 227 | 108 | 131 | 1389 |

**Table 2**
**Teva phone/text communications with other Defendants (by month)**
**January 1, 2014 – December 31, 2014**

|  | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | 31 | 17 | 47 | 42 | 76 | 9 | 38 | 24 | 36 | 23 | 8 | 14 | 365 |
| Glenmark | 4 | 11 | 11 | 7 | 7 | 2 | 9 | 6 | 1 | 6 | 3 | 3 | 70 |
| Greenstone | 17 | 3 | 13 | 3 | 1 | 1 | 6 | 1 | 9 | 0 | 0 | 0 | 54 |
| Lupin | 11 | 5 | 13 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 33 |
| Mylan | 6 | 1 | 1 | 1 | 7 | 2 | 0 | 10 | 13 | 5 | 2 | 9 | 57 |
| Sandoz | 5 | 10 | 7 | 10 | 0 | 1 | 28 | 7 | 4 | 1 | 6 | 3 | 82 |
| Taro | 1 | 1 | 7 | 4 | 17 | 16 | 5 | 2 | 1 | 0 | 0 | 1 | 55 |
| Zydus | 18 | 36 | 44 | 24 | 37 | 14 | 19 | 15 | 5 | 5 | 4 | 4 | 225 |
| Totals | 93 | 84 | 143 | 95 | 145 | 45 | 105 | 65 | 69 | 40 | 23 | 34 | 941 |

May 2019 AG Complaint, ¶¶119-121.

130.   According to the State AGs, the tables are "conservative" as they are "based on phone and text messages records from only some of the executives and salespeople at issue." *Id.* Even based on a conservative tabulation, Allergan and Teva executives communicated at least 548 times in the span of 2 years.

131.   In addition, even based on a limited catalogue of calls and text messages among the May 2019 AG Complaint's defendants and selected co-conspirator contacts, Allergan executives were in constant communication with other co-conspirators across the industry – exchanging texts or phone calls over 3,100 times between 2013 to 2016[12]:

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Min Date | Max Date |
|---|---|---|---|---|
| Marc Falkin | Stephen Rutledge  (Amneal) | 15 | 10/19/2013 | 11/16/2015 |
| Marc Falkin | Tina Kaus  (Apotex) | 22 | 3/4/2014 | 6/4/2015 |
| Marc Falkin | Jeffrey Hampton  (Apotex) | 6 | 4/7/2014 | 4/8/2014 |
| Marc Falkin | Beth Hamilton  (Apotex) | 1 | 6/10/2014 | 6/10/2014 |
| Marc Falkin | Robert Cunard  (Aurobindo) | 80 | 11/14/2013 | 3/16/2015 |
| Marc Falkin | Kon Ostaficiuk  (Camber) | 2 | 9/27/2013 | 12/5/2013 |
| Marc Falkin | Jim Brown  (Glenmark) | 270 | 8/9/2013 | 6/16/2016 |
| Marc Falkin | CW-5  (Glenmark) | 22 | 11/7/2013 | 2/26/2014 |
| Marc Falkin | Jill Nailor  (Greenstone) | 41 | 1/6/2014 | 3/14/2016 |
| Marc Falkin | Kevin Smith  (Lannett) | 181 | 8/1/2013 | 9/29/2015 |
| Marc Falkin | David Berthold  (Lupin) | 52 | 9/3/2013 | 4/1/2016 |
| Marc Falkin | Steve Randazzo  (Lupin) | 2 | 10/5/2013 | 10/5/2013 |
| Marc Falkin | Jim Nesta  (Mylan) | 78 | 12/3/2013 | 8/17/2015 |
| Marc Falkin | Jon Holden  (Par) | 48 | 9/24/2013 | 8/11/2015 |
| Marc Falkin | Steven Greenstein  (Sandoz) | 5 | 4/30/2014 | 6/23/2014 |
| Marc Falkin | Ara Aprahamian  (Taro) | 21 | 4/17/2014 | 3/8/2016 |
| Marc Falkin | Michael Perfetto  (Taro) | 9 | 12/13/2013 | 8/4/2014 |
| Marc Falkin | David Rekenthaler  (Teva) | 433 | 8/7/2013 | 3/25/2015 |
| Marc Falkin | Maureen Cavanaugh  (Teva) | 410 | 9/10/2013 | 7/29/2016 |
| Marc Falkin | Christine Baeder  (Teva) | 199 | 7/21/2015 | 7/29/2016 |
| Marc Falkin | Theresa Coward  (Teva) | 36 | 12/28/2015 | 7/27/2016 |
| Marc Falkin | Teva Pharmaceuticals (Teva) | 26 | 5/28/2015 | 7/19/2016 |
| Marc Falkin | Nisha Patel  (Teva) | 11 | 2/5/2016 | 6/16/2016 |
| Marc Falkin | Jocelyn Baker  (Teva) | 11 | 11/24/2015 | 6/2/2016 |
| Marc Falkin | Cassie Dunrud  (Teva) | 11 | 2/8/2016 | 6/22/2016 |
| Marc Falkin | Jessica Peters  (Teva) | 7 | 9/27/2014 | 3/22/2016 |
| Marc Falkin | Kevin Galownia  (Teva) | 6 | 1/14/2016 | 5/12/2016 |

---

[12]   Initials from the May 2019 AG Complaint were replaced with full names identified from individuals on the September 11, 2019 search terms proposal filed in the Generic Drugs MDL and based upon information in other publicly available sources such as LinkedIn, company websites, and other court filings.

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Min Date | Max Date |
|---|---|---|---|---|
| Marc Falkin | Michael Craney  (Wockhardt) | 3 | 5/24/2016 | 5/24/2016 |
| Marc Falkin | Kristy Ronco  (Zydus) | 550 | 8/3/2013 | 4/13/2016 |
| Marc Falkin | Michael Keenley  (Zydus) | 4 | 1/10/2014 | 1/11/2014 |
| Rick Rogerson | Nimish Muzumdar  (Dr. Reddy's and Sandoz) | 43 | 10/15/2013 | 3/6/2018 |
| Rick Rogerson | S.G.  (Glenmark) | 3 | 2/8/2010 | 2/8/2010 |
| Rick Rogerson | Jolene McGalliard  (Lannett and Glenmark) | 32 | 6/24/2010 | 1/6/2012 |
| Rick Rogerson | Armando Kellum  (Sandoz) | 3 | 5/5/2011 | 9/28/2011 |
| Rick Rogerson | Ara Aprahamian  (Taro) | 4 | 6/17/2013 | 4/16/2014 |
| Rick Rogerson | Taro Pharmaceuticals (Taro) | 2 | 6/14/2013 | 11/20/2013 |
| Rick Rogerson | Nisha Patel  (Teva) | 157 | 5/2/2013 | 11/9/2015 |
| Rick Rogerson | Kevin Galownia  (Teva) | 29 | 12/15/2015 | 7/29/2016 |
| Rick Rogerson | Teva Pharmaceuticals (Teva) | 27 | 9/24/2015 | 7/29/2016 |
| Rick Rogerson | Christine Baeder  (Teva) | 17 | 2/26/2016 | 7/26/2016 |
| Rick Rogerson | Karen Andrus  (Wockhardt) | 316 | 3/11/2010 | 1/28/2016 |
| Rick Rogerson | Jodi Weber  (Zydus) | 2 | 6/24/2014 | 6/25/2014 |
| Allan Slavsky | David Berthold (Lupin) | 3 | 2/13/2012 | 5/24/2012 |
| Allan Slavsky | Ara Aprahamian (Taro) | 1 | 1/9/2014 | 1/9/2014 |
| Allan Slavsky | David Rekenthaler (Teva) | 26 | 1/11/2012 | 4/1/2013 |
| Allan Slavsky | Maureen Cavanaugh (Teva) | 17 | 8/21/2015 | 7/26/2016 |
| Allan Slavsky | Nisha Patel (Teva) | 28 | 9/16/2015 | 3/10/2016 |
| Andrew Boyer | Jill Nailor (Greenstone) | 86 | 9/21/2011 | 7/14/2016 |
| Andrew Boyer | Ara Aprahamian (Taro) | 16 | 8/16/2013 | 4/19/2016 |
| Andrew Boyer | David Rekenthaler (Teva) | 16 | 4/1/2013 | 9/16/2014 |
| Andrew Boyer | Maureen Cavanaugh (Teva) | 113 | 8/12/2015 | 7/25/2016 |
| Andrew Boyer | Nisha Patel (Teva) | 28 | 4/30/2013 | 10/16/2015 |
| Anthony Giannone | David Berthold (Lupin) | 301 | 3/22/2011 | 12/14/2017 |
| Anthony Giannone | Ara Aprahamian (Taro) | 4 | 4/23/2013 | 4/30/2013 |
| Anthony Giannone | Nisha Patel (Teva) | 9 | 1/27/2015 | 6/9/2016 |
| Ara Aprahamian | Jim Grauso (Aurobindo) | 6 | 1/20/2012 | 1/27/2012 |
| David Schmidt | Jill Nailor (Greenstone) | 5 | 11/27/2010 | 1/31/2012 |
| Jonathan Kafer | David Rekenthaler (Teva) | 15 | 10/11/2013 | 3/29/2015 |
| Jonathan Kafer | Maureen Cavanaugh (Teva) | 4 | 4/29/2014 | 3/31/2015 |
| M.B. | Nisha Patel (Teva) | 3 | 2/26/2016 | 6/6/2016 |
| Michael Baker | Ara Aprahamian (Taro) | 12 | 5/13/2014 | 8/22/2015 |
| Michael Dorsey | Ara Aprahamian (Taro) | 52 | 3/19/2013 | 9/2/2016 |
| Michael Perfetto | Jim Grauso (Aurobindo) | 57 | 12/6/2011 | 1/13/2014 |
| Napoleon Clark | Jill Nailor (Greenstone) | 1 | 1/29/2013 | 1/29/2013 |
| Steve Cohen | Jill Nailor (Greenstone) | 5 | 4/18/2012 | 4/22/2012 |
| Thad Demos | Ara Aprahamian (Taro) | 3 | 4/12/2013 | 7/10/2013 |
| **Total:** | | **4008** | | |

### 4. Propranolol

132.   Discovered in the 1960s, Propranolol is a beta blocker used to treat high blood pressure and certain types of irregular heart rates, to prevent migraines, and to treat further heart problems in individuals who suffered a previous heart attack or have angina.  Beta blockers work by blocking the effects of epinephrine, causing a patient's heart to beat slower and with less force, thereby reducing blood pressure. Propranolol is included as a preventative anti-migraine medicine on the Core List within the World Health Organization's ("WHO") Model List of Essential Medicines – a list "of minimum medicine needs for a basic health-care system, listing the most efficacious, safe and cost-effective medicines for priority conditions."

### a. The Co-Conspirators' Price Hikes

133.   Allergan and the Co-Conspirators engaged in anticompetitive conduct by colluding to improperly raise and maintain the prices of Propranolol beginning in late 2013.  For example, Allergan, Heritage, Impax and Mylan raised the price of generic Propranolol HCL 10mg, 20mg, and 80mg tablets by as much as *1,200%* between December 2014 and December 2015.

134.   The graph below similarly shows the price hikes of Propranolol HCL sustained release capsules manufactured by Allergan, Mylan and other Co-Conspirators in late 2013:



135.   This drastic increase in the price of Propranolol HCL sustained release capsules occurred shortly after and/or in conjunction with the GPhA 2013 Fall Technical Conference in October 2013.

136.   In addition, Allergan and its Co-Conspirators raised the price of Propranolol HCL tablets by as much as 1,200% between December 2014 and December 2015.  The drastic increase in the price of Propranolol HCL 10mg tablets occurred shortly after and/or in conjunction with the following trade association meetings:

- GPhA 2015 Annual Meeting in February 2015 attended by representatives from Allergan, Heritage, Mylan and other Co-Conspirators;

- NACDS 2015 Annual Meeting in April 2015 attended by representatives from Allergan (including Boyer and Falkin) and representatives from Mylan, along with representatives from other Co-Conspirators;

- GPhA 2015 CMC Workshop in June 2015 attended by representatives from Allergan, Heritage, Impax, Mylan and other Co-Conspirators;

- HDA 2015 BLC in June 2015 attended by representatives from Allergan (including Boyer, Falkin and Rogerson) and representatives from Mylan and Heritage, along with representatives from other Co-Conspirators; and

- NACDS 2015 Total Store Expo in August 2015 attended by representatives from Allergan (including Boyer, Falkin and Rogerson) and representatives from Mylan and Heritage, along with representatives from other Co-Conspirators.

137. The drastic increase in the price of Propranolol HCL 20mg tablets occurred shortly after and/or in conjunction with the following trade association meetings:

- GPhA 2015 Annual Meeting in February 2015 attended by representatives from Allergan, Heritage, Mylan and other Co-Conspirators;

- NACDS 2015 Annual Meeting in April 2015 attended by representatives from Allergan (including Boyer and Falkin) and representatives from Mylan, along with representatives from other Co-Conspirators;

- GPhA 2015 CMC Workshop in June 2015 attended by representatives from Allergan, Heritage, Impax, Mylan and other Co-Conspirators;

- HDA 2015 BLC in June 2015 attended by representatives from Allergan (including Boyer, Falkin and Rogerson) and representatives from Mylan and Heritage, along with representatives from other Co-Conspirators; and

- NACDS 2015 Total Store Expo in August 2015 attended by representatives from Allergan (including Boyer, Falkin and Rogerson) and representatives from Mylan and Heritage, along with representatives from other Co-Conspirators.

138.   The drastic increase in the price of Propranolol HCL 80mg tablets occurred shortly after and/or in conjunction with the following trade association meetings:

- GPhA 2015 Annual Meeting in February 2015 attended by representatives from Allergan, Heritage, Mylan and other Co-Conspirators;

- NACDS 2015 Annual Meeting in April 2015 attended by representatives from Allergan (including Boyer and Falkin) and representatives from Mylan, along with representatives from other Co-Conspirators;

- GPhA 2015 CMC Workshop in June 2015 attended by representatives from Allergan, Heritage, Impax, Mylan and other Co-Conspirators;

- HDA 2015 BLC in June 2015 attended by representatives from Allergan, (including Boyer, Falkin and Rogerson) and representatives from Mylan and Heritage, along with representatives from other Co-Conspirators; and

- NACDS 2015 Total Store Expo in August 2015 attended by representatives from Allergan (including Boyer, Falkin and Rogerson) and representatives from Mylan and Heritage, along with representatives from other Co-Conspirators.

### b.    No Commercial Justification for Price Hikes

139.   There was no reasonable justification for the price hikes discussed above. While a supply shortage can explain an abrupt rise in prices, here – notwithstanding the drug manufacturers' obligation to report shortages to the FDA – no such shortage of Propranolol was reported during the relevant time period.  In addition, there was no significant increase in the demand for Propranolol or in the drug's production costs that would explain the enormous price increase.  Even if there was such a benign

market explanation for the price increase, at no point following the initial spike did the price return to the pre-spike equilibrium price point.

140.   In addition, price increases of this magnitude would have been contrary to each of the Co-Conspirators' economic interest absent the price-fixing scheme. Without the certainty that all of the Co-Conspirators would raise and maintain the prices for generic Propranolol, each Co-Conspirator risked getting undercut by the others, leading to a loss of market share and a loss of revenue.  This risk was alleviated by the Co-Conspirators' agreement to raise and maintain their prices for generic Propranolol.

### c.   The Market for Generic Propranolol HCL Was Susceptible to Anticompetitive Conduct

### (1)   Market Concentration

141.   In 2014 and 2015, the markets for generic Propranolol HCL were highly concentrated, as demonstrated by the HHI calculations below:

|  | 2014 HHI | 2015 HHI |
| --- | --- | --- |
| **Propranolol HCL 10mg tablets** | 2,444 | 2,786 |
| **Propranolol HCL 20mg tablets** | 2,506 | 3,034 |
| **Propranolol HCL 80mg tablets** | 2,514 | 2,684 |
| **Propranolol HCL Sustained Release Capsules** | 4,446 | 3,569 |

142.   At the time of the price hike, Allergan and its Co-Conspirators combined to account for more than 75% of the total markets for generic Propranolol HCL 10mg, 20mg and 80mg tablets and almost 100% of the total market for Propranolol HCL sustained release capsules, as set forth in the chart below.



**(2)     Significant Barriers to Entry**

143.   As mentioned above, the barriers to entry into the markets for generic Propranolol HCL included high manufacturing costs as well as certain regulatory and intellectual property barriers. For example, the requirement that generic drug companies file an ANDA and receive FDA approval can delay entry into the market by an average of 36 months.

**(3)     Lack of Available Substitutes**

144.   As discussed above, pharmacists presented with a prescription for a given drug can only substitute another drug if that drug has an "AB" rating.  Only generic Propranolol and brand-name Propranolol for a given dosage are AB-rated to one another.  Therefore, a pharmacist can only fill a prescription for Propranolol with the brand-name version or one of the AB-rated generic versions and cannot substitute another drug.

### (4)     Commodity-Like Product

145.   As mentioned above, all generic versions of any given brand-name drug are necessarily interchangeable. Generic Propranolol is no exception.  The FDA-approved versions of generic Propranolol HCL manufactured by the Co-Conspirators each has an "AB" rating.  Thus, pharmacists are able to substitute one manufacturer's generic version of Propranolol for another.

### (5)     Inelastic Demand

146.   The generic Propranolol market was characterized by nearly perfect inelastic demand with Ed measured at close to zero.  For example, at the time of the collusive price-fixing, the market for generic Propranolol sustained release capsules was so inelastic that the dramatic price increase had no negative effect on sales whatsoever and the quantities sold actually increased by 2%.  As a result, the coordinated price hike translated immediately and directly into collusive revenues shared by Allergan and its Co-Conspirators.

### (6)     Absence of Competitive Sellers

147.   In the case of generic Propranolol sustained release capsules and Propranolol HCL 10mg, 20mg and 80mg tablets, there was no realistic threat that minor market participants would take market share from Allergan and its Co-Conspirators.  The dominance of Allergan and the Co-Conspirators facilitated their ability to raise prices without losing market share to minor market participants.  Indeed, following the dramatic price increases discussed above, neither Allergan nor

the Co-Conspirators were willing to meaningfully undercut prices to gain market share, thereby further demonstrating the absence of a competitive market.

148.   Allergan and its Co-Conspirators' coordinated price hikes left behind a trail of collusive markers which are evidence of anticompetitive behavior.   For example, the Propranolol sustained release capsules' price increases by the Co-Conspirators for the period from May 2013 to December 2016 were so uniform that they registered at 86% to 98% correlation.   Under the collusion scheme, after the price hike, the volatility of Allergan's price for the drug steadily declined from 10.8% in 2013 to 0.6% in 2016 as prices were sustained at heightened levels.   Allergan's market share remained uncharacteristically stable despite the price hike, with an annual standard deviation ranging from a mere 2.1% to 9.0% during the Relevant Period.

### d.   Collusive Revenue

149.   Collusive revenue represents the amount of additional revenue that Allergan received due to anticompetitive behavior.   This is calculated by taking the difference between the actual price Allergan received minus the "but for" price and multiplied by the actual quantity sold. The "but for" price is  based on three distinct methodologies: (i) "But for" Price Regression; (ii) "But for" Price Regression + CPI; and (iii) "But for" Price Average Drug Price Trend.   These three values are depicted, respectively, by the first three bars for each year on the collusive revenue chart below.

150.   As a result of the price hikes in Propranolol, Allergan improperly recognized over $91 million of collusive revenue[13] between 2014 and 2016:



Total Yearly Collusive Revenue

|  | 2014 | 2015 | 2016 |
|---|---|---|---|
| (1) Collusive Revenue | 59.8 | 32.3 | 21.2 |
| (2) Collusive Revenue | 58.3 | 31.0 | 19.0 |
| (3) Collusive Revenue | 46.3 | 5.6 | - |
| Average | 54.8 | 23.0 | 13.4 |

5.   **Ursodiol**

151.   Ursodiol, or ursodeoxycholic acid, is a bile acid used to treat gallbladder stones and is usually prescribed to patients with small gallstones who cannot undergo gallbladder surgery.  The drug decreases the amount of cholesterol produced by the liver and absorbed by the intestines and helps to break down cholesterol that has formed into gallstones.  Generic versions of Ursodiol in capsule form have been on the market since 2000.  Allergan listed Ursodiol as one of the "key products" that made up "a majority of product sales for North American Generics" for 2014 in the Company's 2014 Form 10-K.

---

[13]   The average of all three methodologies – depicted as the fourth bar in the collusive revenue chart – is used *infra* for the purposes of aggregating revenue throughout the Relevant Period.

### a.   The Co-Conspirators' Price Hikes

152.   Allergan and the Co-Conspirators engaged in anticompetitive conduct by colluding to improperly raise and maintain the prices of Ursodiol, beginning in early 2014.  For example, as demonstrated below, Allergan and co-conspirators Epic and Lannett raised the prices of Ursodiol capsules by almost ***1,200%***.

153.   The graph below shows the price hikes of Ursodiol capsules manufactured by Allergan, Epic and Lannett between December 2010 and October 2016:



154.   The drastic increase in the price of Ursodiol capsules occurred shortly after and/or in conjunction with the following trade association meetings:

- GPhA 2014 Annual Meeting in February 2014 attended by representatives from Allergan, Epic and other Co-Conspirators;

- NACDS 2014 Annual Meeting in April 2014 attended by representatives from Allergan (including Boyer and Falkin) and certain Co-Conspirators;

- GPhA 2014 CMC Workshop in June 2014 attended by representatives from Allergan, Lannett and other Co-Conspirators;

- HDA 2014 BLC in June 2014 attended by representatives from Allergan (including Falkin) and certain Co-Conspirators;

- NACDS 2014 Total Store Expo in August 2014 attended by representatives from Allergan (including Boyer, Falkin and Rogerson) and certain Co-Conspirators; and

- In addition to these industry meetings, the AG Complaint describes a dinner at a steakhouse in Bridgewater, New Jersey in January 2014, just before the price for Ursodiol skyrocketed. The dinner was attended by high-ranking executives from Allergan, Lannett and other generic manufacturers.

### b. No Commercial Justification for Price Hikes

155. There was no reasonable justification for the price hikes discussed above. While a supply shortage can explain an abrupt rise in prices, here – notwithstanding the drug manufacturers' obligation to report shortages to the FDA – no such shortage of Ursodiol was reported during the relevant time period. In addition, there was no significant increase in the demand for Ursodiol or in the drug's production costs that would explain the enormous price increase. Even if there was such a benign market explanation for the price increase, at no point following the initial spike did the price return to the pre-spike equilibrium price point.

156. In addition, price increases of this magnitude would have been contrary to each of the Co-Conspirators' economic interest absent the price-fixing scheme. Without the certainty that all of the Co-Conspirators would raise and maintain the prices for generic Ursodiol, each Co-Conspirator risked getting undercut by the others,

leading to a loss of market share and a loss of revenue.  This risk was alleviated by the Co-Conspirators' agreement to raise and maintain their prices for generic Ursodiol.

### c.   The Market for Generic Ursodiol Capsules Was Susceptible to Anticompetitive Conduct

#### (1)   Market Concentration

157.   In 2014, the market for generic Ursodiol capsules was highly concentrated, as demonstrated by the HHI calculation below:

|  | 2014 HHI |
| --- | --- |
| **Ursodiol 300mg capsules** | 3,579 |

158.   During this period, Allergan and co-conspirators Epic and Lannett combined to account for more than 95% of the total market for generic Ursodiol capsules, as shown in the chart below:



## (2)     Significant Barriers to Entry

159.   As mentioned above, the barriers to entry into the market for generic Ursodiol capsules included high manufacturing costs as well as certain regulatory and intellectual property barriers.   For example, the requirement that generic drug companies file an ANDA and receive FDA approval can delay entry into the market by an average of 36 months.

160.   Further discouraging new entrants into the market for generic Ursodiol capsules is the relatively small size of the worldwide market for the drug.

## (3)     Lack of Available Substitutes

161.   As discussed above, pharmacists presented with a prescription for a given drug can only substitute another drug if that drug has an "AB" rating. Only generic Ursodiol and brand-name Ursodiol for a given dosage are AB-rated to one another. Therefore, a pharmacist can only fill a prescription for Ursodiol with the brand-name version or one of the AB-rated generic versions and cannot substitute another drug.

## (4)     Commodity-Like Product

162.   As mentioned above, all generic versions of any given brand-name drug are necessarily interchangeable.   Generic Ursodiol is no exception.   The FDA-approved versions of generic Ursodiol capsules manufactured by co-conspirators Allergan, Epic and Lannett each has an "AB" rating.   Thus, pharmacists are able to substitute one manufacturer's generic version of Ursodiol for another.

### (5) Inelastic Demand

163. The generic Ursodiol market was characterized by nearly perfect inelastic demand with Ed measured at close to zero. For example, at the time of the collusive price fixing, the market for generic Ursodiol capsules was so inelastic that the dramatic price increase had negligible effect on sales with the quantities sold declining by a mere 1%. As a result, the coordinated price hike translated immediately and directly into collusive revenues shared by Allergan and its Co-Conspirators.

### (6) Absence of Competitive Sellers

164. In the case of generic Ursodiol capsules, there was no realistic threat that the other market participants, who collectively contributed less than 5% of the total generic Ursodiol capsule sales, would take market share from Allergan and co-conspirators Epic and Lannett. The dominance of Allergan and the Co-Conspirators facilitated their ability to raise prices without losing market share to non-conspirators. Moreover, following the dramatic price increases in the second half of 2014, discussed above, neither Allergan nor the Co-Conspirators were willing to meaningfully undercut prices to gain market share, thereby further demonstrating the absence of a competitive market.

165. Allergan and its Co-Conspirators' coordinated price hikes left behind a trail of collusive markers which are evidence of anticompetitive behavior. The Ursodiol capsules' price increases by the Co-Conspirators from 2014 to 2016 were so

uniform that they registered at 88% to 97% correlation. Under the collusion scheme, after the price hike, the volatility of Allergan's price for the drug went from 35% in 2014 to 0% in 2016, as prices were sustained at heightened levels. Allergan's market share remained uncharacteristically stable despite the price hike, with an annual standard deviation ranging from a mere 0.8% to 11.0% during the Relevant Period.

### d. Collusive Revenue

166. As a result of the price hikes in Ursodiol, Allergan improperly recognized over $189 million of collusive revenue between 2014 and 2016:



### 6. Doxycycline

167. Patented in 1957 and put into commercial use in 1967, Doxycycline is a broad-spectrum antibiotic in the tetracycline class. Doxycycline is commonly produced in two salt forms: hyclate and monohydrate. Doxycycline is used to treat a variety of bacterial infections, including pneumonia, acne, chlamydia, Lyme disease,

cholera and syphilis.  Doxycycline, in combination with quinine, is also used to treat malaria.  Doxycycline is included on the Core List within the WHO's Model List of Essential Medicines.  Allergan listed doxycycline hyclate as a "key product" in the Company's 2013 Form 10-K and December 5, 2014 Form 8-K.  For 2014, the drug was one of the "key products" that made up "a majority of product sales for North American Generics," according to the 2014 Forms 10-K.

### a.    The Co-Conspirators' Price Hikes

168.    Allergan and the Co-Conspirators engaged in anticompetitive conduct by colluding to improperly raise and maintain the prices of Doxycycline beginning in early 2013.  For example, Allergan, Mutual and West-Ward raised the prices of Doxycycline capsules and by as much as ***5,000%***.

169.    The graph below shows the price hikes of Doxycycline manufactured by Allergan, Sun and West-Ward from January 2012 to July 2014:



170.   This drastic increase in the price of Doxycycline capsules occurred in conjunction with the GPhA 2013 Annual Meetings in October 2012 and February 2013 attended by representatives from Allergan (including Olafsson) and other Co-Conspirators.

### b.   No Commercial Justification for Price Hikes

171.   There were no reported shortages of Doxycycline that justified the drastic price increases discussed above.  While the FDA did report a shortage of Doxycycline in January 2013, this shortage cannot explain the significant price increases because, among other reasons, the Doxycycline prices did not return to the pre-shortage levels following the resolution of the shortage in October 2013.  Indeed, Allergan's price immediately before the shortage was significantly lower and never returned to this level after March 2013.  There were also no significant increases in the demand for this drug that would explain the enormous price increases.

172.   In addition, price increases of this magnitude would have been contrary to each of the Co-Conspirators' economic interest absent the price-fixing scheme. Without the certainty that all of the Co-Conspirators would raise and maintain the prices for generic Doxycycline, each Co-Conspirator risked getting undercut by the others, leading to a loss of market share and a loss of revenue.  This risk was alleviated by the Co-Conspirators' agreement to raise and maintain their prices for generic Doxycycline.

### c. The Market for Generic Doxycycline Was Susceptible to Anticompetitive Conduct

#### (1) High Level of Market Concentration

173.   In 2012 and 2013, the market for generic Doxycycline capsules was highly concentrated, as demonstrated by the HHI calculation below:

|  | 2012 HHI | 2013 HHI |
|---|---|---|
| **Doxycycline capsules** | 3,187 | 2,550 |

174.   During this period, Allergan and the Co-Conspirators combined to account for almost 100% of the total market for generic Doxycycline, as shown in the charts below:



#### (2) Significant Barriers to Entry

175.   As mentioned above, the barriers to entry into the market for generic Doxycycline capsules included high manufacturing costs as well as certain regulatory and intellectual property barriers.  For example, the requirement that generic drug

companies file an ANDA and receive FDA approval can delay entry into the markets for generic Doxycycline by an average of 36 months.

### (3)   Lack of Available Substitutes

176.   As discussed above, pharmacists presented with a prescription for a given drug can only substitute another drug if that drug has an "AB" rating.  Only generic Doxycycline and brand-name Doxycycline for a given dosage are AB-rated to one another.  Therefore, a pharmacist can only fill a prescription for Doxycycline with the brand-name version or one of the AB-rated generic versions and cannot substitute another drug.

### (4)   Commodity-Like Product

177.   As mentioned above, all generic versions of any given brand-name drug are necessarily interchangeable.  Generic doxycycline hyclate is no exception.  The FDA-approved versions of generic doxycycline hyclate manufactured by co-conspirators Allergan, Sun and West-Ward each has an "AB" rating.  Thus, pharmacists are able to substitute one manufacturer's generic version of doxycycline hyclate for another.

### (5)   Inelastic Demand

178.   The generic Doxycycline market was characterized by nearly perfect inelastic demand with Ed measured at close to zero.  For example, at the time of the collusive price fixing, the market for generic Doxycycline capsules was so inelastic that the dramatic price increase had negligible effect on sales, with quantities sold

declining by only 3%.  As a result, the coordinated price hike translated immediately and directly into collusive revenues shared by Allergan and its Co-Conspirators.

### (6)    Absence of Competitive Sellers

179.   In the case of generic Doxycycline capsules, there was no realistic threat that the other small market participants would take market share from Allergan and co-conspirators Sun and West-Ward.  The dominance of Allergan and the Co-Conspirators facilitated their ability to raise prices without losing market share to non-conspirators.  Moreover, following the dramatic price increases in early 2013, discussed above, neither Allergan nor the Co-Conspirators were willing to meaningfully undercut prices to gain market share, thereby further demonstrating the absence of a competitive market.

180.   Allergan and its Co-Conspirators' coordinated price hikes left behind a trail of collusive markers which are evidence of anticompetitive behavior.  The Doxycycline capsules' price increases by the Co-Conspirators were so uniform that they registered at 90% to 99% correlation.  Under the collusion scheme, after the price hike, the volatility of Allergan's price for the drug went from 29% to 0.8% as prices were sustained at heightened levels.  Allergan's market share remained uncharacteristically stable despite the price hike, with an annual standard deviation ranging from a mere 0.8% to 11.6% during the Relevant Period.

### d.    Collusive Revenue

181.   As a result of the price hikes in Doxycycline, Allergan improperly recognized over $574 million of collusive revenue between 2013 and 2016:



### 7.    Desonide

182.   Desonide is a mild topical corticosteroid produced in cream, gel and ointment form.  Desonide is used to treat a variety of skin conditions, including eczema, seborrheic and contact dermatitis, allergies and psoriasis, and works by reducing the swelling, itching and redness that accompanies these conditions. Allergan listed Desonide lotion and cream as "key products" in the Company's 2013 Form 10-K and December 5, 2014 Form 8-K.  For 2014, the drug was listed as one of the "key products" that made up "a majority of product sales for North American Generics," according to the 2014 Form 10-K.

### a.      The Co-Conspirators' Price Hikes

183.   Allergan and the Co-Conspirators engaged in anticompetitive conduct by colluding to improperly raise and/or maintain the prices of Desonide.  Between March and September of 2013, co-conspirators Taro and Perrigo raised the price of Desonide cream by as much as ***470%***. Allergan entered the Desonide cream market after the price hike in September 2013 and, despite the new competition, the price remained inflated, strongly suggesting that Allergan joined the conspiracy.  Similarly, Allergan raised prices of Desonide lotion along with its Co-Conspirators more than ***442%*** between June 2011 and September 2013. Allergan and its Co-Conspirators first hiked prices of Desonide lotion in 2011 and, as reflected in the chart below, more than doubled the already inflated price again in the middle of 2013

184.   The graph below shows the price hikes of Desonide lotion manufactured by Taro, Fougera Pharmaceuticals ("Fougera") and Allergan between January 2012 and May 2017:



185.   These drastic increases in the price of generic Desonide lotion and Allergan's entrance into the market at an inflated price occurred shortly after the GPhA 2013 Annual Meeting in February 2013 attended by representatives from Allergan (including Olafsson) and other Co-Conspirators, the NACDS 2013 Annual Meeting in April 2013 attended by representatives from Allergan (including Bisaro and Boyer) and certain Co-Conspirators, and the GPhA 2013 CMC Workshop in June 2013 attended by representatives from Allergan and other Co-Conspirators.

### b.   No Commercial Justification for Price Hikes

186.   There was no reasonable justification for the price hikes discussed above. While a supply shortage can explain an abrupt rise in prices, here – notwithstanding the drug manufacturers' obligation to report shortages to the FDA – no such shortage of Desonide was reported during the relevant time period.  In addition, there was no significant increase in the demand for Desonide or in the drug's production costs that would explain the enormous price increase.  Even if there was such a benign market explanation for the price increase, at no point following the initial spike did the price return to the pre-spike equilibrium price point.

187.   In addition, price increases of this magnitude would have been contrary to each of the Co-Conspirators' economic interest absent the price-fixing scheme. Without the certainty that all of the Co-Conspirators would raise and maintain the prices for generic Desonide, each Co-Conspirator risked getting undercut by the

others, leading to a loss of market share and a loss of revenue.  This risk was alleviated by the Co-Conspirators' agreement to raise and maintain their prices for generic Desonide.

### c.     The Market for Generic Desonide Was Susceptible to Anticompetitive Conduct

### (1)     High Level of Market Concentration

188.   From 2011 to 2014, the market for generic Desonide lotion was highly concentrated, as demonstrated by the HHI calculation below:

|  | 2011 HHI | 2012 HHI | 2013 HHI | 2014 HHI |
|---|---|---|---|---|
| **Desonide 0.05% 15gm tube** | 5,190 | 5,163 | 8,738 | 5,551 |

189.   During this period, Allergan and the Co-Conspirators combined to account for almost 100% of the total market for generic Desonide lotion:



Desonide Topical Lotion: Total Sales %

### (2) Significant Barriers to Entry

190. As mentioned above, the barriers to entry into the market for generic Desonide included high manufacturing costs as well as certain regulatory and intellectual property barriers.  For example, the requirement that generic drug companies file an ANDA and receive FDA approval can delay entry into the market by an average of 36 months.

### (3) Lack of Available Substitutes

191. As discussed above, pharmacists presented with a prescription for a given drug can only substitute another drug if that drug has an "AB" rating.  Only generic Desonide and brand-name Desonide for a given dosage are AB-rated to one another. Therefore, a pharmacist can only fill a prescription for Desonide with the brand-name version or one of the AB-rated generic versions and cannot substitute another drug.

### (4) Commodity-Like Product

192. As mentioned above, all generic versions of any given brand-name drug are necessarily interchangeable.  Generic Desonide is no exception.  The FDA-approved versions of generic Desonide manufactured by Allergan and the Co-Conspirators each has an "AB" rating.  Thus, pharmacists are able to substitute one manufacturer's generic version of Desonide for another.

### (5) Inelastic Demand

193. The generic Desonide market was characterized by highly inelastic demand with Ed measured at -0.197.  For example, at the time of the collusive price

fixing, the market for generic Desonide was so inelastic that the dramatic price increase had only a small effect on sales, with quantities sold declining by 12%. As a result, the coordinated price hike translated immediately and directly into collusive revenues shared by Allergan and its Co-Conspirators.

### (6)    Absence of Competitive Sellers

194.   In the case of generic Desonide lotion and cream, there were no other market participants who could take market share from Allergan and co-conspirators Perrigo, Taro and Fougera.  The complete dominance of Allergan and the Co-Conspirators facilitated their ability to raise prices without losing market share to non-conspirators.  Moreover, following the dramatic price increases, discussed above, neither Allergan nor the Co-Conspirators were willing to meaningfully undercut prices to gain market share, thereby further demonstrating the absence of a competitive market.

195.   Allergan and its Co-Conspirators' coordinated price hikes left behind a trail of collusive markers which are evidence of anticompetitive behavior.  The Desonide lotion's price increases by the Co-Conspirators were so uniform that they registered at close to 78% correlation.  Under the collusion scheme, after the price hike, the volatility of Allergan's price for the drug went from 33.8% in 2013 to 0.6% in 2016, as prices were sustained at heightened levels.  Allergan's market share

remained uncharacteristically stable despite the price hike, with an annual standard deviation ranging from a mere 0.7% to 7.7% during the Relevant Period.

### d.   Collusive Revenue

196.   As a result of the price hikes in Desonide lotion, Allergan improperly recognized almost $16 million of collusive revenue between 2013 and 2016:



| | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| (1) Collusive Revenue | 1.3 | 9.6 | 6.6 | 3.3 |
| (2) Collusive Revenue | 1.3 | 9.4 | 6.3 | 2.9 |
| (3) Collusive Revenue | 1.2 | 4.6 | 0.1 | - |
| Average | 1.3 | 7.9 | 4.3 | 2.1 |

### 8.   Tretinoin

197.   Tretinoin is a medication used for the treatment of acne.  Allergan sold generic versions of Tretinoin during the Relevant Period.

### a.   The Co-Conspirators' Price Hikes

198.   Allergan and the Co-Conspirators engaged in anticompetitive conduct by colluding to improperly raise and maintain the prices of Tretinoin external cream beginning in early 2014.  For example, as demonstrated by the graph and table below,

Allergan and co-conspirator Perrigo raised the prices of Tretinoin cream by over *190%*.

199.    The graph below shows the Tretinoin external cream price hikes during the Relevant Period:



200.    This drastic increase in the price of Tretinoin external cream occurred shortly after and/or in conjunction with the following trade association meetings:

- GPhA 2014 Fall Technical Conference in October 2013 attended by representatives from Allergan and other Co-Conspirators; and

- GPhA Annual Meeting in February 2014 attended by representatives from Allergan and other Co-Conspirators.

### b.    No Commercial Justification for Price Hikes

201.    There was no reasonable justification for the price hikes discussed above. While a supply shortage can explain an abrupt rise in prices, here – notwithstanding the drug manufacturers' obligation to report shortages to the FDA – no such shortage of Tretinoin external cream was reported during the relevant time period.  In addition,

there was no significant increase in the demand for Tretinoin external cream or in the drug's production costs that would explain the enormous price increase. Even if there was such a benign market explanation for the price increase, at no point following the initial spike did the price return to the pre-spike equilibrium price point.

202.   In addition, price increases of this magnitude would have been contrary to each of the Co-Conspirators' economic interest absent the price-fixing scheme. Without the certainty that all of the Co-Conspirators would raise and maintain the prices for generic Tretinoin external cream, each Co-Conspirator risked getting undercut by the others, leading to a loss of market share and a loss of revenue. This risk was alleviated by the Co-Conspirators' agreement to raise and maintain their prices for generic Tretinoin.

### c.    The Market for Generic Tretinoin External Cream Was Susceptible to Anticompetitive Conduct

### (1)    High Level of Market Concentration

203.   In 2014, the market for generic Tretinoin external cream was highly concentrated, as demonstrated by the HHI calculation below:

|  | 2014 HHI |
|---|---|
| **Tretinoin external cream** | 3,977 |

204.   During this period, Allergan and Co-Conspirators combined to account for more than 90% of the total market for generic Tretinoin external cream, as shown in the chart below:

- 89 -



**(2)     Significant Barriers to Entry**

205.   As mentioned above, the barriers to entry into the market for generic Tretinoin external cream included high manufacturing costs as well as certain regulatory and intellectual property barriers.   For example, the requirement that generic drug companies file an ANDA and receive FDA approval can delay entry into the market by an average of 36 months.

**(3)     Lack of  Available Substitutes**

206.   As discussed above, pharmacists presented with a prescription for a given drug can only substitute another drug if that drug has an "AB" rating.   Only generic Tretinoin and brand-name Tretinoin for a given dosage are AB-rated to one another.  Therefore, a pharmacist can only fill a prescription for Tretinoin with the brand-name version or one of the AB-rated generic versions and cannot substitute another drug.

### (4)     Commodity-Like Product

207.   As mentioned above, all generic versions of any given brand-name drug are necessarily interchangeable.   Generic Tretinoin is no exception.   The FDA-approved versions of generic Tretinoin external cream manufactured by the Co-Conspirators each has an "AB" rating.   Thus, pharmacists are able to substitute one manufacturer's generic version of Tretinoin for another.

### (5)     Inelastic Demand

208.   The generic Tretinoin external cream market was characterized by nearly perfect inelastic demand with Ed measured at close to zero.   For example, at the time of the collusive price fixing, the market for generic Tretinoin external cream was so inelastic that the dramatic price increase had negligible effect on sales, with quantities sold declining by a mere 1%.   As a result, the coordinated price hike translated immediately and directly into collusive revenues shared by Allergan and its Co-Conspirators.

### (6)     Absence of Competitive Sellers

209.   In the case of generic Tretinoin external cream, there was no realistic threat that the other small market participants would take market share from Allergan and the Co-Conspirators.   The dominance of Allergan and the Co-Conspirators facilitated their ability to raise prices without losing market share to non-conspirators. Moreover, following the dramatic price increases in early 2014, discussed above, neither Allergan nor the Co-Conspirators were willing to meaningfully undercut prices

to gain market share, thereby further demonstrating the absence of a competitive market.

210.   Allergan and its Co-Conspirators' coordinated price hikes left behind a trail of collusive markers which are evidence of anticompetitive behavior.   The Tretinoin external cream's price increases by the Co-Conspirators were so uniform that they registered at 82% to 95% correlation between 2013 and 2016.   Under the collusion scheme, after the price hike, the volatility of Allergan's price for the drug went from 49.4% in 2014 to 0.5% in 2016, as prices were sustained at heightened levels.   Allergan's market shares remained uncharacteristically stable despite the price hike, with an annual standard deviation declining from 2.9% to 0.5% during the Relevant Period.

### d.    Collusive Revenue

211.   As a result of the price hikes in Tretinoin, Allergan improperly recognized over $59 million of collusive revenue between 2014 and 2016:



| | 2014 | 2015 | 2016 |
|---|---|---|---|
| (1) Collusive Revenue | 16.0 | 23.5 | 23.7 |
| (2) Collusive Revenue | 16.0 | 23.5 | 23.4 |
| (3) Collusive Revenue | 15.0 | 19.6 | 17.2 |
| Average | 15.7 | 22.2 | 21.4 |

### 9. Clobetasol Propionate Topical Cream

212.  Clobetasol is a corticosteroid used for the reduction of redness, swelling and itching associated with dermatological conditions such as allergies, eczema, and dermatitis.  It is the generic version of the Temovate topical cream.

### a. The Co-Conspirators' Price Hikes

213.  Allergan and the Co-Conspirators engaged in anticompetitive conduct by colluding to improperly raise and maintain the prices of Clobetasol topical cream beginning in May 2014.  For example, as demonstrated by the graph below, Allergan, Taro, Sandoz, and Akorn raised the prices of Clobetasol by over ***670%*** – with Allergan taking its Clobetasol price to $6.66 per unit in March 2015, similar to the levels set by the Co-Conspirators in May to July 2014.

214.  The graph below shows the Clobetasol topical cream price hikes during the Relevant Period:

- 93 -



215.   This drastic increase in the price of Clobetasol external cream occurred

shortly after and/or in conjunction with the following trade association meetings:

| Conference | Allergan Attendees Including: | Co-Conspirator Attendees Including: |
|---|---|---|
| GPhA 2014 Annual Meeting, Orlando, FL (February 19-21, 2014) | Allergan | Akorn/Hi-Tech<br><br>Sandoz: Sattler<br><br>Taro |
| NACDS 2014 Annual Meeting, Scottsdale, AZ (April 26-29, 2014) | Defendants Bisaro and Olafsson, and Falkin, Boyer, Stewart | Taro:  Aprahamian, Perfetto, Likvornik, Ivey<br><br>Sandoz: Greenstein, Kellum, Hasija, Goldschmidt |
| HDMA 2014 Business and Leadership Conference, Phoenix, AZ (June 1-4, 2014) | Falkin, Boyer, Rogerson, Giannone | Taro: Shah<br><br>Akorn/Hi-Tech<br><br>Sandoz: Greenstein, Badura, Hasija, Walsh, Lubke, Picard, Bihari |

| Conference | Allergan Attendees Including: | Co-Conspirator Attendees Including: |
|---|---|---|
| NACDS, Boston, MA (August 23-26, 2014) | Defendant Buchen, Falkin, Rogerson, Boyer, Slavsky, Giannone, Dorsey, Clark, Reed | Taro: Aprahamian, Perfetto, Brick, Kriel, Urbanski, Likvornik<br><br>Akorn/Hi-Tech: Berrios, Corley, Kronovich, McCanna, Rai, Sabat, Tranter<br><br>Sandoz: Greenstein, Kellum, Badura, Bihari,. Hasija. Lubke, Smith, Verma, Walsh |
| GPhA 2014 Fall Technical Conference, Bethesda, MD (October 27-29, 2014) | Allergan | Taro<br><br>Sandoz |
| 2014 NACDS NYC Week Annual Foundation Dinner, New York, NY (December 3, 2014) | Defendant Saunders, Falkin, Boyer, Reed | Sandoz: Kellum, Smith |
| GPhA 2015 Annual Meeting, Miami, FL (February 9-11, 2015) | Allergan | Akorn/Hi-Tech, Taro, Sandoz |
| 2015 HCSCA National Pharmacy Forum, Tampa, FL (February 16-18, 2015) | Fallon | Taro |
| ECRM's Annual Retail Pharmacy Efficient Program Planning (February 22-25, 2015) | Allergan | Akorn, Taro, Sandoz |

216. In addition to meeting in person, Allergan communicated with the co-conspirators frequently. Throughout the period of collusion and the Relevant Period, Allergan's Falkin, Rogerson, Boyer and other executives communicated at least 120 times with Taro's Aprahamian and Perfetto and Sandoz's Greenstein:

| Allergan Executive | Co-Conspirator's Executive | Number of Texts/Calls | Date |
|---|---|---|---|
| Marc Falkin | Ara Aprahamian  (Taro) | 21 | 4/17/2014 - 3/8/2016 |
| Marc Falkin | Michael Perfetto (Taro) | 9 | 12/13/2013 - 8/4/2014 |
| Rick Rogerson | Ara Aprahamian (Taro) | 4 | 6/17/2013 - 4/16/2014 |
| Michael Dorsey | Ara Aprahamian (Taro) | 52 | 3/19/2013 - 9/2/2016 |
| Andrew Boyer | Ara Aprahamian (Taro) | 16 | 8/16/2013 - 4/19/2016 |
| Michael Baker | Ara Aprahamian (Taro) | 12 | 5/13/2013 - 8/22/2015 |

| Allergan Executive | Co-Conspirator's Executive | Number of Texts/Calls | Date |
|---|---|---|---|
| Allan Slavsky | Ara Aprahamian (Taro) | 1 | 1/9/2014 |
| **Total Calls to Taro** | | **115** | |
| | | | |
| Marc Falkin | Steven Greenstein (**Sandoz**) | 5 | 4/30/2014 - 6/23/2014 |

### b.   No Commercial Justification for Price Hikes

217.   There was no reasonable justification for the price hikes discussed above. While a supply shortage can explain an abrupt rise in prices, here – notwithstanding the drug manufacturers' obligation to report shortages to the FDA – no such shortage of Clobetasol cream was reported during the relevant time period.  In addition, there was no significant increase in the demand for Clobetasol or in the drug's production costs that would explain the enormous price increase.  Even if there was such a benign market explanation for the price increase, at no point following the initial spike did the price return to the pre-spike equilibrium price point.

218.   In addition, price increases of this magnitude would have been contrary to each of the Co-Conspirators' economic interest absent the price-fixing scheme. Without the certainty that all of the Co-Conspirators would raise and maintain the prices for Clobetasol cream, each Co-Conspirator risked getting undercut by the others, leading to a loss of market share and a loss of revenue.  This risk was alleviated by the Co-Conspirators' agreement to raise and maintain their prices for Clobetasol.

### c.   The Market for Clobetasol Topical Cream Was Susceptible to Anticompetitive Conduct

#### (1)   High Level of Market Concentration

219.   In 2014-2015, the market for Clobetasol cream was highly concentrated, as demonstrated by the HHI calculation below:

|  | 2014 HHI | 2015 HHI |
|---|---|---|
| **Clobetasol topical cream** | 4,286 | 3,371 |

220.   During this period, Allergan and Co-Conspirators combined to account for close to the entirety of the market.

#### (2)   Significant Barriers to Entry

221.   As mentioned above, the barriers to entry into the market for Clobetasol topical cream included high manufacturing costs as well as certain regulatory and intellectual property barriers.   For example, the requirement that generic drug companies file an ANDA and receive FDA approval can delay entry into the market by an average of 36 months.

#### (3)   Lack of Available Substitutes

222.   As discussed above, pharmacists presented with a prescription for a given drug can only substitute another drug if that drug has an "AB" rating.   Only generic Clobetasol and brand-name Temovate for a given dosage are AB-rated to one another. Therefore, a pharmacist can only fill a prescription for Clobetasol with the brand-

name version or one of the AB-rated generic versions and cannot substitute another
drug.

### (4)    Commodity-Like Product

223.   As mentioned above, all generic versions of any given brand-name drug
are necessarily interchangeable.  Clobetasol is no exception.  The FDA-approved
versions of Clobetasol cream manufactured by the Co-Conspirators each has an "AB"
rating.  Thus, pharmacists are able to substitute one manufacturer's generic version of
Clobetasol for another.

### (5)    Inelastic Demand

224.   The Clobetasol cream market was characterized by nearly perfect
inelastic demand with Ed measured at close to zero.  For example, at the time of the
collusive price fixing, the market for Clobetasol cream was so inelastic that the
dramatic price increase had no negative effect on demand – in fact, demand for
Clobetasol cream continued to increase after the price hikes.  As a result, the
coordinated price hike translated immediately and directly into collusive revenues
shared by Allergan and its Co-Conspirators.

### (6)    Absence of Competitive Sellers

225.   In the case of Clobetasol cream, there was no realistic threat that the
other small market participants would take market share from Allergan and the Co-
Conspirators.  The dominance of Allergan and the Co-Conspirators facilitated their

ability to raise prices without losing market share to non-conspirators.  Moreover, following the dramatic price increases, neither Allergan nor the Co-Conspirators were willing to meaningfully undercut prices to gain market share, thereby further demonstrating the absence of a competitive market.

226.   Allergan and its Co-Conspirators' coordinated price hikes left behind a trail of collusive markers which are evidence of anticompetitive behavior.  Clobetasol cream's price increases by the Co-Conspirators were so uniform that their pricing was highly correlated, with a 99% chance that the probability of "no correlation" can be rejected and that a relationship exists.  Under the collusion scheme, after the price hike, the volatility of Allergan's price for the drug went from more than 50% in 2014 and 2015 to 0.2%-1.3% in 2016, as prices were sustained at heightened levels. Allergan's market shares remained uncharacteristically stable despite the price hike, with an annual standard deviation declining from 7.1% to 1.6% during the Relevant Period.

### d.    Collusive Revenue

227.  As a result of the price hikes in Clobetasol, Allergan improperly recognized over $80 million of collusive revenue between 2015 and 2016:



### 10.  Nystatin External Cream and Ointment

228.  Nystatin external cream and Nystatin external ointment (together, "Nystatin") are antifungal topical treatments for dermatological infections.  They are generic versions of the branded medications Mycostatin cream and Mycostatin ointment.

### a.  The Co-Conspirators' Price Hikes

229.  Between June and December 2011, Allergan and the Co-Conspirators engaged in anticompetitive conduct by colluding to improperly raise and maintain the prices of Nystatin.  As demonstrated by the graph below, Allergan hiked the prices of the cream and ointment by close to 650% – taking prices of the cream from $0.10 to $0.73 per unit and the ointment from $0.10 to $0.74 per unit.  Allergan increased the prices for both the cream and ointment to levels identical to those set by Perrigo when

it hiked prices of the cream and ointment in July 2011.  For Nystatin cream, Taro and Par also hiked prices to similar levels in June and September 2011, respectively.

230.   Sandoz also increased its prices for the Nystatin ointment in July 2012 and Nystatin cream in September 2013 to similar levels set by the Co-Conspirators.

231.   The graph below shows the Nystatin cream price hikes by Allergan, Par, Perrigo, Taro, and Sandoz:



232.   The graph below shows the Nystatin external ointment price hikes by Allergan, Perrigo, and Sandoz:



233.   These drastic increase in the prices of Nystatin occurred shortly after and/or in conjunction with the following trade association meetings:

| Conference | Allergan Attendees Including: | Co-Conspirator Attendees Including: |
|---|---|---|
| NACDS Annual Meeting, Scottsdale, AZ (April 30-May 3, 2011) | Defendants Bisaro and Olafsson, and Slavsky, Boyer, Baker | Perrigo: Kochan, McWilliams, Tomshack, Wesolowski<br><br>Par: Campanelli, Altamuro, Kenney<br><br>Taro: Kedrowski, Josway, Seiden<br><br>Sandoz: Kellum, DeGolyer, George, Greenstein, Krauthauser, Lubke |
| HDMA 2011 Business and Leadership Conference, Phoenix, AZ (June 6-7, 2011) | Baker, Shane | Par: Altamuro, Kenney, Bayer<br><br>Sandoz: Kellum, Greenstein, Krauthauser, Lubke, Tremonte |
| NACDS 2011 Pharmacy & Technology Meeting, Boston, MA (August 27-30, 2011) | Defendant Olafsson, and Aprahamian, Slavsky, Boyer, Baker, Clark, Giannone, Perfetto | Perrigo: Kochan, Wesolowski, Felix, Polman, Schott<br><br>Par: Campanelli, Altamuro, Kenney, Holden, O'Conner, Bayer<br><br>Taro: Josway, Seiden, Brick<br><br>Sandoz: Kellum, DeGolyer, George, Greenstein, Krauthauser, Lubke |

234.   In addition to meeting in person, Allergan communicated with the Co-Conspirators frequently.  Throughout the period of collusion and the Relevant Period, Allergan's Falkin, Rogerson, Boyer, and other executives communicated with Co-Conspirators over 170 times:

| Allergan Executive | Co-Conspirator's Executive | Number of Texts/Calls | Date |
|---|---|---|---|
| Marc Falkin | Ara Aprahamian  (Taro) | 21 | 4/17/2014 - 3/8/2016 |
| Marc Falkin | Michael Perfetto  (Taro) | 9 | 12/13/2013 - 8/4/2014 |
| Rick Rogerson | Taro Pharmaceuticals | 2 | 6/14/2013 - 11/10/2013 |
| Rick Rogerson | Ara Aprahamian (Taro) | 4 | 6/17/2013 - 4/16/2014 |
| Michael Dorsey | Ara Aprahamian (Taro) | 52 | 3/19/2013 - 9/2/2016 |
| Andrew Boyer | Ara Aprahamian (Taro) | 16 | 8/16/2013 - 4/19/2016 |
| Michael Baker | Ara Aprahamian (Taro) | 12 | 5/13/2013 - 8/22/2015 |
| Thad Demo | Ara Aprahamian (Taro) | 3 | 4/12/2013 - 7/10/2013 |
| Allan Slavsky | Ara Aprahamian (Taro) | 1 | 1/9/2014 |
| **Total Calls to Taro** | | **120** | |
| | | | |
| Marc Falkin | Steven Greenstein (Sandoz) | 5 | 4/30/2014 - 6/23/2014 |
| Rick Rogerson | Armando Kellum (Sandoz) | 3 | 5/5/2011 - 9/28/2011 |
| **Total Calls to Sandoz** | | **8** | |
| | | | |
| Marc Falkin | Jon Holden (**Par**) | **48** | 9/24/2013 - 8/11/2015 |

### b.    No Commercial Justification for Price Hikes

235.   There was no reasonable justification for the price hikes discussed above. While a supply shortage can explain an abrupt rise in prices, here – notwithstanding the drug manufacturers' obligation to report shortages to the FDA – no such shortage of Nystatin cream and ointment was reported during the Relevant Period.  In addition, there was no significant increase in the demand for Nystatin or in the drug's production costs that would explain the enormous price increase.  Even if there was

such a benign market explanation for the price increase, at no point following the initial spike did the price return to the pre-spike equilibrium price point.

236.   In addition, price increases of this magnitude would have been contrary to each of the Co-Conspirators' economic interest absent the price-fixing scheme. Without the certainty that all of the Co-Conspirators would raise and maintain the prices for Nystatin cream and ointment, each Co-Conspirator risked getting undercut by the others, leading to a loss of market share and a loss of revenue.  This risk was alleviated by the Co-Conspirators' agreement to raise and maintain their prices for Nystatin.

### c.   The Markets for Nystatin Cream and Ointment Were Susceptible to Anticompetitive Conduct

### (1)   High Level of Market Concentration

237.   In 2010-2011, the markets for Nystatin cream and ointment were highly concentrated, as demonstrated by the HHI calculation below:

|  | 2010 HHI | 2011 HHI |
|---|---|---|
| Nystatin cream | 5,052 | 7,064 |
| Nystatin ointment | 5,247 | 8,503 |

238.   During this period, Allergan, Par, Perrigo, Taro, and Sandoz accounted for close to the entirety of the market for the cream; and Allergan, Perrigo, and Sandoz accounted for close to the entirety of the market for the ointment.

- 104 -

### (2)    Significant Barriers to Entry

239.    As mentioned above, the barriers to entry into the markets for Nystatin cream and ointment included high manufacturing costs as well as certain regulatory and intellectual property barriers.  For example, the requirement that generic drug companies file an ANDA and receive FDA approval can delay entry into the market by an average of 36 months.

### (3)    Lack of Available Substitutes

240.    As discussed above, pharmacists presented with a prescription for a given drug can only substitute another drug if that drug has an "AB" rating.  Only generic Nystatin and brand-name Mycostatin for a given dosage are AB-rated to one another.  Therefore, a pharmacist can only fill a prescription for Nystatin with the brand-name version or one of the AB-rated generic versions and cannot substitute another drug.

### (4)    Commodity-Like Product

241.    As mentioned above, all generic versions of any given brand-name drug are necessarily interchangeable.  Nystatin cream and ointment are no exception.  The FDA-approved versions of Nystatin manufactured by the Co-Conspirators each has an "AB" rating.  Thus, pharmacists are able to substitute one manufacturer's generic version of Nystatin for another.

### (5)    Inelastic Demand

242.    The Nystatin cream and ointment markets were characterized by nearly perfect inelastic demand with Ed measured at close to zero.  For example, at the time of the collusive price fixing, the markets for Nystatin cream and ointment were so inelastic that the dramatic price increases had minimal negative effect on demand.  As a result, the coordinated price hikes translated immediately and directly into collusive revenues shared by Allergan and its Co-Conspirators.

### (6)    Absence of Competitive Sellers

243.    In the case of Nystatin cream and ointment, there was no realistic threat that the other small market participants would take market share from Allergan and the Co-Conspirators.  The dominance of Allergan and the Co-Conspirators facilitated their ability to raise prices without losing market share to non-conspirators.  Moreover, following the dramatic price increases, neither Allergan nor the Co-Conspirators were willing to meaningfully undercut prices to gain market share, thereby further demonstrating the absence of a competitive market.

244.    Allergan and its Co-Conspirators' coordinated price hikes left behind a trail of collusive markers which are evidence of anticompetitive behavior.  For both Nystatin cream and ointment, the price increases by the Co-Conspirators were so uniform that their pricing was highly correlated, with a 99% chance that the probability of "no correlation" can be rejected and that a relationship exists.  Under

the collusion scheme, after the price hike, the volatility of Nystatin cream prices declined from 11.5%-17.7% to 0.2%-1.2% after the price hikes, as prices were sustained at heightened levels.  Similarly, price volatility for the ointment also dropped from 10.7%-21.7% to 0.1%-0.5% after the price hikes.  The unusual stability indicated that the co-conspirators did not compete on pricing to gain market share.

### d.    Collusive Revenue

245.   As a result of the Nystatin price hikes, Allergan improperly recognized over $41 million of collusive revenue between 2011 and 2016:





### 11.    Additional Drugs from the Amended AG Complaint

246.    In addition to the drugs described above, Allergan colluded with the Co-Conspirators to maintain supracompetitive prices for least two other drugs: Glyburide-Metformin and Verapamil.

#### a.    Glyburide-Metformin

247.    Glyburide-Metformin, also known by the brand name Glucovance, is an oral medication used to treat Type 2 diabetes.  As of April 2014, the manufacturers in the Glyburide-Metformin market were Allergan, Teva, Aurobindo and Heritage.

248.    In preparation for the Amended AG Complaint, the 45 state Attorneys General obtained limited phone and text message records from Allergan and the Co-Conspirators.  These records demonstrate that Allergan finalized an agreement with Heritage to increase prices of Glyburide-Metformin during a nine-minute telephone call on April 22, 2014.  During this same call, the companies also agreed to increase the prices of other generic drugs, including Verapamil (discussed below).  Information about the agreement spread quickly throughout the sales and pricing teams at Allergan.  On April 28, 2014, the Company circulated an internal email regarding potential price increases for Glyburide-Metformin, Verapamil and several other drugs.

249.    Shortly after reaching this agreement, Allergan and Heritage contacted Teva and Aurobindo, the only other companies in the market, to discuss the deal.  On May 1, 2014, an Allergan representative listed as a recipient to the April 28, 2014

email contacted a Teva representative and they spoke for five minutes.  They spoke three more times on May 6, 2014, with one of the calls lasting 15 minutes, and continued to communicate frequently over the next several months.  In all, Allergan and Teva communicated via phone or text message at least 119 times between May 2014 and July 2014.

250.   Phone records also demonstrate that Allergan communicated with Aurobindo, the other manufacturer in the market.  On May 12, 2014, an Allergan representative spoke with the CEO of Aurobindo two separate times.

251.   Although the companies did not increase customer prices for Glyburide-Metformin in July 2014, like they did for many other drugs, they did increase their WAC prices.  On July 9, 2014, an internal email at Citron Pharma, LLC, a company that had approval to sell Glyburide-Metformin but was not actively doing so, revealed that at least Heritage and Teva had increased their WAC prices as of that date.  On August 20, 2014, a Heritage representative exchanged a text message with a colleague at Sun that described Allergan's agreement to do the same.

### b.   Verapamil

252.   Verapamil, also known by various brand names, is a calcium channel blocker used to treat hypertension, angina and certain heart rhythm disorders.  It works by relaxing the muscles of the heart and blood vessels.  As of April 2014, the manufacturers in the Verapamil market were Allergan, Mylan and Heritage.

253.   On April 22, 2014, during the same call where Allergan and Heritage agreed to raise the price of Glyburide-Metformin, the companies also reached an agreement to raise the price of Verapamil.  And on April 28, 2014, the same internal email that spread word to Allergan's sales and pricing teams about the Glyburide-Metformin agreement also notified them about the Verapamil agreement.

254.   Just over a week later, on May 6, 2014, an Allergan representative who had received the April 28, 2014 email called Mylan – the only other market participant – and left a message.  A Mylan representative returned the call on May 9, 2014 and spoke to the Allergan representative for over three minutes. They spoke again on May 19, 2014 for almost seven minutes, and continued to communicate frequently over the next several months.

255.   On August 20, 2014, a Heritage representative confirmed Allergan's acquiescence to the agreement in a text message with a colleague at Sun.

### 12.   Additional Collusive Price-Hike Drugs from the May 2019 AG Complaint

256.   According to the May 2019 AG Complaint, beginning in at least 2012, "a troubling pattern began to emerge" in which manufacturers communicated with intensified frequency in coordinated efforts to hike prices of generic drugs.  May 2019 AG Complaint, ¶¶536-537.   In implementing the price hikes, the overarching conspiracy rule of the road requires that "a competitor's price increase be quickly followed; but even if it could not, the overarching conspiracy dictated that the

competitors who had not increased their prices would, at a minimum, not seek to take advantage of a competitor's price increase by increasing their own market share." *Id.*, ¶537.

257.  The May 2019 AG Complaint alleges that Allergan and its Co-Conspirators followed the overarching conspiracy rule of the road for at least 13 additional generic drugs with coordinated price hikes.

### a.    Ciprofloxacin HCL

258.   Ciprofloxacin HCL Tablets is bioequivalent to branded antibiotics such as  Otiprio, Cetraxal, and Ciloxan, and is used for the treatment of infections caused by bacteria.  May 2019 AG Complaint, ¶901.

259.   In 2014-2015, the Ciprofloxacin HCL market was susceptible to collusion.  The Ciprofloxacin HCL market was highly concentrated with HHI of 2,428-2,489, with Allergan, Teva, and Dr. Reddy's making up over 80% of the market.  In such a highly concentrated market, the cartel tended to be stable with the absence of cheating.  Furthermore, the drug was one of the WHO's essential medicines and was crucial to "the priority health care needs of the population."  With no effective substitute, consumers could not replace the drug after massive price hikes.  As such, demand was highly inelastic such that a massive price increase had little to no effect on demand.

260.   Between July 2014 and January 2015, co-conspirators Allergan, Dr. Reddy's, and Teva implemented collusive price hikes on Ciprofloxacin HCL. *Id.*, ¶¶903-909.

261.   Beginning in July 2014, Dr. Reddy's senior sales executive Victor Borelli communicated extensively with Teva's Patel to coordinate its August 28, 2014 price hike.  During the two weeks between July 10, 2014 and July 24, 2014, Borelli and Patel exchanged at least six phone calls to discuss Dr. Reddy's price hikes for Ciprofloxacin HCL and other drugs.  *Id.*, ¶904.  Three days before the price hike, on August 25, 2014, Borelli and Patel exchanged four text messages and ultimately reached an agreement that Teva would follow Dr. Reddy's price hike.  *Id.*, ¶¶905-906.

262.   Before Teva could follow Dr. Reddy's price increase, Allergan also reached out to Teva by phone to coordinate its Ciprofloxacin HCL price hike in December 2014.   On December 17, 2014, Allergan's Falkin spoke to Teva's Rekenthaler twice for at least nine minutes.  *Id.*, ¶908.  Falkin and Rekenthaler spoke again on December 18, the day prior to Allergan's price hike.  *Id.*  On December 19, 2014, Allergan hiked Ciprofloxacin HCL's pricing to a level identical to Dr. Reddy's pricing.  *Id.*

263.   On January 28, 2015, Teva also increased its Ciprofloxacin HCL pricing to the same level set by Allergan and Dr. Reddy's.  *Id.*, ¶¶907, 909.  Before Teva's price hike, Allergan's Falkin and Teva's Rekenthaler spoke four times to coordinate

the price increase – once on January 13, twice on January 14, and again on January 16. *Id*., ¶¶895-897. According to the StateAGs, Teva's internal documents showed "Follow Competitor: DRL [Dr. Reddy's Lab] & Actavis" as a "Reason for Increase." *Id.*, ¶889.

264. Plaintiff's investigation confirmed that Allergan, Teva, and Dr. Reddy's hiked Ciprofloxacin HCL prices by 191%, 193%, and 315%, respectively:



265. During the collusion period, Allergan, Teva, and Dr. Reddy's Ciprofloxacin HCL pricing was marked by high correlation and uniformity, with a 99% chance that the probability of "no correlation" can be rejected and that a relationship exists. After the price hike, pricing became stable with minimal volatility of 1.0%-2.1%, which indicated that the co-conspirators did not compete on pricing to gain market share.

266. During the period of collusion and throughout the Relevant Period, Allergan, Teva, and Dr. Reddy's were in constant communication. Between July and

December 2014, Allergan and Teva executives communicated at least 143 times by text or phone.  §III.D.3.h.  In addition to the calls with Teva's Rekenthaler, as discussed above, Allergan's Falkin spoke to Teva's Rekenthaler 433 times between August 2013 and March 2015, and exchanged phone calls with other Teva executives over 700 times.  *Id.*  Similarly, Allergan's Rogerson spoke with Dr. Reddy's Nimish Muzumdar frequently, and exchanged phone calls with Teva executives at least 230 times.  *Id.*  Other Allergan executives also spoke to their counterparts at Teva at least 233 times.  *Id.*

267.    In addition, the co-conspirators had ample opportunities to meet in person to collude.  According to the StateAGs:

> Upon information and belief, Defendant Patel also spoke in-person with many of these competitors.  For example, in her new role as a Director of National Accounts, Defendant Patel personally attended the following trade association events and customer conferences in the fall of 2014 and winter of 2014-2015: NACDS, Boston, MA (August 23-26, 2014), Econdisc Bidders Meeting, St. Louis, MO (September 17-19, 2014), PCMA Annual Meeting in Rancho Palos Verdes, CA (October 13-14, 2014), Anda Strategy Meeting, Miami, FL (October 26-29, 2014); and the HDMA Round Table, Washington, DC (January 8, 2015).  These industry events were all well-attended by Teva's competitors.

May 2019 AG Complaint, ¶891.

268.    Indeed, the Ciprofloxacin HCL co-conspirators all attended events and conferences, including:

> NACDS, Boston, MA (August 23-26, 2014):
> - Allergan attendees included: Defendant Buchen, Falkin, Rogerson, Boyer, Slavsky, Giannone, Dorsey, Clark, Reed.
> - Teva attendees included: Rekenthaler, Patel, Cavanaugh, Galownia, Peters, Coward, Baeder, Baker, Dunrud.

- Dr. Reddy's attendees included: Borelli, Muzumdar, McCormick, Austin.

HDMA 2014 Annual Board and Membership Meeting, Laguna Beach, CA (September 27-October 1, 2014)
- Allergan attendees included: Falkin, Boyer.
- Teva attendees included: Rekenthaler, Cavanaugh, Baeder, Baker, Dunrud.

GPhA 2014 Fall Technical Conference, Bethesda, MD (October 27-29, 2014)
- Allergan
- Teva
- Dr. Reddy's

2014 IGPA Annual Conference, Miami, FL (November 19-21, 2014)
- Allergan attendees included: Defendant Buchen, Brown.
- Teva attendees included: Oberman, Livneh.
- Dr. Reddy's attendees included: Cappuccino.

2014 NACDS NYC Week Annual Foundation Dinner, New York, NY (December 3, 2014)
- Allergan attendees included: Defendant Saunders, Falkin, Boyer, Reed.
- Teva attendees included: Rekenthaler, Cavanaugh, Coward, Peters, Baeder.

App.[14]

269.   As a result of the Ciprofloxacin HCL price hikes, Allergan improperly recognized close to $60 million of collusive revenues between 2014 and 2016:

---

[14] "App." refers to the Appendix to this complaint, listing trade shows and conferences.



Actavis's Total Yearly Collusive Revenues: Ciprofloxacin HCL Tablets

| | 2014 | 2015 | 2016 |
|---|---|---|---|
| (1) Collusive Revenue | 6.1 | 40.5 | 12.8 |
| (2) Collusive Revenue | 6.1 | 40.5 | 12.7 |
| (3) Collusive Revenue | 6.0 | 38.0 | 10.8 |
| Average | 6.1 | 39.7 | 12.1 |

### b.    Labetalol HCL Tablets

270.   Labetalol HCL Tablets is a beta blocker for the treatment of high blood pressure and is bioequivalent to the branded drug Normodyne.   May 2019 AG Complaint, ¶551.

271.   In 2012, the Labetalol HCL market was susceptible to collusion.  The Labetalol HCL market was highly concentrated with HHI of 4,492, and Allergan, Teva, and Sandoz made up almost the entirety of the market.  In such a highly concentrated market, the cartel tended to be stable with the absence of cheating.  In addition, demand was so highly inelastic that a massive price increase had no negative effect on demand – in fact, demand continued to increase even with a massive price increase.

272.   Between June to July 2012, Allergan, Teva, and Sandoz implemented coordinated price increases on Labetalol.  Prior to their collusive price hikes, pricing

for Labetalol was around $0.21 per unit.  After the price hikes, Labetalol's prices

more than doubled to $0.54 to $0.57 per unit:



273.   Allergan's senior sales executive Allan Slavsky and Teva's Rekenthaler

communicated frequently before and after the Labetalol price hikes.  Immediately

prior to their price hikes, on July 11, 2012, Slavsky and Rekenthaler spoke at least

twice by phone for over ten minutes to coordinate the price increases. *Id.*, ¶539.  On

October 18, 2012, after Par entered the Labetalol market at the collusive price level set

by the co-conspirators, Slavsky and Rekenthaler spoke by phone four times to re-

affirm their commitment to maintain elevated pricing. *Id.*, ¶554.

274.   While Allergan was coordinating with Teva on the Labetalol price hikes

and price maintenance, Teva and Sandoz also communicated – with Teva's Kevin

Green speaking with Stage AG CW-2[15] from Sandoz by phone at least 3 times on July 29, 2012 and July 31, 2012 for more than 12 minutes, and twice on October 16, 2012 after Par entered the market.  *Id.*, ¶¶539, 553. ##

275.   Despite Par joining the Labetalol market with new supplies in September 2012, the co-conspirators painted a picture of supply constraint to justify the price hikes.  On October 2012, rumors were in the market that Allergan did not have sufficient supply to meet demand while Sandoz "no longer [had] supply issues." *Id.*, ¶552.  In truth, no supply shortage was reported to the FDA in 2012 by any Labetalol manufacturers, and Allergan actually increased the quantity of Labetalol sold by close to 18% in October 2012 and 7.5% in November 2012.

276.   At the time of the price hikes, and during the Relevant Period, the Labetalol market was marked by an absence of competition with Allergan, Teva, Sandoz, and Par having close to 100% of the Labetalol market.  Allergan's Labetalol pricing was 71%-86% correlated to the co-conspirators.  The high correlations were statistically significant, with a 99% chance that the probability of "no correlation" can be rejected and that a relationship exists.  In addition, pricing volatility dropped from 5%-8% prior to collusion to close to zero at 0.2%-0.6% after the price hikes.  Similarly, Allergan's market share volatility dropped from 3% in the years prior to collusion to

---

[15]  State AG CW-2 is one of the StateAGs' cooperating witnesses.  May 2019 AG Complaint, ¶67.  State AG CW-2 was a sales and marketing executive at Sandoz until 2013, when he/she left Sandoz to join Rising Pharmaceuticals, Inc.  *Id.*, ¶958.

less than 0.7%-0.8% for years after its price hike, with its co-conspirators Teva and Sandoz also experiencing volatility declines (Sandoz from 10.2% to 3.2% and Teva from 8.1% to 1.2%.)  The unusual stability was uncharacteristic of a competitive market where manufacturers would compete on pricing to gain market share.

277.   The co-conspirators had ample opportunities to communicate during the period immediately prior to the price hike in June to July 2012 and the re-affirmation of the commitment to maintain heightened pricing in October 2012:

| Conference | Allergan Attendees Including: | Co-Conspirator Attendees Including: |
|---|---|---|
| NACDS Annual Meeting in Palm Beach, FL (April 24-27, 2012) | Defendants Paul Bisaro and Sigurdur Olafsson, and Michael Perfetto, Andrew Boyer, Allan Slavsky, Michael Reed, Paul Reed, John Shane, and Robert Stewart | Teva: Theresa Coward, Maureen Cavanaugh, Jeremy Levin, Jonathan Kafer, and Christine Baeder.<br><br>Sandoz: Armando Kellum, Don DeGolyer, and Jeff George<br><br>Par: Paul Campanelli, Michael Altamuro, Renee Kenney, Thomas Haughey |
| HDMA 2012 Business and Leadership Conference in San Antonio, TX (June 13, 2012) | Andrew Boyer, Richard Rogerson, Allan Slavsky, Michael Baker, Jack Ericsson, Michael Reed, Paul Reed, John Shane, and Carrie Wetzel | Teva: David Rekenthaler, Kevin Green, Theresa Coward, Teri Sherman, and Jessica Peters<br><br>Sandoz: Steven Greenstein, Paul Krauthauser, Della Lubke, and Christopher Neurohr<br><br>Par:  Sandra Bayer |
| NACDS 2012 Pharmacy and Technology Conference in Denver, CO (August 25-28, 2012) | Andrew Boyer, Allan Slavsky, Michael Dorsey, Michael Perfetto, David Schmidt, Anthony Giannone, Ara Aprahamian, Steven Cohen, Napoleon Clark, Michael Baker, and Jinping McCormack | Teva: David Rekenthaler, Kevin Green, Theresa Coward, Maureen Cavanaugh, Kevin Galownia, Christine Baeder, Teri Sherman, Jessica Peters, and Scott Goldy<br><br>Sandoz: Armando Kellum, Steven Greenstein, Della Lubke, and Christopher Neurohr<br><br>Par:  Paul Campanelli, Jon Holden, Michael Altamuro |
| GPhA Technical Conference in Bethesda, MD (October 1-3, 2012) | Joyce DelGaudio | Teva: Allan Oberman, Jonathan Kafer<br><br>Sandoz: Don DeGolyer<br><br>Par |

278.   Indeed, prior to the price hike and throughout the Relevant Period, Allergan and its co-conspirators communicated frequently.  In addition to the calls to Teva's Rekenthaler, discussed above, Allergan's Allan Slavsky communicated with Teva's Rekenthaler, Cavanaugh, and Patel over 70 times by phone.  §III.D.3.h.  Other Allergan executives also communicated frequently with the co-conspirators – with over 1,500 calls to Teva, at least 48 calls to Par and 8 calls to Sandoz:

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Date |
|---|---|---|---|
| Allan Slavsky | David Rekenthaler (Teva) | 26 | 1/11/2012 - 4/1/2013 |
| Allan Slavsky | Maureen Cavanaugh (Teva) | 17 | 8/21/2015 - 7/26/2016 |
| Allan Slavsky | Nisha Patel (Teva) | 28 | 9/16/2015 - 3/10/2016 |
| **Total Slavsky Calls with Teva:** | | **71** | |
| | | | |
| Marc Falkin | David Rekenthaler  (Teva) | 433 | 8/7/2013 - 3/25/2015 |
| Marc Falkin | Maureen Cavanaugh  (Teva) | 410 | 9/10/2013 - 7/29/2016 |
| Marc Falkin | Christine Baeder  (Teva) | 199 | 7/21/2015 - 7/29/2016 |
| Marc Falkin | Theresa Coward  (Teva) | 36 | 12/28/2015 - 7/27/2016 |
| Marc Falkin | Teva Pharmaceuticals | 26 | 5/28/2015 - 7/19/2016 |
| Marc Falkin | Nisha Patel  (Teva) | 11 | 2/5/2016 - 6/16/2016 |
| Marc Falkin | Jocelyn Baker  (Teva) | 11 | 11/24/2015 - 6/2/2016 |
| Marc Falkin | Cassie Dunrud  (Teva) | 11 | 2/8/2016 - 6/22/2016 |
| Marc Falkin | Jessica Peters  (Teva) | 7 | 9/27/2014 - 3/22/2016 |
| Marc Falkin | Kevin Galownia  (Teva) | 6 | 1/14/2016 - 5/12/2016 |
| Rick Rogerson | Nisha Patel  (Teva) | 157 | 5/2/2013 - 11/9/2015 |
| Rick Rogerson | Kevin Galownia  (Teva) | 29 | 12/15/2015 - 7/29/2016 |
| Rick Rogerson | Teva Pharmaceuticals | 27 | 9/24/2015 - 7/29/2016 |
| Rick Rogerson | Christine Baeder  (Teva) | 17 | 2/26/2016 - 7/26/2016 |
| Andrew Boyer | David Rekenthaler (Teva) | 16 | 4/1/2013 - 9/16/2014 |
| Andrew Boyer | Maureen Cavanaugh (Teva) | 113 | 8/12/2015 - 7/25/2016 |
| Andrew Boyer | Nisha Patel (Teva) | 28 | 4/30/2013 - 10/16/2015 |
| Anthony Giannone | Nisha Patel (Teva) | 9 | 1/27/2015 - 6/9/2016 |
| Jonathan Kafer | David Rekenthaler (Teva) | 15 | 10/11/2013 - 3/29/2015 |
| Jonathan Kafer | Maureen Cavanaugh (Teva) | 4 | 4/29/2014 - 3/31/2015 |
| M.B. | Nisha Patel (Teva) | 3 | 2/26/2016 - 6/6/2016 |
| **Total Calls with Teva** | | **1568** | |
| | | | |
| Rick Rogerson | Armando Kellum  (Sandoz) | 3 | 5/5/2011 - 9/28/2011 |
| Marc Falkin | Steven Greenstein  (Sandoz) | 5 | 4/30/2014 - 6/23/2014 |
| **Total Calls with Sandoz:** | | **8** | |
| | | | |

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Date |
|---|---|---|---|
| Marc Falkin | Jon Holden  (Par) | **48** | 9/24/2013 - 8/11/2015 |

279.   As a result of the Labetalol price hikes, Allergan improperly recognized over $35 million of collusive revenues between 2012 and 2016:



c.   **Fluocinonide 0.5% Cream**

280.   Fluocinonide is the generic version of Lidex.  May 2019 AG Complaint, ¶828.  Fluocinonide is one of the most widely used prescription skin treatments in the United States, as it is a potent steroid topical medication for the reduction of rashes, swellings, or itching associated with allergies, dermatitis, eczema, and psoriasis.  *Id.*

281.   In 2013, the Fluocinonide 0.5% Cream market was susceptible to collusion.  The Fluocinonide 0.5% Cream market was highly concentrated with HHI of 7,976, with Teva and Taro making up almost the entirety of the market.  In such a highly concentrated market, the cartel tended to be stable with the absence of

cheating.  In addition, demand was so highly inelastic that a massive price increase had no negative effect on demand – in fact, demand continued to increase even with a massive price increase.

282.   Allergan entered the Fluocinonide 0.5% Cream market in June 2014 and joined the ongoing collusive activities that began in mid-2013.

283.   In 2013, Teva's Patel conceived of collusive price hikes for the wide-selling drug even before she started her job at Teva.  *Id.*, ¶¶602, 830.  Shortly after she began employment at Teva, she coordinated with Taro's Ara Aprahamian – her former colleague from AmerisourceBergen – and in July 2013, implemented a 10%-17% price hike on Fluocinonide 0.5% Cream.  *Id.*, ¶830.

284.   But the small price hike was not enough for the co-conspirators.  On May 14, 2014, Taro's Aprahamian discussed the impending massive second round price hikes on Fluocinonide with Patel and she explicitly agreed to follow.  After a series of text messages and a phone conversation between Patel and Aprahamian on May 14, 2014, Patel instructed her colleagues to put together a "2014 Future Price Increase Candidate Analysis," which included the Fluocinonide 0.5% Cream with the notation "Follow/Urgent."  *Id.*, ¶¶833-834.  The notation signified the urgent need to follow Taro's upcoming price hikes.  *Id.*, ¶¶831, 834.

285.   After Taro's price hikes became effective on June 3, 2014, Teva received Fluocinonide bid requests from customers such as CVS and Walmart, and Teva's

Galownia suggested that "it was a good opportunity to take some share from Taro."
*Id*., ¶¶831, 834, 837, 839.  At the time, Taro had 87% of the market for Fluocinonide
0.5% Cream and Teva had the remaining 13%.  *Id*., ¶829.  Patel engaged in another
series of phone calls and text messages with Taro's Aprahamian on June 3-4, 2014
after Galownia's suggestion of taking market share from Taro.  *Id*., ¶¶837-838.  After
communicating with Aprahamian, Patel sent multiple emails urging Teva "to be
responsible" to the "high quality" co-conspirator:

| | |
|---|---|
| From: | Nisha Patel02 |
| Sent: | Wed 6/04/2014 10:44 AM (GMT-05:00) |
| To: | ▮▮▮▮▮▮▮▮ |
| Cc: | |
| Bcc: | |
| Subject: | Fluo Crm and E Crm Info |
| Attachments: | Analysource_Report_20140604113534(1).xlsx |

▮▮▮,

Per your request, I have added in the plain cream. I know you're working on a lot, so just let me know if you'd like to discuss further. I have additional intel (I can discuss with you) that will be useful.

We should probably discuss how we want to handle all Taro increase items. Taro is a high quality competitor--I think we need to be responsible where we have adequate market share.

Thanks,

Nisha

From:     Nisha Patel02
Sent:     Wed 6/04/2014 2:09 PM (GMT-05:00)
To:       ████████████████
Cc:
Bcc:
Subject: RE: Item Questions

████████

(Please consider the Taro items alert items.) Based on quality of competitor, the intention of being responsible in the market, and market share, below is my commentary:

1. **Gel**: WAC issue. I estimate that WM nets are right around our WAC. Recommend bidding right below WAC, assuming we can supply.
2. **Ointment**: Should not pursue. We have reasonable share.
3. **Cream**: Since we are pursuing CVS, and assuming it works out, we should probably not pursue.

*Id.*, ¶¶838-839.

286.   Instead of competing for Walmart's business and in conformance with its agreement with Taro, Teva implemented a price hike on Fluocinonide 0.5% Cream by approximately 430% in July 2014, taking pricing from $0.46 to $2.43 per unit – identical to Taro's price increase. *Id.*, ¶¶831, 839, 843. On June 26, 2014, Teva's sales and pricing teams received a 3:00 p.m. conference call calendar notice with an agenda stating: "We will discuss the upcoming price increase for all Fluocinonide products: Fluocinonide Cream, Fluocinonide E-Cream, Fluocinonide Gel, Fluocinonide Ointment. We are targeting an announcement date of Monday, June 30th for an effective date of July 1st." *Id.*, ¶842.

287.   Allergan entered the Fluocinonide 0.5% Cream market in June 2014, prior to Teva's price hike, and Plaintiff's investigation confirmed that Allergan entered the market at $0.46 per unit. After a series of calls with co-conspirators Teva

and Taro in December 2014, Allergan also implemented a massive price hike on December 19, 2014. As shown in the phone log below, Allergan's Falkin exchanged five phone calls with Teva's Rekenthaler on December 3, 2014; Allergan's Michael Dorsey exchanged two phone calls with Taro's Aprahamian on December 5; Allergan's Falkin exchanged six phone calls with Teva's Rekenthaler on December 9-10; Allergan's Dorsey spoke with Taro's Aprahamian again on December 11; and two days before Allergan's price hike, Allergan's Falkin exchanged three phone calls with Teva's Rekenthaler:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:01:39 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:00 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:06 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:16 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:00 |
| 12/5/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 12/5/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 12/9/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:00 |
| 12/9/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:22 |
| 12/9/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:19 |
| 12/10/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:07 |
| 12/10/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:07:59 |
| 12/10/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:02:37 |
| 12/11/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 0:02:00 |
| 12/11/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Patel, Nisha (Teva) | 0:16:00 |
| 12/17/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:02:35 |
| 12/17/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:08:00 |
| 12/18/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:02:40 |

*Id.*, ¶845.

288. After extensive coordination with co-conspirators Teva and Taro, Allergan implemented an identical 430% price hike as Teva had taken in July 2014 – increasing the price of Fluocinonide 0.5% Cream from $0.46 per unit to $2.43 per unit:



289.   The market for Fluocinonide 0.5% Cream showed little to no sign of competition after the collusive price hikes.  Pricing by the three co-conspirators were highly correlated with an unusual degree of uniformity, with a 99% chance that the probability of "no correlation" can be rejected and that a relationship exists.   In addition, pricing volatility fell from 37%-39.6% to 2.5%-5.0% after collusion, and market share volatility dropped from 7.1%-12.5% prior to collusion to less than 0.9%-1.6% after collusion.  The unusual stability was uncharacteristic of a competitive market where manufacturers would compete on pricing to gain market share.

290.   During the period of collusion and throughout the Relevant Period, Allergan was in frequent contact with its co-conspirators, Teva and Taro.  Between June to December 2014, Allergan executives communicated at least 152 times by text and/or phone with Teva executives.  §III.D.3.h.  In addition to communicating with

Rekenthaler, as discussed above, Allergan's Falkin spoke to Teva executives at least

1,150 times and Taro's Aprahamian at least 21 times:

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Date |
|---|---|---|---|
| Marc Falkin | David Rekenthaler  (Teva) | 433 | 8/7/2013 - 3/25/2015 |
| Marc Falkin | Maureen Cavanaugh  (Teva) | 410 | 9/10/2013 - 7/29/2016 |
| Marc Falkin | Christine Baeder  (Teva) | 199 | 7/21/2015 - 7/29/2016 |
| Marc Falkin | Theresa Coward  (Teva) | 36 | 12/28/2015 - 7/27/2016 |
| Marc Falkin | Teva Pharmaceuticals | 26 | 5/28/2015 - 7/19/2016 |
| Marc Falkin | Nisha Patel  (Teva) | 11 | 2/5/2016 - 6/16/2016 |
| Marc Falkin | Jocelyn Baker  (Teva) | 11 | 11/24/2015 - 6/2/2016 |
| Marc Falkin | Cassie Dunrud  (Teva) | 11 | 2/8/2016 - 6/22/2016 |
| Marc Falkin | Jessica Peters  (Teva) | 7 | 9/27/2014 - 3/22/2016 |
| Marc Falkin | Kevin Galownia  (Teva) | 6 | 1/14/2016 - 5/12/2016 |
| **Total Falkin Calls to Teva** | | **1150** | |
| | | | |
| Marc Falkin | Ara Aprahamian (Taro) | 21 | 4/17/2014 – 3/8/2016 |
| Marc Falkin | Michael Perfetto (Taro) | 9 | 12/13/2013 – 8/4/2014 |
| **Total Falkin Calls to Taro** | | **30** | |

291.   Allergan's Michael Dorsey also spoke to Taro's Aprahamian at least 52

times, with other Allergan executives speaking to Aprahamian at least 28 times:

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Date |
|---|---|---|---|
| Michael Dorsey | Ara Aprahamian (Taro) | 52 | 3/19/2013 - 9/2/2016 |
| Andrew Boyer | Ara Aprahamian (Taro) | 16 | 8/16/2013 - 4/19/2016 |
| Michael Baker | Ara Aprahamian (Taro) | 12 | 5/13/2013 - 8/22/2015 |
| **Total Calls to Taro** | | **80** | |

292.   Other Allergan executives were also frequently communicating with

Teva executives Rekenthaler, Patel, Galownia, Baeder, and Cavanaugh:

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Date |
|---|---|---|---|
| Rick Rogerson | Nisha Patel  (Teva) | 157 | 5/2/2013 - 11/9/2015 |
| Rick Rogerson | Kevin Galownia  (Teva) | 29 | 12/15/2015 - 7/29/2016 |
| Rick Rogerson | Teva Pharmaceuticals | 27 | 9/24/2015 - 7/29/2016 |
| Rick Rogerson | Christine Baeder  (Teva) | 17 | 2/26/2016 - 7/26/2016 |
| Allan Slavsky | Maureen Cavanaugh (Teva) | 17 | 8/21/2015 - 7/26/2016 |
| Allan Slavsky | Nisha Patel (Teva) | 28 | 9/16/2015 - 3/10/2016 |

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Date |
|---|---|---|---|
| Andrew Boyer | David Rekenthaler (Teva) | 16 | 4/1/2013 - 9/16/2014 |
| Andrew Boyer | Maureen Cavanaugh (Teva) | 113 | 8/12/2015 - 7/25/2016 |
| Andrew Boyer | Nisha Patel (Teva) | 28 | 4/30/2013 - 10/16/2015 |
| Anthony Giannone | Nisha Patel (Teva) | 9 | 1/27/2015 - 6/9/2016 |
| Jonathan Kafer | David Rekenthaler (Teva) | 15 | 10/11/2013 - 3/29/2015 |
| Jonathan Kafer | Maureen Cavanaugh (Teva) | 4 | 4/29/2014 - 3/31/2015 |
| M.B. | Nisha Patel (Teva) | 3 | 2/26/2016 - 6/6/2016 |
| **Total Calls with Teva** | | **463** | |

293.   In addition, the co-conspirators had ample opportunities to meet in person prior to the massive price hikes:

| Conference | Allergan Attendees Including: | Co-Conspirator Attendees Including: |
|---|---|---|
| NACDS 2014 Annual Meeting, Scottsdale, AZ (April 26-29, 2014) | Defendants Bisaro and Olafsson, Falkin, Boyer, Stewart | Teva: Oberman, Rekenthaler, Cavanaugh, Coward, Baeder<br><br>Taro:  Aprahamian, Perfetto, Likvornik, Ivey |
| HDMA 2014 Business and Leadership Conference, Phoenix, AZ (June 1-4, 2014) | Falkin, Boyer, Rogerson, Giannone | Teva: Rekenthaler, Patel, Peters, Coward, Sherman, Dunrud<br><br>Taro: Shah |
| NACDS, Boston, MA (August 23-26, 2014) | Defendant Buchen, Falkin, Rogerson, Boyer, Slavsky, Giannone, Dorsey, Clark, Reed | Teva: Rekenthaler, Patel, Cavanaugh, Galownia, Peters, Coward, Baeder, Baker, Dunrud<br><br>Taro: Aprahamian, Perfetto, Brick, Kriel, Urbanski, Likvornik |
| HDMA 2014 Annual Board and Membership Meeting, Laguna Beach, CA (September 27-October 1, 2014) | Falkin, Boyer | Teva: Rekenthaler, Cavanaugh, Baeder |
| GPhA 2014 Fall Technical Conference, Bethesda, MD (October 27-29, 2014) | Allergan | Teva<br><br>Taro |
| 2014 NACDS NYC Week Annual Foundation Dinner, New York, NY (December 3, 2014) | Defendant Saunders, Falkin, Boyer, Reed | Teva: Rekenthaler, Cavanaugh, Coward, Peters, Baeder |

As a result of the Fluocinonide 0.5% Cream price hikes, Allergan improperly recognized over $49 million of collusive revenues between 2014 and 2016:



Actavis's Total Yearly Collusive Revenues: Fluocinonide External Cream

| | 2014 | 2015 | 2016 |
|---|---|---|---|
| (1) Collusive Revenue | 4.3 | 31.9 | 11.5 |
| (2) Collusive Revenue | 4.3 | 31.9 | 11.4 |
| (3) Collusive Revenue | 4.4 | 33.5 | 13.8 |
| Average | 4.3 | 32.4 | 12.3 |

### d.   Griseofulvin Microsize Oral Suspension

294.   Griseofulvin Microsize Oral Suspension is the generic version of Grifulvin V and is an anti-fungal medication for infections affecting hair, skin, and nails.  May 2019 AG Complaint, ¶910.

295.   In 2014, the Griseofulvin market was susceptible to collusion.  The Griseofulvin market was highly concentrated with HHI of 3,180, and Allergan and Teva made up close to 80% of the market.  In such a highly concentrated market, the cartel tended to be stable with the absence of cheating.  Furthermore, the drug was one of the WHO's essential medicines and was crucial to "the priority health care needs of the population."  With no effective substitute, consumers could not replace the drug

- 129 -

after massive price hikes.  As such, demand was highly inelastic such that a massive price increase had little to no effect on demand.

296.   Taking advantage of the vulnerable market structure, in September 2014, Allergan and Teva began coordinating massive price hikes for Griseofulvin.  During the week preceding Allergan's issuance of price increase notices to its Griseofulvin customers, Allergan's Falkin communicated with Teva's Rekenthaler extensively – exchanging 2 calls on September 3 for 3 minutes, 3 calls on September 4 for 17 minutes, and 4 calls totaling 29 minutes on the day prior to the price increase.  *Id.,* ¶911.  On September 9, 2014, the day that Allergan issued its notices of price increase, Allergan's Rogerson also spoke with Teva's Patel for over 4.5 minutes:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 9/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:02:00 |
| 9/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:15:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:02:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:21:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:05:00 |
| 9/9/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 0:04:32 |

*Id.*

297.  Plaintiff's investigation revealed that Allergan hiked the price of Griseofulvin by 50%, taking the drug from $0.27 per unit to $0.40 per unit.  Allergan's Griseofulvin price increase took effect on October 6, 2014.  *Id.*



298.  According to the StateAGs, internal documents showed that Teva "promptly added Griseofulvin to its own price increase list, with the notation 'Follow Competitor – Actavis' as the reason for the price increase." *Id.*, ¶912.  Teva's Griseofulvin price hike took place on January 28, 2015.  *Id.*, ¶913.  Before Teva's price hike, Allergan's Falkin and Teva's Rekenthaler spoke four times to coordinate the price increase – once on January 13, twice on January 14, and again on January 16. *Id.*, ¶860.

299.  As shown in the chart above, Teva took its Griseofulvin price to Allergan's pricing level with an identical 50% price hike.  Allergan and Teva's pricing correlation was high and uniformed, with a 99% chance that the probability of "no correlation" can be rejected and that a relationship exists.  After the price hike, Griseofulvin pricing became stable with no volatility, which indicated that the co-conspirators did not compete on pricing to gain market share.

300.   During the period of collusion and throughout the Relevant Period,

Allergan and Teva communicated frequently.    Between September and

December 2014, Allergan and Teva executives communicated at least 81 times by text

or phone.  §III.D.3.h.  In addition to the calls with Teva's Rekenthaler, as discussed

above, Allergan's Falkin spoke to Teva's Rekenthaler 433 times between August 2013

and March 2015, and exchanged phone calls with other Teva executives over 700

times.  *Id.*  Similarly, Allergan's Rogerson spoke with Teva's Patel over 150 times

between May 2013 and November 2015, and exchanged phone calls with other Teva

executives over 70 times.   *Id.*   Other Allergan executives also spoke to their

counterparts at Teva over 230 times.  *Id.*

301.   In addition, the co-conspirators had ample opportunities to meet in person

to collude.  According to the StateAGs:

> Upon information and belief, Defendant Patel also spoke in-person with
> many of these competitors.  For example, in her new role as a Director of
> National Accounts, Defendant Patel personally attended the following
> trade association events and customer conferences in the fall of 2014 and
> winter of 2014-2015: NACDS, Boston, MA (August 23-26, 2014),
> Econdisc Bidders Meeting, St. Louis, MO (September 17-19, 2014),
> PCMA Annual Meeting in Rancho Palos Verdes, CA (October 13-14,
> 2014), Anda Strategy Meeting, Miami, FL (October 26-29, 2014); and
> the HDMA Round Table, Washington, DC (January 8, 2015).  These
> industry events were all well-attended by Teva's competitors.

May 2019 AG Complaint, ¶891.

302.  Indeed, the Griseofulvin co-conspirators all attended events and

conferences, including:

NACDS, Boston, MA (August 23-26, 2014):
- Allergan attendees included: Defendant Buchen, Falkin, Rogerson, Boyer, Slavsky, Giannone, Dorsey, Clark, Reed.
- Teva attendees included: Rekenthaler, Patel, Cavanaugh, Galownia, Peters, Coward, Baeder, Baker, Dunrud.

HDMA 2014 Annual Board and Membership Meeting, Laguna Beach, CA (September 27-October 1, 2014)
- Allergan attendees included: Falkin, Boyer.
- Teva attendees included: Rekenthaler, Cavanaugh, Baeder.

GPhA 2014 Fall Technical Conference, Bethesda, MD (October 27-29, 2014)
- Allergan
- Teva

2014 IGPA Annual Conference, Miami, FL (November 19-21, 2014)
- Allergan attendees included: Defendant Buchen, Brown.
- Teva attendees included: Oberman, Livneh.

2014 NACDS NYC Week Annual Foundation Dinner, New York, NY (December 3, 2014)
- Allergan attendees included: Defendant Saunders, Falkin, Boyer.
- Teva attendees included: Rekenthaler, Cavanaugh, Coward, Peters, Baeder.

App.

303. As a result of the Griseofulvin price hikes, Allergan improperly recognized over $12 million of collusive revenues between 2014 and 2016:



Actavis's Total Yearly Collusive Revenues: Griseofulvin Micro Oral Suspension

|  | 2014 | 2015 | 2016 |
|---|---|---|---|
| (1) Collusive Revenue | 1.0 | 1.9 | 1.1 |
| (2) Collusive Revenue | 1.0 | 2.0 | 1.1 |
| (3) Collusive Revenue | 0.9 | 1.0 | 0.0 |
| Average | 1.0 | 1.7 | 0.7 |

### e.    Estradiol

304.   Estradiol is the generic version of Estrace and is an estrogen used to reduce menopause symptoms.

305.   In 2014-2015, the Estradiol market was susceptible to collusion.  It was highly concentrated with HHI of 7,400-7,530, and Allergan and Teva represented over 90% of the market.  In such a highly concentrated market, the cartel tended to be stable with the absence of cheating.  In addition, demand was so highly inelastic that a massive price increase had little to no negative effect on demand.

306.   On January 28, 2015, Teva implemented a price hike on Estradiol. May 2019 AG Complaint, ¶¶889-890.  Prior to Teva's price hike, Allergan's Falkin and Teva's Rekenthaler spoke on January 13, 2015, twice on January 14, 2015, and on January 16, 2015 to coordinate the price increase.  *Id*., ¶890.   Teva's internal

spreadsheet on collusive price hikes, maintained by Galownia, showed that Teva planned to lead a 90% increase on Estradiol.  *Id.*, ¶889.

307.   Plaintiff's investigation revealed that Teva indeed led the coordinated price hikes – increasing its Estradiol price by 90% and taking the drug from $0.17 per unit to $0.32 per unit.  Allergan followed Teva's lead and hiked its Estradiol price in May 2015 to the identical $0.32 per unit level set by Teva:



308.   At the time of the price hikes, and during the Relevant Period, the Estradiol market was marked by an absence of competition.  Allergan and Teva's pricing correlation was high and uniformed, with a 99% chance that the probability of "no correlation" can be rejected and that a relationship exists.  In addition, pricing volatility dropped from 3.2% prior to collusion to close to zero at 0.1% after the price hikes.  Similarly, Allergan's market share volatility dropped from 3% in the years prior to collusion to a low of 0.3%.  The unusual stability was uncharacteristic of a

competitive market where manufacturers would compete on pricing to gain market share.

309.   During the period of collusion and throughout the Relevant Period, Allergan and Teva communicated frequently.   Between September and December 2014, Allergan and Teva executives communicated at least 81 times by text or phone.  §III.D.3.h.  In addition to the calls with Teva's Rekenthaler, as discussed above, Allergan's Falkin spoke to Teva's Rekenthaler 433 times between August 2013 and March 2015, and exchanged phone calls with other Teva executives over 700 times.  Similarly, other Allergan executives also spoke to their counterparts at Teva over 460 times:

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Date |
|---|---|---|---|
| Marc Falkin | David Rekenthaler  (Teva) | 433 | 8/7/2013 - 3/25/2015 |
| Marc Falkin | Maureen Cavanaugh  (Teva) | 410 | 9/10/2013 - 7/29/2016 |
| Marc Falkin | Christine Baeder  (Teva) | 199 | 7/21/2015 - 7/29/2016 |
| Marc Falkin | Theresa Coward  (Teva) | 36 | 12/28/2015 - 7/27/2016 |
| Marc Falkin | Teva Pharmaceuticals | 26 | 5/28/2015 - 7/19/2016 |
| Marc Falkin | Nisha Patel  (Teva) | 11 | 2/5/2016 - 6/16/2016 |
| Marc Falkin | Jocelyn Baker  (Teva) | 11 | 11/24/2015 - 6/2/2016 |
| Marc Falkin | Cassie Dunrud  (Teva) | 11 | 2/8/2016 - 6/22/2016 |
| Marc Falkin | Jessica Peters  (Teva) | 7 | 9/27/2014 - 3/22/2016 |
| Marc Falkin | Kevin Galownia  (Teva) | 6 | 1/14/2016 - 5/12/2016 |
| **Total Falkin Calls to Teva** | | **1150** | |
| | | | |
| Rick Rogerson | Nisha Patel  (Teva) | 157 | 5/2/2013 - 11/9/2015 |
| Rick Rogerson | Kevin Galownia  (Teva) | 29 | 12/15/2015 - 7/29/2016 |
| Rick Rogerson | Teva Pharmaceuticals | 27 | 9/24/2015 - 7/29/2016 |
| Rick Rogerson | Christine Baeder  (Teva) | 17 | 2/26/2016 - 7/26/2016 |
| Allan Slavsky | Maureen Cavanaugh (Teva) | 17 | 8/21/2015 - 7/26/2016 |
| Allan Slavsky | Nisha Patel  (Teva) | 28 | 9/16/2015 - 3/10/2016 |
| Andrew Boyer | David Rekenthaler (Teva) | 16 | 4/1/2013 - 9/16/2014 |
| Andrew Boyer | Maureen Cavanaugh (Teva) | 113 | 8/12/2015 - 7/25/2016 |
| Andrew Boyer | Nisha Patel (Teva) | 28 | 4/30/2013 - 10/16/2015 |
| Anthony Giannone | Nisha Patel (Teva) | 9 | 1/27/2015 - 6/9/2016 |

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Date |
|---|---|---|---|
| Jonathan Kafer | David Rekenthaler (Teva) | 15 | 10/11/2013 - 3/29/2015 |
| Jonathan Kafer | Maureen Cavanaugh (Teva) | 4 | 4/29/2014 - 3/31/2015 |
| M.B. | Nisha Patel (Teva) | 3 | 2/26/2016 - 6/6/2016 |
| **Total Calls with Teva** | | **463** | |

310.   In addition, the co-conspirators had ample opportunities to meet in person

to collude.  According to the StateAGs:

> Upon information and belief, Defendant Patel also spoke in-person with
> many of these competitors.  For example, in her new role as a Director of
> National Accounts, Defendant Patel personally attended the following
> trade association events and customer conferences in the fall of 2014 and
> winter of 2014-2015: NACDS, Boston, MA (August 23-26, 2014),
> Econdisc Bidders Meeting, St. Louis, MO (September 17-19, 2014),
> PCMA Annual Meeting in Rancho Palos Verdes, CA (October 13-14,
> 2014), Anda Strategy Meeting, Miami, FL (October 26-29, 2014); and
> the HDMA Round Table, Washington, DC (January 8, 2015).  These
> industry events were all well-attended by Teva's competitors.

May 2019 AG Complaint, ¶891.

311.   Indeed, the Estradiol co-conspirators all attended events and conferences,

including:

| Conference | Allergan Attendees Including: | Teva Attendees Including: |
|---|---|---|
| NACDS, Boston, MA (August 23-26, 2014) | Defendant Buchen, Falkin, Rogerson, Boyer, Slavsky, Giannone, Dorsey, Clark, Reed | Rekenthaler, Patel, Cavanaugh, Galownia, Peters, Coward, Baeder, Baker, Dunrud |
| HDMA 2014 Annual Board and Membership Meeting, Laguna Beach, CA (September 27-October 1, 2014) | Falkin, Boyer | Rekenthaler, Cavanaugh, Baeder |
| GPhA 2014 Fall Technical Conference, Bethesda, MD (October 27-29, 2014) | Allergan | Teva |
| 2014 IGPA Annual Conference, Miami, FL (November 19-21, 2014) | Defendant Buchen, Brown | Oberman, Livneh |
| 2014 NACDS NYC Week Annual Foundation Dinner, New York, NY (December 3, 2014) | Defendant Saunders, Falkin, Boyer | Rekenthaler, Cavanaugh, Coward, Peters, Baeder |

| Conference | Allergan Attendees Including: | Teva Attendees Including: |
|---|---|---|
| GPhA 2015 Annual Meeting, Miami, FL (February 9-11, 2015) | Allergan | Olafsson, Rubenstein |
| 2015 HCSCA National Pharmacy Forum, Tampa, FL (February 16-18, 2015) | Fallon | Gerebi, McClard, Bivens, Bradford |
| HDMA 2015 Annual CEO Roundtable Fundraiser, New York, NY (April 14, 2015) | Falkin, Boyer, Giannone | Cavanaugh, Baeder |
| NACDS 2015 Annual Meeting, Palm Beach, FL (April 25-28, 2015) | Defendants Bisaro and Saunders, Falkin, Boyer, Steward | Cavanaugh, Coward, Baeder |

App.

312.   As a result of the Estradiol price hikes, Allergan improperly recognized

$7.7 million of collusive revenues between 2015 and 2016:



### f.     Clarithromycin ER, Estazolam, Tamoxifen Citrate, and Hydroxyzine Pamoate

313.   Clarithromycin ER Tablet is the generic version of Biaxin XL and is an antibiotic used to treat respiratory infections caused by the flu or pneumonia.

314.   Estazolam Tablet is the generic version of ProSom and is a sedative used to treat insomnia.

315.   Tamoxifen Citrate Tablet is the generic version of Nolvadex and is an antiestrogen used in hormone therapies for the prevention or treatment of breast cancer.

316.   Hydroxyzine Pamoate Capsule is the generic version of Vistaril and is an antihistamine and sedative used for the relief of psychoneurosis symptoms such as tension and anxiety.  It is also used to treat certain allergic reactions.

317.   In 2013 to 2014, the market for each of these four drugs was susceptible to collusion.

318.   Allergan and Teva represented over 80% of the market for Clarithromycin ER, close to the entirety of the market for Estazolam and Tamoxifen Citrate, and close to 60% of the market for Hydroxyzine Pamoate.  The market for each drug was highly concentrated with HHI over 3000:

|  | 2013 HHI | 2014 HHI |
|---|---|---|
| Clarithromycin ER | 3367 | 3835 |
| Estazolam | 4990 | 4998 |
| Tamoxifen Citrate | 5987 | 5226 |
| Hydroxyzine Pamoate | 3743 | 3088 |

- 139 -

In such highly concentrated markets, the cartels tended to be stable with the absence of cheating.

319.   Demand was also highly inelastic for each drug such that a massive price increase had little to no effect on demand.   In addition, Clarithromycin ER and Tamoxifen Citrate were considered essential medicines by the WHO and were crucial to "the priority health care needs of the population." With no effective substitute, consumers could not replace the drugs after massive price hikes.

320.   According to the May 2019 AG Complaint, Allergan implemented price increases on Clarithromycin, Tamoxifen Citrate, and Estazolam in March 2014 after reaching an agreement with Teva, in which "Actavis understood that Teva would follow the increases, or, at a minimum, would not poach Actavis customers after the increase."  May 2019 AG Complaint, ¶¶774-779.

321.   Indeed, on April 4, 2014, Teva not only followed Allergan's price hikes on the three drugs, but also led the price hike for Hydroxyzine Pamoate after extensive communication and coordination with Allergan.  *Id.*, ¶¶743-748.  As alleged in the May 2019 AG Complaint, the agreement with co-conspirators was summarized in a spreadsheet after Teva was "[s]atisfied that Defendants Patel and Rekenthaler had confirmed agreement with all appropriate competitors":

| Product Description | Lead/Follow | Competitors |
|---|---|---|
| AZITHROMYCIN ORAL SUSPENSION | Follow | Greenstone |
| AZITHROMYCIN SUSPENSION | Follow | Greenstone |
| BUMETANIDE TABLETS | Lead | Sandoz |
| CEPHALEXIN SUSPENSION | Follow | Lupin |
| CLARITHROMYCIN ER TABLETS | Follow | Actavis; Zydus |
| CYPROHEPTADINE HCL TABLETS 4MG 100 | Follow | Breckenridge |
| DICLOXACILLIN SODIUM CAPSULES | Lead | Sandoz |
| DIFLUNISAL TABLETS | Lead | Rising |
| ESTAZOLAM TABLETS | Follow | Actavis |
| ETHOSUXIMIDE CAPSULES | Lead | Versapharm |
| ETHOSUXIMIDE ORAL SOLUTION | Lead | Versapharm |
| HYDROXYZINE PAMOATE CAPSULES | Lead | Sandoz; Actavis |
| KETOCONAZOLE CREAM 2% | Lead | Taro; Sandoz |
| KETOCONAZOLE TABLETS | Lead | Taro; Mylan |
| MEDROXYPROGESTERONE TABLETS | Follow | Greenstone |
| MIMVEY (ESTRADIOL/NORETH) TAB | Follow | Breckenridge |
| NYSTATIN ORAL TABLETS | Lead | Heritage; Mutual |
| PENTOXIFYLLINE TABLETS | Lead | Apotex; Mylan |
| TAMOXIFEN CITRATE TABLETS | Follow | Actavis |
| THEOPHYLLINE ER TABLETS 100MG 100 | Lead | Heritage |

*Id.*, ¶747.

322.   Coordination between Allergan and Teva began at the start of 2014, when Zydus was planning to exit the market for Clarithromycin (and ultimately exited almost a year later).  *Id.*, ¶769.  At the end of 2013, Actavis, Teva, and Zydus made up the entirety of the Clarithromycin market.  *Id.*, ¶768.  In advance of Zydus' exit, Cardinal was actively seeking a new supplier.  *Id.*, ¶769.

323.   Instead of competing for Zydus' market share and the Cardinal business, Allergan and Teva reached an agreement to increase the price of Clarithromycin and painted a picture of supply shortage despite the fact that no shortage was reported to the FDA.  At 9:37 a.m. on January 2, 2014, Teva's customer marketing manager Liz Ricketts sent out an email suggesting that Teva should compete for Cardinal's

Clarithromycin business "at 10% under market intel pricing for [the] Watson/Actavis product" because "[i]f Cardinal is willing to wait until April, I suspect that Actavis isn't interested in picking up a lot of additional share." *Id.*, ¶770. Cardinal had agreed to wait until April to switch its supplier, as Teva represented that it did not have adequate supply to meet the excess demand. *Id.*, ¶769. Sensing an opportunity to collude with a "quality" co-conspirator, within 3 minutes of receiving Ricketts' email recommendation, Teva's Patel called Allergan's Rogerson at 9:40 a.m. and spoke with him for 17 minutes. *Id.*, ¶771. At 10:12 a.m., immediately after speaking with Rogerson, Patel opposed Ricketts' recommendation and instructed instead: "I think we have an opportunity to go higher. Let's aim for around $148 net and request feedback." *Id.* A week later, on January 9, 2014, Allergan's Rogerson and Teva's Patel spoke again for over six minutes about Cardinal's bid. *Id.*, ¶772. Shortly after the call with Rogerson, Patel emailed her Teva colleagues and announced: "It looks like Cardinal accepted our bid at the higher price. We may have an opportunity to take some increases." *Id.*

324. The opportunity to hike prices quickly expanded beyond Clarithromycin. On January 14, 2014, Patel sent an email to her boss Kevin Galownia with a spreadsheet containing a list of collusive price hike candidates, including Clarithromycin ER, entitled "Increase Potentials Q1 2014." *Id.*, ¶¶741, 773. The email stated: "Attached is my list of potential items. Note that they still need to go

through the review process." *Id.*, ¶741. According to the May 2019 AG Complaint, "Patel was feverishly coordinating by phone with a number of different competitors to identify price increase candidates" from February 4-7, 2014 in effort to put together a February 7 spreadsheet entitled "PI Candidates" with a more "formal list" of collusive drugs for her boss. *Id.*, ¶743. Allergan's Rogerson was one of the core co-conspirators who spoke with Patel for over 30 minutes on February 5-6, 2014:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:23:21 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:00 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:10 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 0:15:53 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:22 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:04 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:00:00 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:00:29 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:00:11 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:04 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 0:00:04 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 0:30:28 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 1:02:06 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:05 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:00 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:03 |
| 2/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | S.C. (Breckenridge) | 0:01:20 |
| 2/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | S.C. (Breckenridge) | 0:04:53 |

325. According to the StateAGs, Patel's efforts were so successful that she put together "a more refined list of 'PI Candidates'" by February 26, 2014, which included Allergan's Clarithromycin and Hydroxyzine Pamoate:

- 143 -

| Family | Market Notes | Pricing Notes |
|---|---|---|
| Clarithromycin ER | Zydus exiting | Raise non-Cardinal customers in accordance with new Cardinal price |
| OCs | Secondary at ABC | Raise to non-primary pricing/within 10% of primary market sell-refer to Anda intel |
| Cephalexin OS | | Follow Lupin - price points - WS net $14.70, 23.52, 16.75, 25.13 |
| Azith Susp | | Follow GS - price points - WS net $12.50 on all sku's |
| Medroxypro Tabs | | Follow GS - price points - WS net 8.50, 9.50, 10.50 on 100s |
| Nadolol (Econdisc only) | | Raise to originally planned increase price |
| Ethosuximide Liquid | Shared only with Versa; test quality of competitor | |
| Ethosuximide Caps | Shared only with Versa; test quality of competitor; UNPROFITABLE | |
| Cyproheptadine | Shared only with Breckenridge | Follow Breckenridge - price points - WS contract $5.10 |
| Mimvey | Shared only with Breckenridge | Follow Breckenridge - price points - WS contract 96.30 |
| BUDESONIDE | Exclusive | PER PRICING INFORMATION FROM DECEMEBER |
| NIACIN ER | Exclusive but Lupin entering | PER PRICING INFORMATION FROM DECEMEBER |
| Bumetanide | Teva exiting  CHECK SALES FOR % INCREASE | Lead market with potential share loss in mind |
| Diva Iproex ER | UNPROFITABLE  several competitors | |
| Diflunisal | Shared only with Rising | |
| Ketoconazole Cream | Shared with Taro and Sandoz | |
| Ketoconazole Tab | Shared with Taro, Myl and Apo | |
| Mupirocin Ointment | Shared with Perrigo, GM, Taro, Sandoz | |
| Theophylline Tab | Shared with Heritage, Major and Inwood | |
| Nystatin Tab | Shared with Heritage and Mutual/Caraco | |
| Hydroxyzine Pamoate | Shared with Sandoz and Actavis | |
| Pentoxi ER | Shared with Apo and Mylan | |

*Id.*, ¶744.

326.   Allergan continued to communicate with Teva in March 2014 to coordinate its own price hikes as well as Teva's price hikes to be implemented in April.   Within the span of a week, between March 11-17, 2014, Allergan's Marc Falkin and Teva's David Rekenthaler spoke for over 30 minutes and texted 4 times, while Allergan's Rogerson and Teva's Patel spoke for over 38 minutes.  *Id.*, ¶745.



| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/10/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | S.G. (Zydus) | 7:46:00 | 0:02:00 |
| 3/10/2014 | Voice | Rekenthaler, David (Teva) | Incoming | S.G. (Zydus) | 8:23:00 | 0:16:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:59:46 | 0:00:02 |
| 3/10/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:00:03 | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 10:46:30 | 0:05:08 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 17:48:05 | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 17:48:28 | 0:00:30 |
| 3/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 9:25:06 | 0:06:25 |
| 3/11/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 15:25:00 | 0:01:00 |
| 3/12/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 12:36:00 | 0:03:00 |
| 3/12/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 12:40:00 | 0:01:00 |
| 3/13/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 13:41:03 | 0:00:00 |
| 3/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 13:41:24 | 0:00:21 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:05:47 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 8:07:44 | 0:20:38 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:35:27 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:41:11 | 0:19:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rekenthaler, David (Teva) | 9:00:43 | 0:10:43 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 9:11:50 | 0:07:54 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 9:53:49 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 9:54:11 | 0:00:22 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 10:31:09 | 0:12:37 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 12:36:59 | 0:05:31 |
| 3/14/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 16:11:00 | 0:01:00 |
| 3/15/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 10:27:00 | 0:11:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:57:19 | 0:05:53 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 9:06:23 | 0:05:04 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 10:23:00 | 0:07:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 10:26:51 | 0:07:44 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 10:40:04 | 0:00:05 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | CW-2 (Rising) | 10:44:00 | 0:05:00 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | CW-2 (Rising) | 10:56:00 | 0:03:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 11:07:35 | 0:00:01 |
| 3/17/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 11:08:08 | 0:00:00 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 11:17:00 | 0:20:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 11:35:28 | 0:15:25 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 11:53:08 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 11:53:31 | 0:00:05 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 12:17:50 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 12:18:13 | 0:00:22 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 12:19:10 | 0:19:13 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 12:36:50 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 12:38:42 | 0:09:51 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 16:46:25 | 0:11:13 |

327.   Many of these calls took place immediately before and after Allergan's announcement of its price hikes on March 13, 2014 (to be effective on April 15, 2014).  *Id*., ¶¶745, 775.  In particular, on March 11-12, 2014 – the two days immediately prior to Allergan's price increase announcement – Allergan's Falkin spoke to Teva's Rekenthaler three times to coordinate the increases.  *Id*., ¶745.  On March 14, 2014, the day after Allergan's announcement, Allergan's Rogerson called Teva's Patel twice that morning and finally spoke to her for over 12.5 minutes at

10:31 a.m. *Id.*, ¶¶745, 775. At 10:47 a.m., within minutes after the call, Patel emailed her National Account Managers ("NAMs") about Allergan's price increases and some of the drugs that overlapped with Teva:

> **From:** Nisha Patel02
> **Sent:** Friday, March 14, 2014 10:47 AM
> **To:** ██████████████████████████████
> **Cc:** Dave Rekenthaler; ████████████████████
> **Subject:** Market Increases
>
> NAMs,
>
> I'm hearing that Actavis announced a bunch of price increases yesterday. Please share any intel you gather. I believe some of the products, that overlap with Teva, are as follows (not sure if there are any more):
>
> Tamoxifen
>
> Mirtazipine
>
> Estazolam

*Id.*, ¶775.

328.   When Allergan's Rogerson and Teva's Patel spoke again for more than 5.5 minutes at 12:37 p.m. that same day (March 14), Patel confirmed that Teva would follow Allergan's price increases. *Id.*, ¶777. At 12:51 p.m., within minutes after the Rogerson call, Patel emailed her colleagues and announced: "Actavis took an increase. We will follow. We need to review price per my alert list. Let's wait to see what intel we can get and discuss Monday." *Id.*

329.   Indeed, on Monday (March 17, 2014), Patel added Tamoxifen and Estazolam to the collusive price increase list in the spreadsheet "PI Candidates," and called Allergan's Rogerson shortly after emailing the spreadsheet to her boss

Galownia. *Id.*, ¶778. Rogerson and Patel spoke for 19 minutes. *Id.* Allergan's Falkin also spoke with Teva's Rekenthaler for more than six minutes that morning and communicated by text four times. *Id.*

330. Before and at the time of Teva's April 4, 2014 price hikes, Allergan and Teva communicated extensively – as shown in an illustration by the StateAGs concerning the co-conspirators' conversations relating to the collusive price hike drugs. *Id.*, ¶748. Allergan's communications with Teva concerning the price hikes on Clarithromycin, Estazolam, Tamoxifen, and Hydroxyzine Pamoate are notated in blue:



*Id.*

331. As the StateAGs allege, "[t]hese price increases were all coordinated and agreed to between Teva and its competitors." *Id.* In particular, for drugs with price

hikes that were led by Teva,  such drugs had "the most risk if Teva did not secure an agreement beforehand with a competitor before raising its own price." *Id.*, ¶746. Patel also circulated a list on April 1, 2014 targeting such drugs, including Hydroxyzine Pamoate, to her colleague Rekenthaler to ensure that "Teva had successfully coordinated increases with everyone." *Id.*  As the graphic above demonstrates, Allergan's Rogerson spoke to Teva's Patel three times on April 1 and 3, prior to Teva's price hikes; and on April 4, 2014, the day of the hike, they spoke twice for close to ten minutes.  Allergan's Falkin and Teva's Rekenthaler also spoke on the day of the price hikes, as well as on each of the three days preceding the hike.

332.   In addition to communicating by phone, prior to and at the time of the price hikes, the co-conspirators had opportunities to collude in person:

2013 NACDS NYC Week Annual Foundation Dinner, New York, NY (December 3, 2013)
- Allergan attendees included: Falkin, Boyer, Giannone, Reed, Shane
- Teva attendees included: Rekenthaler, Cavanaugh, Coward, Marshall

GPhA 2014 Annual Meeting, Orlando, FL (February 19-21, 2014)
- Allergan
- Teva attendees included: Oberman

HDMA Sixth Annual CEO Roundtable Fundraiser, New York, NY (April 1, 2014)
- Allergan attendees included: Falkin, Boyer, Rogerson, Giannone, Clark
- Teva attendees included: Rekenthaler, Cavanaugh, Doerr

NACDS 2014 Annual Meeting, Scottsdale, AZ (April 26-29, 2014)
- Allergan attendees included: Defendants Bisaro and Olafsson, Falkin, Boyer, Stewart

- Teva attendees included: Oberman, Rekenthaler, Cavanaugh, Coward, Baeder

App.

333.   Plaintiff's investigation confirmed that Allergan and Teva implemented collusive price hikes in March and April 2014.  Allergan led the Estazolam price hikes in March 2014, and Teva followed in April 2014, increasing Estazolam pricing to the identical level of $0.59 per unit, resulting in a 39% price increase:



334.   The collusive drugs showed little to no sign of competition after the agreements.  Allergan and Teva's Estazolam pricing were highly correlated at 97% with an unusual degree of uniformity, with a 99% chance that the probability of "no correlation" can be rejected, and that a relationship exists.  In addition, pricing volatility fell from 7.1% to close to zero at 0.1%, and market share volatility dropped from 5.6% in the years prior to collusion to less than 4.8% after collusion.  Similarly, for Clarithromycin, Hydroxyzine Pamoate, and Tamoxifene Citrate, Allergan's market

share volatility fell from 9.3% to 1.3%, 3.5% to 0.7%, and 5.3% to 2.4%, respectively. The unusual stability was uncharacteristic of a competitive market where manufacturers would compete on pricing to gain market share.

335.   Indeed, based on their review of the evidence, the StateAGs have found that the co-conspirators refrained from competing in the market, particularly after Allergan and Teva's price hikes:

> After the price increases became effective, Teva took consistent steps not to disrupt the market or steal market share from Actavis. For example, on May 14, Defendant Patel declined to bid at ABC on both Tamoxifen Citrate and Estazolam, stating: "unable to bid (strategic reasons, for internal purposes)." When Defendant Patel and her other conspirators at Teva used the term "strategic" in this context, it was code for the fact that there was an understanding in place with a competitor.

> Similarly, on May 21, 2014, Teva received a request from a large customer for a bid on Tamoxifen Citrate. As of that date, Teva had 58.4% of the market, and Actavis had 40.7%. A Teva analyst forwarded the request to Defendant Patel and others, recommending (pursuant to the fair share understanding in the industry) that Teva not bid "as we are first in a two-player market with good share already." Defendant Patel responded: "Agree. We should decline to bid."

May 2019 AG Complaint, ¶¶780-781.

336.   Prior to the price hikes and throughout the Relevant Period, Allergan executives were in constant contact with Teva.  During the four months of January to April 2014, Allergan and Teva executives communicated over 137 times.  §III.D.3.h. In addition to the calls with his Teva counterparts that took place during January to April 2014 as discussed above, Allergan's Falkin communicated with Teva over 1,100

times.  Similarly, Allergan's Rogerson spoke with Teva executives over 200 times.

Other Allergan executives also spoke with their counterparts at Teva over 250 times:

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Date |
|---|---|---|---|
| Marc Falkin | David Rekenthaler  (Teva) | 433 | 8/7/2013 - 3/25/2015 |
| Marc Falkin | Maureen Cavanaugh  (Teva) | 410 | 9/10/2013 - 7/29/2016 |
| Marc Falkin | Christine Baeder  (Teva) | 199 | 7/21/2015 - 7/29/2016 |
| Marc Falkin | Theresa Coward  (Teva) | 36 | 12/28/2015 - 7/27/2016 |
| Marc Falkin | Teva Pharmaceuticals | 26 | 5/28/2015 - 7/19/2016 |
| Marc Falkin | Nisha Patel  (Teva) | 11 | 2/5/2016 - 6/16/2016 |
| Marc Falkin | Jocelyn Baker  (Teva) | 11 | 11/24/2015 - 6/2/2016 |
| Marc Falkin | Cassie Dunrud  (Teva) | 11 | 2/8/2016 - 6/22/2016 |
| Marc Falkin | Jessica Peters  (Teva) | 7 | 9/27/2014 - 3/22/2016 |
| Marc Falkin | Kevin Galownia  (Teva) | 6 | 1/14/2016 - 5/12/2016 |
| **Total Falkin Calls to Teva** | | **1150** | |
| | | | |
| Rick Rogerson | Nisha Patel  (Teva) | 157 | 5/2/2013 - 11/9/2015 |
| Rick Rogerson | Kevin Galownia  (Teva) | 29 | 12/15/2015 - 7/29/2016 |
| Rick Rogerson | Teva Pharmaceuticals | 27 | 9/24/2015 - 7/29/2016 |
| Rick Rogerson | Christine Baeder  (Teva) | 17 | 2/26/2016 - 7/26/2016 |
| **Total Rogerson Calls to Teva** | | **230** | |
| | | | |
| Allan Slavsky | David Rekenthaler (Teva) | 26 | 1/11/2012 - 4/1/2013 |
| Allan Slavsky | Maureen Cavanaugh (Teva) | 17 | 8/21/2015 - 7/26/2016 |
| Allan Slavsky | Nisha Patel (Teva) | 28 | 9/16/2015 - 3/10/2016 |
| Andrew Boyer | David Rekenthaler (Teva) | 16 | 4/1/2013 - 9/16/2014 |
| Andrew Boyer | Maureen Cavanaugh (Teva) | 113 | 8/12/2015 - 7/25/2016 |
| Andrew Boyer | Nisha Patel (Teva) | 28 | 4/30/2015 - 10/16/2015 |
| Anthony Giannone | Nisha Patel (Teva) | 9 | 1/27/2015 - 6/9/2016 |
| Jonathan Kafer | David Rekenthaler (Teva) | 15 | 10/11/2013 - 3/29/2015 |
| Jonathan Kafer | Maureen Cavanaugh (Teva) | 4 | 4/29/2014 - 3/31/2015 |
| M.B. | Nisha Patel (Teva) | 3 | 2/26/2016 - 6/6/2016 |
| **Total Calls with Teva** | | **259** | |

337.  As a result of the Estazolam price hikes alone, Allergan improperly recognized $0.35 million of collusive revenues between 2014 and 2016:



Actavis's Total Yearly Collusive Revenues: Estazolam Tablets

| | 2014 | 2015 | 2016 |
|---|---|---|---|
| ■(1) Collusive Revenue | 0.25 | 0.17 | 0.08 |
| ■(2) Collusive Revenue | 0.24 | 0.16 | 0.06 |
| ■(3) Collusive Revenue | 0.10 | - | - |
| ■Average | 0.20 | 0.11 | 0.04 |

■(1) Collusive Revenue   ■(2) Collusive Revenue   ■(3) Collusive Revenue   ■Average

**g.   Desmopressin Acetate Tablets, Disopyramide Phosphate Capsules, Flutamide Capsules, and Topiramate Sprinkle Capsules**

338.   Desmopressin Acetate tablet is the generic version of DDAVP tablet and is used to control thirst and urination.  It is usually prescribed to patients with diabetes insipidus or children with bedwetting problems.

339.   Disopyramide Phosphate Capsule is the generic version of Norpace capsule and is an anti-arrhythmic used to control serious cases of irregular heartbeat in an effort to prevent stroke or heart attack.

340.   Flutamide Capsule is the generic version of Eulexin and is an anti-testosterone used to treat or control the growth of prostate cancer.

341.   Topiramate Sprinkle Capsule is the generic version of Topamax and is an antiepileptic used to control seizures.  It is also used to prevent the onset of migraine headaches.

342.   From 2013 to 2014, the market for each of the four drugs was susceptible to collusion.

343.   Allergan and Teva made up close to the entirety of the market for Desmopressin Acetate and Disopyramide Phosphate.  For Flutamide, Allergan, Teva, and Par made up close to the entirety of the market.  For Topiramate Sprinkle, Allergan, Teva, and Zydus represented the entirety of the market.  The market for each drug was highly concentrated with HHI over 3000:

|  | **2013 HHI** | **2014 HHI** |
|---|---|---|
| Desmopressin Acetate | 5005 | 5011 |
| Disopyramide Phosphate | 5024 | 5537 |
| Flutamide | 3423 | 3863 |
| Topiramate Sprinkle | 5765 | 5451 |

344.   In such highly concentrated markets, the cartels tended to be stable with the absence of cheating.

345.   Demand was also highly inelastic for each drug such that a massive price increase had little to no effect on demand.  In addition, Desmopressin Acetate was considered an essential medicine by the WHO and was crucial to "the priority health care needs of the population." With no effective substitute, consumers could not replace the drug after massive price hikes.

346.   Desmopressin Acetate Tablets, Disopyramide Phosphate Capsules, Flutamide Capsules, and Topiramate Sprinkle Capsules were part of Teva's August 28, 2014 massive price hikes, which were implemented after Teva's Patel and Rekenthaler coordinated with "every high-quality competitor" for weeks.  May 2019

- 153 -

AG Complaint, ¶846.  The StateAGs illustrated the co-conspirators' communication in the graphic below, with the Allergan-Teva phone calls highlighted in blue:



*Id.*

347.  As the graphic demonstrates, Allergan's Falkin and Rogerson coordinated extensively with Teva prior to and immediately after Teva's price hikes.  Allergan's Falkin spoke to Teva's Rekenthaler twice on August 18, 2014 and again on August 24, 2014.  On August 26, 2014, two days prior to the price hikes, they spoke four times.   On the day before the price hikes, Teva's Patel called Allergan's Rogerson 5 times in the morning and discussed the price increases for more than 16 minutes:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:11:03 | 0:11:13 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:02:19 | 0:00:00 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:02:42 | 0:00:03 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:27:27 | 0:02:25 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:31:03 | 0:00:33 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:32:42 | 0:20:31 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 8:41:01 | 0:00:00 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 8:41:06 | 0:00:25 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:58:01 | 0:16:23 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 9:23:26 | 0:18:34 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Brown, Jim (Glenmark) | 10:34:34 | 0:00:06 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 16:29:08 | 0:07:52 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 17:09:15 | 0:00:06 |

*Id.*, ¶847.

348.   Allergan's Falkin also spoke to Teva's Rekenthaler again on August 28, 2014, the day immediately after the price hike.  *Id*., ¶846.

349.   According to the StateAGs, "[i]n addition to those phone communications noted above, representatives from Teva and every other defendant met in Boston, Massachusetts shortly before the increase, from August 23-26, 2014, for the NACDS annual event, which was the largest pharmaceutical industry meeting of the year.  Defendants Cavanaugh, Rekenthaler and Patel, along with many other executives, as well as executives from every other corporate Defendant, attended." *Id.*, ¶848; App.  Allergan's Falkin, Rogerson, Boyer, Slavsky, Clark, and Defendant Buchen were also among the attendees of the NACDS annual event – along with Zydus's Green, Ronco, Goldy, Keenley, Nayak, and Purcell; and Par's Holden, Kenney, Propst, and Minnihan.  App.

350.   For some of the collusive drugs, Teva agreed to follow its co-conspirators' price hikes – such as Topiramate Sprinkle Capsules.  May 2019 AG

- 155 -

Complaint, ¶876.  On June 11, 2014, Teva's Rekenthaler spoke to Allergan's Falkin twice.  *Id.,* ¶880.  On the same day, Teva's Rekenthaler and Patel spoke extensively to their former colleague Kevin Green, who had moved to Zydus.  *Id.,* ¶879.  Patel spoke to Green for more than 14 minutes, and Rekenthaler spoke to Green for 8 minutes.  *Id.,* ¶880.  Shortly after the calls with Allergan and Zydus, on June 13, 2014, Patel added Topiramate Sprinkle Capsules to her price increase list, noting: "Follow/Urgent – Zydus."  *Id.*

351.  For drugs that Teva led the price increases, such as Desmopressin Acetate Tablets and Disopyramide Phosphate Capsules, co-conspirators like Allergan agreed to coordinate and follow the price hikes.  *Id.*, ¶882.  Because Teva knew that Allergan planned to follow its price hikes shortly after being implemented, when a customer requested that Teva lower its uncompetitive Desmopressin Acetate Tablets pricing on October 15, 2014, Teva's Patel simply told the customer to wait and check market pricing later, stating: "[w]e believe the market is still settling on this product. Can you please review in a few days and advise of more current pricing intelligence?" *Id.*, ¶885.

352.  Indeed, within six weeks, on December 19, 2014, Allergan followed Teva's Desmopressin Acetate Tablets price increase.  *Id.*, ¶884.  Allergan's Falkin spoke to Teva's Rekenthaler on November 18, 21, and 25 prior to the price hike.  *Id.* In addition, shortly before Allergan's price hike, on December 3, 2014, Allergan's

Falkin, Boyer, and defendant Saunders attended the 2014 NACDS Dinner in New York City with Teva's Rekenthaler, Cavanaugh, and Coward – with opportunity to meet in person and collude during the event.  App.

353.   Plaintiff's investigation revealed that Allergan hiked Desmopressin Acetate Tablets prices by 75% in December 2014, taking pricing to the same level as Teva:



Desmopressin Acetate Tablets: Price per Unit

354.   Allergan and Teva's Desmopressin Acetate Tablets pricing were highly correlated and uniformed, with a 99% chance that the probability of "no correlation" can be rejected, and that a relationship exists.

355.   For Disopyramide Phosphate Capsules, Plaintiff's investigation revealed that Allergan did not immediately follow Teva's price hike because Allergan temporarily exited the market after Teva's price increase.  When Allergan re-entered the Disopyramide Phosphate Capsules market in May 2016, it set the re-entry price at

the identical level as co-conspirator Teva – $2.11 per unit – and immediately gained

14% market share:



356.   Prior to Allergan's re-entry into the Disopyramide Phosphate Capsules

market in May 2016 and its decision to join Teva's collusive pricing in lieu of setting

a lower price and competing for market share, Allergan and Teva executives

communicated frequently.  Allergan's Falkin communicated with Teva's (i) Patel by

text and/or phone calls 11 times from February 5, 2016 and June 16, 2016, and (ii)

Galownia by text and/or phone calls 6 times from January 14, 2016 and May 12, 2016

§III.D.3.h.  Similarly, Allergan's Rogerson and Teva's Baeder communicated 17

times between February 26, 2016 and July 26, 2016.  *Id.*  In addition, on April 16-19,

2016, the co-conspirators gathered at the NACDS Annual Meeting in Palm Beach,

Florida with opportunity to meet in person.  App.  Allergan's Boyer and Falkin

attended the meeting, along with defendant Olafsson (who had resigned from Allergan and became President of Teva USA), Cavanaugh, and Baeder from Teva.  *Id.*

357.  The collusive drugs had little to no sign of competition after the agreements.  Allergan's market share volatility fell from 6.9% to 2.8% for Desmopressin Acetate Tablets, 10.1% to 0.6% for Disopyramide Phosphate Capsules, and 2.1% to 0.1% for Topiramate Sprinkle Capsules.  The unusual stability was uncharacteristic of a competitive market where manufacturers would compete on pricing to gain market share.

358.  During the period of collusion and throughout the Relevant Period, Allergan was in constant contact with its co-conspirators.  Between June 2014 to December 2014, Allergan spoke to and/or texted Teva executives at least 152 times.  §III.D.3.h.  In addition, Allergan's Falkin communicated with Teva's Rekenthaler at least 433 times and with other Teva executives over 710 times.  He also exchanged texts and calls with Zydus executive Kristy Ronco close to 550 times and Par executive Jon Holden 48 times.  Similarly, Allergan's Rogerson spoke to Teva's executives at least 230 times, with over 150 calls to Teva's Patel alone.  Other Allergan executives also spoke with their counterparts at Teva at least 239 times:

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Date |
|---|---|---|---|
| Marc Falkin | David Rekenthaler  (Teva) | 433 | 8/7/2013 - 3/25/2015 |
| Marc Falkin | Maureen Cavanaugh  (Teva) | 410 | 9/10/2013 - 7/29/2016 |
| Marc Falkin | Christine Baeder  (Teva) | 199 | 7/21/2015 - 7/29/2016 |
| Marc Falkin | Theresa Coward  (Teva) | 36 | 12/28/2015 - 7/27/2016 |
| Marc Falkin | Teva Pharmaceuticals | 26 | 5/28/2015 - 7/19/2016 |

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Date |
|---|---|---|---|
| Marc Falkin | Nisha Patel  (Teva) | 11 | 2/5/2016 - 6/16/2016 |
| Marc Falkin | Jocelyn Baker  (Teva) | 11 | 11/24/2015 - 6/2/2016 |
| Marc Falkin | Cassie Dunrud  (Teva) | 11 | 2/8/2016 - 6/22/2016 |
| Marc Falkin | Jessica Peters  (Teva) | 7 | 9/27/2014 - 3/22/2016 |
| Marc Falkin | Kevin Galownia  (Teva) | 6 | 1/14/2016 - 5/12/2016 |
| **Total Falkin Calls to Teva** | | **1150** | |
| | | | |
| Marc Falkin | Kristy Ronco (**Zydus**) | **550** | 8/3/2013 - 4/13/2016 |
| | | | |
| Marc Falkin | Jon Holden (**Par**) | **48** | 9/24/2013 - 8/11/2015 |
| | | | |
| Rick Rogerson | Nisha Patel  (Teva) | 157 | 5/2/2013 - 11/9/2015 |
| Rick Rogerson | Kevin Galownia  (Teva) | 29 | 12/15/2015 - 7/29/2016 |
| Rick Rogerson | Teva Pharmaceuticals | 27 | 9/24/2015 - 7/29/2016 |
| Rick Rogerson | Christine Baeder  (Teva) | 17 | 2/26/2016 - 7/26/2016 |
| **Total Rogerson Calls to Teva** | | **230** | |
| | | | |
| Allan Slavsky | David Rekenthaler (Teva) | 26 | 1/11/2012 - 4/1/2013 |
| Allan Slavsky | Maureen Cavanaugh (Teva) | 17 | 8/21/2015 - 7/26/2016 |
| Allan Slavsky | Nisha Patel (Teva) | 28 | 9/16/2015 - 3/10/2016 |
| Andrew Boyer | David Rekenthaler (Teva) | 16 | 4/1/2013 - 9/16/2014 |
| Andrew Boyer | Maureen Cavanaugh (Teva) | 113 | 8/12/2015 - 7/25/2016 |
| Andrew Boyer | Nisha Patel (Teva) | 28 | 4/30/2013 - 10/16/2015 |
| Anthony Giannone | Nisha Patel (Teva) | 9 | 1/27/2015 - 6/9/2016 |
| Jonathan Kafer | David Rekenthaler (Teva) | 15 | 10/11/2013 - 3/29/2015 |
| Jonathan Kafer | Maureen Cavanaugh (Teva) | 4 | 4/29/2014 - 3/31/2015 |
| M.B. | Nisha Patel (Teva) | 3 | 2/26/2016 - 6/6/2016 |
| **Total Calls with Teva** | | **259** | |

359.  As a result of the price hikes, Allergan improperly recognized over $50 million of collusive revenues for Desmopressin Acetate Tablets and Disopyramide Phosphate Capsules alone.

360.  For Desmopressin Acetate Tablets, Allergan generated almost $50 million of collusive revenues between 2014 and 2016:



361.   For   Disopyramide   Phosphate   Capsules,   Allergan   generated   over $0.4 million of collusive revenues in 2016:



### 13.   Additional Market Allocation Drugs from the May 2019 AG Complaint

362.   The concept of "fair share" – also known as the "'rules of engagement'" – particularly applies when a new competitor enters the generic drug market and engages in market allocation.  May 2019 AG Complaint, ¶126.  While "no precise method" applies in allocating "'fair share,'" later entrants are generally given less than

a proportional share of the market.  *Id*., ¶¶128-130.  According to the StateAGs, to achieve the purpose of minimizing competition, the scheme is effectuated in the following way:

> First, Defendants allocate the market for an individual drug based on the number of competitors and the timing of their entry so that each competitor obtains an acceptable share of the market. Then, the competitors agree on ways to avoid competing on price and, at times, significantly raise price. This pattern is frequently followed even in the absence of direct communication between the competitors, demonstrating the universal code of conduct agreed to by Defendants.

*Id.*, ¶132.

363.   As alleged in the May 2019 AG Complaint, Allergan and its co-conspirators implemented the fair share market allocation scheme to at least nine generic drugs.

### a.   Amphetamine/Dextroamphetamine Extended Release

364.   Amphetamine/Dextroamphetamine Extended Release ("MAS-XR") is the generic version of Adderall XR and is used to treat attention deficit disorder. May 2019 AG Complaint, ¶328.  The drug is also known as "Mixed Amphetamine Salts" or "MAS," as it is a mixture of levoamphetamine and dextroamphetamine salts. *Id.*

365.   In 2011-2012, the MAS-XR market was highly concentrated with HHI of 4,462-5,135.  Before Allergan's entry, Teva had over half of the market.

366.   Allergan began marketing MAS-XR as early as April 2012, while its application to manufacture MAS-XR was still pending at the FDA.  *Id.*, ¶¶330, 332. Allergan initially reached out to Teva's customer – the customer, in turn, contacted Teva on April 9, 2012 to request lower pricing on the drug and alerted Teva on Allergan's pending approval.  *Id.*, ¶330.

367.   Allergan initiated the discussion concerning its impending launch of MAS-XR with Teva, and by June 22, 2012 – when the FDA approved Allergan's application for MAS-XR – Allergan had already communicated to Teva its desired fair share of 15% market share and customer allocations.  Teva's Rekenthaler instructed his colleagues to gather intelligence around Allergan's launch plans at 9:58 p.m. on June 22, 2012, and at 8:32 a.m. the next morning, Teva's national account executive Teri Sherman responded that Allergan's senior sales and marketing executive Michael Perfetto had already spoken to her.  *Id.*, ¶332.   In her email response, Sherman laid out the details of her conversation with Allergan's Michael Perfetto, and the identity of the customers Allergan targeted to receive from Teva:

From: ▮▮▮▮▮
Sent: Saturday, June 23, 2012 8:32 AM
To: Dave Rekenthaler; ▮▮▮▮▮▮▮▮▮▮ Kevin Green
Subject: Re: Actavis Adderall XR

Spoke to ▮▮▮▮. Going after approx 15 share.
1 wholesaler (either McKesson or Cardinal) as backup and possibly Econdisc. NOT Walgreens and CVS.

*Id.*

368.   In response to the Allergan customer allocation wish list, Teva's senior sales executive Theresa Coward told colleagues that "this allocation of market share could be tricky" because one of Allergan's targeted customers warehoused products for another customer not subject to the market allocation.  *Id.*, ¶333.

369.   Nevertheless, as Allergan demanded, Teva conceded customers to Allergan, and the MAS-XR market allocation process was completed by May 7, 2013.  *Id.*, ¶334.  On May 7, 2013, Teva's Coward confirmed the completion of the scheme in an email to a customer seeking a lower price for the drug and stated: "'we have plenty of supply and want to keep you [sic] full business [sic] we have already let other customers go to [Actavis] go to help the market dynamites [sic].'"  *Id.*

370.   Plaintiff's investigation revealed that Allergan indeed attained its desired 15% market share by October 2012 without competing on pricing for MAS-XR, and MAS-XR quickly became one of Allergan's "key products which comprised a majority of product sales for North American Generic" by 2014 as recognized in the 2014 Form 10-K.  In fact, Allergan entered the market in July 2012 at the same elevated pricing as set by Teva at $4.91 per unit, and the conspirators maintained the collusive pricing throughout the Relevant Period:



371.   Anti-competitive behavior by Allergan and Teva left behind a series of collusive markers in the MAS-XR market, as evidenced by uniform pricing marked by high correlations, low volatility of drug prices post-collusion, and the high stability of market share.  From the time of Allergan's entry to the end of the Relevant Period, Allergan and Teva's MAS-XR pricing were highly correlated and uniformed, with a 99% chance that the probability of "no correlation" can be rejected, and that a relationship exists.  In addition, pricing volatility was close to zero, and market share volatility dropped from 4.5%-6.4% in the years prior to collusion to less than 2% for years after Teva's Coward announced the completion of the market allocation process in May 2013.  The unusual stability was uncharacteristic of a competitive market where manufacturers would compete on pricing to gain market share.

372. Throughout the MAS-XR market allocation process, representatives from Allergan and Teva had the opportunity to communicate in person through the following trade association meetings:

| Conference | Allergan Attendees Including: | Teva Attendees Including: |
|---|---|---|
| NACDS Annual Meeting in Palm Beach, FL (April 24-27, 2012) | Defendants Paul Bisaro and Sigurdur Olafsson, and Michael Perfetto, Andrew Boyer, Allan Slavsky, Michael Reed, Paul Reed, John Shane, and Robert Stewart | Theresa Coward, Maureen Cavanaugh, Jeremy Levin, Jonathan Kafer, and Christine Baeder |
| HDMA 2012 Business and Leadership Conference in San Antonio, TX (June 13, 2012) | Andrew Boyer, Richard Rogerson, Allan Slavsky, Michael Baker, Jack Ericsson, Michael Reed, Paul Reed, John Shane, and Carrie Wetzel | Theresa Coward, David Rekenthaler, Teri Sherman, Kevin Green, and Jessica Peters |
| NACDS 2012 Pharmacy and Technology Conference in Denver, CO (August 25-28, 2012) | Michael Perfetto, Andrew Boyer, Allan Slavsky, Napoleon Clark, Michael Baker, Ara Aprahamian, Steven Cohen, Michael Dorsey, and Jinping McCormack | Theresa Coward, Teri Sherman, David Rekenthaler, Maureen Cavanaugh, Kevin Galownia, Kevin Green, Christine Baeder, Jessica Peters, and Scott Goldy |
| GPhA Technical Conference in Bethesda, MD (October 1-3, 2012) | Allergan | Teva |
| NACDS Regional Chain Conference in Fort Lauderdale, FL (February 3-5, 2013) | Michael Baker and Paul Reed | Theresa Coward |
| GPhA Annual Meeting in Orlando, FL (February 20-22, 2013) | Defendant Sigurdur Olafsson | Allan Oberman |
| NACDS 2013 Annual Meeting in Palm Beach, FL (April 20-23, 2013) | Defendants Paul Bisaro and Sigurdur Olafsson, and Andrew Boyer, Allan Slavsky, Robert Steward, Michael Baker, Michael Reed, Paul Reed, and John Shane | Theresa Coward, David Rekenthaler, Maureen Cavanaugh, Jeremy Levin, Allan Oberman, and Jonathan Kafer |

373. In addition, throughout the market allocation process and the Relevant Period, Allergan and Teva executives communicated constantly. Between January 2013 to May 2013, Allergan and Teva executives texted and/or spoke by phone at least 38 times. §III.D.3.h. In particular, Teva's Rekenthaler and Allergan's

Slavsky exchanged calls and/or texts at least 26 times between January 2012 and April 2013, while other senior executives also communicated extensively:

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Date |
|---|---|---|---|
| Marc Falkin | David Rekenthaler  (Teva) | 433 | 8/7/2013 - 3/25/2015 |
| Marc Falkin | Maureen Cavanaugh  (Teva) | 410 | 9/10/2013 - 7/29/2016 |
| Marc Falkin | Christine Baeder  (Teva) | 199 | 7/21/2015 - 7/29/2016 |
| Marc Falkin | Theresa Coward  (Teva) | 36 | 12/28/2015 - 7/27/2016 |
| Marc Falkin | Teva Pharmaceuticals | 26 | 5/28/2015 - 7/19/2016 |
| Marc Falkin | Nisha Patel  (Teva) | 11 | 2/5/2016 - 6/16/2016 |
| Marc Falkin | Jocelyn Baker  (Teva) | 11 | 11/24/2015 - 6/2/2016 |
| Marc Falkin | Cassie Dunrud  (Teva) | 11 | 2/8/2016 - 6/22/2016 |
| Marc Falkin | Jessica Peters  (Teva) | 7 | 9/27/2014 - 3/22/2016 |
| Marc Falkin | Kevin Galownia  (Teva) | 6 | 1/14/2016 - 5/12/2016 |
| Rick Rogerson | Nisha Patel  (Teva) | 157 | 5/2/2013 - 11/9/2015 |
| Rick Rogerson | Kevin Galownia  (Teva) | 29 | 12/15/2015 - 7/29/2016 |
| Rick Rogerson | Teva Pharmaceuticals | 27 | 9/24/2015 - 7/29/2016 |
| Rick Rogerson | Christine Baeder  (Teva) | 17 | 2/26/2016 - 7/26/2016 |
| Allan Slavsky | David Rekenthaler (Teva) | 26 | 1/11/2012 - 4/1/2013 |
| Allan Slavsky | Maureen Cavanaugh (Teva) | 17 | 8/21/2015 - 7/26/2016 |
| Allan Slavsky | Nisha Patel (Teva) | 28 | 9/16/2015 - 3/10/2016 |
| Andrew Boyer | David Rekenthaler (Teva) | 16 | 4/1/2013 - 9/16/2014 |
| Andrew Boyer | Maureen Cavanaugh (Teva) | 113 | 8/12/2015 - 7/25/2016 |
| Andrew Boyer | Nisha Patel (Teva) | 28 | 4/30/2013 - 10/16/2015 |
| Anthony Giannone | Nisha Patel (Teva) | 9 | 1/27/2016 - 6/9/2016 |
| Jonathan Kafer | David Rekenthaler (Teva) | 15 | 10/11/2013 - 3/29/2015 |
| Jonathan Kafer | Maureen Cavanaugh (Teva) | 4 | 4/29/2014 - 3/31/2015 |
| M.B. | Nisha Patel (Teva) | 3 | 2/26/2016 - 6/6/2016 |
| **Total Calls with Teva** | | **1639** | |

### b.   Budesonide Inhalation

374.   Budesonide Inhalation is an anti-inflammatory steroid used to control asthma and is bioequivalent to the branded drug Pulmicort Respules.  May 2019 AG Complaint, ¶351.  Prior to Allergan's entry into the market in April 2013, Teva was the only manufacturer of Budesonide Inhalation.  *Id*., ¶¶352, 559.  As such, the HHI for the Budesonide Inhalation market was close to 10,000.  The drug was one of the

WHO's essential medicines, was crucial to "the priority health care needs of the population," and had no effective substitute.

375.   In April 2013, Allergan launched and priced Budesonide Inhalation after entering into collusive agreements with Teva to avoid competition and maintain pricing. *Id.*, ¶¶560-561. Allergan launched Budesonide Inhalation after winning a patent lawsuit against the brand manufacturer of the drug.  *Id.*, ¶560.  While the appeal was still pending, Allergan quickly implemented an "'at risk'" launch of the drug – taking the risk that an appellate court could ultimately find a patent violation by the Company.  *Id.* In preparation for the launch, Allergan's senior sales and marketing executive Andrew Boyer spoke with Teva's Rekenthaler three times on April 1 and 2, which resulted in Actavis pricing the drug at exactly the same price as Teva.  *Id.*, ¶561.  Indeed, as a customer's email to Teva confirmed on April 2, 2013,  Actavis's Budesonide Inhalation pricing was "'in line with [Teva's] current wholesale pricing.'"  *Id.*

376.   According to Olafsson, shortly after Allergan began shipping Budesonide Inhalation, further legal actions by the brand manufacturer and an injunction caused Allergan to temporarily exit the market.  When Allergan re-entered the market in February 2015, it continued the pricing and market allocation agreement reached with Teva in April 2013.  *Id.*, ¶¶353, 562.  On February 10, 2015, Allergan's Vice President of Marketing, Pricing and Contracts Marc Falkin spoke with Teva's Rekenthaler by phone. *Id.*, ¶353.  Rekenthaler relayed his conversation with Falkin to

his colleagues on February 13 and stated: "'[i]t appears that Actavis is intending on shipping'" Budesonide Inhalation. *Id.* Falkin spoke with Rekenthaler again for 23 minutes on February 16, 2015 to allocate customers. *Id.*, ¶354. After the extended Allergan-Teva phone conversation, Teva's Theresa Coward sent out an internal email the next day to announce Teva's concession of two major accounts to Allergan due to the Company's urgent need to put out products before further lawsuits by the brand manufacturer. *Id.* According to Coward, to implement the customer allocation process, she had been working on an "'exit strategy'" with the customers to eliminate Teva's Budesonide Inhalation from the supply channel in order to facilitate Allergan's entry. *Id.*

377.  Plaintiff's investigation confirmed that Allergan again re-entered the Budesonide Inhalation market in February 2015 at the same price set by Teva and rapidly gained market share:



378.    Within a few months, Allergan received close to 23% of the market from Teva as a result of the anticompetitive agreement to allocate customers and not compete on price.    Because of the collusion, Allergan and Teva's prices for Budesonide Inhalation during the Relevant Period were closely correlated,  with a 99% chance that the probability of "no correlation" can be rejected, and that a relationship exists.  After Allergan took a quarter of the Budesonide Inhalation market from Teva, the co-conspirators' market share stabilized with no fluctuation – with Teva's market share volatility reaching close to zero at 0.7% and Allergan's volatility bottoming out at 1.2%.  Budesonide Inhalation prices remained flat.  The unusual stability of market share and prices demonstrated the absence of a competitive market, and the co-conspirators did not meaningfully undercut prices to gain market share.

379.    Indeed, between 2013 to 2016, Allergan was in constant communication with Teva to facilitate the collusion.  In addition to the calls discussed above, Allergan's Marc Falkin spoke with Teva at least 1,150 times during the three-year period.  May 2019 AG Complaint, ¶1065.  At the same time, Allergan's Andrew Boyer also spoke with Teva's David Rekenthaler, Maureen Cavanaugh, and Nisha Patel at least 157 times.  *Id*., ¶¶1064, 1075-1076.  And other Allergan executives spoke with their counterparts at Teva over 330 times:

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Date |
|---|---|---|---|
| Andrew Boyer | David Rekenthaler (Teva) | 16 | 4/1/2013 - 9/16/2014 |
| Andrew Boyer | Maureen Cavanaugh (Teva) | 113 | 8/12/2015 - 7/25/2016 |
| Andrew Boyer | Nisha Patel (Teva) | 28 | 4/30/2013 - 10/16/2015 |
| **Total:** | | **157** | |
| | | | |
| Marc Falkin | David Rekenthaler (Teva) | 433 | 8/7/2013 - 3/25/2015 |
| Marc Falkin | Maureen Cavanaugh (Teva) | 410 | 9/10/2013 - 7/29/2016 |
| Marc Falkin | Christine Baeder (Teva) | 199 | 7/21/2015 - 7/29/2016 |
| Marc Falkin | Theresa Coward (Teva) | 36 | 12/28/2015 - 7/27/2016 |
| Marc Falkin | Teva Pharmaceuticals | 26 | 5/28/2015 - 7/19/2016 |
| Marc Falkin | Nisha Patel (Teva) | 11 | 2/5/2016 - 6/16/2016 |
| Marc Falkin | Jocelyn Baker (Teva) | 11 | 11/24/2015 - 6/2/2016 |
| Marc Falkin | Cassie Dunrud (Teva) | 11 | 2/8/2016 - 6/22/2016 |
| Marc Falkin | Jessica Peters (Teva) | 7 | 9/27/2014 - 3/22/2016 |
| Marc Falkin | Kevin Galownia (Teva) | 6 | 1/14/2016 - 5/12/2016 |
| **Total:** | | **1150** | |
| | | | |
| Allan Slavsky | David Rekenthaler (Teva) | 26 | 1/11/2012 - 4/1/2013 |
| Allan Slavsky | Maureen Cavanaugh (Teva) | 17 | 8/21/2015 - 7/26/2016 |
| Allan Slavsky | Nisha Patel (Teva) | 28 | 9/16/2015 - 3/10/2016 |
| Anthony Giannone | Nisha Patel (Teva) | 9 | 1/27/2015 - 6/9/2016 |
| Jonathan Kafer | David Rekenthaler (Teva) | 15 | 10/11/2013 - 3/29/2015 |
| Jonathan Kafer | Maureen Cavanaugh (Teva) | 4 | 4/29/2014 - 3/31/2015 |
| M.B. | Nisha Patel (Teva) | 3 | 2/26/2016 - 6/6/2016 |
| Rick Rogerson | Nisha Patel (Teva) | 157 | 5/2/2013 - 11/9/2015 |
| Rick Rogerson | Kevin Galownia (Teva) | 29 | 12/15/2015 - 7/29/2016 |
| Rick Rogerson | Teva Pharmaceuticals | 27 | 9/24/2015 - 7/29/2016 |
| Rick Rogerson | Christine Baeder (Teva) | 17 | 2/26/2016 - 7/26/2016 |
| **Total:** | | **332** | |

380.   In addition, Allergan and Teva had ample opportunities to meet in person prior to the April 2013 and February 2015 Budesonide Inhalation launches:

| Conference | Allergan Attendees Including: | Teva Attendees Including: |
|---|---|---|
| NACDS 2013 Regional Chain Conference, Ft. Lauderdale, FL (February 3-5, 2013) | Baker, Reed | Coward |
| GPhA 2013 Annual Meeting, Orlando, FL (February 20-22, 2013) | Defendant Olafsson | Oberman |
| ECRM Annual Retail Pharmacy Efficient Program Planning Session, Dallas, TX (February 24-27, 2013) | Allergan | Teva |

- 171 -

| Conference | Allergan Attendees Including: | Teva Attendees Including: |
|---|---|---|
| 2014 NACDS NYC Week Annual Foundation Dinner, New York, NY (December 3, 2014) | Defendant Saunders, Falkin, Boyer | Rekenthaler, Cavanaugh, Coward, Peters, Baeder |
| GPhA 2015 Annual Meeting, Miami, FL (February 9-11, 2015) | Allergan | Olafsson, Rubenstein |
| 2015 HCSCA National Pharmacy Forum, Tampa, FL (February 16-18, 2015) | Fallon | Gerebi, McClard, Bivens, Bradford |

App.

### c.  Drospirenone and Ethinyl Estradiol

381.  Drospirenone and Ethinyl Estradiol ("generic Ocella") is an oral contraceptive and also known as Gianvi®, Yaz®, or Yasmin®.  May 2019 AG Complaint, ¶275.  During 2012-2013, the generic Ocella market was highly concentrated with HHI of 3,240-3,368.  Although both Allergan and Teva were in the generic Ocella market in April 2013, Teva held 70%-75% of the market and Allergan sought to change that by engaging in customer allocation with Teva.  *Id.*, ¶279.

382.  According to the May 2019 AG Complaint, Lupin's entry into the generic Ocella market provided the opportunity for the co-conspirators to allocate customers.  *Id.*, ¶278.  Allergan and Teva engaged in a series of phone and text communications on April 30, 2013, with Allergan's Boyer speaking with Teva's executives three times in the same day – twice with Rekenthaler and once with Patel. *Id.*, ¶280.  Boyer continued communicating with Teva's Patel on May 1 through four text messages.  *Id.*

383.   During the negotiations, Allergan applied pressure on Teva to reach an agreement by submitting a bid for one of Teva's major customer's generic Ocella business.  *Id.*, ¶282.  The tactic worked.  When the customer reached out to Teva about Allergan's bid on May 8, 2013, "Teva doubled down on its efforts to reach a deal" with Allergan and Lupin "that would give each its fair share."  *Id.*  Teva's Patel immediately reached out to Allergan's Rogerson in a May 8, 2013 19-minute phone call to discuss the terms of the agreement.  *Id.*  After the call, on May 9, 2013, Teva proceeded to analyze the effect of conceding two major customers to Allergan or Lupin.  *Id.*, ¶283.  With the analysis in hand, Teva's Patel again spoke with Allergan's Rogerson for five minutes.  *Id.*  On May 14, 2013, Teva's Galownia and Rekenthaler agreed to concede the generic Ocella business to Allergan to avoid competing on price.  *Id.*, ¶284.

384.   By October 2013, after entering the generic Ocella market in July 2013 and negotiating for several months, Lupin also obtained its fair share market allocation and the customer allocations were finalized.  *Id.*, ¶¶285-291.  In discussing the furtive agreements, Teva's Kevin Galownia warned his colleagues about the need to allocate customers on a drug-by-drug basis instead of conceding the entire customer accounts in whole to avoid "'giving up volume on products where we do not have our fair share.'"  *Id.*, ¶291.  With an agreement in hand, Lupin set its generic Ocella price at the same level as Allergan and Teva:



385.   Plaintiff's investigation revealed that Allergan's market share increased by 8% between May 2013 and October 2013, and grew by 18% between May 2013 to May 2014 – all at the expense of Teva.  Lupin also took 6% of the market.

386.   The generic Ocella market share shifts occurred without price competition and were anticompetitive.  Price volatility registered at close to zero for years after the collusion – ranging from 0.0% to 0.3%.  Market share also stabilized for years after the agreements were in place, with Teva's market share volatility dropping from close to 5% to 0.5% and Allergan's volatility dropping from 3.2% to 0.5%.  The unusual stability of market share and prices demonstrated the absence of a competitive market, and the co-conspirators did not meaningfully compete on prices to gain market share.

387.   Allergan was in constant communication with its co-conspirators during the Relevant Period to facilitate the collusion.  Between May and October 2013,

Allergan and Teva executives communicated at least 112 times via phone calls and text messages.  §III.D.3.h.  In addition to the discussions outlined above, Allergan's Andrew Boyer spoke with Teva's David Rekenthaler, Maureen Cavanaugh, and Nisha Patel at Teva at least 157 times between 2013 to 2016.  *Id.*  At the same time, Allergan's Rick Rogerson spoke to Teva's Nisha Patel, Kevin Galownia, Christine Baeder and others executives at least 230 times.  *Id.*

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Date |
|---|---|---|---|
| Andrew Boyer | David Rekenthaler (Teva) | 16 | 4/1/2013 - 9/16/2014 |
| Andrew Boyer | Maureen Cavanaugh (Teva) | 113 | 8/12/2015 - 7/25/2016 |
| Andrew Boyer | Nisha Patel (Teva) | 28 | 4/30/2013 - 10/16/2015 |
| **Total:** | | **157** | |
| | | | |
| Rick Rogerson | Nisha Patel  (Teva) | 157 | 5/2/2013 - 11/9/2015 |
| Rick Rogerson | Kevin Galownia  (Teva) | 29 | 12/15/2015 - 7/29/2016 |
| Rick Rogerson | Teva Pharmaceuticals | 27 | 9/24/2015 - 7/29/2016 |
| Rick Rogerson | Christine Baeder  (Teva) | 17 | 2/26/2016 - 7/26/2016 |
| **Total:** | | **230** | |

In addition to Boyer and Rogerson, Allergan's other executives were in frequent communication with their co-conspirators – speaking with their counterparts at Lupin at least 355 times and Teva at least 1,252 times.  *Id.*  In particular, Allergan's Marc Falkin also spoke to Lupin's David Berthold and Steve Randazzo at least 54 times during the same period, with 2 calls between Falkin and Randazzo taking place on October 5, 2013 – around the time when the generic Ocella customer allocation was being finalized.  *Id.*  Allergan's Anthony Giannone also spoke to Lupin's Berthold approximately 301 times around the same period.  *Id.*

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Date |
|---|---|---|---|
| Anthony Giannone | David Berthold (Lupin) | 301 | 3/22/2011 - 12/14/2017 |
| Marc Falkin | David Berthold (Lupin) | 52 | 9/3/2013 - 4/1/2016 |
| Marc Falkin | Steve Randazzo (Lupin) | 2 | 10/5/2013 |
| **Total Calls with Lupin:** | | **355** | |
| | | | |
| Allan Slavsky | David Rekenthaler (Teva) | 26 | 1/11/2012 - 4/1/2013 |
| Allan Slavsky | Maureen Cavanaugh (Teva) | 17 | 8/21/2015 - 7/26/2016 |
| Allan Slavsky | Nisha Patel (Teva) | 28 | 9/16/2015 - 3/10/2016 |
| Anthony Giannone | Nisha Patel (Teva) | 9 | 1/27/2015 - 6/9/2016 |
| Jonathan Kafer | David Rekenthaler (Teva) | 15 | 10/11/2013 - 3/29/2015 |
| Jonathan Kafer | Maureen Cavanaugh (Teva) | 4 | 4/29/2014 - 3/31/2015 |
| M.B. | Nisha Patel (Teva) | 3 | 2/26/2016 - 6/6/2016 |
| Marc Falkin | David Rekenthaler (Teva) | 433 | 8/7/2013 - 3/25/2015 |
| Marc Falkin | Maureen Cavanaugh (Teva) | 410 | 9/10/2013 - 7/29/2016 |
| Marc Falkin | Christine Baeder (Teva) | 199 | 7/21/2015 - 7/29/2016 |
| Marc Falkin | Theresa Coward (Teva) | 36 | 12/28/2015 - 7/27/2016 |
| Marc Falkin | Teva Pharmaceuticals | 26 | 5/28/2015 - 7/19/2016 |
| Marc Falkin | Nisha Patel (Teva) | 11 | 2/5/2016 - 6/16/2016 |
| Marc Falkin | Jocelyn Baker (Teva) | 11 | 11/24/2015 - 6/2/2016 |
| Marc Falkin | Cassie Dunrud (Teva) | 11 | 2/8/2016 - 6/22/2016 |
| Marc Falkin | Jessica Peters (Teva) | 7 | 9/27/2014 - 3/22/2016 |
| Marc Falkin | Kevin Galownia (Teva) | 6 | 1/14/2016 - 5/12/2016 |
| **Total Calls with Teva** | | **1252** | |

388.   In addition, Allergan, Teva, and Lupin had ample opportunities to meet in person:

| Conference | Allergan Attendees Including: | Co-Conspirator Attendees Including: |
|---|---|---|
| NACDS 2013 Annual Meeting, Palm Beach, FL (April 20-23, 2013) | Defendants Bisaro and Olafsson, and Boyer, Slavsky, Steward, Baker, Reed, Shane | Teva: Levin, Oberman, Rekenthaler, Cavanaugh, Coward, Kafer.<br><br>Lupin: Berthold, Gupta, Hoffman, McGarty |
| HDMA 2013 Business and Leadership Conference, Orlando, FL (June 2-5, 2013) | Falkin, Boyer, Giannone | Teva: Peters, Coward, Sherman, Baeder<br><br>Lupin: Berthold, Shirkey, Walten |
| GPhA 2013 CMC Conference, Bethesda, MD (June 4-5, 2013) | Allergan | Teva |
| 2013 NACDS Total Store Expo, Las Vegas, NV (August 10-13, 2013) | Boyer, Rogerson, Falkin, Slavsky, Baker, Clark, Dorsey, Giannone | Teva: Rekenthaler, Cavanaugh, Galownia, Green, Oberman, Baeder, Peters, Coward, Sherman<br><br>Lupin: Berthold, Randazzo, Hoffman, McGarty, Shirkey, Walten |

| Conference | Allergan Attendees Including: | Co-Conspirator Attendees Including: |
|---|---|---|
| GPhA 2013 Fall Technical Conference, Bethesda, MD (October 28-30, 2013) | Allergan | Teva<br><br>Lupin |

### d.    Nortriptyline Hydrochloride

389.    Nortriptyline Hydrochloride ("Nortriptyline"), the generic version of the branded drug Pamelor, is an antidepressant used to control the brain's chemical balance.  May 2019 AG Complaint, ¶410.

390.    In 2012-2013, the Nortriptyline market was highly concentrated with HHI of 5,030-5,199.  Allergan and Teva split the market for the drug with 45% and 55% market share, respectively, at the start of 2013 after Taro left the market.  *Id.*, ¶411.

391.    By February 2013, Taro was considering re-entry, evidenced by an internal document that stated "'Nortriptyline capsules should be seriously considered for re-launch as soon as possible.'"  *Id.*, ¶412.

392.    By November 2013, Allergan, Teva, and Taro were engaged in the customer allocation process for the drug in effort to accommodate Taro's re-entry without causing pricing pressure.  After Taro's Ara Aprahamian put out feelers in the market on November 6, 2013, Allergan and Teva conducted a series of conversations to determine customers to concede in order to give Taro its fair share and avoid price competition.  *Id.*, ¶¶414-418.  Allergan's Marc Falkin and Teva's David Rekenthaler

spoke twice on November 10, 2013 and continued their conversations on November 14, 15, and 18. *Id.*, ¶¶416, 418. Falkin also texted Teva's Maureen Cavanaugh on November 17 and 18. *Id.*, ¶418. During these negotiations with Allergan, Teva agreed to concede its Nortriptyline business with Cardinal to Taro and emailed its customer on November 21, 2013 with "'[w]e are going to concede the business with Cardinal.'" *Id.*, ¶421.

393.   In the meantime and in preparation for his negotiations with Allergan, Taro's Aprahamian instructed his colleagues to seek out Allergan customers. Armed with such information, Aprahamian called Allergan's Michael Dorsey on November 20, 2013. *Id.*, ¶¶419-420. Aprahamian and Dorsey also spoke for 11 minutes on November 22, 2013 and 13 minutes on December 6, 2013. *Id.*, ¶¶420, 422. During the December 6 call, Allergan's Dorsey agreed to cede the Company's large customer – supermarket chain HEB – to Taro. *Id.*, ¶423.

394.   The co-conspirators continued their negotiations into 2014. By February 6, 2014, Taro was seeking additional market share from only Allergan as Teva had conceded two large accounts – Cardinal and OptiSource – to Taro. *Id.*, ¶425. When asked by a colleague whether to pursue another Teva customer (Omnicare), Aprahamian firmly responded with "No, need Actavis" as Teva had conceded enough:



*Id.*

395.    In the first week of March 2014, Allergan continued to negotiate Nortriptyline customer allocation with Taro and Teva, with Allergan's Falkin speaking with Teva's Rekenthaler for more than 30 minutes between March 4-7 and Allergan's Dorsey speaking with Taro for over 21 minutes on March 6:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:19 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:01:03 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:11:56 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:00 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:10:37 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:02 |
| 3/6/2014 | Voice | M.D. (Actavis) | Outgoing | Taro Pharmaceuticals | 0:21:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:15:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:09:42 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:02 |
| 3/10/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:05:08 |

*Id.*, ¶426.

396.    As a result of Allergan and Teva allocating customers to Taro, the co-conspirators avoided price competition by a new competitor entering the market.

Plaintiff's investigation confirmed that Taro set its Nortriptyline price at $0.14 per unit at re-entry – identical to Allergan and Teva's pricing.  Allergan ceded market share in order to avoid price competition on the drug and its market share declined from 45% in the beginning of 2013 to 32% by March 2014.

397.   In the meantime, the co-conspirators postponed plans for a coordinated price increase after Teva's Nisha Patel communicated with Taro's Ara Aprahamian on March 10, 2014.  In a March 10 email to her colleagues attaching a spreadsheet of collusive price increase candidates, Patel removed Nortriptyline from the list with notations of "'Delay – Taro (new) seeking share.'"  *Id.*, ¶427.

398.   According to the StateAG's investigation, "Teva subsequently raised the price of Nortriptyline on January 28, 2015 – in coordination with both Taro and Actavis."  *Id.*  Allergan's Marc Falkin spoke with Teva's David Rekenthaler four times on January 13, 14, and 16 prior to the 90% price hike.  *Id.*, ¶¶889-890.  In addition, Allergan, Teva and Taro communicated in person as the May 2019 AG Complaint alleges:

> Upon information and belief, Defendant Patel also spoke in-person with many of these competitors.  For example, in her new role as a Director of National Accounts, Defendant Patel personally attended the following trade association events and customer conferences in the fall of 2014 and winter of 2014-15: NACDS, Boston, MA (August 23-26, 2014); Econdisc Bidders Meeting, St. Louis, MO (September 17-19, 2014); PCMA Annual Meeting in Rancho Palos Verdes, CA (October 13-14, 2014); Anda Strategy Meeting, Miami, FL (October 26-29, 2014); and the HDMA Round Table, Washington, DC (January 8, 2015).   These industry events were all well-attended by Teva's competitors.

*Id.*, ¶891.

399.   Indeed, Allergan, Teva, and Taro had opportunities to collude at events and conferences prior to and during the market allocation activities in 2013 and the coordinated price hikes in 2015:

| Conference | Allergan Attendees Including: | Co-Conspirator Attendees Including: |
|---|---|---|
| 2013 NACDS Total Store Expo, Las Vegas, NV (August 10-13, 2013) | Boyer, Rogerson, Falkin, Slavsky, Baker, Clark, Dorsey, Giannone | Teva: Rekenthaler, Cavanaugh, Galownia, Green, Oberman, Baeder, Peters, Coward, Sherman<br><br>Taro: Aprahamian, Perfetto, Marcus, Statler, Guerrero, Holmes |
| GPhA 2013 Fall Technical Conference, Bethesda, MD (October 28-30, 2013) | Allergan | Teva<br><br>Taro |
| 2014 NACDS Total Store Expo, Boston, MA (August 23-26, 2014) | Defendant Buchen, Falkin, Rogerson, Boyer, Slavsky, Giannone, Dorsey, Clark, Reed | Teva: Rekenthaler, Patel, Cavanaugh, Galownia, Peters, Coward, Baeder, Baker, Dunrud<br><br>Taro: Aprahamian, Perfetto, Likvornik, Brick, Kriel |
| HDMA 2014 Annual Board and Membership Meeting, Laguna Beach, CA (September 27-October 1, 2014) | Falkin, Boyer | Teva: Rekenthaler, Cavanaugh, Baeder |
| GPhA 2014 Fall Technical Conference, Bethesda, MD (October 27-29, 2014) | Allergan | Teva<br><br>Taro |
| 2014 IGPA Annual Conference, Miami, FL (November 19-21, 2014) | Defendant Buchen, Brown | Teva: Oberman, Livneh |
| 2014 NACDS NYC Week Annual Foundation Dinner, New York, NY (December 3, 2014) | Defendant Saunders, Falkin, Boyer | Teva: Rekenthaler, Cavanaugh, Coward, Peters, Baeder |

App.

400.   In addition to meeting at conferences and communicating by phone as discussed above, Allergan was in constant communication with its co-conspirators. Between   November 2013   to   March 2014,   Allergan   and   Teva   executives

communicated at least 115 times by phone and/or text. §III.D.3.h. During the periods of Nortriptyline market allocation and subsequent price hikes, Allergan's Marc Falkin spoke to Teva executives at least 850 times and Taro's Ara Aprahamian and Michael Perfetto at least 30 times:

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Date |
|---|---|---|---|
| Marc Falkin | David Rekenthaler (Teva) | 433 | 8/7/2013 - 3/25/2015 |
| Marc Falkin | Maureen Cavanaugh (Teva) | 410 | 9/10/2013 - 7/29/2016 |
| Marc Falkin | Jessica Peters (Teva) | 7 | 9/27/2014 - 3/22/2016 |
| **Total Falkin Calls to Teva:** | | **850** | |
| | | | |
| Marc Falkin | Ara Aprahamian (Taro) | 21 | 4/17/2014 - 3/8/2016 |
| Marc Falkin | Michael Perfetto (Taro) | 9 | 12/13/2013 – 8/4/2014 |
| **Total Falkin Calls to Taro:** | | **30** | |

401.   Allergan's Dorsey also communicated with Taro at least 52 times:

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Date |
|---|---|---|---|
| Michael Dorsey | Ara Aprahamian (Taro) | 52 | 3/19/2013 – 9/2/2016 |

402.   Besides Falkin and Dorsey, other Allergan executives were in frequent communication with their Teva and Taro counterparts during the same period – speaking with Teva's Rekenthaler, Cavanaugh, and Patel at least 220 times and Taro's Aprahamian at least 33 times:

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Date |
|---|---|---|---|
| Andrew Boyer | David Rekenthaler (Teva) | 16 | 4/1/2013 - 9/16/2014 |
| Andrew Boyer | Nisha Patel (Teva) | 28 | 4/30/2013 - 10/16/2015 |
| Jonathan Kafer | David Rekenthaler (Teva) | 15 | 10/11/2013 - 3/29/2015 |
| Jonathan Kafer | Maureen Cavanaugh (Teva) | 4 | 4/29/2014 - 3/31/2015 |
| Rick Rogerson | Nisha Patel (Teva) | 157 | 5/2/2013 - 11/9/2015 |
| **Total Calls with Teva:** | | **220** | |
| | | | |
| Allan Slavsky | Ara Aprahamian (Taro) | 1 | 1/9/2014 - 1/9/2014 |
| Andrew Boyer | Ara Aprahamian (Taro) | 16 | 8/16/2013 - 4/19/2016 |

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Date |
|---|---|---|---|
| Michael Baker | Ara Aprahamian (Taro) | 12 | 5/13/2013 - 8/22/2015 |
| Rick Rogerson | Ara Aprahamian (Taro) | 4 | 6/17/2013 - 4/16/2014 |
| Total Calls with Taro: | | 33 | |

### e. Amphetamine/Dextroamphetamine Immediate Release

403.   Amphetamine/Dextroamphetamine Immediate Release ("MAS-IR") is the generic version of Adderall IR® and is used to treat attention deficit disorder. May 2019 AG Complaint, ¶335.  The drug is also known as "Mixed Amphetamine Salts" or "MAS," as it is a mixture of levoamphetamine and dextroamphetamine salts. *Id.*

404.   The MAS-IR market was highly concentrated at the end of 2013, with HHI at 4,057.  Teva dominated over half of the market.

405.   In March 2014, Allergan began market allocation negotiations with Teva in preparation for its launch of MAS-IR.  On March 17, 2014, Allergan's Director of Pricing Rick Rogerson spoke to Teva's Nisha Patel three times, and Allergan's Marc Falkin spoke to Teva's David Rekenthaler once.  *Id.*, ¶337.  On March 20, 2014, Falkin and Rekenthaler continued their negotiations and spoke seven times.  *Id.*

406.   During these negotiations, the co-conspirators reached an agreement and Teva ceded a MAS-IR customer to Allergan on April 16, 2014.  *Id.*, ¶338.  Teva's Patel, who had spoken to Allergan's Rogerson on March 17, recommended to Galownia to cede the customer to Allergan.  *Id.*  After Galownia took her

- 183 -

recommendation, Patel promptly called Rogerson at 1:55 p.m. on April 16 with the news.  *Id.*

407.   Aurobindo also launched MAS-IR in April 2014 and negotiated market allocation with Teva.  On March 18, Aurobindo's Robert Cunard spoke to Teva's Rekenthaler for 30 minutes.  *Id.*, ¶337.  Teva's internal email revealed that Aurobindo wanted a 10% fair share of the MAS-IR market.  *Id.*, ¶336.

408.   By engaging in collusive market allocation, Teva avoided pricing competition from the new entrants.  Plaintiff's investigation confirmed that Allergan and Aurobindo set their MAS-IR April 2014 entry prices at Teva's pricing for the drug – at $1.15 per unit.  Within three months of launch, Allergan took 2% of the market.  For years after the inception of collusion, MAS-IR pricing was so stable that volatility fell from 6.5% to 0.9%-1.9%.  Market share volatility also dropped from 4.6% to 0.3%-2.0%.  The unusual stability of market share and prices demonstrated the absence of a competitive market, and the co-conspirators did not meaningfully compete on prices to gain market share.

409.   Prior to the MAS-IR launch and continuing throughout the Relevant Period, Allergan was in frequent communication with its co-conspirators.  In March and April 2014, Allergan and Teva executives exchange at least 89 calls and text messages.  §III.D.3.h.  In addition to his conversations with Teva's Rekenthaler as

discussed above, Allergan's Marc Falkin spoke to Aurobindo's Robert Cunard at least

80 times and communicated with Teva's executives over 1,150 times:

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Date |
|---|---|---|---|
| Marc Falkin | Robert Cunard (Aurobindo) | 80 | 11/14/2013 – 3/16/2015 |
| | | | |
| Marc Falkin | David Rekenthaler  (Teva) | 433 | 8/7/2013 - 3/25/2015 |
| Marc Falkin | Maureen Cavanaugh  (Teva) | 410 | 9/10/2013 - 7/29/2016 |
| Marc Falkin | Christine Baeder  (Teva) | 199 | 7/21/2015 - 7/29/2016 |
| Marc Falkin | Theresa Coward  (Teva) | 36 | 12/28/2015 - 7/27/2016 |
| Marc Falkin | Teva Pharmaceuticals | 26 | 5/28/2015 - 7/19/2016 |
| Marc Falkin | Nisha Patel  (Teva) | 11 | 2/5/2016 - 6/16/2016 |
| Marc Falkin | Jocelyn Baker  (Teva) | 11 | 11/24/2015 - 6/2/2016 |
| Marc Falkin | Cassie Dunrud  (Teva) | 11 | 2/8/2016 - 6/22/2016 |
| Marc Falkin | Jessica Peters  (Teva) | 7 | 9/27/2014 - 3/22/2016 |
| Marc Falkin | Kevin Galownia  (Teva) | 6 | 1/14/2016 - 5/12/2016 |
| **Total Falkin Calls to Teva** | | **1150** | |

410.   Similarly, in addition to negotiating with Teva's Patel as discussed

above, Allergan's Rogerson spoke to Teva executives at least 230 times:

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Date |
|---|---|---|---|
| Rick Rogerson | Nisha Patel  (Teva) | 157 | 5/2/2013 - 11/9/2015 |
| Rick Rogerson | Kevin Galownia  (Teva) | 29 | 12/15/2015 - 7/29/2016 |
| Rick Rogerson | Teva Pharmaceuticals | 27 | 9/24/2015 - 7/29/2016 |
| Rick Rogerson | Christine Baeder  (Teva) | 17 | 2/26/2016 - 7/26/2016 |
| **Total Rogerson Calls to Teva** | | **230** | |

411.   Besides Falkin and Rogerson, other Allergan executives were also in

constant communication with their Teva counterparts – logging in over 230 calls:

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Date |
|---|---|---|---|
| Allan Slavsky | Maureen Cavanaugh (Teva) | 17 | 8/21/2015 - 7/26/2016 |
| Allan Slavsky | Nisha Patel (Teva) | 28 | 9/16/2015 - 3/10/2016 |
| Andrew Boyer | David Rekenthaler (Teva) | 16 | 4/1/2013 - 9/16/2014 |
| Andrew Boyer | Maureen Cavanaugh (Teva) | 113 | 8/12/2015 - 7/25/2016 |
| Andrew Boyer | Nisha Patel (Teva) | 28 | 4/30/2013 - 10/16/2015 |
| Anthony Giannone | Nisha Patel (Teva) | 9 | 1/27/2015 - 6/9/2016 |
| Jonathan Kafer | David Rekenthaler (Teva) | 15 | 10/11/2013 - 3/29/2015 |

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Date |
|---|---|---|---|
| Jonathan Kafer | Maureen Cavanaugh (Teva) | 4 | 4/29/2014 - 3/31/2015 |
| M.B. | Nisha Patel (Teva) | 3 | 2/26/2016 - 6/6/2016 |
| **Total Calls to Teva** | | **233** | |

412.   In addition to communicating by phone, the Allergan, Teva, and Aurobindo executives had ample opportunities to meet in person to allocate customers for MAS-IR:

2013 NACDS NYC Week Annual Foundation Dinner, New York, NY (December 3, 2013)
- Allergan attendees included: Falkin, Boyer, Giannone, Reed, Shane
- Teva attendees included: Rekenthaler, Cavanaugh, Coward, Marshall

GPhA 2014 Annual Meeting, Orlando, FL (February 19-21, 2014)
- Allergan
- Aurobindo
- Teva attendees included: Oberman

HDMA Sixth Annual CEO Roundtable Fundraiser, New York, NY (April 1, 2014)
- Allergan attendees included: Falkin, Boyer, Rogerson, Giannone, Clark
- Aurobindo attendees included: Cunard, McMahon
- Teva attendees included: Rekenthaler, Cavanaugh, Doerr

NACDS 2014 Annual Meeting, Scottsdale, AZ (April 26-29, 2014)
- Allergan attendees included: Defendants Bisaro and Olafsson, Falkin, Boyer, Stewart
- Aurobindo attendees included: Cunard, McMahon
- Teva attendees included: Oberman, Rekenthaler, Cavanaugh, Coward, Baeder

App.

- 186 -

### f.      Clonidine-TTS Patch

413.    Clonidine-TTS is a generic version of Catapres-TTS, which is a skin patch used for the treatment of high blood pressure.  May 2019 AG Complaint, ¶177.

414.    When Allergan launched Clonidine-TTS Patch in May 2014, the market for the medication was highly concentrated and tainted by collusion.  HHI was 5,002-6,858 in 2013-2014, with Teva and Mylan taking approximately two-thirds and one-third of the market, respectively.

415.    At the end of 2011, Teva violated the rule of road by taking more than its fair share of the Clonidine-TTS Patch market and suffered dire consequences.  *Id.,* ¶¶179-180.  According to the May 2019 AG Complaint, Teva's internal document stated that Mylan retaliated by "'trashing the price in pretty much a two-player market,'" and "Teva heard Mylan's retaliatory message loud and clear." *Id.*, ¶¶181-182.  As a result of the retaliation, Clonidine-TTS Patch prices dropped to less than half of the pre-retaliation invoice prices in April 2012 – with the 0.1 mg dosage dropping from $22.13 to $10.49, 0.2 mg dropping from $37.81 to $18.17, and 0.3 mg dropping from $54.41 to $26.51.  *Id.*, ¶185.

416.    As part of a reconciliation effort, Teva and Mylan entered into a collusive arrangement where Teva hiked prices while Mylan temporary exited from the market, with an agreement for Mylan to reclaim its market share at re-entry without competing on pricing.  *Id.*, ¶¶183-187.  Teva's Kevin Green and Mylan's Jim Nesta and other

executives from the two companies continuously communicated from July 18, 2012 through April 2013. *Id.*, ¶¶183-191. Teva's invoice price for Clonidine-TTS Patch tripled for certain dosages, rising above pre-retaliation levels to $33.28 for 0.1 mg, $56.08 for 0.2 mg, and $80.76 for 0.3 mg in October 2012. *Id.*, ¶¶185. Mylan re-entered the Clonidine-TTS Patch market in February 2013 at the elevated prices, and Teva internal documents showed that Teva conceded Econdisc's Clonidine-TTS Patch business to Mylan in March 2013, along with Rite Aid and McKesson in April 2013 – all without competitive bidding. *Id.*, ¶188.

417.    According to the StateAGs, "[h]aving successfully allocated the market, however, Mylan and Teva were now conspiring to raise prices on Clonidine-TTS" in April 2013. *Id.*, ¶191. Teva's marketing manager Jared Levinson documented the Teva-Mylan agreement to hike prices in an email to his colleagues:



*Id.*

418.   With the Clonidine-TTS Patch market infested by collusion, Allergan entered the market when its application was approved by the FDA on May 6, 2014 and immediately contacted Teva to negotiate its fair share. *Id.*, ¶344. On the same day, Allergan's Falkin spoke to Teva's Rekenthaler 3 times totaling 19 minutes. *Id.* Rekenthaler communicated the news of Allergan's entry to his colleagues the day after speaking with Falkin, and Teva's Kevin Galownia instructed Patel to identify the customers to allocate to Allergan. *Id.*, ¶345.

419.   To pressure Teva into a quick agreement, Allergan initially set a low entry price for Clonidine-TTS – to which Teva characterized internally as "'ridiculous'" and bemoaned that the pricing "'is already eroded here.'" *Id.* The tactic worked. According to the StateAGs, Teva executives "accelerated their efforts to convince Actavis to revise its pricing and market share plans for Clonidine-TTS to more acceptable levels with an even more intensive flurry of phone calls." *Id.*, ¶346. On May 8, 2014, Allergan's Falkin and Teva's Rekenthaler again spoke 3 times, totaling 23 minutes. *Id.* Allergan's Rogerson and Teva's Patel also negotiated the agreement, and after their fourth phone call at 9:54 a.m., Patel emailed her colleagues at 10:02 a.m. that Teva was conceding HEB and Ahold to Allergan. *Id.*

420.   Allergan was not satisfied, however, and pursued Teva's customers with a pricing challenge in an effort to pressure Teva into conceding more market share. *Id.*, ¶347. After hearing from a customer impacted by the pricing challenge, on

May 9, 2014, Teva's Patel immediately fired off three calls to Allergan's Rogerson and conveyed Teva's displeasure with Allergan's low Clonidine-TTS Patch pricing. *Id.* After the call, she told her colleagues that Allergan wanted a fair share of 25%, with a portion of 10%-15% expected to come from Teva. *Id.* Teva's Rekenthaler agreed to concede 15% and stated: "'I'm okay with adjusting 15% but we're not going to play any games with them. They take the 15% and I don't want to hear about this product again.'" *Id.*, ¶348. To which senior sales executive Theresa Coward replied, "'now, now Mr. Rekenthaler play nice in the sand box . . . . If history repeats itself activist [sic] is going to be responsible in the market. . . .'" *Id.* After Teva's agreement, Patel announced that Allergan "'resent all of their offer letters at pricing that is higher than our [Teva's] current.'" *Id.*, ¶347.

421.    Conforming to its agreement, Teva began conceding customers to Allergan in the next few weeks so Allergan could achieve its fair share of the Clonidine-TTS Patch market. On May 14, 2014, Patel instructed her colleagues to concede a wholesaler's Clonidine-TTS Patch business to Allergan and urged Teva to be "'responsible.'" *Id.*, ¶349. In addition, Teva conceded a large retailer's Clonidine-TTS Patch business on May 17, 2014, and Patel refused to bid for another customer's business on May 20, 2014 because "'[w]e are trying to be responsible with share and price.'" *Id.* Finally, after Allergan's Rogerson spoke with Teva's Patel several times on May 22, 2014, Teva conceded another customer's Clonidine-TTS Patch business

the next day, with Teva's Galownia stating "'[o]kay to concede, but we are getting to the point where we will not be able to concede further.'" *Id.*, ¶350.

422.   Indeed, Plaintiff's investigation revealed that Allergan entered the Clonidine-TTS Patch market in May 2014 at $45.55 per unit – higher than Teva's pricing of $45.28.  And even with higher pricing, Allergan rapidly gained 10% market share for the medication within three months – all from Teva.  By January 2015, Allergan had taken the agreed-upon 15% market share from Teva.

423.   The co-conspirators' market shares stabilized during the collusion period and volatility fell to close to zero – with an unusual stability that was uncharacteristic of a competitive market where manufacturers would compete on pricing to gain market share.  Allergan's market share volatility stabilized at 0.4% and remained at that level during the collusion period.  Teva and Mylan's market share volatility dropped from 11.5%-11.7% to 0.7%-3.6% during the same period.

424.   During the period of collusion and throughout the Relevant Period, Allergan and Teva executives were in constant communication.  In addition to the calls and texts discussed above, between May 2014 to December 2014, Allergan and Teva executives communicated over 220 times.  §III.D.3.h.  In particular, Allergan's Falkin communicated with Teva's Rekenthaler at least 433 times during 2013-2015 and with other Teva executives over 700 times.  *Id.*  Falkin also communicated with Mylan's James Nesta frequently – logging in 78 calls during the same period.  *Id.*

Similarly, Allergan's Rogerson communicated with Teva's Patel over 157 times and with other Teva executives over 75 times.  *Id.*

425.   In addition to calls and text messages, Allergan's executives had ample opportunities to meet in person with their counterparts at Teva and Mylan to allocate market for Clonidine-TTS Patch:

> HDMA Sixth Annual CEO Roundtable Fundraiser, New York, NY (April 1, 2014)
> - Allergan attendees included: Falkin, Boyer, Rogerson, Giannone, Clark
> - Mylan attendees included: Nesta, Mauro, Potter
> - Teva attendees included: Rekenthaler, Cavanaugh, Doerr
>
> NACDS 2014 Annual Meeting, Scottsdale, AZ (April 26-29, 2014)
> - Allergan attendees included: Defendants Bisaro and Olafsson, Falkin, Boyer, Stewart
> - Mylan attendees included: Nesta, Korman, Potter, O'Neill
> - Teva attendees included: Oberman, Rekenthaler, Cavanaugh, Coward, Baeder

App.

### g.      Dextroamphetamine Sulfate Extended Release

426.   Dextroamphetamine Sulfate Extended Release ("Dex Sulfate XR") is the generic version of Dexedrine® and is used for the treatment of attention deficit hyperactivity disorder.  May 2019 AG Complaint, ¶339.

427.   At the end of 2013, the Dex Sulfate XR market was highly concentrated with HHI of 4,924, and Teva had over 70% of the market share.

428.   As Allergan was planning its Dex Sulfate XR market entry, Allergan's Marc Falkin spoke with Teva's David Rekenthaler by phone on the morning of

June 19, 2014 to negotiate the Company's fair share market allocation. Falkin and Rekenthaler spoke twice that morning for 11 minutes and 9 minutes. *Id.*, ¶340. During the discussions, Falkin told Rekenthaler that Allergan was targeting 20%-25% market share. *Id.* Rekenthaler relayed that information to his colleague Patel after the call and she conducted a profitability analysis review for Dex Sulfate XR to determine which customer to allocate to Allergan. *Id.*

429.   Because Teva had over 70% market share for Dex Sulfate XR, Teva agreed to allocate customers to Allergan to avoid price competition.  On June 24, 2014, Teva's Strategic Customer Analyst S.B. emailed her colleagues with the recommendation to reduce Teva's market share to 58% and concede a large Dex Sulfate XR customer to Allergan. *Id.*, ¶¶340-341. According to the StateAGs, this recommendation was made "in accordance with the industry understanding to allocate the market, and Teva's ongoing agreement with Actavis." *Id.*, ¶341. Teva's internal email later confirmed that the large Dex Sulfate XR customer was indeed conceded to Allergan, with "'Actavis is entering the market and seeking share'" as the rationale for the concession. *Id.*

430.   By agreeing to allocate a fair share of the Dex Sulfate XR market to Allergan, Teva avoided pricing competition from the new entrant.  Plaintiff's investigation confirmed Allergan's August 2014 entry price for the drug at $4.19 per unit, slightly above Teva's pricing of $4.10 per unit.  Nevertheless, despite the higher

pricing, Allergan captured over 15% of the market in less than a year.   After Allergan's entry, Dex Sulfate XR's pricing became so stable that it dropped to close to zero to 0.6%, falling from 2.3%.   Market share volatility also dropped from 3.1% to 1.0%-1.4%.   The unusual stability of market share and prices demonstrated the absence of a competitive market, and the co-conspirators did not meaningfully compete on prices to gain market share.

431.   During the period of collusion and throughout the Relevant Period, Allergan was in constant contact with its co-conspirators.   Between June 2014 to December 2014, Allergan and Teva executives spoke and/or texted at least 152 times. §III.D.3.h.  In addition to his phone conversations with Rekenthaler in June 2014 as discussed above, Allergan's Falkin spoke with Teva's Rekenthaler at least 433 times and spoke with other Teva executives over 710 times.  *Id.*   Similarly, Allergan's Rogerson spoke to Teva's executives at least 230 times, with over 150 calls to Teva's Patel alone.  *Id.*  Other Allergan executives also spoke with their counterparts at Teva at least 239 times.  *Id.*

432.   In addition, Allergan and Teva had ample opportunities to collude in person to allocate market for Dex Sulfate XR:

NACDS 2014 Annual Meeting, Scottsdale, AZ (April 26-29, 2014)
- Allergan attendees included: Defendants Bisaro and Olafsson, Falkin, Boyer, Stewart
- Mylan attendees included: Nesta, Korman, Potter, O'Neill
- Teva attendees included: Oberman, Rekenthaler, Cavanaugh, Coward, Baeder

HDMA 2014 Business and Leadership Conference, Phoenix, AZ
(June 1-4, 2014)
- Allergan attendees included: Falkin, Boyer, Rogerson, Giannone
- Mylan attendees included: Nesta, Aigner, Wyatt
- Teva attendees included: Rekenthaler, Patel, Peters, Coward, Sherman, Dunrud

NACDS, Boston, MA (August 23-26, 2014)
- Allergan attendees included: Falkin, Rogerson, Boyer, Slavsky, Giannone, Dorsey, Clark, Buchen, Reed
- Mylan attendees included: Nesta, Aigner, Wyatt, Potter, Duda
- Teva attendees included: Rekenthaler, Patel, Cavanaugh, Galownia, Peters, Coward, Baeder, Baker, Dunrud

App.

### h.    Raloxifene HCL Tablets

433.   Raloxifene Hydrochloride Tablets is the generic version of Evista and is used in the treatment or prevention of postmenopause osteoporosis.  May 2019 AG Complaint, ¶1087.

434.   When Allergan, Teva, and Camber engaged in Raloxifene HCL market allocation, the market was highly concentrated with HHI of 4,473 in 2014 and 3,467 in 2015.  Teva controlled over half of the Raloxifene market.

435.   While both Allergan and Camber received FDA approval for Raloxifene HCL in 2014, Teva's Rekenthaler discovered from Allergan's Boyer and Falkin through a series of phone conversations in September 2014 that Allergan would enter the market later than expected.  *Id.*, ¶¶1088-1091.  On September 17, Teva's Rekenthaler relayed his Allergan conversations to his colleagues and announced: "'I

know Actavis will be late.  Camber is talking but their [sic] being somewhat unclear as well.  I'll know more about them after my trip this week.'"  *Id*., ¶1092.

436.   Rekenthaler met with Camber's President Kon Ostaficiuk during his trip to an industry gathering in Kentucky on September 17-19, 2014 and the two conspirators began Raloxifen market allocation negotiations.  *Id.*, ¶1093.  While Camber went after Teva's customer Econdisc, Ostaficiuk assured Rekenthaler during their phone conversations on September 21 that Camber only wanted Econdisc and one more customer.  *Id*., ¶¶1094-1095.  On September 24, Patel relayed Rekenthaler's conversation to her colleagues via email, stating "'Camber indicated that they are targeting Econdisc and a small retailer . . . and then they would be "done."'"  *Id*., ¶1095.

437.   While Teva's Galownia considered whether to concede Econodisc, Patel sent an email that Rekenthaler was continuing to negotiate with Camber:

From: Nisha Patel02
Sent: Wed 9/24/2014 9:07 AM (GMT-05:00)
To: ▮▮▮▮▮▮▮▮
Cc: Dave Rekenthaler; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Bcc:
Subject: Re: Econdisc Raloxifene Intel

FYI, Dave is working on verifying the Camber price. Stand by.

Sent from my iPhone

*Id.*, ¶1096.

438.   After the email, Rekenthaler and Ostaficiuk had a series of phone calls:



| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Rekenthaler, David (Teva) | 5:28:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Outgoing | Rekenthaler, David (Teva) | 8:19:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Outgoing | Berthold, David (Lupin) | 8:21:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Berthold, David (Lupin) | 8:23:00 | 0:10:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Rekenthaler, David (Teva) | 10:35:00 | 0:07:00 |

*Id.*, ¶1097.

439.   And on September 25, Teva's Galownia agreed to allocate customers to
Camber to avoid Raloxifene HCL pricing competition and stated via email: "'Okay,
we will concede additional smaller customer challenges (particularly distributors)
since they are not going to target One Stop.'"   *Id.,* ¶1098.  Camber kept its end of the
bargain as Ostaficiuk sent an email to his colleagues that Camber would not bid for
McKesson's OS [One Stop] – emphasizing "Not even a 'bad price.'!"



| Message | |
|---|---|
| From: | Kon Ostaficiuk [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=Kon Ostaficiuk] |
| on behalf of | Kon Ostaficiuk |
| Sent: | 9/29/2014 5:27:43 PM |
| To: | [redacted] [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=[redacted]; [redacted] [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=[redacted] |
| CC: | [redacted] [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=[redacted] |
| Subject: | RE: McKesson -- dead net prices for OS w/ Riteaid |

Hi Gang,
We do not offer anything to any Teva customers…

Not even a "bad price"!

Please acknowledge…We do not want to upset them more!

Thank you,
Kon

*Id.*, ¶1101.

440.   Indeed, Plaintiff's investigation confirmed that Camber entered the
market at the identical Raloxifene HCL pricing as Teva – at $5.70 per unit.

441.   Less than a year later, in July 2015, Allergan also entered the collusion-infested Raloxifene HCL market at the exact same price set by the co-conspirators at $5.70 per unit.  Allergan had begun market allocation negotiations with Teva in September 2014, when its senior executive Andrew Boyer had a 26-minute conversation with Teva's Rekenthaler on September 9, 2014.  *Id.*, ¶1090.  Shortly after the call, Teva's internal email reflected that "Camber and Actavis expect to launch 9/24."  *Id.*  Allergan and Teva continued their negotiations for a week – with Allegan's Falkin exchanging two calls with Teva's Rekenthaler on September 10 for a total of 16 minutes, followed by another call the next day for 10 minutes.  *Id.*, ¶1091.  On September 16, 2014, Allergan's Boyer spoke with Teva's Rekenthaler for 34 minutes.  *Id.*  On the same day, other Allergan executives also spoke with Rekenthaler five times.  *Id.*

442.   In less than a year after Allergan entered the Raloxifene HCL market, by May 2016, Teva had ceded 10% of its market share to Allergan.

443.   With Allergan and Camber attaining their fair share, the Raloxifene HCL market became uncharacteristically stable with price volatility of 0%.  Teva's market share volatility also dropped from 4.8% to 1.8% during the Relevant Period.  The Raloxifene HCL market was marked by an absence of competition.

444.   Throughout the period of collusion and Relevant Period, Allergan was in frequent contact with the co-conspirators.  Between September 2014 and

December 2014, Allergan and Teva executives communicated by text or phone at least 81 times.  §III.D.3.h.  In addition to the calls with Teva's Rekenthaler as discussed above, Allergan's Boyer spoke to Teva's executives over 150 times during the period.

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Date |
|---|---|---|---|
| Andrew Boyer | David Rekenthaler (Teva) | 16 | 4/1/2013 - 9/16/2014 |
| Andrew Boyer | Maureen Cavanaugh (Teva) | 113 | 8/12/2015 - 7/25/2016 |
| Andrew Boyer | Nisha Patel (Teva) | 28 | 4/30/2013 - 10/16/2015 |
| **Total Boyer Calls to Teva:** | | **157** | |

445.   Similarly, Allergan's Falkin spoke to Teva's Rekenthaler 433 times between August 2013 and March 2015, and exchanged phone calls with other Teva executives over 700 times.

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Date |
|---|---|---|---|
| Marc Falkin | David Rekenthaler  (Teva) | 433 | 8/7/2013 - 3/25/2015 |
| Marc Falkin | Maureen Cavanaugh  (Teva) | 410 | 9/10/2013 - 7/29/2016 |
| Marc Falkin | Christine Baeder  (Teva) | 199 | 7/21/2015 - 7/29/2016 |
| Marc Falkin | Theresa Coward  (Teva) | 36 | 12/28/2015 - 7/27/2016 |
| Marc Falkin | Teva Pharmaceuticals | 26 | 5/28/2015 - 7/19/2016 |
| Marc Falkin | Nisha Patel  (Teva) | 11 | 2/5/2016 - 6/16/2016 |
| Marc Falkin | Jocelyn Baker  (Teva) | 11 | 11/24/2015 - 6/2/2016 |
| Marc Falkin | Cassie Dunrud  (Teva) | 11 | 2/8/2016 - 6/22/2016 |
| Marc Falkin | Jessica Peters  (Teva) | 7 | 9/27/2014 - 3/22/2016 |
| Marc Falkin | Kevin Galownia  (Teva) | 6 | 1/14/2016 - 5/12/2016 |
| **Total Falkin Calls to Teva:** | | **1150** | |

446.   Other Allergan executives also spoke to their counterparts at Teva over 300 times.

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Date |
|---|---|---|---|
| Allan Slavsky | David Rekenthaler (Teva) | 26 | 1/11/2012 - 4/1/2013 |
| Allan Slavsky | Maureen Cavanaugh (Teva) | 17 | 8/21/2015 - 7/26/2016 |
| Allan Slavsky | Nisha Patel (Teva) | 28 | 9/16/2015 - 3/10/2016 |

| Allergan Executive | Co-Conspirator's Executive | Number of Calls | Date |
|---|---|---|---|
| Anthony Giannone | Nisha Patel (Teva) | 9 | 1/27/2015 - 6/9/2016 |
| Jonathan Kafer | David Rekenthaler (Teva) | 15 | 10/11/2013 - 3/29/2015 |
| Jonathan Kafer | Maureen Cavanaugh (Teva) | 4 | 4/29/2014 - 3/31/2015 |
| M.B. | Nisha Patel (Teva) | 3 | 2/26/2016 - 6/6/2016 |
| Rick Rogerson | Nisha Patel  (Teva) | 157 | 5/2/2013 - 11/9/2015 |
| Rick Rogerson | Kevin Galownia  (Teva) | 29 | 12/15/2015 - 7/29/2016 |
| Rick Rogerson | Teva Pharmaceuticals | 27 | 9/24/2015 - 7/29/2016 |
| Rick Rogerson | Christine Baeder  (Teva) | 17 | 2/26/2016 - 7/26/2016 |
| **Total Calls to Teva:** | | **332** | |

447.   In addition, Allergan and Teva executives had ample opportunities to meet in person to negotiate customer allocation for Raloxifene HCL prior to and during Allergan's entry into the market:

2015 HDMA Business & Leadership Conference, San Antonio, TX (June 7-10, 2015)
- Allergan attendees included: Falkin, Boyer, Giannone, Reed
- Teva attendees included: Patel, Coward, Baeder, Bradford, Dunrud, Gerebi

2015 NACDS Total Store Expo, Denver, CO (August 22-25, 2015)
- Allergan attendees included: Falkin, Boyer, Rogerson, Slavsky, Giannone, Dorsey, Clark
- Teva attendees included: Cavanaugh, Galownia, Patel, Peters, Coward, Baeder, Dunrud

App.

### i.    Celecoxib

448.   Celecoxib is the generic version of Celebrex® and is an anti-inflammatory drug used for relieve of pain and discomfort caused by arthritis, menstruation, or other disorders.  May 2019 AG Complaint, ¶355.

449.   Both Allergan and Teva were in Celecoxib launch preparation in November 2014, and when the two companies began targeting the same customers, market allocation discussions began – initially with the customers as the intermediary. On November 20, 2014, Allergan targeted one of Teva's Celecoxib customers for a portion of its business. *Id.*, ¶357.  In turn, the customer told Teva that Allergan was in preparation for launch and wanted to get its fair share given that Teva had captured more than 30% of the market. *Id.*  According to the StateAGs, Teva's Rekenthaler "took a cooperative – rather than competitive – stance" and responded "'[t]hat's all pretty accurate and hard to argue with.'" *Id.*, ¶358.

450.   On November 25, 2014, Allergan's Falkin spoke with Teva's Rekenthaler for six minutes. *Id.*, ¶361.

451.   Allergan continued to seek its fair share by targeting another Teva customer.  On December 1, 2014, Teva's retail pharmacy chain customer tried to broker a Celecoxib agreement for Allergan and Teva while Allergan tried to take 25% of its Celecoxib business. *Id.*, ¶359.  The pharmacy chain's representative assured Teva's Theresa Coward that "'he would not move this unless we are all on the same page'" and he had no problem with sending Actavis "'a message.'" *Id.*  Rekenthaler's responded with a message for Allergan: "'I don't want to give up anything . . . . We're at 32% and I think that's reasonable.'" *Id.*, ¶360.  According to the StateAGs, "Rekenthaler's response was consistent with the 'fair share' understanding." *Id.*

452.    Allergan's bid for Teva's customer triggered another round of negotiations before Teva's December 10, 2014 launch.   On December 3, 2014, Allergan's Falkin and Teva's Rekenthaler exchanged two calls for a total of three minutes. *Id.*, ¶361. Allergan's Andrew Boyer also had discussions with Teva's Patel on December 5 and December 8, 2014, speaking for more than 8 minutes and 16 minutes, respectively.   *Id.*   On December 9, 2014, Allergan's Falkin and Teva's Rekenthaler spoke again for one minute.   *Id.*   And on the day of Teva's launch, the two spoke 3 times for a total of 13 minutes.   *Id.*

453.   Plaintiff's investigation revealed that Allergan and Teva came to an agreement to not compete on price and market share.  Both co-conspirators entered the market around the same time in December 2014, with Allergan pricing Celecoxib at $5.90 per unit and Teva pricing the drug at $4.30 per unit.  Even though Allergan's pricing was substantially higher than Teva's, Allergan nevertheless captured 28% of the market in December 2014 while Teva took 31% of the market, and Celecoxib quickly became one of Allergan's "key products which comprised a majority of product sales for North American Generic."   For years after, each co-conspirator achieved its fair share and market share volatility stabilized, with pricing volatility reaching close to zero at 0.9% to 1.7% and market share volatility also dropping to 0.8%-2.5%.  The unusual stability was uncharacteristic of a competitive market where manufacturers would compete on pricing to gain market share.

454.   The co-conspirators communicated frequently during both the period of collusion and Relevant Period.  During November and December 2014, Allergan and Teva executives spoke over 22 times, with two-thirds of the calls taking place in December during the Celecoxib launches and intensified market allocation negotiations.  §III.D.3.h.  In addition to the phone conversations discussed above, Allergan's Falkin communicated with Teva's Rekenthaler over 400 times from August 7, 2013 to March 25, 2015, and Allergan's Boyer spoke to Patel more than 20 times between April 30, 2013 and October 16, 2015. *Id.*  Falkin also spoke with other Teva executives more than 700 times and Boyer spoke to other Teva executives over 130 times. *Id.*  Allergan executives such as Rogerson, Slavsky, and others also spoke to Teva's Rekenthaler, Patel, and other executives more than 300 times.

455.   In addition to phone or text communications, the co-conspirators had opportunities to meet in person to divide the Celecoxib market:

| Conference | Allergan Attendees Including: | Teva Attendees Including: |
|---|---|---|
| 2014 NACDS Total Store Expo, Boston, MA (August 23-26, 2014) | Defendant Buchen, Falkin, Rogerson, Boyer, Slavsky, Giannone, Dorsey, Clark, Reed | Rekenthaler, Patel, Cavanaugh, Galownia, Peters, Coward, Baeder, Baker, Dunrud |
| HDMA 2014 Annual Board and Membership Meeting, Laguna Beach, CA (September 27-October 1, 2014) | Falkin, Boyer | Rekenthaler, Cavanaugh, Baeder |
| GPhA 2014 Fall Technical Conference, Bethesda, MD (October 27-29, 2014) | Allergan | Teva |
| 2014 IGPA Annual Conference, Miami, FL (November 19-21, 2014) | Defendant Buchen, Brown | Oberman, Livneh |
| 2014 NACDS NYC Week | Defendant Saunders, Falkin, | Rekenthaler, Cavanaugh, Coward, |

| Conference | Allergan Attendees Including: | Teva Attendees Including: |
|---|---|---|
| Annual Foundation Dinner, New York, NY (December 3, 2014) | Boyer | Peters, Baeder |

## 14.    Government Investigations into Allergan's Anticompetitive Conduct

456.   As discussed above, according to a press release, on October 2, 2014, U.S. Senator Bernie Sanders and U.S. Representative Elijah Cummings launched an investigation into "soaring generic drug prices."  Sen. Sanders and Rep. Cummings sent out letters to various generic pharmaceutical manufacturers, including Allergan (then Actavis), demanding information relating to generic drug price increases.

457.   As part of the letter to Allergan, Sen. Sanders and Rep. Cummings asked defendant Saunders to provide the following information concerning doxycycline hyclate:

> In order to evaluate the underlying causes of recent increases in the price of your company's drug, we request that you provide the following documents and information for the time period covering January 1, 2012, to the present:
>
> (1)    total gross revenues from the company's sales of this drug;
>
> (2)    the dates, quantities, purchasers, and prices paid for all sales of this drug;
>
> (3)    total expenses relating to the sales of this drug, as well as the specific amounts for manufacturing, marketing and advertising, and purchases of active pharmaceutical ingredients, if applicable;
>
> (4)    sales contracts or purchase agreements for active pharmaceutical ingredients for this drug, including any agreements relating to exclusivity, if applicable;

    (5)    a description and valuation of the specific financial and non-financial factors that contributed to your company's decisions to increase the price of this drug;

    (6)    any cost estimates, profit projections, or other analyses relating to the company's current and future sales of this drug;

    (7)    price of this drug in all foreign countries or markets, including price information for the countries paying the highest and lowest price; and

    (8)    the identity of company official(s) responsible for setting the price of the drug over the above time period.

458.   One month later, the DOJ convened a grand jury in the U.S. District Court for the Eastern District of Pennsylvania.  One of Allergan's Co-Conspirators, Lannett, reported that on November 3, 2014, its Senior Vice President of Sales and Marketing had received a subpoena from the DOJ in connection with the federal investigation of the generic pharmaceutical industry requesting information on Lannett's generic drug pricing and communications with competitors.   On December 5, 2014, Lannett itself received a subpoena requesting similar information. Lannett was the first of at least ten other generic drug manufacturers to receive DOJ subpoenas in connection with the investigation, including Allergan and co-conspirators Heritage, Impax and Mylan – companies which, as shown above, also raised the prices of some of their generics at or close to the same time as Allergan's price increases.  On August 6, 2015, Allergan disclosed for the first time that its Actavis generic drug unit had received a DOJ subpoena in June 2015. In response to the news, *Bloomberg* noted that Allergan was "the biggest company yet to draw

scrutiny in the government's widening antitrust probe of the [generic pharmaceutical] industry."

459.   The fact that the DOJ sent a subpoena to Allergan after sending subpoenas to its competitors strongly suggests that evidence learned through those prior subpoenas led the DOJ to believe that Allergan was also engaged in improper pricing.   Moreover, the DOJ has filed motions to intervene in at least six civil antitrust actions alleging price-fixing in violation of the Sherman Act against Allergan and/or the Actavis generic drug unit sold to Teva in August 2016, including one case in which the district court has already denied the defendants' motion to dismiss.   *See In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712 (S.D.N.Y. 2017).   In these cases, now consolidated into the Generic Drugs MDL, the plaintiffs have requested that the various generic drug-company defendants produce all documents produced to the DOJ in the criminal investigation.   In the DOJ's motion to intervene in *In re Propranolol Antitrust Litig.*, No. 1:16-cv-09901-JSR, ECF No. 72 (S.D.N.Y. Jan. 30, 2017), the DOJ explained that the "action presents a risk to the United States' interest in ensuring the integrity of its on-going criminal investigation" because, among other reasons, "its ongoing criminal antitrust investigation shares common questions of law and fact with the civil claims" and because the plaintiffs have sought the same documents produced to the federal prosecutors.   *Id*. at 5, 7.   Subsequently, in a May 1, 2017 motion to stay further discovery in the Generic Drugs MDL, the DOJ explained that "[e]vidence

- 206 -

uncovered during the criminal investigation implicates other companies and individuals (including a significant number of the Defendants [in the Generic Drugs MDL]) in collusion with respect to doxycycline hyclate, glyburide, and other drugs (including a significant number of the drugs at issue [in the Generic Drugs MDL])."[16] The DOJ's intervention in these civil actions implicating Allergan's price-fixing activities is a powerful indication that the allegations of price-fixing are supported (at least in part) by documents and other information provided to the DOJ in its investigation.

460.   The DOJ filed the first criminal charges in connection with its investigation on December 12 and 13, 2016 against Jeffrey A. Glazer and Jason T. Malek of Heritage in the U.S. District Court for the Eastern District of Pennsylvania. Malek was Heritage's President and Glazer was Heritage's CEO and Chairman during the period covered by the DOJ's investigation.  On December 14, 2016, the DOJ released a complaint charging Glazer and Malek with criminal violations of §1 of the Sherman Act (15 U.S.C. §1) for price fixing and other anticompetitive conduct in connection with generic Doxycycline, one of the drugs sold by Allergan at historically high prices during the Relevant Period, and a second drug, Glyburide.  The DOJ alleged that Glazer and Malek conspired to:

---

[16] *In re Generic Pharm. Pricing Antitrust Litig.*, No. 2:16-md-02724-CMR (E.D. Pa. May 1, 2017), ECF No. 279, at 1-2.

(a)   Participate in, direct, authorize or consent to subordinate employees discussing the sale of Doxycycline and Glyburide and creating "rig bids" for those drugs in meetings, conversations and ***communications with co-conspirators***;

(b)   Agreed during those meetings to "allocate customers" and not compete against one another for Doxycycline and Glyburide customers in the United States;

(c)   Actually submitted or withheld the discussed bids and issued price proposals in accordance with the agreements reached; and

(d)   Sold and profited from selling Doxycycline and Glyburide in the United States at "collusive and noncompetitive prices."

461.   The DOJ described how Glazer and Malek did not act alone and that "[v]arious corporations and individuals, ***not made defendants in this Count***, participated as co-conspirators in the offenses charged herein and performed acts and made statements in furtherance of."

462.   Glazer and Malek pled guilty to the DOJ charges on January 9 and 10, 2017.

463.   On December 14, 2016, in a *Forbes* article entitled "The Man The Feds Are Using To First Crack Open Their Big Antitrust Case Against Generic Drug Makers," Robert Connolly, former chief of the DOJ's Antitrust Division, stated the following:

[A] criminal information against an individual for antitrust charges prior to any other government action in an antitrust case suggests the individual is cooperating with the government investigation. "*It sounds like it can be just the first case and others will follow, it would be unusual for the federal government to charge just one individual so I would assume there is more to come*."

464.   On December 15, 2016, 20 state Attorneys General revealed that they had sued six generic drug companies for their roles in the conspiracy to artificially inflate prices of Doxycycline and Glyburide, including Heritage, Mayne, Mylan and Teva USA. Teva's Actavis unit (part of Allergan prior to July 26, 2015) received a subpoena from the Connecticut Attorney General in connection with its price-fixing investigation which began in June 2014.  Twenty-five other state Attorneys General later joined the action.

465.   The AG Complaint states that the Attorneys General "have uncovered a wide-ranging series of conspiracies implicating numerous different drugs and competitors, which will be acted upon at the appropriate time."  The Attorneys General describe these conspiracies as "schemes to fix and maintain prices, allocate markets and otherwise thwart competition" and explain that they are carried out by generic drug companies through their senior executives, who "exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements."

466.   According to the AG Complaint, the drug manufacturers attempted to explain the suspicious price hikes through "a myriad of benign factors," however, the plaintiff States "found through their investigation . . . that the reason underlying many of these price increases is much more straightforward, and sinister – collusion among generic drug competitors."   Among other things, the company executives met at "regular 'industry dinners'" and exchanged "numerous and frequent telephone calls, emails and text messages."

467.   The Connecticut Attorney General noted in his December 15, 2016 press release that the price collusion was not the isolated misconduct of a few rogue employees, explaining that "the misconduct was conceived and carried out by senior drug company executives and their subordinate marketing and sales executives."   The Connecticut Attorney General further noted that the states' investigation is still ongoing and has "uncovered evidence of a well-coordinated and long-running conspiracy to fix prices and allocate markets for doxycycline hyclate delayed release and glyburide."   As the Connecticut Attorney General explained, "[w]hile the principal architect of the conspiracies addressed in this lawsuit was Heritage Pharmaceuticals, *we have evidence of widespread participation in illegal conspiracies across the generic drug industry* . . . .   We intend to pursue this and other enforcement actions aggressively, and look forward to working with our colleagues across the country to restore competition and integrity to this important market."

468.   As discussed herein, the Amended AG Complaint and the May 2019 AG Complaint, made public on October 31, 2017 and June 24, 2019, respectively, contain additional details and cite even more particular evidence about Allergan's price-fixing activities.

### E.   Misleading Statements and Omissions

469.   During the Relevant Period, defendants made a series of materially false or misleading statements and omissions of material fact regarding: (i) the competitive nature of the generic drug market, the reasons for drug price increases and the source of Allergan's revenues; (ii) the Company's compliance with laws and regulations; (iii)  the Company's reported revenues; (iv) the accuracy of the Company's SEC filings; and (v) compliance with the Company's Code of Conduct.

### 1.   Statements Regarding the Competitive Nature of the Generic Drug Market and Source of Revenues

470.   The Relevant Period begins on October 29, 2013, when Allergan filed a Form 8-K, signed by Joyce, with the SEC (the "3Q 2013 Form 8-K").  In the press release attached to the 3Q 2013 Form 8-K, which announced certain of the Company's financial and operating results for the quarter ended September 30, 2013, Bisaro stated, in part:

>  *Strong global growth in our Actavis Pharma segment was driven by our ability to capitalize on product opportunities from our industry leading R&D pipeline*.  In the U.S., we launched generic versions of Lidoderm® and Opana® ER and received FDA approval of a generic version of Lamictal® ODT.  We also confirmed that we have initiated

U.S. patent challenges on such important products as generic versions of Nucynta ER® and Suboxone® Sublingual Film.

471.   On October 29, 2013, Allergan hosted a conference call to discuss the

Company's 3Q 2013 financial results.  During this call, Olafsson stated, in part:

> With regard to the generic pricing outlook at a high level, what has happened probably over the last two years is it has been more common that obviously there is a price erosion in the market due to the consolidation. *But there is opportunities [sic] to take pricing increases; and that is what has changed since maybe five years ago when there wasn't an opportunity.  These pricing increases have been in products where there has been manufacturing problems or stock-out situation.*
>
> *So I think that has been a fact in the US generic market, that there is an opportunity to take price increases*.  But also at the same time with the environment on the consolidation of the customers, clearly there is a pricing pressure overall in the market.

472.   On October 31, 2013, Allergan filed a quarterly report on Form 10-Q

with the SEC, reporting certain of the Company's financial and operating results for

the quarter ended September 30, 2013 (the "3Q 2013 Form 10-Q"). In the 3Q 2013

Form 10-Q, Allergan stated, in part: "The pharmaceutical industry is highly

competitive . . . .  *We face strong competition in our all of our businesses*."

473.   On February 20, 2014, Allergan filed a Form 8-K, signed by Joyce, with

the SEC (the "4Q 2013 Form 8-K"). In the press release attached to the 4Q 2013 Form

8-K, which announced certain of the Company's financial and operating results for the

year and quarter ended December 31, 2013, Bisaro stated, in part: "Growth in our U.S.

generic business was driven by strong product launches of generic versions of

Suboxone® Sublingual tablets, Lidoderm® and Cymbalta®."

474.  On February 25, 2014, Allergan filed a Form 10-K reporting the Company's financial results for 2013 (the "2013 Form 10-K").  In the 2013 Form 10-K Allergan stated:

**Competition**

> *The pharmaceutical industry is highly competitive*.  In our Actavis Pharma and Actavis Specialty Brands businesses, we compete with different companies depending upon product categories, and within each product category, upon dosage strengths and drug delivery systems. Such competitors include the major brand name and generic manufacturers of pharmaceutical products.  In addition to product development, other competitive factors in the pharmaceutical industry include product quality and price, reputation and service and access to proprietary and technical information. . . .

> *We actively compete in the generic pharmaceutical industry*. . . . *[T]he level of market share, revenues and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market, pricing* and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. . . .  In addition to competition from other generic drug manufacturers, *we face competition from brand name companies in the generic market*.  Many of these companies seek to participate in sales of generic products by, among other things, collaborating with other generic pharmaceutical companies or by marketing their own generic equivalent to their brand products as Authorized Generics.  Our major competitors include Teva Pharmaceutical Industries, Ltd., Mylan Inc. and Sandoz, Inc. (a division of Novartis AG).

475.  On April 30, 2014, Allergan filed a Form 8-K, signed by Joyce, with the SEC (the "1Q 2014 Form 8-K").  In the press release attached to the 1Q 2014 Form 8-K, which announced certain of the Company's financial and operating results for the quarter ended March 31, 2014, Bisaro stated, in part: "'Overall revenue growth of 36 percent in our commercial pharmaceutical business benefitted from the continued strength of our generics business, resulting from the launch of our generic Micardis®

in the U.S. and continued strong sales of the generic versions of Lidoderm® and Cymbalta®.'"

476.    In the 1Q 2014 Form 8-K, Allergan stated: "North American Generics revenue increased 7 percent to $1.02 billion for the first quarter 2014, driven by product launches including generic versions of Cymbalta® and Lidoderm® partially offset by generic competition of extended release products including our authorized generic version of Concerta®."

477.    On May 29, 2014, Allergan participated in the Sanford C. Bernstein Strategic Decisions Conference ("Bernstein Conference").  During this conference, Bisaro stated, in part:

> And I guess where that leads to is I think sustainable and longer-term higher pricing in the generic industry than people are generally used to. ***We have also seen in the short term the ability to take price increases on older products where the price had gone to a point where companies had to make the decision about whether to continue manufacturing or raise price.  And now we are taking those price increases and those price increases are sticking***.

> So instead of discontinuing a product we are looking to raise the price.  And while it may seem like a lot of money, or it is not an insignificant number in a very high percentage, but we are talking about going from $10 a thousand to $20 a thousand.  So not enormous numbers when it comes to the patient but important and relevant to us.

478.    On August 5, 2014, Allergan filed a Form 8-K, signed by Joyce, with the SEC  (the "2Q 2014 Form 8-K").  In the press release attached to the 2Q 2014 Form 8-K, which announced the highlights from the Company's 2Q 2014 financial and operating results, Bisaro stated, in part:

> "Our exceptional performance during the second quarter resulted from double digit revenue growth in both our North American brand and generics businesses and Anda Distribution . . . ."

> . . . We also saw strong growth within our generics business, powered by our strong base business along with continued strong sales of the generic versions of Lidoderm® and Cymbalta®".

479.   On August 5, 2014, Allergan hosted a conference call to discuss the Company's 2Q 2014 financial results.   During this call, an analyst from Leerink Partners inquired about the "US generic pricing outlook for 2014 and 2015" and also asked whether Allergan had "factored any aggressive pricing increases" into the Company's guidance numbers, specifically noting that "smaller generic players seem to be taking very aggressive pricing increases."   In responding to these questions, Saunders stated, in part:

> Clearly we think there are more opportunities to take price [increases], particularly as we leverage our strong supply chain and the reliability of high-quality supply that we can offer customers that perhaps you are seeing with some of our competitors not to be as true.   And so that always creates opportunity.

480.   Buchen then added:

> We have a very broad portfolio and we take pricing opportunities where we can. . . .

> That is one of the advantages of having a very diverse portfolio is we can – with our supply chain the way it is, we can react very quickly when there are pricing opportunities and the ability to take more share.

481.   On November 5, 2014, Allergan filed a Form 8-K, signed by Joyce, with the SEC (the "3Q 2014 Form 8-K").   In the press release attached to the 3Q 2014

Form 8-K, which announced certain of the Company's financial and operating results

for the quarter ended September 30, 2014, Saunders stated, in part:

> **"Our 53 percent year-over-year growth in non-GAAP EPS reflects** the strong contributions of our new brand pharmaceutical portfolios, resulting from the acquisitions of Warner Chilcott and Forest, as well as **the continued strong performance of our U.S. Generics** and International businesses and the Anda Distribution business . . . . Within our North American Generics business, we capitalized on continued strength across the business."

482.   On December 5, 2014, Allergan filed a Form 8-K, signed by Joyce,

superseding portions of the 2013 Form 10-K.  In the Form 8-K, Allergan stated, in

part:

> Our North American Generics and International business is focused on maintaining a leading position within both the North America, and in particular, the U.S. market and our key international markets and strengthening our global position **by offering a consistent and reliable supply of quality brand and generic products.**

> **Our strategy in the U.S. is to develop pharmaceuticals that are difficult to formulate or manufacture or will complement or broaden our existing product lines**.

> *         *         *

> **[A] small number of large, wholesale distributors and large chain drug stores control a significant share of the market. This concentration may adversely impact pricing and create other competitive pressures on drug manufacturers.**

> *         *         *

> **Competition**

> **The pharmaceutical industry is highly competitive.  In our North American Brands and North American Generics and International businesses, we compete with different companies depending upon product categories, and within each product category, upon dosage strengths and drug delivery systems.**  Such competitors include the major brand name and generic manufacturers of pharmaceutical

- 216 -

products.  In addition to product development, *other competitive factors in the pharmaceutical industry include product quality and price*, reputation and service and access to proprietary and technical information. . . .

*We actively compete in the generic pharmaceutical industry. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors. . . .  As competing off-patent manufacturers receive regulatory approvals on similar products, market share, revenues and gross profit typically decline, in some cases dramatically.  Accordingly, the level of market share, revenues and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market pricing* and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches.  Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross profit.  *In addition to competition from other generic drug manufacturers, we face competition from brand name companies in the generic market.*  Many of these companies seek to participate in sales of generic products by, among other things, collaborating with other generic pharmaceutical companies or by marketing their own generic equivalent to their brand products as Authorized Generics.  *Our major competitors include Teva Pharmaceutical Industries, Ltd., Mylan Inc. and Sandoz, Inc.*

\*   \*   \*

Our operating results and financial condition may fluctuate from quarter to quarter and year to year for a number of reasons.  *The following events or occurrences, among others, could cause fluctuations in our financial performance from period to period*:

\*   \*   \*

• *our responses to price competition*

\*   \*   \*

*We face strong competition in our all of our businesses*. . . .  Most of our competitors have been in business for a longer period of time than us, have a greater number of products on the market and have greater financial and other resources than we do.  *Furthermore, recent trends in this industry are toward further market consolidation of large drug companies into a smaller number of very large entities, further concentrating financial, technical and market strength and increasing competitive pressure in the industry*. . . .

Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors. . . .  As competing manufacturers receive regulatory approvals on similar products or as brand manufacturers launch generic versions of such products (for which no separate regulatory approval is required), market share, revenues and gross profit typically decline, in some cases dramatically.  ***Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market*** and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. . . .  ***Additionally, as new competitors enter the market, there may be increased pricing pressure on certain products, which would result in lower gross margins***. . . . .

> . . . ***Increased competition in the generic industry as a whole may result in increased price erosion in the pursuit of market share***.

\* \* \*

Our principal customers in our brand and generic pharmaceutical operations are wholesale drug distributors and major retail drug store chains. . . .  ***We expect that consolidation of drug wholesalers and retailers will increase pricing and other competitive pressures on drug manufacturers, including the Company***.

483.   On January 13, 2015, Allergan participated in the JPMorgan Healthcare Conference ("JPMorgan Conference").   During this conference, a Company representative stated, in part:

> We do take appropriate price increases, but not the most aggressive price increases.  And we do that because we need to manage our relationships and treat our customers fairly, so that we don't find ourselves on exclusion lists or other things like that.

484.   On February 18, 2015, Allergan filed a Form 8-K, signed by Hilado, with the SEC (the "4Q 2014 Form 8-K").   In the press release attached to the 4Q 2014 Form 8-K, which announced certain of the Company's financial and operating results for the year and quarter ended December 31, 2014, Saunders stated, in part:

- 218 -

In our North American Generics business, strong results were driven by continued performance of our generic versions of Lidoderm® and Concerta®, and fourth quarter launches of generic versions of Intuniv™ and Celebrex®.

485.   On February 18, 2015, Allergan also filed an Annual Report on Form 10-K with the SEC, reiterating the financial and operating results previously announced in the 4Q 2014 Form 8-K and reporting in full the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 Form 10-K").

486.   In the 2014 Form 10-K, Allergan stated, in part:

Our North American Generics and International business is focused on maintaining a leading position within both the North American, and in particular, the U.S. market and our key international markets and strengthening our global position *by offering a consistent and reliable supply of quality brand and generic products*.

*Our strategy in the U.S. is to develop pharmaceuticals that are difficult to formulate or manufacture or will complement or broaden our existing product lines.*

\*      \*      \*

Our significant customers comprise a large part of the distribution network for pharmaceutical products in North America.  As a result, a small number of large, wholesale distributors and large drug store chains control a significant share of the market.  Changes in the mix of concentration amongst the Company's largest customers over the last three years are due, in part, to the impact of acquisitions as well as changes in the supply chain of our indirect customers.  *This concentration may adversely impact pricing and create other competitive pressures on drug manufacturers.*

\*      \*      \*

**Competition**

The pharmaceutical industry is highly competitive.  *In our North American Brands and North American Generics and International*

*businesses, we compete with different companies* depending upon product categories, and within each product category, upon dosage strengths and drug delivery systems. Such competitors include the major brand name and generic manufacturers of pharmaceutical products. In addition to product development, other competitive factors in the pharmaceutical industry include product quality, price, reputation, service and access to proprietary and technical information.

\*     \*     \*

*We actively compete in the generic pharmaceutical industry. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors. . . . As competing off-patent manufacturers receive regulatory approvals on similar products, market share, revenues and gross profit typically decline, in some cases dramatically. Accordingly, the level of market share, revenues and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market, pricing* and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross profit. *In addition to competition from other generic drug manufacturers, we face competition from brand name companies in the generic market.* Many of these companies seek to participate in sales of generic products by, among other things, collaborating with other generic pharmaceutical companies or by marketing their own generic equivalent to their brand products as "Authorized Generics". *Our major competitors include Teva Pharmaceutical Industries, Ltd., Mylan Inc. and Sandoz, Inc. (a division of Novartis AG).*

\*     \*     \*

*We face strong competition in all of our businesses*. . . . Most of our competitors have been in business for a longer period of time than us, have a greater number of products on the market and have greater financial and other resources than we do. *Furthermore, recent trends in this industry are toward further market consolidation of large drug companies into a smaller number of very large entities, further concentrating financial, technical and market strength and increasing competitive pressure in the industry*.

\*     \*     \*

Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain

- 220 -

regulatory and competitive factors. . . .  As competing manufacturers receive regulatory approvals on similar products or as brand manufacturers launch generic versions of such products (for which no separate regulatory approval is required), market share, revenues and gross profit typically decline, in some cases dramatically. ***Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market*** and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. . . . ***Additionally, as new competitors enter the market, there may be increased pricing pressure on certain products, which would result in lower gross margins***. . . .

>   . . . ***Increased competition in the generic industry as a whole may result in increased price erosion in the pursuit of market share.***

*     *     *

Our principal customers in our brand and generic pharmaceutical operations are wholesale drug distributors and major retail drug store chains. . . .  ***We expect that consolidation of drug wholesalers and retailers will increase pricing and other competitive pressures on drug manufacturers, including the Company.***

487.   On May 11, 2015, Allergan filed a Form 8-K, signed by Hilado, with the SEC (the "1Q 2015 Form 8-K").  In the press release attached to the 1Q 2015 Form 8-K, which announced certain of the Company's financial and operating results for the quarter ended March 31, 2015, Saunders stated, in part:

>   ***Our first quarter performance was highlighted by strong revenue growth*** from Namenda XR®, Linzess®, Bystolic®, Viibryd®/Fetzima®, LoLoestrin® Fe, Saphris®, Estrace® Cream ***as well as continued growth within our generics business***, powered by strong sales of the generic versions of Concerta®, Intuniv® and the recent launch of our generic version of OxyContin®.

488.   On May 11, 2015, Allergan hosted a conference call to discuss the Company's 1Q 2015 financial results.  During this call, an analyst from Guggenheim Securities LLC asked for Allergan's thoughts on "***generic drug pricing*** given that

- 221 -

there have been concerns that it may not be as favorable going forward."  Responding

to this question, Saunders stated, in part:

> We haven't seen much of a change despite all the fanfare and publicity around drug pricing and generics.  There are obviously a few products that go up but the model for generics is price decreases as more competitors come into the market.  That is just the way the business works and overall we still model a mid single-digit price decrease in our business.  That being said, the environment has remained pretty stable and favorable.  We don't expect that to change short-term either.

489.  Bisaro added:

> [O]ur pipeline and product line gives us a bit of an advantage because of the uniqueness of it and allows us to be somewhat insulated from the general reduction of prices.  As you know we have worked very hard to create that product line and we are obviously taking advantage of the situation as the situations present themselves.

490.  On August 6, 2015, Allergan filed a Form 8-K, signed by Hilado, with

the SEC (the "2Q 2015 Form 8-K").  In the press release attached to the 2Q 2015

Form 8-K, which announced certain of the Company's financial and operating results

for the quarter ended June 30, 2015, Saunders stated, in part:

> "In our first full quarter as a combined Company, Allergan delivered exceptional results.  ***Our performance was powered by operational excellence and double-digit growth across our Brands and Global Generics businesses***, while continuing outstanding momentum on the integration of Actavis and Allergan.  We also achieved important R&D milestones that will help fuel both our branded and generics businesses in the future . . . ."

491.  On August 6, 2015, Allergan hosted a conference call to discuss the

Company's 2Q 2015 financial results.  During this call, Saunders stated, in part:

> [O]ur global generics business is doing very well and the units that comprise it are firing on all cylinders as we prepare for the combination with Teva.  Generic sales are up 17% excluding the impact of foreign currency.  Generic profitability is up. . . .  US generic revenues were

$1.1 billion in the quarter, and continue to benefit from new product introductions and contribution from high-barrier and semi-exclusive products like generic Concerta.

492.    On August 6, 2015, Saunders appeared on CNBC's *Mad Money* with Jim Cramer to discuss the state of the Company.  During the interview, Cramer asked Saunders about the Company's recent disclosure of a subpoena it received from the DOJ in June regarding price collusion.  Saunders responded:

> *[T]he DOJ investigation really is a red herring*. . . .  [T]he government in the U.S. has gotten used to drug prices in generics going one way – down.  *But it's a commodity business, and so they go up and down depending on supply and demand*.  This was a subpoena about three products where *prices went up because of supply and demand* and, to be fair, it will play itself out.  But in the context of Allergan, it's not that significant.

493.    On November 4, 2015, Allergan filed a Form 8-K, signed by Hilado, with the SEC (the "3Q 2015 Form 8-K").  In the press release attached to the 3Q 2015 Form 8-K, which announced certain of the Company's financial and operating results for the quarter ended September 30, 2015, Saunders stated, in part:

> "Allergan delivered exceptional performance across the board in the third quarter that exceeded expectations.  These strong results were driven by our continued focus on customers, fueling volume-driven year-over-year growth in our U.S. Brands, Medical Aesthetics, International Brands and Anda Distribution segments, while also executing pre-integration activities ahead of the divestiture of the Generics business to Teva, which remains on track to be completed in the first quarter of 2016 . . . ."

494.    On November 4, 2015, Allergan hosted a conference call to discuss the Company's 3Q 2015 financial results.  During this call, Saunders stated, in part:

> Pricing has been in the headlines and featured in the presidential debates, but let's not pretend that this is [a] topic that has just appeared in the

news, it's been a focus for many years.  We know that cost is a constant concern, so is patient access to medical innovation.  Allergan seeks to strike the right balance between care and cost.

\*      \*      \*

Allergan has a heritage in knowing health-system economics very well, and we want to make sure patients have access to important medicines. Like many of our peers, we have patient-assistance programs to make sure patients have access to our medicines regardless of their ability to pay. . . .  Our business model does not involve purchasing old products already on the marketplace and taking excessive price increases.  We prefer to acquire mid- to late-stage drugs and invest[] extensively in their development.

495.    On February 22, 2016, Allergan filed a Form 8-K, signed by Hilado, with the SEC (the "4Q 2015 Form 8-K").  In the press release attached to the 4Q 2015 Form 8-K, which announced certain of the Company's financial and operating results for the quarter and year ended December 31, 2015, Allergan stated, in part:

The Global Generics business delivered solid performance during the fourth quarter.

496.    On February 23, 2016, certain of the Individual Defendants participated in the RBC Capital Markets Healthcare Conference.  During this conference, Saunders stated:

*We have never been aggressive price takers*.  We, in fact, have been criticized or I have been criticized and I think Bill Meury, who's here, has been criticized in forums like this in the past for not taking more price.  And we have always explained that this is a customer long-term relationship and to the extent you poke them in the eye over and over again, they are going to poke back.

You wouldn't do that with any customer regardless of whether it's a PBM or a hospital or a physician buying group or an individual physician.  *You just don't treat customers that way.  There has to be mutual respect and planning, and so we price our drugs appropriately.*

- 224 -

> *We look to take price increases as we believe we can, but we have never done it in a significant way because our products don't lend themselves to that in large part.  But also our business model and our philosophy doesn't lend itself to that.*

> \*       \*       \*

> *And this idea that you can just take price increases as you see fit is really not true*.  There are anomalies and there are companies that have figured out how to exploit that system, but the reality is every price increase comes with a reaction.  They are highly negotiated and the system does, for the most part, work.  There are, again, anomalies to it, but it does work.

497.   On February 26, 2016, Allergan filed an Annual Report on Form 10-K with the SEC, reiterating the financial and operating results previously announced in the 4Q 2015 Form 8-K and reporting in full the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 Form 10-K").

498.   In the 2015 Form 10-K, Allergan stated, in part:

**Competition**

> The pharmaceutical industry is highly competitive.

> \*       \*       \*

> As a result of the Teva Transaction, the Company's global generics business is classified as discontinued operations.  ***Our discontinued operations actively competes in the generic pharmaceutical industry***.

> \*       \*       \*

> Accordingly, ***the level of market share, revenues and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market, pricing*** and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches.  ***We face competition from other generic drug manufacturers and from brand name companies in the generic market***.  Many of these companies seek to participate in sales of generic products by, among other things, collaborating with other

generic pharmaceutical companies or by marketing their own generic equivalent to their brand products as "Authorized Generics."

499.   The statements set forth in ¶¶470-498 above were materially false and misleading or omitted material facts about the Company's business, operations, compliance with policies, and financial results.   Specifically, defendants made materially false and/or misleading statements, which had the effect of concealing, and/or failed to disclose, that: (i) Allergan's generics unit and several of its pharmaceutical industry peers colluded to fix generic drug prices; (ii) the foregoing conduct constituted anticompetitive conduct; and (iii) consequently, Allergan's revenues during the Relevant Period were in part the result of anticompetitive conduct.   By electing to speak publicly about Allergan's generic drug business – specifically, pricing and competition for generic drugs and revenues received from those drugs – and thereby putting the subject into play during earnings calls with shareholders and in SEC filings, defendants had a duty to fully, completely and truthfully disclose all material facts regarding generic drug pricing, competition and revenues so as to not mislead investors.   As a result of the foregoing, defendants' public statements were materially false and misleading at all relevant times.

## 2.   Statements Regarding Compliance with Laws and Regulations

500.   During the Relevant Period, Allergan filed: (i) a Form S-4 registration statement and a joint proxy statement/prospectus that formed part of the registration statement on December 23, 2014, signed by Bisaro, Saunders, Hilado and Bailey;

(ii) Amendment No. 1 to the Form S-4 registration statement and joint proxy statement/prospectus that formed part of the registration statement on January 26, 2015, signed by Bisaro, Saunders, Hilado and Bailey; and (iii) a Rule 424(b)(3) Joint Proxy Statement/Prospectus on January 27, 2015, which contained materially false and/or misleading statements that the Company complied with laws and regulations:

> Allergan's obligation to effect the Merger is conditioned, among other things, upon:
>
> • the accuracy of Actavis' and Merger Sub's representations and warranties, subject to specified materiality standards;
>
> *     *     *
>
> • the delivery by Actavis of an officer's certificate certifying such accuracy of such representations and warranties and such performance of such obligations and covenants . . . .
>
> *     *     *
>
> Many of the representations and warranties are reciprocal and apply to Actavis or Allergan, as applicable, and their respective subsidiaries. Some of the more significant representations and warranties relate to:
>
> *     *     *
>
> • SEC reports and financial statements, including their preparation in accordance with GAAP, filing or furnishing with the SEC, and compliance with the applicable rules and regulations promulgated thereunder, and that **_such reports and financial statements fairly present, in all material respects, the relevant financial position and results of operations_**;
>
> *     *     *
>
> • **_compliance with laws and government regulations_**, including environmental laws . . . .
>
> *     *     *

- 227 -

Many of the representations and warranties made by each of Actavis and Allergan are qualified by a "material adverse effect" standard . . . .  For the purpose of the Merger Agreement, a "material adverse effect" with respect to each of Actavis and Allergan means any change, effect, development, circumstance, condition, state of facts, event or occurrence (each referred to in this section of this joint proxy statement/prospectus as an "Effect") that, individually or in the aggregate, has a material adverse effect on the assets, liabilities, condition (financial or otherwise), business or results of operations of the relevant party and its subsidiaries, taken as a whole . . . .

\*      \*      \*

## REPRESENTATIONS AND WARRANTIES OF PARENT [ACTAVIS PLC] AND MERGER SUB

\*      \*      \*

Section 4.4  <u>Reports and Financial Statements</u>.

(a)      From January 1, 2012 through the date of this Agreement, each of Parent [Actavis plc] and Actavis, Inc. have filed or furnished all forms, documents and reports required to be filed or furnished prior to the date hereof by it with the SEC (the "Parent SEC Documents"). As of their respective dates, or, if amended, as of the date of (and giving effect to) the last such amendment, the Parent [Actavis plc] SEC Documents complied in all material respects with the requirements of the Securities Act and the Exchange Act, as the case may be, and the applicable rules and regulations promulgated thereunder, and ***none of the Parent [Actavis plc] SEC Documents contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading***.

(b)      The consolidated financial statements (including all related notes and schedules) of Parent or Actavis, Inc., as applicable, included in the Parent [Actavis plc] SEC Documents when filed complied as to form in all material respects with the applicable accounting requirements and the published rules and regulations of the SEC with respect thereto in effect at the time of such filing and ***fairly present in all material respects the consolidated financial position of Parent [Actavis plc] or Actavis, Inc., as applicable, and its consolidated Subsidiaries, as at the respective dates thereof***, and the consolidated results of their operations and their consolidated cash flows for the respective periods then ended (subject, in the case of the unaudited statements, to normal year-end audit adjustments and to any other adjustments described therein, including the notes thereto) in conformity with GAAP (except, in the

- 228 -

case of the unaudited statements, to the extent permitted by the SEC) applied on a consistent basis during the periods involved (except as may be indicated therein or in the notes thereto).

\*       \*       \*

Section 4.7   <u>Compliance with Law; Permits</u>.

(a)   ***Parent [Actavis plc] and each of Parent's Subsidiaries are in compliance with and are not in default under or in violation of any Laws***, applicable to Parent, such Subsidiaries or any of their respective properties or assets, except where such non-compliance, default or violation would not reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect.

\*       \*       \*

Section 4.12   <u>Information Supplied</u>.   ***The information relating to Parent [Actavis plc] and its Subsidiaries to be contained in the Joint Proxy Statement/Prospectus and the Form S-4 will not***, on the date the Joint Proxy Statement/Prospectus (and any amendment or supplement thereto) is first mailed to shareholders of Parent or at the time the Form S-4 (and any amendment or supplement thereto) is filed and the date it is declared effective or any post-effective amendment thereto is filed or is declared effective, or at the time of the Company Special Meeting or the Parent Special Meeting, ***contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, at the time and in the light of the circumstances under which they were made, not misleading***. The Joint Proxy Statement/Prospectus (other than the portions thereof relating solely to the meeting of the stockholders of the Company) and the Form S-4 will comply as to form in all material respects with the provisions of the Exchange Act, the rules and regulations promulgated thereunder and any other applicable federal securities laws. . . .

Section 4.13   <u>Regulatory Matters</u>.

\*       \*       \*

(b)   Except as would not, individually or in the aggregate, reasonably be expected to have a Parent Material Adverse Effect, the ***businesses of each of Parent [Actavis plc] and each Parent Subsidiary are being conducted in compliance with all applicable Laws*** . . . .

(c)   Except as would not, individually or in the aggregate, reasonably be expected to have a Parent Material Adverse Effect, Parent

and the Parent Subsidiaries have not engaged in activities which are, as applicable, cause for false claims liability, civil penalties or mandatory or permissive exclusion from Medicare, Medicaid or any other government healthcare program.

*　　*　　*

"Parent Material Adverse Effect" means any Effect that, individually or in the aggregate, has a material adverse effect on the assets, liabilities, condition (financial or otherwise), business or results of operations of Parent and the Parent Subsidiaries, taken as a whole . . . .

501.   On March 2, 2015, Allergan filed a Form 8-K, signed by Bailey and Hilado, with underwriting agreements relating to the Ordinary/Preferred Shares Offerings that stated:

The Company represents and warrants to each Underwriter that: . . .

(c)　　Issuer Free Writing Prospectus. . . . ***Each such Issuer Free Writing Prospectus complied in all material respects with the Securities Act***, has been or will be (within the time period specified in Rule 433) filed in accordance with the Securities Act (to the extent required thereby) and, when taken together with the Preliminary Prospectus filed prior to the first use of such Issuer Free Writing Prospectus, did not, and as of the Closing Date and as of the Additional Closing Date, as the case may be, ***will not, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading*** . . . .

(d)　　Registration Statement and Prospectus. . . . ***[A]s of the applicable effective date of the Registration Statement and any post-effective amendment thereto, the Registration Statement and any such post-effective amendment complied and will comply in all material respects with the Securities Act, and did not and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein not misleading; and as of the date of the Prospectus and any amendment or supplement thereto and as of the Closing Date and as of the Additional Closing Date, as the case may be, the Prospectus will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading*** . . . .

(e)     Incorporated Documents.  *The documents incorporated by reference in the Registration Statement, the Prospectus and the Pricing Disclosure Package*, including, to the knowledge of the Company, the documents filed with the Commission by Allergan, when they were filed with the Commission, conformed in all material respects to the requirements of the Exchange Act, and *none of such documents, including, to the knowledge of the Company, the documents so filed by Allergan, contained any untrue statement of a material fact or omitted to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; and any further documents so filed by the Company or any of its subsidiaries and incorporated by reference in the Registration Statement, the Prospectus or the Pricing Disclosure Package, when such documents are filed with the Commission, will conform in all material respects to the requirements of the Exchange Act and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading*.

(f)     *Financial Statements.*

(i)     *Preparation of the Financial Statements of the Company*. The financial statements (including the related notes thereto) of the Company and its consolidated subsidiaries included or *incorporated* by reference in the Registration Statement, the Pricing Disclosure Package and the Prospectus present fairly, in all material respects, the financial position of the Company and its consolidated subsidiaries as of and at the dates indicated and the results of their operations and the changes in their cash flows for the periods specified. *Such financial statements comply in all material respects as to form with the applicable requirements of the Securities Act and the Exchange Act, as applicable, and have been prepared in conformity with generally accepted accounting principles as applied in the United States ("GAAP")* applied on a consistent basis throughout the periods covered thereby, except as may be expressly stated in the related notes thereto, and any supporting schedules included or incorporated by reference in the Registration Statement present fairly, in all material respects, the information required to be stated therein. The selected financial data and the summary financial information of the Company and its consolidated subsidiaries included or incorporated by reference in the Registration Statement, the Pricing Disclosure Package and the Prospectus presents fairly, in all material respects, the information shown therein and has been compiled on a basis consistent with that of the Company's audited financial statements included or incorporated by reference in the Registration Statement, the Pricing Disclosure Package and the Prospectus.

\*      \*      \*

(o)    *No Violation or Default.* **None of the Company, any of the Significant Subsidiaries or, to the knowledge of the Company, any of the Acquired Companies is . . .  (iii) in violation of any law or statute applicable to the Company, any of its subsidiaries or any of the Acquired Companies** or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority having jurisdiction over the Company, any of its subsidiaries or any of the Acquired Companies, except, in the case of clauses (ii) and (iii) above, for any such default or violation that would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

\*      \*      \*

As used herein, "Material Adverse Effect" means (A) when used in respect of any matter relating to the Company or any of its subsidiaries, any material adverse effect, or any development that would reasonably be expected to result in a material adverse effect, on the business, properties, management, financial position, stockholders' equity, results of operations or prospects of the Company and its subsidiaries taken as a whole, or on the performance by the Company of its obligations under the Transaction Documents and (B) when used in respect of any matter relating to any of the Acquired Companies, any material adverse effect, or any development that would reasonably be expected to result in a material adverse effect, on the business, properties, management, financial position, stockholders' equity, results of operations or prospects of the Combined Company, or on the performance by the Company of its obligations under the Transaction Documents.

502.   The statements set forth in ¶¶500-501 above were materially false and misleading or omitted material facts.  Allergan's inflation of its sales through illegal price-fixing constituted a violation of U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal authorities along with the attendant negative financial and reputational harm.  In addition, Allergan's failure to make required disclosures regarding the impact of artificial price increases (tied to illegal price-fixing activity) on its reported revenue was in violation of SEC disclosure rules.

As a result, defendants' public statements were materially false and misleading at all relevant times.

### 3.    Financial Statements

503.    During the Relevant Period, Allergan reported the financial results set forth in the table below:

**3Q 2013 Form 8-K, Filed on Oct. 29, 2013:**

| | Three Months Ended Sep. 30, 2013 | | |
|---|---|---|---|
| | Actavis Pharma (U.S.) | Actavis Pharma (Total) | Consolidated |
| Net Revenue | $942.8 million | $1,552.1 million | $2,013.0 million |

Actavis Pharma net revenue increased 69 percent to $1.55 billion for the third quarter 2013, due to the acquisition of legacy Actavis in late 2012 and new product launches including generic versions of Suboxone® sublingual tablets and Lidoderm®, which more than offset lower sales of our authorized generic version of Concerta® as a result of expected competition. Third quarter international net revenue was $609.3 million, up 208 percent from the prior year quarter as a result of the inclusion of legacy Actavis product sales. Net revenue consists of sales of generics, legacy brands, branded generics and OTC products in the Americas (U.S., Canada and Latin America), Europe (Europe, Russia, CIS and Turkey), and the Middle East, Africa, Australia and Asia Pacific (collectively, MEAAP).

**4Q 2013 Form 8-K, Filed on Feb. 20, 2014:**

| | Three Months Ended Dec. 31, 2013 | | |
|---|---|---|---|
| | Actavis Pharma (U.S.) | Actavis Pharma (Total) | Consolidated |
| Net Revenue | $999.9 million | $1,700.8 million | $2,779.3 million |

Actavis Pharma net revenue increased 20 percent to $1.70 billion for the fourth quarter 2013, due to the acquisition of legacy Actavis in November 2012 and new product launches including generic versions of Suboxone® sublingual tablets, Cymbalta® and Lidoderm®, which more than offset lower sales of our authorized generic version of Concerta® as a result of expected competition. Fourth quarter international net revenue was $700.9 million, up 34 percent from the prior year quarter as a result of the inclusion of legacy Actavis product sales for the full quarter.

**2013 Form 10-K, Filed on Feb. 25, 2014:**

| | Twelve Months Ended Dec. 31, 2013 | | |
|---|---|---|---|
| | Actavis Pharma (U.S.) | Actavis Pharma (Total) | Consolidated |
| Net Revenue | $3,813.5 million | $6,355.9 million | $8,677.6 million |

Our Actavis Pharma business in the U.S. remains the dominant source of revenue for the Company with approximately 60%, 75% and 84% of 2013, 2012 and 2011 segment net revenue coming from our U.S. businesses, respectively. While our U.S. generics business

will continue to be the dominant source of revenue for the Company, we expect international generic revenue to represent an increasing percentage of total revenues in future periods due to the Actavis Group Acquisition.

*     *     *

The increase in net revenues is primarily due to the full year net sales resulting from the Actavis Group Acquisition of $2,799.5 million in the year ended December 31, 2013 versus $428.3 million in the year ended December 31, 2012. Also contributing to the increase are higher U.S. unit sales related to new products including lidocaine topical patch 5% ($392.9 million) and mixed amphetamine (Adderall XR CII) ($145.2 million), offset in part by lower net sales of certain U.S. products including the authorized generic version of Lipitor (atorvastatin) ($403.6 million, of which $24.3 million is due to price and $379.3 million is due to volume) and declines in other international revenues.

**1Q 2014 Form 8-K, Filed on Apr. 30, 2014 and 1Q 2014 Form 10-Q Filed on May 5, 2014:**

|  | Three Months Ended March 31, | | Three Months Ended March 31, | |
| --- | --- | --- | --- | --- |
|  | 2014 | 2013 | 2014 | 2013 |
|  | North American Generics | North American Generics | Consolidated | Consolidated |
| Net Revenue | $1,024.2 million | $956.7 million | $2,655.1 million | $1,895.5 million |

**North American Generics revenue** increased 7 percent to $1.02 billion for the first quarter 2014, driven by product launches including generic versions of Cymbalta® and Lidoderm® partially offset by generic competition of extended release products including our authorized generic version of Concerta®. North American Generics revenue consists of non-branded pharmaceutical revenue in the United States and Canada.

**2Q 2014 Form 10-Q Filed on Aug. 5, 2014:**

|  | Three Months Ended Jun. 30, | | Three Months Ended Jun. 30, | |
| --- | --- | --- | --- | --- |
|  | 2014 | 2013 | 2014 | 2013 |
|  | North American Generics | North American Generics | Consolidated | Consolidated |
| Net Revenue | $1,031.4 million | $949.8 million | $2,667.2 million | $1,989.8 million |

The increase in North American Generics revenues was primarily the result of period-over-period increases in Lidocaine topical patch 5% (generic of Lidoderm®) of $116.1 million due to the timing of the launch in 2013 and Duloxetine HCl (generic of Cymbalta®), which was not sold in the first six months of 2013, of $47.5 million, offset, in part, by a decline in Methlyphenidate ER (generic of Concerta®) of $78.1 million due primarily to decreased volume. Other movements within this category are due to product mix.

**3Q 2014 Form 10-Q Filed on Nov. 5, 2014:**

|  | Three Months Ended Sep. 30, | | Three Months Ended Sep. 30, | |
| --- | --- | --- | --- | --- |
|  | 2014 | 2013 | 2014 | 2013 |
|  | North American Generics | North American Generics | Consolidated | Consolidated |
| Net Revenue | $979.9 million | $976.1 million | $3,683.1 million | $2,013.0 million |

The movement in North American Generics revenues was primarily the result of changes in product mix.

**Form 8-K Filed on Dec. 5, 2014, superseding portions of the 2013 Form 10-K:**

| | Years Ended Dec. 31, | | Years Ended Dec. 31, | |
| | 2013 | 2012 | 2013 | 2012 |
| | North American Generics | North American Generics | Consolidated | Consolidated |
|---|---|---|---|---|
| Net Revenue | $3,915.7 million | $3,472.2 million | $8,677.6 million | $5,914.9 million |

The increase in net revenues is primarily due to the full year North American Generic and International net sales resulting from the Actavis Group Acquisition of $2,799.5 million in the year ended December 31, 2013 versus $428.3 million in the year ended December 31, 2012 as well as the Warner Chilcott Acquisition, which contributed three months of sales in 2013 compared to no sales in the prior period ($64.7 million). Also contributing to the movement are higher U.S. unit sales related to new products including lidocaine topical patch 5% ($392.9 million) and mixed amphetamine (Adderall XR® CII) ($145.2 million); offset in part by lower net sales of certain U.S. products including the authorized generic version of Lipitor® (atorvastatin) ($403.6 million, of which $24.3 million is due to price and $379.3 million is due to volume) and declines in other international revenues.

**4Q 2014 Form 8-K filed on Feb. 18, 2015:**

| | Three Months Ended Dec. 31, | | Three Months Ended Dec. 31, | |
| | 2014 | 2013 | 2014 | 2013 |
| | North American Generics | North American Generics | Consolidated | Consolidated |
|---|---|---|---|---|
| Net Revenue | $1,140 million | N.A. | $4,056.9 million | $2,779.3 million |

In our North American Generics business, strong results were driven by continued performance of our generic versions of Lidoderm® and Concerta®, and fourth quarter launches of generic versions of Intuniv™ and Celebrex®.

**2014 Form 10-K filed on Feb. 18, 2015:**

| | Years Ended Dec. 31, | | Years Ended Dec. 31, | |
| | 2014 | 2013 | 2014 | 2013 |
| | North American Generics | North American Generics | Consolidated | Consolidated |
|---|---|---|---|---|
| Net Revenue | $4,173.6 million | $3,915.7 million | $13,062.3 million | $8,677.6 million |

Within North American Generics, revenue by product moves based on the timing of launches, including an exclusivity period in certain circumstances, and the amount of generic competition in the market. An increase in competition can decrease both volume and the price received for each product. The increase in North American Generics revenues was primarily the result of changes in product mix including new product launches and competition on existing products.

**1Q 2015 Form 10-Q Filed on May 11, 2015:**

| | Three Months Ended Mar. 31, | | Three Months Ended Mar. 31, | |
| | 2015 | 2014 | 2015 | 2014 |

|  | North American Generics | North American Generics | Consolidated | Consolidated |
|---|---|---|---|---|
| Net Revenue | $1,220.2 million | $1,024.2 million | $4,234.2 million | $2,655.1 million |

Within North American Generics, revenue by product moves based on the timing of launches, including an exclusivity period in certain circumstances, and the amount of generic competition in the market. An increase in competition can decrease both volume and the price received for each product. The increase in North American Generics revenues was primarily the result of changes in product mix.

**2Q 2015 Form 10-Q Filed on Aug. 6, 2015:**

|  | Three Months Ended Jun. 30, 2015 | Three Months Ended Jun. 30, 2014 | Three Months Ended Jun. 30, 2015 | Three Months Ended Jun. 30, 2014 |
|---|---|---|---|---|
|  | U.S. Generics | U.S. Generics | Consolidated | Consolidated |
| Net Revenue | $1,077.1 million | $997.4 million | $5,730.9 million | $2,635.3 million |

Within the Global Generics segment, and in particular the United States market, revenue by product moves based on the timing of launches, including an exclusivity period in certain circumstances, and the amount of generic competition in the market. An increase in competition can decrease both volume and the price received for each product.

The increase in Global Generics revenues was primarily the result of changes in product mix within the United States and the acquisition of Legacy Allergan, offset, in part, by a decline in international revenues due in part to the impact of foreign currency exchange rates of $102.1 million.

**3Q 2015 Form 10-Q Filed on Nov. 6, 2015:**

|  | Three Months Ended Sep. 30, 2015 | Three Months Ended Sep. 30, 2014 | Three Months Ended Sep. 30, 2015 | Three Months Ended Sep. 30, 2014 |
|---|---|---|---|---|
|  | Global Generics | Global Generics | Consolidated | Consolidated |
| Net Revenue | $1,430.5 million | $1,590.1 million | $4,088.9 million | $2,150.8 million |

On July 27, 2015, the Company announced that it has entered into the Teva Transaction.

\*      \*      \*

Financial results of the global generics business are presented as "Income from discontinued operations" on the Consolidated Statements of Operations for the three and nine months ended September 30, 2015 and 2014 . . . .

**2015 Form 10-K Filed on Feb. 26, 2016:**

|  | Years Ended Dec. 31, 2015 | Years Ended Dec. 31, 2014 | Years Ended Dec. 31, 2015 | Years Ended Dec. 31, 2014 |
|---|---|---|---|---|
|  | Global Generics | Global Generics | Consolidated | Consolidated |
| Net Revenue | $6,375.3 million | $6,578.8 million | $15,071.0 million | $ 6,738.9 million |

The results of our global generics business operations are dependent on the timing of product launches and competition within the generics market, primarily in the United States. The increase in operating income is the result of continued cost savings

initiatives as well as the cessation of depreciation and amortization for assets being divested to Teva once they met the definition of held for sale on July 27, 2015. Offsetting these amounts, is an increase in divestiture related expenses in the year ended December 31, 2015 of $97.2 million.

**1Q 2016 Form 10-Q Filed on May 10, 2016:**

|  | Three Months Ended Mar. 31, | | Three Months Ended Mar. 31, | |
|---|---|---|---|---|
|  | 2016 | 2015 | 2016 | 2015 |
|  | Global Generics | Global Generics | Consolidated | Consolidated |
| Net Revenue | $1,296.6 million | $1,741.1 million | $3,795.9 million | $2,562.6 million |

504.    The financial results set forth in ¶503 above were materially false and misleading because: (i) Allergan's generics unit and several of its pharmaceutical industry peers colluded to fix generic drug prices; (ii) the foregoing conduct constituted anticompetitive conduct; and (iii) consequently, Allergan's revenues during the Relevant Period were in part the result of anticompetitive conduct. None of these facts were disclosed in connection with defendants' issuance of Allergan's financial results and, consequently, defendants concealed the true source of Allergan's revenues.  By electing to speak publicly about Allergan's financial results, including revenues from its generic drug business, and thereby putting the financial results into play in SEC filings, defendants had a duty to fully, completely and truthfully disclose all material facts regarding such financial results so as to not mislead investors.  As a result of the foregoing, defendants' public statements regarding Allergan's financial results were materially false and misleading at all relevant times.

### 4.    False Certifications

505.    Each of Allergan's Forms 10-Q filed with the SEC during the Relevant Period contained the following SOX certification:

The undersigned officer of [Allergan] (the "Compan[y]"), hereby certifies, to such officer's knowledge, that:

(i)      the Quarterly Report on Form 10-Q of the Compan[y] for the quarter ended [DATE OF QUARTER END] (the "Report") fully complies with the requirements of Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934, as amended; and

(ii)      the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Compan[y].

506.   This certification was signed by: Bisaro for the Company's 3Q 2013 and 1Q 2014 Forms 10-Q; Saunders for the Company's 2Q 2014, 3Q 2014, 1Q 2015, 2Q 2015, 3Q 2015 and 1Q 2016 Forms 10-Q, as well as the Company's August 8, 2016 Form 10-Q ("2Q 2016 Form 10-Q") and its November 4, 2016 Form 10-Q ("3Q 2016 Form 10-Q"); Joyce for the Company's 3Q 2013, 1Q 2014, 2Q 2014 and 3Q 2014 Forms 10-Q; and Hilado for the Company's 1Q 2015, 2Q 2015, 3Q 2015, 1Q 2016, 2Q 2016, and 3Q 2016 Forms 10-Q.

507.   The certifications referenced in ¶¶505-506 above were materially false and misleading when made because defendants' quarterly and annual reports did not "fairly present[], in all material respects, the financial condition and results of operations of the Compan[y]."  In reality, the filings contained materially false and/or misleading statements and/or failed to disclose material facts about the Company's financial condition and operations.  Specifically, these filings contained materially false and/or misleading statements which had the effect of concealing, and/or failed to disclose, that: (i) Allergan's generics unit and several of its pharmaceutical industry

peers colluded to fix generic drug prices; (ii) the foregoing conduct constituted illegal anticompetitive conduct; and (iii) consequently, Allergan's revenues during the Relevant Period were in part the result of anticompetitive conduct. As a result of the foregoing, defendants' public statements were materially false and misleading at all relevant times.

508.  Each of Allergan's Forms 10-K filed with the SEC during the Relevant Period contained the following SOX certification:

> The undersigned officer of [Allergan] . . . (the "Compan[y]"), hereby certifies, to such officer's knowledge, that:
>
> (i)      the Annual Report on Form 10-K of the Compan[y] for the year ended December 31, [year] (the "Report") fully complies with the requirements of Section 13(a) or Section 15(d), as applicable, of the Securities  Exchange Act of 1934, as amended; and
>
> (ii)      the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Compan[y].

509.  This certification was signed by: Bisaro for the Company's 2013 Form 10-K; Saunders for the Company's 2014 and 2015 Forms 10-K; Joyce for the Company's 2013 Form 10-K; and Hilado for the Company's 2014 and 2015 Forms 10-K.

510.  Each of Allergan's Forms 10-Q filed with the SEC during the Relevant Period also contained the following certification pursuant to Rule 13a-14(a):

I, [EXECUTIVE NAME AND TITLE], certify that:

1.      I have reviewed this quarterly report on Form 10-Q of [Allergan];

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

511.    This certification was signed by: Bisaro for the Company's 3Q 2013 and 1Q 2014 Forms 10-Q; Saunders for the Company's 2Q 2014, 3Q 2014, 1Q 2015, 2Q 2015, 3Q 2015, 1Q 2016, 2Q 2016 and 3Q 2016 Forms 10-Q; Joyce for the Company's 3Q 2013, 1Q 2014, 2Q 2014 and 3Q 2014 Forms 10-Q; and Hilado for the Company's 1Q 2015, 2Q 2015, 3Q 2015, 1Q 2016, 2Q 2016 and 3Q 2016 Forms 10-Q.

512.    Each of Allergan's Forms 10-K filed with the SEC during the Relevant Period also contained the following certification pursuant to Rule 13a-14(a):

I, [EXECUTIVE NAME AND TITLE], certify that:

1.      I have reviewed this annual report on Form 10-K of [Allergan];

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

513.   This certification was signed by: Bisaro for the Company's 2013 Form 10-K; Saunders for the Company's 2014 and 2015 Forms 10-K; Joyce for the Company's 2013 Form 10-K; and Hilado for the Company's 2014 and 2015 Forms 10-K.

514.   The certifications referenced in ¶¶508-513 above were materially false and misleading when made because – at the time of the certification – defendants knew that Allergan's quarterly and annual reports contained untrue statements of material fact and/or omissions of material fact necessary to make the statements made not misleading.  Defendants also knew that the quarterly and annual reports did not "fairly present in all material respects the financial condition, results of operations and cash flows" of the Company.  Specifically, the signatories knew the Company's quarterly and annual reports contained materially false and/or misleading statements, which had the effect of concealing, and/or failed to disclose, that: (i) Allergan's generics unit and several of its pharmaceutical industry peers colluded to fix generic drug prices; (ii) the foregoing conduct constituted illegal anticompetitive conduct; and (iii) consequently, Allergan's revenues during the Relevant Period were in part the result of anticompetitive conduct.  As a result of the foregoing, defendants' public statements were materially false and misleading at all relevant times.

### 5. Code of Conduct

515. Throughout the Relevant Period, Allergan's Forms 10-K represented that the Company had "adopted a Code of Conduct that applies to our employees, including our principal executive officer, principal financial officer and principal accounting officer." The version of the referenced Code of Conduct, effective as of August 2014, stated: "No employee may discuss with, or provide information to, any competitor about pricing or related matters, whether the information concerns the Company or Actavis' suppliers, distributors, wholesalers or customers." The Company's Code of Conduct also provided "[e]xamples of conduct that violates Actavis policy," including "[a]greements or understandings with competitors on price." This policy further explained: "An 'agreement' or 'understanding' need not be in writing for it to be unlawful. It can be oral or inferred from the conduct of the parties . . . ."

516. The statements referenced in ¶515 above were materially false and misleading and/or omitted material facts because Allergan and its representatives did not comply with the Company's stated Code of Conduct, given the anticompetitive and collusive conduct alleged herein, and failed to disclose that: (i) Allergan's generics unit and several of its pharmaceutical industry peers colluded to fix generic drug prices; (ii) the foregoing conduct constituted anticompetitive conduct; and (iii) consequently, Allergan's revenues during the Relevant Period were in part the

result of anticompetitive conduct.  Having elected to speak publicly about the Company's adoption of the Code of Conduct which expressly prohibits price collusion, defendants had a duty to fully, completely and truthfully disclose all material facts regarding violations of that Code of Conduct, including the anticompetitive conduct alleged herein.  As a result of the foregoing, defendants' public statements were materially false and misleading at all relevant times.

## F.    Loss Causation

517.    On August 6, 2015, Allergan revealed to shareholders in its Q2 2015 Form 10-Q that it had "received a subpoena from the [DOJ] seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."

518.    On the same day, in an article entitled "Allergan Brought into Widening U.S. Probe of Generic Drug Prices," *Bloomberg* reported that Allergan had received a subpoena from the DOJ "seeking information on the marketing and prices of its generic drugs," thus "becoming the biggest company yet to draw scrutiny in the government's widening antitrust probe of the industry."  The article further revealed that the Company first received the subpoena on June 25, 2015, and that the subpoena "sought information about communications with competitors regarding the products." Furthermore, the article named Impax, Lannett, Endo International Plc, and Par

Pharmaceutical Holdings as having made "similar disclosures" in the past several months.

519.   Other media outlets reported on the DOJ investigation into Allergan as well. In an August 6, 2015 article, *The Wall Street Journal*, reported: "Allergan noted that its Actavis business had received a subpoena in June from the Justice Department seeking information relating to the marketing and pricing of certain generic products and the company's communications with competitors about such products."  An *MTNewswires* article published the same day noted Allergan's acknowledgement of the June 25, 2015 subpoena in the Company's SEC filing and also referenced Lannett and Impax as among Allergan's competitors who had made similar disclosures regarding the receipt of subpoenas.

520.   In response to this news, Allergan's common share price fell $17.17 per share, or approximately 5%, from its previous closing price to close at $319.47 per share on August 6, 2015, and its preferred share price fell $39.24 per share, or approximately 3.5%, from its previous closing price to close at $1,084.00 per share on August 6, 2015.

521.   Several articles published on August 7, 2015, including articles from *TheStreet.com*, *Herald Democrat* and *The Buffalo News*, also discussed Allergan's receipt of the DOJ subpoena.  In addition, on August 19, 2015, *Generic Line* cited Jeffrey Loo, an S&P Capital IQ analyst, who described the market's cause for

concern: "the request for information about competitors suggests DOJ is looking into whether drugmakers colluded to raise generic prices."

522.   Allergan's stock price remained inflated, however, because defendants continued to conceal the existence and full impact of defendants' price-fixing.

523.   On November 3, 2016, media outlets reported that U.S. prosecutors might file criminal charges against Allergan and several other pharmaceutical companies for unlawfully colluding to fix generic drug prices.  In an article titled "U.S. Charges in Generic-Drug Probe to Be Filed by Year-End," *Bloomberg* reported, in relevant part:

> U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion, a fresh challenge for an industry that's already reeling from public outrage over the spiraling costs of some medicines.

> The antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter.  The grand jury probe is examining whether some executives agreed with one another to raise prices, and the first charges could emerge by the end of the year, they said.

> Though individual companies have made various disclosures about the inquiry, they have identified only a handful of drugs under scrutiny, including a heart treatment and an antibiotic.  Among the drugmakers to have received subpoenas are industry giants Mylan NV and Teva Pharmaceutical Industries Ltd.  ***Other companies include Actavis, which Teva bought from Allergan plc in August***, Lannett Co., Impax Laboratories Inc., Covis Pharma Holdings Sarl, Sun Pharmaceutical Industries Ltd., Mayne Pharma Group Ltd., Endo International Plc's subsidiary Par Pharmaceutical Holdings and Taro Pharmaceutical Industries Ltd.

> All of the companies have said they are cooperating except Covis, which said last year it was unable to assess the outcome of the investigation.

- 245 -

524.   On this news, Allergan's common share price fell $9.07 per share, or approximately 4.6%, to close at $188.82 per share on November 3, 2016, and its preferred share price fell $30.03 per share, or approximately 4%, to close at $708.45 per share on November 3, 2016.

525.   Defendants' conduct, as alleged herein, directly and proximately caused Plaintiff's damages.  The disclosures of previously misrepresented and concealed material facts about Allergan's involvement in anticompetitive price collusion caused the price of Allergan's securities to decline markedly, wiping out billions of dollars in shareholder wealth.

526.   It was entirely foreseeable that concealing from the public the Company's involvement in an illegal anticompetitive price-fixing scheme, which, among other things, vastly inflated the revenues from its generic drugs business and misled investors about the source and sustainability of Allergan's profits, would artificially inflate the prices of Allergan's securities.  It was also foreseeable that the disclosure of this information, and the materialization of concealed risks associated with Allergan's misconduct, would cause the prices of Allergan securities to decline, as the inflation caused by Allergan's earlier misrepresentations and omissions was removed from the prices.  Accordingly, the conduct of defendants, as alleged herein, proximately caused foreseeable losses for Plaintiff, which purchased Allergan securities during the Relevant Period.

### G.     Summary of Scienter Allegations

527.    Allergan and the Individual Defendants were active and culpable participants in the fraud, as evidenced by their knowing or reckless issuance and/or control over Allergan's and the Individual Defendants' materially false and misleading statements and omissions.  Allergan and the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements set forth in §III.E. above were materially false and misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws.  Allergan's and the Individual Defendants' scienter is evidenced by the following facts, among others:

528.    *First*, there were no material increases in demand or production costs or reported supply shortages for Allergan's generic drugs that would justify or otherwise explain the dramatic and concerted price increases for these drugs and Allergan's competitors' generic drugs during the Relevant Period.   The more compelling explanation for these price increases is price collusion between Allergan and its competitors, as evidenced by: (i) the sudden and astronomical nature of the increases; (ii) the fact that the increases occurred in concert with the Company's competitors; and (iii) the fact that the  increases typically occurred within weeks of the industry conferences or events attended by Allergan executives, including those directly responsible for setting prices at the Company.  Moreover, as the graphs above depict,

the drug prices never decreased following the initial price increases to their pre-increase equilibrium price points as one would expect if the sudden price increases reflected temporary supply shortages, cost increases, or other benign market explanations.

529.   **Second**, price increases of the magnitude alleged herein would have been contrary to Allergan's economic interest absent an agreement to fix prices.  Without the certainty that all of the Co-Conspirators would raise and maintain the prices for their generic drugs, each Co-Conspirator risked getting undercut by the others, leading to a loss of market share and revenue.   This risk was alleviated by the Co-Conspirators' agreement to raise and maintain their prices.

530.   **Third**, Allergan and the Individual Defendants had a palpable motive to fix prices with Allergan's competitors, which derives from the nature of the U.S. generic drug market itself.  As discussed above, because federal law requires each generic pharmaceutical to be readily substitutable for another generic of the same brand drug, competition will cause prices to fall until they near generic drugmakers' marginal production costs.  This is confirmed by the graphs of the price movements herein, which show that prior to the alleged price collusion among Allergan and the Co-Conspirators, the prices of Propranolol, Ursodiol, Doxycycline, Tretinoin and Desonide had stabilized.  This stabilization of prices in turn caused Allergan's profits

to level off, thus giving Allergan and its Co-Conspirators a common motive to conspire to raise prices.

531. **Fourth**, Allergan and the Individual Defendants had substantial opportunities at industry conferences and events to collude on prices. As confirmed by CW1 and CW2, the Allergan representatives who attended the conferences (including Boyer, Falkin, Clark and Rogerson) were in charge of setting prices for the Company's generic drugs. Moreover, given the frequency and regularity of these conferences – as well as the fact that several of the attendees for Allergan and its competitors were "repeat attendees" at the conferences and, in some cases, served together on industry boards – there is a strong inference that the various participants in the alleged price-fixing schemes were well acquainted with each other, bolstering the likelihood that these participants entrusted each other to engage in, and jointly conceal, the illicit price fixing.

532. Indeed, the StateAGs allege that Allergan earned its highest quality co-conspirator ranking from Teva due to Allergan executives' "strong relationship" with Teva's Nisha Patel, David Rekenthaler, and Maureen Cavanaugh. May 2019 AG Complaint, ¶¶585, 588. Falkin's relationship with Teva's Rekenthaler began as soon as he joined Allergan in August 2013, and the two executives communicated more than 430 times from August 2013 until Rekenthaler resigned from Teva in April 2015. *Id.*, ¶587; §III.D.3.h. Falkin and Teva's Cavanaugh also had a "strong relationship"

and communicated with "great frequency" – at least 410 times from August 2013 to May 2016.  *Id.*, ¶588; §III.D.3.h.  Falkin also communicated with Teva's Christine Baeder constantly – logging in almost 200 calls and text messages during the one-year period between July 2015 and July 2016.  §III.D.3.h.  Similar to Falkin, Boyer was also close to Teva's Cavanaugh and the two executives communicated at least 113 times between August 2015 and July 2016.  *Id.*  Boyer's relationship with Teva's Patel started soon after she joined Teva in April 2013, but Rogerson was closest with Patel as she called him "at or around every significant price increase taken by the respective companies."   May 2019 AG Complaint, ¶586.   As such, Rogerson and Patel communicated at least 157 times from May 2013 to November 2015.  §III.D.3.h.  In addition, Allergan's Allan Slavsky had a long-standing relationship with Teva's Rekenthaler, marked by frequent communications.  May 2019 AG Complaint, ¶585.

533.   Besides communicating with Teva, Falkin, Rogerson, Boyer, Giannone, and other Allergan senior executives liaised extensively with other Co-Conspirators.  §III.D.3.h.  Examples include:

- Zydus:  Falkin and Rogerson reached out to Kristy Ronco, Jodi Weber, and Michael Keenley of Zydus over 550 times between August 2013 and April 2016.

- Taro:  Falkin, Rogerson, Boyer, Dorsey, and other Allergan executives all communicated with Taro's Ara Aprahamian over 110 times between March 2013 and September 2016.

- Lupin:  Falkin and Giannone contacted Lupin's David Berthold at least 350 times between March 2011 and December 2017.

- <u>Aurobindo</u>:  Falkin and Perfetto reached out to Robert Cunard and Jim Grauso of Aurobindo close to 140 times between December 2011 and March 2015.

- <u>Mylan</u>:  Falkin called and texted Mylan's Jim Nesta at least 78 times between December 2013 and August 2015.

- <u>Lannett</u>:  Falkin contacted Lannett's Kevin Smith over 180 times between August 2013 to September 2015.

- <u>Par</u>:  Falkin reached out to Par's Jon Holden 48 times between September 2013 to August 2015.

- <u>Dr. Reddy's</u>:  Rogerson communicated at least 43 times with Nimish Muzumdar while he was at Dr. Reddy's and Sandoz during October 2013 to March 2018.

In addition to the communications above, Falkin, Boyer, and Rogerson also frequently exchanged calls and text messages with Glenmark, Greenstone, Apotex, and Wockhardt. *Id.*

534.   The level of familiarity between Allergan and the Co-Conspirators is further demonstrated by the flux of executives from one company to another.  For example, in early 2014, G. Frederick Wilkinson, the President of Actavis Global R&D, left the Company to become the CEO of Co-Conspirator Impax.   In commenting on Wilkinson's departure, defendant Bisaro noted during an April 30, 2014 conference call, "it is always good to have a friend in a competitor."  Shortly thereafter, defendant Olafsson left Allergan to become the President and CEO of Teva's Global Generic Medicines Group. In discussing Olafsson's departure for Teva, defendant Saunders stated on June 11, 2014, "it's nice to have a disciplined

competitor at a big company."  In addition, Boothe, CEO of Actavis between August 2008 and December 2012, left the Company in 2013 and became the Executive Vice President and General Manager of Co-Conspirator Perrigo's Pharmaceutical business.  In July 2016, Co-Conspirator Impax named Boothe as the President of its Generics Division.

535.  **Fifth**, as described above (at §III.D.), the historic rise in generic drug prices immediately before and during the Relevant Period was well publicized.  These price increases led Congress to commence an industry-wide investigation beginning in 2014.  On October 2, 2014, defendant Saunders received a letter from U.S. Senator Bernie Sanders and U.S. Representative Elijah Cummings putting Allergan on notice of an investigation and requesting pricing data and other information regarding the Company's generics business.  This Congressional investigation, the subsequent DOJ subpoena to the Company, and the widespread publicity surrounding the price hikes that spawned these investigations, gave rise to a duty to investigate the existence of price collusion and a duty to monitor changes in the Company's generic drug pricing.  These duties to investigate and monitor fell upon the Individual Defendants as the Company's senior-most executives who were responsible for signing and attesting to the accuracy of the Company's filings with the SEC and addressing market analysts and the investing public during earnings calls. Even without the Congressional – and later, DOJ – investigations, the Individual Defendants' duties to investigate and

monitor were triggered by the Company's Code of Conduct, which expressly prohibited price fixing and other anticompetitive conduct. At a minimum, Allergan's and the Individual Defendants' false and misleading statements were recklessly made, in dereliction of their duty to investigate perceived anticompetitive behavior and their duty to monitor changes in the pricing of the Company's core products.

536. **Sixth**, Allergan's production of generic drugs was the Company's core operation during the Relevant Period. As discussed and demonstrated in the charts above, generic drug sales accounted for a substantial portion of Allergan's revenues and operations during the Relevant Period. In 2013 and 2014, Allergan's revenues from North American Generics accounted for 45% and 32% of the Company's total revenues, respectively. In 2015, the percentage of the Company's revenues from its global generics business was 42%. Further, analysts covering Allergan during the Relevant Period, including JP Morgan and Piper Jaffray, identified "greater-than-expected price erosion/competition for the company's core US generics business" and "pricing pressure for key generics products" as among the risks to achieving the analysts' stated price targets, suggesting that the market considered Allergan's generics business to be a primary determinant of the Company's bottom line. It is implausible that the Individual Defendants, who were the Company's senior-most executives, were unaware of the historically colossal price increases and the reasons for these increases. The Individual Defendants had access to information concerning

these price increases, including the Company's pricing models described above. At a minimum, the Individual Defendants were reckless in falsely telling investors that the market for Allergan's generic drugs was truly competitive without confirming the absence of price collusion, and reckless in certifying the accuracy of the Company's substantial Relevant Period revenues without confirming the true reason for these revenues (*i.e.*, price collusion).

537. **Seventh**, the fact that the DOJ has intervened in at least six civil antitrust actions against Allergan after subpoenaing and receiving documents from the Company strongly suggests that federal prosecutors have determined that there is evidence of a criminal conspiracy to fix prices in an anticompetitive manner. At least two former executives of Allergan's co-conspirator, Heritage, have pled guilty to price-fixing charges in connection with one of the drugs (Doxycycline) also sold by Allergan during the Relevant Period. The Amended AG Complaint describes in detail substantial and particularized evidence of Allergan's collusive activities.

538. **Eighth**, during the Relevant Period, the Individual Defendants, the Audit and Compliance Committee, the General Counsel, and the Global Chief Compliance Officer of Allergan met frequently to review the Company's actual and potential violations of laws and regulations. Allergan's Audit and Compliance Committee charter required that the committee "obtain from the Global Chief Compliance Officer, the General Counsel, and/or when necessary, the head of internal audit, no

less frequently than quarterly, reports on the Company's Global Compliance Program, including confirmation that the Company and its affiliated entities are in conformity with applicable legal requirements and the Company's Code of Conduct." Specifically, the committee must meet with "the General Counsel, the Global Chief Compliance Officer and other appropriate legal staff of the Company and, if appropriate, the Company's outside counsel, to review any legal matters that may have a material impact on the Company's financial statements or the Company's compliance policies." In addition, at least annually, the committee must "review with management, including the General Counsel and the Global Chief Compliance Officer, the implementation and effectiveness of the Company's Global Compliance Program." Allergan's Global Compliance Program mandates that "[a]ll colleagues, officers and directors of the Company shall respect and comply with all applicable federal, state, local, and foreign laws and regulations."

539.   The Individual Defendants' scienter is further evidenced by the following facts:

540.   **Bisaro** served as Allergan's CEO and President from before the start of the Relevant Period through July 2014 and signed the Registration Statements and SOX certifications and Rule 13a-14(a) certifications for the Company's 3Q 2013 and 1Q 2014 Forms 10-Q and 2013 Form 10-K.  Bisaro was a signatory of: (i) the SOX certification representing that "the information contained in the [SEC filings] fairly

presents, in all material respects, the financial condition and results of operations of [Allergan]"; and (ii) the Rule 13a-14(a) certification representing that the Company's SEC filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading." In addition, as an executive officer of the registrant, Bisaro met regularly with the audit committee and General Counsel concerning Allergan's actual and potential violations of laws and regulations. Bisaro had a duty to monitor any conduct that threatened to undermine the veracity of these filings, including the illegal anticompetitive conduct alleged herein. Furthermore, Bisaro, as Allergan's CEO, had access to pricing data for the Company's generic drugs. Notwithstanding the certifications signed by Bisaro and his access to pricing data, Bisaro knowingly or recklessly failed to disclose the illegal price-fixing scheme and misrepresented the Company's compliance with laws and regulations.

541. Bisaro also made a materially false and misleading statement during a Company earnings call on May 11, 2015 in response to a question specifically regarding "generic drug pricing given that there have been concerns that it may not be as favorable going forward," demonstrating that he was in a position to know all material facts regarding the Company's generic drug pricing. Even in the face of this direct question, Bisaro never disclosed the price-fixing scheme, opting instead to project a false picture of a highly competitive generic pharmaceutical market.

542.   Among other industry events, Bisaro attended the NACDS 2013 Annual Meeting that was also attended by representatives from a number of the Co-Conspirators.  This meeting accompanied the dramatic and historic increase in the price of doxycycline hyclate manufactured by Allergan and certain of the Co-Conspirators, as well as Allergan's entrance into the market for generic Desonide at inflated prices.

543.   Bisaro sold 40,921 shares of Allergan stock, amounting to 8% of his holdings, for proceeds of almost $6.5 million on November 11, 2013.

544.   *Saunders* served as Allergan's CEO from July 2014 through the end of the Relevant Period and signed the Registration Statements and SOX certifications and Rule 13a-14(a) certifications for the Company's 2Q 2014, 3Q 2014, 1Q 2015, 2Q 2015, 3Q 2015, 1Q 2016, 2Q 2016 and 3Q 2016 Forms 10-Q and 2014 and 2015 Forms 10-K.  Saunders was a signatory of: (i) the SOX certification representing that "the information contained in the [SEC filings] fairly presents, in all material respects, the financial condition and results of operations of [Allergan]"; and (ii) the Rule 13a-14(a) certification representing that the Company's SEC filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading."  In addition, as an executive officer of the registrant, Saunders met regularly with the audit committee and General Counsel concerning Allergan's actual and potential violations of laws and regulations.

Saunders had a duty to monitor any conduct that threatened to undermine the veracity of these filings, including the illegal anticompetitive conduct alleged herein. Furthermore, Saunders, as Allergan's CEO, had access to pricing data for the Company's generic drugs. Notwithstanding the certifications signed by Saunders and his access to pricing data, Saunders knowingly or recklessly failed to disclose the price-fixing scheme and misrepresented the Company's compliance with laws and regulations.

545.   Saunders also made false and misleading statements on the Company's earnings calls on August 5, 2014 and May 11, 2015 and during an interview with Jim Cramer on August 7, 2015 – in response to questions specifically inquiring about the "US generic pricing outlook for 2014 and 2015," "aggressive pricing increases" and the DOJ's subpoena – demonstrating that he was in a position to know all material facts regarding the Company's generic drug pricing. Even in the face of these direct questions, Saunders never disclosed the price-fixing scheme, opting instead to project a false picture of a highly competitive generic pharmaceutical market.

546.   *Joyce* served as Allergan's CFO from before the start of the Relevant Period through December 2014 and signed SOX certifications and Rule 13a-14(a) certifications for the Company's 3Q 2013, 1Q 2014, 2Q 2014 and 3Q 2014 Forms 10-Q and 2013 Form 10-K. Joyce was a signatory of: (i) the SOX certification representing that "the information contained in the [SEC filings] fairly presents, in all

material respects, the financial condition and results of operations of [Allergan]"; and (ii) the Rule 13a-14(a) certification representing that the Company's SEC filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading."  In addition, as an executive officer of the registrant, Joyce met regularly with the audit committee and General Counsel concerning Allergan's actual and potential violations of laws and regulations.  Joyce had a duty to monitor any conduct that threatened to undermine the veracity of these filings, including the illegal anticompetitive conduct alleged herein. Furthermore, Joyce, as Allergan's CFO, had access to pricing data for the Company's generic drugs.  Notwithstanding the certifications signed by Joyce and his access to pricing data, Joyce knowingly or recklessly failed to disclose the price-fixing scheme and misrepresented the Company's compliance with laws and regulations.  Joyce also signed Allergan's 3Q 2013, 4Q 2013, 1Q 2014, 2Q 2014 and 3Q 2014 Forms 8-K and the December 5, 2014 Form 8-K, each of which contained material misstatements.

547.   Joyce sold 15,000 shares of Allergan stock on November 5, 2013, 7,500 shares on November 6, 2013, and 14,600 shares on December 6, 2013, amounting to more than 48% of his total holdings, for proceeds of almost $6 million.

548.   *Hilado* served as Allergan's CFO from December 2014 through the end of the Relevant Period and signed the Registration Statements and SOX certifications and Rule 13a-14(a) certifications for the Company's 1Q 2015, 2Q 2015, 3Q 2015, 1Q

2016, 2Q 2016 and 3Q 2016 Forms 10-Q and 2014 and 2015 Forms 10-K.  Hilado was a signatory of: (i) the SOX certification representing that "the information contained in the [SEC filings] fairly presents, in all material respects, the financial condition and results of operations of [Allergan]"; and (ii) the Rule 13a-14(a) certification representing that the Company's SEC filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading."  In addition, as an executive officer of the registrant, Hilado met regularly with the audit committee and General Counsel concerning Allergan's actual and potential violations of laws and regulations.  Hilado had a duty to monitor any conduct that threatened to undermine the veracity of these filings, including the illegal anticompetitive conduct alleged herein.  Furthermore, Hilado, as Allergan's CFO, had access to pricing data for the Company's generic drugs.  Notwithstanding the certifications signed by Hilado and her access to pricing data, Hilado knowingly or recklessly failed to disclose the price-fixing scheme and misrepresented the Company's compliance with laws and regulations.  Hilado also signed Allergan's 4Q 2014, 1Q 2015, 2Q 2015, 3Q 2015 and 4Q 2015 Forms 8-K and the March 2, 2015 Form 8-K underwriting agreements relating to the Ordinary/Preferred Shares Offerings, each of which contained material misstatements.

549.  ***Olafsson*** served as a director of Allergan and the President of Actavis Pharma, the Allergan segment that included the Company's generics business, from

April 2012 to June 2014.  As the highest-ranking officer of Actavis Pharma, Olafsson had access to pricing data for the Company's generic drugs.  Olafsson knowingly or recklessly made a materially false and misleading statement regarding generic pricing during an October 29, 2013 Company earnings call and also signed the Company's 2013 Form 10-K.  He also knowingly or recklessly failed to disclose the price-fixing scheme.

550.    Among other industry events, Olafsson attended the GPhA 2013 Annual Meeting in Orlando, Florida that was also attended by representatives from a number of the Co-Conspirators.  This meeting preceded a dramatic and historic increase in the price of doxycycline hyclate manufactured by Allergan and certain of the Co-Conspirators.

551.    Olafsson sold 25,000 shares of Allergan stock on November 11, 2013, amounting to more than 25% of his total holdings, for proceeds of almost $4 million.

552.    **Buchen** served as the Executive Vice President, Commercial, North American Generics and International from July 2014 to March 21, 2015. Buchen knowingly or recklessly made a false and misleading statement during the Company's August 5, 2014 earnings call in response to questions from analysts specifically inquiring about the "US generic pricing outlook for 2014 and 2015" and "aggressive pricing increases," demonstrating that he was in a position to know all material facts regarding the Company's generic drug pricing.  Even in the face of these direct

questions, Buchen never disclosed the price-fixing scheme, opting instead to project a false picture of a highly competitive generic pharmaceutical market.

553.   Buchen sold 30,000 shares of Allergan stock on November 11, 2013, amounting to more than 33% of his total holdings, for proceeds of almost $4.8 million.

554.   **Bailey** has served as Allergan's Executive Vice President, Chief Legal Officer, and Secretary since July 2014, and signed the Registration Statements and the March 2, 2015 Form 8-K containing underwriting agreements relating to the Ordinary/ Preferred Shares Offerings.  As an executive officer and General Counsel, he met regularly with the audit committee and management concerning Allergan's actual and potential violations of laws and regulations.  Despite his responsibility for overseeing Allergan's legal department, Bailey repeatedly stated without qualification that the Company complied with laws and regulations.  Bailey knowingly and recklessly failed to disclose the illegal price-fixing scheme and misrepresented the Company's compliance with laws and regulations.

**H.    No Safe Harbor**

555.   Allergan's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements issued during the Relevant Period were ineffective to shield those statements from liability.

556.   The defendants are also liable for any false or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Allergan who knew that the forward-looking statement was false.

## I.   Applicability of the Presumption of Reliance: Fraud on the Market

557.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Relevant Period;

- the omissions and misrepresentations were material;

- Allergan securities are traded in an efficient market and were liquid and traded with moderate to heavy volume during the Relevant Period;

- the Company's common stock was traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff purchased, acquired and/or sold Allergan securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

558.   Based upon the foregoing, Plaintiff is entitled to a presumption of reliance upon the integrity of the market.

559. Alternatively, Plaintiff is entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), as defendants omitted material information in their Relevant Period statements in violation of a duty to disclose such information, as detailed above.

## IV.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Allergan, Bisaro, Saunders, Joyce, Hilado, Olafsson, Buchen and Bailey**

560. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

561. This Count is asserted pursuant to §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, against Allergan and the Individual Defendants.

562. As alleged herein, throughout the Relevant Period, Allergan and the Individual Defendants, individually and in concert, directly and indirectly, by use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made materially untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading and carried out a plan, scheme and course of conduct, in violation of §10(b) of the Exchange Act and Rule 10b-5  promulgated thereunder.  Allergan and the Individual Defendants intended to and did, as alleged herein: (i) deceive the

investing public, including Plaintiff; (ii) artificially inflate and maintain the prices of Allergan's common and preferred stock; and (iii) cause Plaintiff to acquire the Company's common stock at artificially inflated prices.

563.   The Individual Defendants were individually and collectively responsible for making the materially false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Plaintiff by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements made therein not misleading.

564.   As set forth above, Allergan and the Individual Defendants made the materially false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiff, which acquired the Company's common stock during the Relevant Period.

565.   In ignorance of the materially false and misleading nature of Allergan's and the Individual Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for Allergan's common and preferred stock, Plaintiff acquired the Company's common stock at artificially inflated prices during the Relevant Period.  But for the fraud, Plaintiff

would not have acquired the Company's common stock at such artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the price of Allergan's common and preferred stock declined precipitously, and Plaintiff was harmed and damaged as a direct and proximate result of its acquisition of the Company's common stock at artificially inflated prices and the subsequent decline in the prices of the stock when the truth was disclosed.

566.   By virtue of the foregoing, Allergan and the Individual Defendants are liable to Plaintiff for violations of §10(b) of the Exchange Act and Rule 10b-5.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against Bisaro, Saunders, Joyce, Hilado, Olafsson, Buchen and Bailey

567.   Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

568.   This Count is asserted pursuant to §20(a) of the Exchange Act against each of the Individual Defendants.

569.   As alleged above, the Company violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making materially false and misleading statements and omissions in connection with the purchase or sale of its common and preferred stock and by participating in a fraudulent scheme and course of business or conduct throughout the Relevant Period.  This fraudulent conduct was undertaken with scienter and Allergan is charged with the knowledge and scienter of each of the

Individual Defendants who knew of or acted with deliberate reckless disregard of the falsity of the Company's statements and the fraudulent nature of its scheme during the Relevant Period.

570.   As set forth above, the Individual Defendants were controlling persons of the Company during the Relevant Period, due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations, including their power to control or influence the policies and practices giving rise to the securities violations alleged herein, and exercised the same.

571.   By virtue of the foregoing, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making  of the Company, including the content of its public statements with respect to its operations, corporate governance and compliance with regulators.

572.   The Individual Defendants were culpable participants in Allergan's fraud alleged herein by acting acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Plaintiff, which acquired the Company's common stock during the Relevant Period.

573.   By reason of the foregoing, the Individual Defendants are liable to Plaintiff as controlling persons of the Company in violation of §20(a) of the Exchange Act.

## COUNT III

**For Violations of §14(a) of the Exchange Act and Rule 14a-9 Promulgated
Thereunder Against Allergan, Saunders, Bisaro,
Olafsson, Bloem, Bodine, Howson, King, Klema, Michal,
Michelson, O'Sullivan, Taylor, Turner and Weiss**

574.   This Count is asserted pursuant to §14(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder, in connection with the Forest Merger.  This claim is asserted against Allergan, Saunders and the 2014 Board of Directors.

575.   Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

576.   The May 6, 2014 Proxy and the documents attached to the May 6, 2014 Proxy or incorporated by reference therein misrepresented material facts or omitted material facts required to be stated to make the statements contained in those documents not misleading.

577.   The defendants named in this Count failed to update the May 6, 2014 Proxy when material information arose between the dissemination of the document or related statements and the June 17, 2014 shareholder vote.

578.   The defendants named in this Count, jointly and severally, solicited and permitted the use of their names in solicitations contained in the May 6, 2014 Proxy.

579.   Allergan was an issuer of the May 6, 2014 Proxy.  Allergan also permitted the use of its name in the May 6, 2014 Proxy by allowing the document to represent, among other things, its operating results and financial condition.

580.    Defendants Bisaro and Saunders signed the cover letters for the May 6, 2014 Proxy and permitted the use of their names in connection with the May 6, 2014 Proxy.

581.    Defendant Buchen signed the Notice of the Extraordinary General Meeting of Shareholders to be held on June 17, 2014, and permitted the use of his name in connection with the May 6, 2014 Proxy.

582.    Defendants Bloem, Bodine, Howson, King, Klema, Michal, Michelson, O'Sullivan, Taylor, Turner and Weiss permitted the use of their names in connection with the May 6, 2014 Proxy by, among other things, allowing the May 6, 2014 Proxy to represent that they recommended a vote to approve the Forest Merger.

583.    By means of the May 6, 2014 Proxy and the documents attached to or incorporated by reference therein, the defendants named in this Count sought to secure the approval of the Forest Merger from Plaintiff, which was a Forest shareholder, and solicited proxies from Plaintiff, which was a Forest shareholder.

584.    Each defendant named in this Count acted negligently in making false or misleading statements of material fact, omitting material facts required to be stated to make the statements contained in the May 6, 2014 Proxy not misleading, and failing to update statements that were rendered misleading by material information that arose after the dissemination of these statements and before the June 17, 2014 shareholder vote.

585.    The May 6, 2014 Proxy described in this Count was an essential link in the accomplishment of the Forest Merger.  As a result of the May 6, 2014 Proxy, Allergan and Forest shareholders approved the Forest Merger.

586.    Plaintiff, which was a Forest shareholder and was eligible to vote on the Forest Merger, was denied the opportunity to make an informed decision in voting on the Forest Merger as a result, and was damaged as a direct and proximate result of the materially false or misleading statements and omissions as alleged in this Count.

587.    As a result of its acquisition of Allergan stock in the Forest Merger in exchange for its Forest stock at an artificially inflated price, and the corrections removing the artificial inflation in the price of those Allergan shares, Plaintiff suffered economic harm under §14(a) of the Exchange Act.  Alternatively, Plaintiff also received Allergan shares and is entitled to a rescissory measure of damages sufficient to put it back in the economic position it was in before the consummation of the Forest Merger.

588.    By reason of the foregoing, the defendants named in this Count violated §14(a) of the Exchange Act and Rule 14a-9.

## COUNT IV

**For Violations of §14(a) of the Exchange Act and Rule 14a-9 Promulgated
Thereunder Against Allergan, Saunders, Bisaro, Bloem, Bodine,
Howson, King, Klema, Michal, O'Sullivan, Taylor, Turner,
Weiss, Basgoz, Coughlin and Bailey**

589.    This Count is asserted pursuant to §14(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder, in connection with the Actavis Merger.  This claim is asserted against Allergan, Saunders and the 2015 Board of Directors.

590.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

591.    For purposes of this Count, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence.

592.    The January 27, 2015 Proxy and the documents attached to the January 27, 2015 Proxy or incorporated by reference therein misrepresented material facts or omitted material facts required to be stated to make the statements contained in those documents not misleading.

593.    The defendants named in this Count failed to update the January 27, 2015 Proxy when material information arose between the dissemination of the document or related statements and the March 10, 2015 shareholder vote.

594.   The defendants named in this Count, jointly and severally, solicited and permitted the use of their names in solicitations contained in the January 27, 2015 Proxy.

595.   Allergan was an issuer of the January 27, 2015 Proxy.  Allergan also permitted the use of its name in the January 27, 2015 Proxy by allowing the document to represent, among other things, its operating results and financial condition.

596.   Defendants Bisaro and Saunders signed the cover letters for the January 27, 2015 Proxy and permitted the use of their names in connection with the January 27, 2015 Proxy.

597.   Defendants Bloem, Bodine, Howson, King, Klema, Michal, O'Sullivan, Taylor, Turner, Weiss, Basgoz, Coughlin and Bailey permitted the use of their names in connection with the January 27, 2015 Proxy by, among other things, allowing the January 27, 2015 Proxy to represent that they recommended a vote to approve the Actavis Merger.

598.   By means of the January 27, 2015 Proxy and the documents attached to or incorporated by reference therein, the defendants named in this Count sought to secure the approval of the Actavis Merger from Plaintiff, which was an Allergan Inc. shareholder, and solicited proxies from Plaintiff.

599.   Each defendant named in this Count acted negligently in making false or misleading statements of material fact, omitting material facts required to be stated to

make the statements contained in the January 27, 2015 Proxy not misleading, and failing to update statements that were rendered misleading by material information that arose after the dissemination of these statements and before the March 10, 2015 shareholder vote.

600.   The January 27, 2015 Proxy described in this Count was an essential link in the accomplishment of the Actavis Merger.  As a result of the January 27, 2015 Proxy, Allergan and Actavis shareholders approved the Actavis Merger.

601.   Plaintiff, which was an Allergan Inc. shareholder eligible to vote on the Actavis Merger, was denied the opportunity to make an informed decision in voting on the Actavis Merger as a result and was damaged as a direct and proximate result of the materially false or misleading statements and omissions as alleged in this Count.

602.   As a result of their acquisition of Allergan plc stock in the Actavis Merger in exchange for their Allergan Inc. stock at an artificially inflated price, and the corrections removing the artificial inflation in the price of those Allergan plc shares, Plaintiff, which was entitled to vote on the Actavis Merger, suffered economic harm under §14(a) of the Exchange Act.  Alternatively, Plaintiff, which was entitled to vote on the Actavis Merger, received Allergan shares and is entitled to a rescissory measure of damages sufficient to put it back in the economic position it was in before the consummation of the Actavis Merger.

603.   By reason of the foregoing, the defendants named in this Count violated §14(a) of the Exchange Act and Rule 14a-9.

## V.   SECURITIES ACT ALLEGATIONS

### A.   Securities Act Parties

#### 1.   Plaintiff

604.   Plaintiff purchased or otherwise acquired Allergan ordinary shares in Allergan's public offering of 14,513,889 ordinary shares issued to finance the acquisition of Allergan, which closed on March 2, 2015, and was damaged thereby. These shares were purchased or otherwise acquired in, pursuant to and/or traceable to the Ordinary/Preferred Shares Offerings Materials (defined below), including the Form S-3 shelf registration statement and prospectus filed on February 19, 2015 and prospectus supplement dated February 25, 2015.   Plaintiff also acquired Allergan ordinary shares in connection with Actavis plc's March 17, 2015 acquisition of Allergan Inc. and was damaged thereby.   Those shares were acquired in, pursuant to and/or traceable to the Merger Offering Materials (defined below), including the Form S-4 registration statement, the amendments thereto, and the joint proxy statement/prospectus that forms a part of the registration statement filed on January 27, 2015.

## 2. Securities Act Defendants

605.   Defendant Allergan was the issuer of the ordinary shares in partial exchange for the outstanding shares of Allergan Inc. common stock and the issuer of ordinary shares and preferred shares to finance the acquisition of Allergan Inc.

### a. Officer Defendants

606.   Defendant Bailey signed: (i) the Form S-4 registration statement and the joint proxy statement/prospectus that formed part of the registration statement, filed with the SEC on December 23, 2014 (Registration No. 333-201242); (ii) Amendment No. 1 to the Form S-4 registration statement and the joint proxy statement/prospectus that formed part of the registration statement, filed with the SEC on January 26, 2015 (Registration No. 333-201242) (together, Amendment No. 1 filed on January 26, 2015 and the Form S-4 registration statement and the joint proxy statement/prospectus filed on December 23, 2014 are referred to herein as the "Form S-4 Registration Statement"); (iii) the Form S-3 registration statement and the prospectus that formed part of the registration statement, filed with the SEC on February 19, 2015 (Registration No. 333-202168) (the "Form S-3 Registration Statement" and, together with the Form S-4 Registration Statement, the "Registration Statements"); and (iv) the March 2, 2015 Form 8-K containing underwriting agreements relating to the Ordinary/Preferred Shares Offerings.   Bailey was the Chief Legal Officer and Corporate Secretary of Allergan at the time of the Offerings.

607.   Defendant Bisaro signed the Registration Statements, the 2013 Form 10-K incorporated by reference into the Form S-4 Registration Statement, and the 2014 Form 10-K incorporated by reference into the Registration Statements.  He also certified the 2013 Form 10-K and served on Allergan's Board as Executive Chairman and director at the time of the Offerings.

608.   Defendant Saunders signed the Registration Statements and the 2014 Form 10-K incorporated by reference into the Registration Statements.  He also certified the 2014 Form 10-K and served as Allergan's CEO, President, a director and Principal Executive Officer at the time of the Offerings.

609.   Defendant Hilado signed the Registration Statements and the 2014 Form 10-K and the Form 8-K underwriting agreements relating to the Ordinary/Preferred Shares Offerings incorporated by reference into the Registration Statements.  She also certified the 2014 Form 10-K and served as Allergan's CFO and Principal Financial Officer at the time of the Offerings.

610.   Defendant James D'Arecca ("D'Arecca") signed the Registration Statements, the 2013 Form 10-K incorporated by reference into the Form S-4 Registration Statement, and the 2014 Form 10-K incorporated by reference into the Registration Statements.  D'Arecca served as Allergan's Chief Accounting Officer and Principal Financial Officer at the time of the Offerings.

611.   Defendant Joyce signed the 2013 Form 10-K and the Form 8-K filed with the SEC on December 5, 2014, which superseded portions of the 2013 Form 10-K. Both documents were incorporated by reference into the Form S-4 Registration Statement.  He also certified the 2013 Form 10-K and served as Allergan's CFO and Principal Financial Officer during the Relevant Period.

612.   Defendant Olafsson signed the 2013 Form 10-K, which was incorporated by reference into the Form S-4 Registration Statement.  He served as a director and President of Actavis Pharma during the Relevant Period.

613.   Defendants Bailey, Bisaro, Saunders, Hilado, D'Arecca, Joyce and Olafsson are referred to as the "Officer Defendants."

### b.      Director Defendants

614.   Defendant Basgoz signed the Registration Statements and the 2014 Form 10-K incorporated by reference into the Registration Statements.  He served as a director on Allergan's Board at the time of the Offerings.

615.   Defendant Bloem signed the Registration Statements, the 2013 Form 10-K incorporated by reference into the Form S-4 Registration Statement, and the 2014 Form 10-K incorporated by reference into the Registration Statements.  He served as a director on Allergan's Board at the time of the Offerings.

616.   Defendant Bodine signed the Registration Statements, the 2013 Form 10-K incorporated by reference into the Form S-4 Registration Statement, and the

2014 Form 10-K incorporated by reference into the Registration Statements. He served as a director on Allergan's Board at the time of the Offerings.

617.   Defendant Coughlin signed the Registration Statements and the 2014 Form 10-K incorporated by reference into the Registration Statements. He served as a director on Allergan's Board at the time of the Offerings.

618.   Defendant Howson signed the Registration Statements, the 2013 Form 10-K incorporated by reference into the Form S-4 Registration Statement, and the 2014 Form 10-K incorporated by reference into the Registration Statements. She served as a director on Allergan's Board at the time of the Offerings.

619.   Defendant King signed the Registration Statements, the 2013 Form 10-K incorporated by reference into the Form S-4 Registration Statement, and the 2014 Form 10-K incorporated by reference into the Registration Statements. He served as a director on Allergan's Board at the time of the Offerings.

620.   Defendant Klema signed the Registration Statements, the 2013 Form 10-K incorporated by reference into the Form S-4 Registration Statement, and the 2014 Form 10-K incorporated by reference into the Registration Statements. She served as a director on Allergan's Board at the time of the Offerings.

621.   Defendant Michal signed the Registration Statements, the 2013 Form 10-K incorporated by reference into the Form S-4 Registration Statement, and the

2014 Form 10-K incorporated by reference into the Registration Statements.  He served as a director on Allergan's Board at the time of the Offerings.

622.   Defendant O'Sullivan signed the Registration Statements, the 2013 Form 10-K incorporated by reference into the Form S-4 Registration Statement, and the 2014 Form 10-K incorporated by reference into the Registration Statements.  He served as a director on Allergan's Board at the time of the Offerings.

623.   Defendant Taylor signed the Registration Statements, the 2013 Form 10-K incorporated by reference into the Form S-4 Registration Statement, and the 2014 Form 10-K incorporated by reference into the Registration Statements.  He served as a director on Allergan's Board at the time of the Offerings.

624.   Defendant Turner signed the Registration Statements, the 2013 Form 10-K incorporated by reference into the Form S-4 Registration Statement, and the 2014 Form 10-K incorporated by reference into the Registration Statements.  He served as a director on Allergan's Board at the time of the Offerings.

625.   Defendant Weiss signed the Registration Statements, the 2013 Form 10-K incorporated by reference into the Form S-4 Registration Statement, and the 2014 Form 10-K incorporated by reference into the Registration Statements.  He served as a director on Allergan's Board at the time of the Offerings.

626.   Defendants Basgoz, Bloem, Bodine, Coughlin, Howson, King, Klema, Michal, O'Sullivan, Taylor, Turner and Weiss are referred to as the "Director Defendants."

## B.   Additional Background Allegations

627.   Plaintiff's claims under the Securities Act do not sound in fraud and Plaintiff expressly disavows and disclaims any allegations of fraud, scheme or intentional conduct as part of its claims under the Securities Act.  Any allegations of fraud, fraudulent conduct or motive are specifically disclaimed from the following allegations for the purposes of Plaintiff's claims under the Securities Act, which do not require allegations of scienter, fraudulent intent or motive.  To the extent that these allegations incorporate factual allegations elsewhere in this complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scienter or intent of the defendants to defraud Plaintiff.

628.   As set forth below, Allergan and other defendants made a series of materially untrue statements and omissions of material facts in the offering materials issued in connection with the Offerings during the Relevant Period.  The Offering Materials are defined collectively as the materials described in the table below:

| Defined Term | Included Filings | Date Filed |
|---|---|---|
| "Merger Offering Materials" | Form S-4 registration statement and the joint proxy statement/prospectus that formed part of the registration statement, Registration No. 333-201242 | December 23, 2014 |

| Defined Term | Included Filings | Date Filed |
|---|---|---|
| | Amendment No. 1 to Form S-4 registration statement and the joint proxy statement/prospectus that formed part of the registration statement, Registration No. 333-201242 | January 26, 2015 |
| | Rule 424(b)(3) joint proxy statement/prospectus, Registration No. 333-201242 | January 27, 2015 |
| | Documents incorporated by reference by the Form S-4 registration statement and Rule 424(b)(3) joint proxy statement/prospectus, including: (1) 2013 Form 10-K, (2) Form 8-K superseding portions of the 2013 Form 10-K, (3) 2014 Form 10-K, and (4) Form 8-K underwriting agreements relating to the Ordinary/Preferred Shares Offerings | (1) February 25, 2014 (2) December 5, 2014 (3) February 18, 2015 (4) March 2, 2015 |
| "Ordinary/Preferred Shares Offerings Materials" | Form S-3 registration statement and the prospectus that formed part of the registration statement, Registration No. 333-202168 | February 19, 2015 |
| | Rule 424(b)(5) prospectus for ordinary shares, Registration No. 333-202168 | February 19, 2015 |
| | Rule 424(b)(5) prospectus for mandatory convertible preferred shares, Registration No. 333-202168 | February 19, 2015 |
| | Rule 424(b)(2) prospectus for ordinary shares, Registration No. 333-202168 | February 26, 2015 |
| | Rule 424(b)(2) prospectus for mandatory convertible preferred shares, Registration No. 333-202168 | February 26, 2015 |
| | Documents incorporated by reference by the Form S-3 registration statement and the Rule 424(b)(5) and 424(b)(2) prospectuses for ordinary shares and mandatory convertible preferred shares, including: (1) 2014 Form 10-K, and (2) Form 8-K underwriting agreements relating to the Ordinary/Preferred Shares Offerings | (1) February 18, 2015 (2) March 2, 2015 |

## C.    Actionable False and Misleading Statements in the Offering Materials

629.   Specifically, during the Relevant Period, Allergan conducted three registered securities offerings.  These offerings included Allergan's public offering of: (i) 14,513,889 ordinary shares, closed on March 2, 2015, which raised approximately $4.18 billion; (ii) 5,060,000 5.00% mandatory convertible preferred shares, closed on March 2, 2015, which raised approximately $5.06 billion; and (iii) approximately 111.2 million ordinary shares in partial exchange for the outstanding shares of Allergan Inc. common stock in connection with the March 17, 2015 merger.

630.   As set forth herein, the Offering Materials that Allergan filed with the SEC for each of the Offerings contained untrue statements of material fact and omitted material facts required to be stated therein or necessary to make the statements therein not misleading, concerning: (i) competition in the generic drug marketplace, including that the marketplace for generic drugs was highly competitive; (ii) the Company's reported revenues and profitability; (iii) price reductions due to competitor actions and entry; (iv) pricing pressures due to industry consolidation and third-party payers' price challenges; (v) competition with Teva, Mylan, Sandoz, and others, which were characterized as "major competitors"; and (vi) compliance with laws and regulations governing the Company's business.

1.      **The Form S-4 Registration Statements and Joint Proxy Statement/Prospectus**

631.    During the Relevant Period, Allergan's inflation of sales through illegal price-fixing constituted a violation of U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal authorities, along with the attendant negative financial and reputational harm, and its failure to make required disclosures regarding the impact of artificial price increases (tied to illegal price-fixing activity) on its reported revenue was in violation of SEC disclosure rules.  Nevertheless, Allergan, the Officer Defendants, and the Director Defendants represented falsely and/or misleadingly that the Company complied with laws and regulations in the Merger Offering Materials:

> Allergan's obligation to effect the Merger is conditioned, among other things, upon:
>
> •      the accuracy of Actavis' and Merger Sub's representations and warranties, subject to specified materiality standards;
>
> *      *      *
>
> •      the delivery by Actavis of an officer's certificate certifying such accuracy of such representations and warranties and such performance of such obligations and covenants;
>
> *      *      *
>
> Many of the representations and warranties are reciprocal and apply to Actavis or Allergan, as applicable, and their respective subsidiaries.  Some of the more significant representations and warranties relate to:
>
> *      *      *
>
> •      SEC reports and financial statements, including their preparation in accordance with GAAP, filing or furnishing with the SEC,

and compliance with the applicable rules and regulations promulgated thereunder, and that *such reports and financial statements fairly present, in all material respects, the relevant financial position and results of operations*;

\*     \*     \*

• *compliance with laws and government regulations*, including environmental laws;

\*     \*     \*

Many of the representations and warranties made by each of Actavis and Allergan are qualified by a "material adverse effect" standard. . . .   For the purpose of the Merger Agreement, a "material adverse effect" with respect to each of Actavis and Allergan means any change, effect, development, circumstance, condition, state of facts, event or occurrence (each referred to in this section of this joint proxy statement/prospectus as an "Effect") that, individually or in the aggregate, has a material adverse effect on the assets, liabilities, condition (financial or otherwise), business or results of operations of the relevant party and its subsidiaries, taken as a whole.

\*     \*     \*

REPRESENTATIONS AND WARRANTIES OF PARENT
[ACTAVIS PLC] AND MERGER SUB

\*     \*     \*

Section 4.4  Reports and Financial Statements.

(a)    From January 1, 2012 through the date of this Agreement, each of Parent [Actavis plc] and Actavis, Inc. have filed or furnished all forms, documents and reports required to be filed or furnished prior to the date hereof by it with the SEC (the "Parent SEC Documents"). As of their respective dates, or, if amended, as of the date of (and giving effect to) the last such amendment, the Parent [Actavis plc] SEC Documents complied in all material respects with the requirements of the Securities Act and the Exchange Act, as the case may be, and the applicable rules and regulations promulgated thereunder, and *none of the Parent [Actavis plc] SEC Documents contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading*.

- 284 -

(b)     The consolidated financial statements (including all related notes and schedules) of Parent or Actavis, Inc., as applicable, included in the Parent [Actavis plc] SEC Documents when filed complied as to form in all material respects with the applicable accounting requirements and the published rules and regulations of the SEC with respect thereto in effect at the time of such filing and *fairly present in all material respects the consolidated financial position of Parent [Actavis plc] or Actavis, Inc., as applicable, and its consolidated Subsidiaries, as at the respective dates thereof*, and the consolidated results of their operations and their consolidated cash flows for the respective periods then ended (subject, in the case of the unaudited statements, to normal year-end audit adjustments and to any other adjustments described therein, including the notes thereto) in conformity with GAAP (except, in the case of the unaudited statements, to the extent permitted by the SEC) applied on a consistent basis during the periods involved (except as may be indicated therein or in the notes thereto).

*     *     *

Section 4.7   Compliance with Law; Permits.

(a)     *Parent [Actavis plc] and each of Parent's Subsidiaries are in compliance with and are not in default under or in violation of any Laws*, applicable to Parent, such Subsidiaries or any of their respective properties or assets, except where such non-compliance, default or violation would not reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect.

*     *     *

Section 4.12 Information Supplied. *The information relating to Parent [Actavis plc] and its Subsidiaries to be contained in the Joint Proxy Statement/Prospectus and the Form S-4 will not*, on the date the Joint Proxy Statement/Prospectus (and any amendment or supplement thereto) is first mailed to shareholders of Parent or at the time the Form S-4 (and any amendment or supplement thereto) is filed and the date it is declared effective or any post-effective amendment thereto is filed or is declared effective, or at the time of the Company Special Meeting or the Parent Special Meeting, *contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, at the time and in the light of the circumstances under which they were made, not misleading*. The Joint Proxy Statement/Prospectus (other than the portions thereof relating solely to the meeting of the stockholders of the Company) and the Form S-4 will comply as to form in all material respects with the provisions of the Exchange Act, the rules and

- 285 -

regulations promulgated thereunder and any other applicable federal securities laws.

\*      \*      \*

Section 4.13 Regulatory Matters.

\*      \*      \*

(b)     Except as would not, individually or in the aggregate, reasonably be expected to have a Parent Material Adverse Effect, ***the businesses of each of Parent [Actavis plc] and each Parent Subsidiary are being conducted in compliance with all applicable Laws***. . . .

(c)     Except as would not, individually or in the aggregate, reasonably be expected to have a Parent Material Adverse Effect, Parent and the Parent Subsidiaries have not engaged in activities which are, as applicable, cause for false claims liability, civil penalties or mandatory or permissive exclusion from Medicare, Medicaid or any other government healthcare program.

\*      \*      \*

"Parent Material Adverse Effect" means any Effect that, individually or in the aggregate, has a material adverse effect on the assets, liabilities, condition (financial or otherwise), business or results of operations of Parent and the Parent Subsidiaries, taken as a whole.

632.    In addition to misrepresentations concerning compliance with laws and regulations, the Merger Offering Materials also reported the Company's net revenue increase for the fiscal year 2013 and year-to-date 2014 and failed to disclosed that the revenues were inflated in part as a result of illegal price-fixing and artificially inflated generic drug prices: Actavis' net revenues for the years ended December 31, 2013 vs. December 31, 2012 were $8,677.6 million and $5,914.9 million, respectively.  Net revenues for the nine months ended September 30, 2014 vs. September 30, 2013 were $9,005.4 million and $5,898.3 million, respectively.

633.   The Form S-4 registration statement and the joint proxy statement/prospectus that formed part of the registration statement filed on December 23, 2014 and the Amendment No. 1 filed on January 26, 2015 were signed by defendants Bailey, Bisaro, Saunders, Hilado, D'Arecca, Basgoz, Bloem, Bodine, Coughlin, Howson, King, Klema, Michal, O'Sullivan, Taylor, Turner and Weiss.

### 2.   The Form 8-K Superseding Portions of the 2013 Form 10-K

634.   On December 5, 2014, Allergan filed a Form 8-K superseding portions of the 2013 Form 10-K, which was incorporated by reference into the Merger Offering Materials and signed by defendant Joyce.  Despite the fact that the market for the Company's generic drugs was collusive and lacked true competition, the Form 8-K contained untrue statements of material fact and omitted material facts required to be stated therein or necessary to make the statements therein not misleading, concerning: (i) competition in the generic drug marketplace, including that the marketplace for generic drugs was highly competitive; (ii) price reductions due to competitor actions and entry; (iii) pricing pressures due to industry consolidation and third-party payers' price challenges; and (iv) competition with Teva, Mylan, Sandoz, and others, which were characterized as "major competitors":

> Our North American Generics and International business is focused on maintaining a leading position within both the North America, and in particular, the U.S. market and our key international markets and strengthening our global position **by offering a consistent and reliable supply of quality brand and generic products.**

*Our strategy in the U.S. is to develop pharmaceuticals that are difficult to formulate or manufacture or will complement or broaden our existing product lines.*

\* \* \*

*[A] small number of large, wholesale distributors and large chain drug stores control a significant share of the market. This concentration may adversely impact pricing and create other competitive pressures on drug manufacturers.*

\* \* \*

## Competition

*The pharmaceutical industry is highly competitive. In our North American Brands and North American Generics and International businesses, we compete with different companies depending upon product categories, and within each product category, upon dosage strengths and drug delivery systems.* Such competitors include the major brand name and generic manufacturers of pharmaceutical products. In addition to product development, *other competitive factors in the pharmaceutical industry include product quality and price*, reputation and service and access to proprietary and technical information. . . .

*We actively compete in the generic pharmaceutical industry. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors*. . . . *As competing off-patent manufacturers receive regulatory approvals on similar products, market share, revenues and gross profit typically decline, in some cases dramatically. Accordingly, the level of market share, revenues and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market pricing* and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross profit. *In addition to competition from other generic drug manufacturers, we face competition from brand name companies in the generic market.* Many of these companies seek to participate in sales of generic products by, among other things, collaborating with other generic pharmaceutical companies or by marketing their own generic equivalent to their brand products as Authorized Generics. *Our major competitors include Teva Pharmaceutical Industries, Ltd., Mylan Inc. and Sandoz, Inc.*

\*   \*   \*

Our operating results and financial condition may fluctuate from quarter to quarter and year to year for a number of reasons.  *The following events or occurrences, among others, could cause fluctuations in our financial performance from period to period*:

\*   \*   \*

• *our responses to price competition*

\*   \*   \*

*We face strong competition in our all of our businesses*. . . . Most of our competitors have been in business for a longer period of time than us, have a greater number of products on the market and have greater financial and other resources than we do.  *Furthermore, recent trends in this industry are toward further market consolidation of large drug companies into a smaller number of very large entities, further concentrating financial, technical and market strength and increasing competitive pressure in the industry*. . . .

Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors. . . .  As competing manufacturers receive regulatory approvals on similar products or as brand manufacturers launch generic versions of such products (for which no separate regulatory approval is required), market share, revenues and gross profit typically decline, in some cases dramatically.  *Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market* and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. . . .  *Additionally, as new competitors enter the market, there may be increased pricing pressure on certain products, which would result in lower gross margins*. . . .

*. . . Increased competition in the generic industry as a whole may result in increased price erosion in the pursuit of market share.*

\*   \*   \*

Our principal customers in our brand and generic pharmaceutical operations are wholesale drug distributors and major retail drug store chains. . . .  *We expect that consolidation of drug wholesalers and retailers will increase pricing and other competitive pressures on drug manufacturers, including the Company*.

- 289 -

635.   In addition to the above misrepresentations, the Form 8-K also reported the Company's net revenue increase for the fiscal year 2013 relating to the North American Generics business and failed to disclosed that the revenues were inflated in part as a result of illegal price-fixing and artificially-inflated generic drug prices:

*Net Revenues*

The following table presents net revenues for the reporting units in the North American Generics and International segment for the years ended December 31, 2013 and 2012 (in millions):

|  | Years Ended December 31, | | Change | |
|  | 2013 | 2012 | Dollars | % |
|---|---|---|---|---|
| **North American Generics** | 3,915.7 | 3,472.2 | 443.5 | 12.8% |

\*       \*       \*

The increase in net revenues is primarily due to the full year North American Generic and International net sales resulting from the Actavis Group Acquisition of $2,799.5 million in the year ended December 31, 2013 versus $428.3 million in the year ended December 31, 2012 as well as the Warner Chilcott Acquisition, which contributed three months of sales in 2013 compared to no sales in the prior period ($64.7 million). Also contributing to the movement are higher U.S. unit sales related to new products including lidocaine topical patch 5% ($392.9 million) and mixed amphetamine (Adderall XR ®  CII) ($145.2 million).

### 3.    The 2014 Form 10-K

636.   On February 18, 2015, Allergan filed the 2014 Form 10-K, incorporated by reference into the Offering Materials.  Despite the fact that the market for the Company's generic drugs was collusive and lacked true competition, the 2014 Form 10-K contained untrue statements of material fact and omitted material facts required to be stated therein or necessary to make the statements therein not misleading, concerning: (i) competition in the generic drug marketplace, including that the marketplace for generic drugs was highly competitive; (ii)  price reductions due to

competitor actions and entry; (iii) pricing pressures due to industry consolidation and third-party payers' price challenges; and (iv) competition with Teva, Mylan, Sandoz, and others, which were characterized as "major competitors":

> Our North American Generics and International business is focused on maintaining a leading position within both the North American, and in particular, the U.S. market and our key international markets and strengthening our global position *by offering a consistent and reliable supply of quality brand and generic products*.

> *Our strategy in the U.S. is to develop pharmaceuticals that are difficult to formulate or manufacture or will complement or broaden our existing product lines*.

> \*     \*     \*

> Our significant customers comprise a large part of the distribution network for pharmaceutical products in North America. As a result, a small number of large, wholesale distributors and large drug store chains control a significant share of the market. Changes in the mix of concentration amongst the Company's largest customers over the last three years are due, in part, to the impact of acquisitions as well as changes in the supply chain of our indirect customers. *This concentration may adversely impact pricing and create other competitive pressures on drug manufacturers*.

> \*     \*     \*

**Competition**

> *The pharmaceutical industry is highly competitive. In our North American Brands and North American Generics and International businesses, we compete with different companies depending upon product categories, and within each product category, upon dosage strengths and drug delivery systems.* Such competitors include the major brand name and generic manufacturers of pharmaceutical products. In addition to product development, *other competitive factors in the pharmaceutical industry include product quality, price, reputation, service and access to proprietary and technical information*.

> \*     \*     \*

- 291 -

*We actively compete in the generic pharmaceutical industry. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors*. . . . *As competing off-patent manufacturers receive regulatory approvals on similar products, market share, revenues and gross profit typically decline, in some cases dramatically. Accordingly, the level of market share, revenues and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market, pricing* and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross profit. *In addition to competition from other generic drug manufacturers, we face competition from brand name companies in the generic market.* Many of these companies seek to participate in sales of generic products by, among other things, collaborating with other generic pharmaceutical companies or by marketing their own generic equivalent to their brand products as "Authorized Generics". *Our major competitors include Teva Pharmaceutical Industries, Ltd., Mylan Inc. and Sandoz, Inc. (a division of Novartis AG).*

\*　　\*　　\*

*We face strong competition in all of our businesses*. . . . Most of our competitors have been in business for a longer period of time than us, have a greater number of products on the market and have greater financial and other resources than we do. *Furthermore, recent trends in this industry are toward further market consolidation of large drug companies into a smaller number of very large entities, further concentrating financial, technical and market strength and increasing competitive pressure in the industry*.

\*　　\*　　\*

Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors. . . . As competing manufacturers receive regulatory approvals on similar products or as brand manufacturers launch generic versions of such products (for which no separate regulatory approval is required), market share, revenues and gross profit typically decline, in some cases dramatically. *Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market* and the timing of that product's regulatory approval and launch, in relation to competing approvals and

launches. . . . ***Additionally, as new competitors enter the market, there may be increased pricing pressure on certain products, which would result in lower gross margins***. . . .

> . . . ***Increased competition in the generic industry as a whole may result in increased price erosion in the pursuit of market share.***

*     *     *

Our principal customers in our brand and generic pharmaceutical operations are wholesale drug distributors and major retail drug store chains. . . . ***We expect that consolidation of drug wholesalers and retailers will increase pricing and other competitive pressures on drug manufacturers, including the Company***.

637.   In addition to the above misrepresentations, the 2014 Form 10-K also reported the Company's net revenue increase for fiscal years 2013 and 2014 relating to the North American Generics business and failed to disclosed that the revenues were inflated in part as a result of illegal price-fixing and artificially inflated generic drug prices:

Net revenues in our North American Generics and International segment consisted of the following ($ in millions):

|  | Years Ended December 31, | | Change | |
|  | 2014 | 2013 | Dollars | % |
| --- | --- | --- | --- | --- |
| North American Generics | $   4,173.6 | $   3,915.7 | $   257.9 | 6.6% |

*     *     *

An increase in competition can decrease both volume and the price received for each product.  The increase in North American Generics revenues was primarily the result of changes in product mix including new product launches and competition on existing products.

*     *     *

*Net Revenues*

The following table presents net revenues for the reporting units in the North American Generics and International segment for the years ended December 31, 2013 and 2012 ($ in millions):

|  | Years Ended December 31, | | Change | |
|  | 2013 | 2012 | Dollars | % |
| --- | --- | --- | --- | --- |
| North American Generics | $ 3,915.7 | $ 3,472.2 | $   443.5 | 12.8% |

- 293 -

\*      \*      \*

The increase in net revenues is primarily due to the full year net sales from the Actavis Group Acquisition of $2,799.5 million in the year ended December 31, 2013 versus $428.3 million in the year ended December 31, 2012 as well as the Warner Chilcott Acquisition, which contributed three months of sales in 2013 compared to no sales in the prior period ($64.7 million). Also contributing to the movement are higher U.S. unit sales related to new products including lidocaine topical patch 5% ($392.9 million) and mixed amphetamine (Adderall XR® CII) ($145.2 million).

638.    The 2014 Form 10-K contained signed certifications pursuant to SOX by defendants Saunders and Hilado, stating that the financial information contained in the 2014 Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.  The 2014 Form 10-K was also signed by defendants Bisaro, D'Arecca, Basgoz, Bloem, Bodine, Coughlin, Howson, King, Klema, Michal, O'Sullivan, Taylor, Turner and Weiss.

## 4.    The Form 8-K Underwriting Agreements

639.    Allergan's inflation of sales through illegal price-fixing constituted a violation of U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal authorities, along with the attendant negative financial and reputational harm, and its failure to make required disclosures regarding the impact of artificial price increases (tied to illegal price-fixing activity) on its reported revenue was in violation of SEC disclosure rules.  Nevertheless, on March 2, 2015, Allergan and defendants Bailey and Hilado represented falsely and/or misleadingly

that the Company complied with laws and regulations in a Form 8-K that attached the

underwriting agreements relating to the Ordinary/Preferred Shares Offerings:

The Company represents and warrants to each Underwriter that:

\*        \*        \*

(c)      Issuer Free Writing Prospectus. . . .  ***Each such Issuer Free Writing Prospectus complied in all material respects with the Securities Act***, has been or will be (within the time period specified in Rule 433) filed in accordance with the Securities Act (to the extent required thereby) and, when taken together with the Preliminary Prospectus filed prior to the first use of such Issuer Free Writing Prospectus, did not, and as of the Closing Date and as of the Additional Closing Date, as the case may be, ***will not, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading***. . . .

(d)      Registration Statement and Prospectus . . . ***as of the applicable effective date of the Registration Statement and any post-effective amendment thereto, the Registration Statement and any such post-effective amendment complied and will comply in all material respects with the Securities Act, and did not and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein not misleading; and as of the date of the Prospectus and any amendment or supplement thereto and as of the Closing Date and as of the Additional Closing Date, as the case may be, the Prospectus will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading***. . . .

(e)      Incorporated Documents.  ***The documents incorporated by reference in the Registration Statement, the Prospectus and the Pricing Disclosure Package***, including, to the knowledge of the Company, the documents filed with the Commission by Allergan, when they were filed with the Commission, conformed in all material respects to the requirements of the Exchange Act, and ***none of such documents, including, to the knowledge of the Company, the documents so filed by Allergan, contained any untrue statement of a material fact or omitted to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; and any further documents so filed by the Company or any***

- 295 -

*of its subsidiaries and incorporated by reference in the Registration Statement, the Prospectus or the Pricing Disclosure Package, when such documents are filed with the Commission, will conform in all material respects to the requirements of the Exchange Act and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading*.

(f)     *Financial Statements.*

(i)     *Preparation of the Financial Statements of the Company.* The financial statements (including the related notes thereto) of the Company and its consolidated subsidiaries included or incorporated by reference in the Registration Statement, the Pricing Disclosure Package and the Prospectus present fairly, in all material respects, the financial position of the Company and its consolidated subsidiaries as of and at the dates indicated and the results of their operations and the changes in their cash flows for the periods specified. *Such financial statements comply in all material respects as to form with the applicable requirements of the Securities Act and the Exchange Act, as applicable, and have been prepared in conformity with generally accepted accounting principles as applied in the United States ("GAAP")* applied on a consistent basis throughout the periods covered thereby, except as may be expressly stated in the related notes thereto, and any supporting schedules included or incorporated by reference in the Registration Statement present fairly, in all material respects, the information required to be stated therein. The selected financial data and the summary financial information of the Company and its consolidated subsidiaries included or incorporated by reference in the Registration Statement, the Pricing Disclosure Package and the Prospectus presents fairly, in all material respects, the information shown therein and has been compiled on a basis consistent with that of the Company's audited financial statements included or incorporated by reference in the Registration Statement, the Pricing Disclosure Package and the Prospectus. . . .

(o)     *No Violation or Default. None of the Company, any of the Significant Subsidiaries or, to the knowledge of the Company, any of the Acquired Companies is . . . (iii) in violation of any law or statute applicable to the Company, any of its subsidiaries or any of the Acquired Companies* or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority having jurisdiction over the Company, any of its subsidiaries or any of the Acquired Companies, except, in the case of clauses (ii) and (iii) above, for any such default or violation that would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

- 296 -

*      *      *

As used herein, "Material Adverse Effect" means (A) when used in respect of any matter relating to the Company or any of its subsidiaries, any material adverse effect, or any development that would reasonably be expected to result in a material adverse effect, on the business, properties, management, financial position, stockholders' equity, results of operations or prospects of the Company and its subsidiaries taken as a whole, or on the performance by the Company of its obligations under the Transaction Documents and (B) when used in respect of any matter relating to any of the Acquired Companies, any material adverse effect, or any development that would reasonably be expected to result in a material adverse effect, on the business, properties, management, financial position, stockholders' equity, results of operations or prospects of the Combined Company, or on the performance by the Company of its obligations under the Transaction Documents.

640.   The March 2, 2015 Form 8-K was signed by Bailey and each of the underwriting agreements therein was signed by Hilado.

**D.     No Safe Harbor**

641.   Allergan's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Relevant Period were ineffective to shield those statements from liability.  First, the statements complained of herein concerned present or historical facts or conditions that were existing or purported to exist at the time they were made.  Second, the statutory safe harbor does not apply to statements included in the financial statements that purport to have been prepared in accordance with Generally Accepted Accounting Principles.  Further, to the extent that any of the untrue of misleading statements alleged herein were identified as forward-looking, and can be construed as forward-looking, the statements were not accompanied by meaningful cautionary statements identifying important facts that could cause actual

- 297 -

results to differ materially from those statements, and the generalized disclosures made by defendants were not sufficient to shield them from liability.

## VI.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT V

**Violations of §11 of the Securities Act Against
All Securities Act Defendants**

642.   This Count is brought by Plaintiff pursuant to §11 of the Securities Act, 15 U.S.C. §77k.  Plaintiff purchased or otherwise acquired securities sold pursuant or traceable to the Registration Statements and was damaged thereby.

643.   Plaintiff repeats and realleges each and every allegation contained above in §§I.-III. and V.

644.   This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, Plaintiff does not allege that defendants acted with scienter or fraudulent intent, which are not elements of a §11 claim.

645.   Liability under this Count is predicated on the Officer Defendants' and the Director Defendants' signing of the Registration Statements and the filings incorporated by reference therein for the Offerings and all Securities Act Defendants' respective participation in the Offerings, which were conducted pursuant to the Offering Materials.  The Offering Materials were false and misleading, contained

untrue statements of material fact, omitted to state facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

646.   Less than one year has elapsed since the time that Plaintiff discovered, or could reasonably have discovered, the facts upon which this complaint is based.  Less than three years has elapsed since the time that the securities at issue in this complaint were bona fide offered to the public.

647.   By reason of the foregoing, the defendants named in this Count are each jointly and severally liable for violations of §11 of the Securities Act to Plaintiff pursuant to §11(e).

## COUNT VI

### Violation of §12(a)(2) of the Securities Act
### Against Allergan

648.   This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77(l)(a)(2).  Plaintiff purchased or otherwise acquired ordinary shares in the Offerings and was damaged thereby.

649.   Plaintiff repeats and realleges each and every allegation contained above in §§I.-III. and V.

650.   This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For

purposes of asserting this Count, Plaintiff does not allege that defendants acted with scienter or fraudulent intent, which are not elements of a §12(a)(2) claim.

651.  By means of the Offering Materials, Allergan sold the Offerings to Plaintiff.  Allergan was a statutory seller of securities offered and sold pursuant to the Offering Materials and solicited sales thereof for financial gain, as it benefitted financially from the sale of the securities.

652.  The Offering Materials contained untrue statements of material fact and failed to disclose material facts.  Allergan owed Plaintiff, which acquired the ordinary shares pursuant to the Offering Materials, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Allergan, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Offering Materials, as set forth above.

653.  Plaintiff did not know, nor in the exercise of reasonable diligence could it have known, of the untruths and omissions contained in the Offering Materials at the time it acquired the ordinary shares.

654.  By reason of the conduct alleged herein, Allergan violated §12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiff, which acquired the ordinary shares pursuant to the Offering Materials, sustained

substantial damages in connection with its acquisition of the securities. Accordingly, for the securities held by Plaintiff and issued pursuant to the Offering Materials, Plaintiff has the right to rescind and recover the consideration paid for its shares, with interest thereon, and hereby tenders its securities to Allergan. For securities sold, Plaintiff seeks damages to the extent permitted by law.

## COUNT VII

### Violations of §15 of the Securities Act Against Allergan, the Officer Defendants and the Director Defendants

655.   This Count is asserted against Allergan, the Officer Defendants and the Director Defendants for violations of §15 of the Securities Act, 15 U.S.C. §77o. Plaintiff purchased or otherwise acquired securities sold pursuant and traceable to the Offerings.

656.   Plaintiff repeats and realleges each and every allegation contained above in §§I.-III. and V.

657.   This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiff does not allege that defendants acted with scienter or fraudulent intent, which are not elements of a §15 claim

658.   At times relevant hereto, the Officer Defendants and the Director Defendants were controlling persons of Allergan within the meaning of §15 of the Securities Act.

659.   The Officer Defendants and the Director Defendants at times relevant hereto participated in the operation and management of Allergan, and conducted and participated, directly and indirectly, in the conduct of Allergan's business affairs.

660.   The Officer Defendants and Director Defendants, as officers and directors of a publicly owned company, had a duty to disseminate accurate and truthful information with respect to Allergan's financial condition and results of operations.  Because of their positions of control and authority as officers or directors of Allergan, the Officer Defendants and Director Defendants were able to, and did, control the contents of the Offering Materials, which contained materially untrue information.

661.   Allergan controlled the Officer Defendants and Director Defendants and all of its other employees.

662.   By reason of the foregoing, Allergan, the Officer Defendants and the Director Defendants are liable under §15 of the Securities Act, to the same extent that they are liable under §§11 and 12(a)(2) of the Securities Act, to Plaintiff, which acquired securities pursuant and/or traceable to the Offerings pursuant to the Registration Statements and/or the applicable Offering Materials.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for judgment as follows:

A.      Declaring and determining that defendants violated the Exchange Act and Securities Act by reason of the acts and omissions alleged herein;

B.      Awarding Plaintiff compensatory damages against all defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

C.      Awarding Plaintiff reasonable costs and expenses incurred in this action, including but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses;

D.      Awarding rescission or a rescissory measure of damages; and

E.      Granting such other and further relief as the Court deems just and proper.

## VIII.  JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  October 8, 2019             SEEGER WEISS LLP
                                    CHRISTOPHER A. SEEGER
                                    DAVID R. BUCHANAN


                                    _____s/ Christopher A. Seeger_____
                                    CHRISTOPHER A. SEEGER

                                    55 Challenger Road, 6th Floor
                                    Ridgefield Park, NJ  07660
                                    Telephone:  973/639-9100
                                    973/639-9393 (fax)

- 303 -

SEEGER WEISS LLP
JENNIFER R. SCULLION
CHRISTOPHER AYERS
77 Water Street, 26th Floor
New York, NY  10005
Telephone:  212/584-0700
212/584-0799 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
LUKE O. BROOKS
RYAN A. LLORENS
ERIC I. NIEHAUS
ANGEL P. LAU
JEFFREY J. STEIN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that, on October 8, 2019, I caused true and correct copies of

these documents to be served via this Court's ECF system to all counsel of record.

DATED:   New York, New York
             October 8, 2019


                                    *s/ Christopher A. Seeger*
                                    CHRISTOPHER A. SEEGER

                                    SEEGER WEISS LLP
                                    55 Challenger Road, 6th Floor
                                    Ridgefield Park, NJ  07660
                                    Telephone:  973/639-9100
                                    973/639-9393 (fax)

                                    E-mail:  cseeger@seegerweiss.com