<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| TIAA-CREF LARGE-CAP GROWTH FUND, TIAA-CREF LARGE-CAP VALUE FUND, TIAA-CREF EQUITY INDEX FUND, TIAA-CREF LARGE-CAP VALUE INDEX FUND, TIAA-CREF GROWTH & INCOME FUND, TIAA-CREF S&P 500 INDEX FUND, TIAA-CREF LARGE-CAP GROWTH INDEX FUND, TIAA-CREF ENHANCED LARGE-CAP VALUE INDEX FUND, TIAA-CREF ENHANCED LARGE-CAP GROWTH INDEX FUND, TIAA-CREF LIFE GROWTH EQUITY FUND, TIAA-CREF LIFE STOCK INDEX FUND, TIAA-CREF LIFE GROWTH & INCOME FUND, TIAA-CREF LIFE LARGE-CAP VALUE FUND, TIAA-CREF SEPARATE ACCOUNT VA-1, COLLEGE RETIREMENT EQUITIES FUND, TIAA-CREF INVESTMENT MANAGEMENT, LLC and TEACHERS ADVISORS, LLC, | |
| *Plaintiffs,* | Civil No.: 17-cv-11089 (KSH) (CLW) |
| v. | |
| ALLERGAN PLC, PAUL M. BISARO, BRENTON L. SAUNDERS, R. TODD JOYCE, MARIA TERESA HILADO, SIGURDUR O. OLAFSSON, DAVID A. BUCHEN, A. ROBERT D. BAILEY, JAMES H. BLOEM, CHRISTOPHER W. BODINE, TAMAR D. HOWSON, JOHN A. KING, CATHERINE M. KLEMA, JIRI MICHAL, JACK MICHELSON, PATRICK J. O'SULLIVAN, RONALD R. TAYLOR, ANDREW L. TURNER, FRED G. WEISS, NESLI BASGOZ, CHRISTOPHER J. COUGHLIN AND JAMES D'ARECCA, | **OPINION** |
| *Defendants.* | |

<u>**Katharine S. Hayden, U.S.D.J.**</u>

**I.    Introduction**

In this "opt-out" action arising from a securities class action pending before this Court, plaintiff investors allege that the defendant pharmaceutical company Allergan plc, seven of its top executives—Paul M. Bisaro, Brenton L. Saunders, R. Todd Joyce, Maria T. Hilado, Sigurdur O. Olafsson, David A. Buchen, and A. Robert D. Bailey, and its Board of Directors (collectively, "Allergan") knowingly misled investors by failing to disclose its purported participation in a generic drug price-fixing conspiracy in violation of Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Sections 11, 12, and 15 of the Securities Act of 1933 (the "Securities Act").

Before the Court is Allergan's motion to dismiss the amended complaint under Rule 12(b)(6) (D.E. 36), arguing that plaintiffs' claims under both the Securities Act and the Exchange Act are untimely.  Allergan also argues that plaintiffs' market-allocation theory allegations are not pled with the particularity required under the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4.  For the reasons expressed in this opinion, Allergan's motion to dismiss is denied.

## II.    Factual Background

The amended complaint (D.E. 32) alleges as follows.

### A.  The Parties

Plaintiffs are funds and accounts managed by wholly-owned subsidiaries of Teachers Insurance and Annuity Association of America, a financial services organization.  (*Id.* ¶ 48.) Plaintiffs allege that they purchased or otherwise acquired Allergan securities at artificially inflated prices between October 29, 2013 and November 3, 2016 (the "relevant period"), and suffered damages as a result of federal securities law violations.  (*Id.*)

Corporate defendant Allergan is a pharmaceutical company incorporated in Ireland with its administrative headquarters located in Parsippany, New Jersey.  (*Id.* ¶ 49.)  Over the last several years, Allergan has been involved in three acquisitions relevant to this lawsuit.  In July 2014, Allergan acquired Forest Laboratories through a series of merger transactions.  (*Id.* ¶ 50.)  In November 2014, Allergan was acquired by the corporation Actavis plc, adopting Allergan plc as its new global name.  (*Id.* ¶ 51.)  In July 2015, Teva announced its agreement with Allergan to acquire Actavis Pharma, Allergan's generics business, for $33.75 billion in cash and $6.75 billion in Teva stock, and the acquisition was completed in August 2016.  (*Id.* ¶ 52.)

The first seven defendants in the caption of the amended complaint (the "individual defendants") are former and current high-ranking corporate officers of Allergan who allegedly made false and misleading statements or omissions in Allergan's SEC materials and/or during Allergan's earnings calls.  (*See id.* ¶¶ 53-60.)  Bisaro served as Allergan's CEO and president between October 2013 and July 2014.  (*Id.* ¶ 53.)  Saunders replaced Bisaro in July 2014 and serves as Allergan's current CEO and president.  (*Id.* ¶ 54.)  Joyce served as Allergan's CFO from October 2009 to December 2014, when Hilado assumed the role.  (*Id.* ¶¶ 55-56.)  From April 2012 until June 2014, Olafsson served as director of Allergan and president of Actavis Pharma, the segment that included Allergan's generics business.  (*Id.* ¶ 57.)  Buchen was Allergan's chief legal officer and secretary from April 2012 through July 2014, and then served in an executive vice president capacity until May 1, 2016.  (*Id.* ¶ 58.)  Bailey was an executive vice president for Allergan and has served as its chief legal officer and secretary since July 2014. (*Id.* ¶ 59.)  The remaining named defendants (the "director defendants") served on Allergan's Board of Directors in 2014 and/or 2015.  (*Id.* ¶¶ 61-75.)

The amended complaint pleads a category of defendants called "co-conspirators" that "participated . . .  with Allergan in the anticompetitive conduct alleged [in the amended complaint]."  (*Id.* ¶ 76.)  Plaintiffs provide the following non-exhaustive list of co-conspirators in the amended complaint:  "Lannett; Impax; Heritage; Mylan; Teva; Aurobindo; Epic Pharma, LLC ("Epic"); West-Ward Pharmaceutical Corporation ("West-Ward"); Akorn, Inc. ("Akorn"); Camber Pharmaceuticals, Inc. ("Camber"); Lupin Pharmaceuticals, Inc. ("Lupin"); Mutual Pharmaceutical ("Mutual"); Par Pharmaceutical Companies, Inc. ("Par"); Perrigo; Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's"); Sandoz, Inc. ("Sandoz"); Taro Pharmaceutical Industries Ltd. ("Taro"); and Zydus Pharmaceuticals (USA), Inc. ("Zydus")."  (*Id.*)

### B.  The Generic Drug Market

Generic drugs are "drugs that are pharmaceutically equivalent in dosage, form, route of administration, strength or concentration and have the same active ingredients as the reference-listed brand name drug."  (*Id.* ¶ 77.)  The Drug Price Competition and Patent Term Restoration Act, commonly known as the Hatch-Waxman Act, was enacted in 1984 to "simplif[y] the regulatory hurdles for bringing generic drugs to market."  (*Id.* ¶¶ 78-79.)  More specifically, the Act eliminated the requirement that generic drug companies file costly New Drug Applications ("NDA") to obtain FDA approval.  (*Id.* ¶ 79.)  Instead, generic drug companies may file an Abbreviated NDA ("ANDA") relying on the safety and efficacy data supplied by the original NDA holder for a given drug, and need not include clinical trial data with their filing.  (*Id.*)

A generic drug must meet certain standards set by the FDA to ensure that the generic drug is "essentially an exact substitute" for the brand-name drug.  (*Id.* ¶ 80.)  However, the first generic drug to enter the market will generally be priced 15-20% lower than the brand-name drug.  (*Id.* ¶ 81.)  The Hatch-Waxman Act provides the company marketing that first generic

drug a 180-day exclusivity period.  (*Id.*)  After the 180-day period, generic competitors enter the

market, and, as more of them do, the price of the generic drugs generally declines until an

"equilibrium" price point is reached – *i.e.*, at or close to the manufacturers' marginal production

costs – which results in a significant savings for consumers.  (*Id.* ¶ 82.)

### C. Government Investigations into Generic Drug Price-Fixing Scheme

This lawsuit followed a number of investigations into the generic pharmaceutical

industry.

In late 2013, a survey conducted by the National Community Pharmacist Association (the

"NCPA") revealed that various generic drugs had experienced "dramatic price increases." (*Id.* ¶

11.)  Concerned by the potential negative impact the price hikes could have on elderly

consumers, the NCPA's CEO wrote a letter to Congress in January 2014 requesting an oversight

hearing.  (*Id.*)  By July 2014, the State of Connecticut began issuing subpoenas to drug

manufacturers requesting documents relating to generic drug pricing.  (*Id.* ¶ 12.)  Three months

later, Senator Bernie Sanders and Representative Elijah E. Cummings sent letters to 14 generic

drug manufacturers demanding information relating to 10 drugs that had experienced dramatic

price increases between 2012 and 2014.  (*Id.*)

As part of its ongoing investigation into the generic pharmaceutical industry, the DOJ

convened a grand jury in the Eastern District of Pennsylvania in November 2014.  Several

generic pharmaceutical companies and their executives—including a number of co-conspirators

that raised the prices of some of their generic drugs at or close to the same time that Allergan

increased its prices—received subpoenas in connection with the DOJ's investigation.  (*Id.* ¶ 13.)

On August 6, 2015, media outlets reported that Allergan disclosed in an SEC filing that it

had also received a DOJ subpoena seeking information on the marketing and pricing of its

generic drugs.  More specifically, the media outlets reported that in June 2015, Allergan "bec[ame] the biggest company yet to draw scrutiny in the government's widening antitrust probe of the industry," and joined other companies that had "made similar disclosures in the past several months."[1]  The news that Allergan had been subpoenaed by the DOJ caused Allergan's common share price to fall $17.17 per share, or approximately 5% from its prior closing price. Allergan's preferred share price fell $39.24 per share, or approximately 3.5% from its previous closing price.  (*Id.* ¶ 15.)

On November 3, 2016, media outlets reported that U.S. prosecutors were "bearing down on generic pharmaceutical companies," including Allergan, "in a sweeping criminal investigation into suspected price collusion," and further reported that "the first charges could emerge by the end of the year."  (*Id.* ¶ 17.)  That same day, Allergan's common share price fell $9.07 per share, or approximately 4.58%.  Its preferred share price fell $30.03 per share, or approximately 4%. (*Id.* ¶ 18.)

The next month, on December 12 and 13, 2016, the DOJ filed the first criminal charges stemming from its ongoing investigation.  (*Id.* ¶ 19.)

**D.  Several States Sue Generic Drug Companies for Market-Allocation Scheme**

While federal and state investigations were still ongoing, the Attorneys General of 20 states brought a civil lawsuit against six generic drug manufacturers in December 2016 for illegal

---

[1] According to Allergan, "[n]umerous [litigants] relied on these publicly disclosed investigations to file civil antitrust class actions in early 2016" which "included allegations directed to specific generic drugs" that plaintiffs included in their complaint in this action.  (D.E. 36-12, Mov. Br. at 4.)

schemes involving "market share allocation" and anticompetitive price inflation.[2]  (*Id.* ¶ 22.)  To effectuate a "market share allocation" scheme, drug companies "allocate the market" for a drug based on the number of competitors and the timing of their entry into the market, so that each competitor obtains an acceptable market share.  In turn, the competitors agree on methods to avoid competing on price and, at times, significantly raise their prices.  This pattern can occur in the absence of direct communication between the competitors, reflecting a "universal code of conduct" among competitors.  (*Id.* ¶ 362.)

According to the amended complaint, Allergan and its co-conspirators allegedly implemented a market-allocation scheme as to at least nine generic drugs in the following manner.  (*Id.* ¶ 363.)

### a.  Amphetamine/dextroamphetamine extended release

Amphetamine/dextroamphetamine extended release ("MAS-XR") is used to treat attention deficit disorder.  (*Id.* ¶ 364.)  Before Allergan's entry, Teva occupied over half of the market for MAS-XR.  (*Id.* ¶ 365.)  Allergan began marketing MAS-XR as early as April 2012 and by the time the FDA approved its application for MAS-XR in June 2012, Allergan had already communicated its desired 15% market share and customer allocations to Teva.  (*Id.* ¶¶ 366-67.)  Allergan entered the market in July 2012 at the same elevated pricing Teva set, and attained its desired 15% market share by October 2012 without competing on pricing.  (*Id.* ¶ 370.)  From the time of Allergan's entry into the MAS-XR market through the end of the relevant period, its pricing was "highly correlated and uniformed" with Teva's pricing, pricing

---

[2] On May 10, 2019, the Attorneys General of 44 states filed a second complaint against 20 generic drug manufacturers, including Allergan.  (*See id.* ¶ 31.)  Allergan is currently a named defendant in at least two Attorney General complaints.

volatility was close to zero, and market share volatility dropped to less than two percent.  (*Id.* ¶ 371.)

Throughout the MAS-XR market allocation process, Allergan and Teva representatives attended seven trade association meetings:  defendant Bisaro attended two of those meetings, and defendant Olafsson attended three.  (*Id.* ¶ 372.)  Allergan and Teva executives were frequently communicating by phone and text.  (*Id.* ¶ 373.)  The amended complaint does not allege that any individual defendants were involved in such communications.

### b.   Budesonide inhalation

Budesonide inhalation ("budesonide") is an anti-inflammatory drug used to control asthma.  Before Allergan entered the budesonide market, Teva was the drug's only manufacturer.  (*Id.* ¶ 374.)   In April 2013, Allergan launched budesonide "after entering into collusive agreements with Teva to avoid competition and maintain pricing."  (*Id.* ¶ 375.)  Allergan was forced to temporarily exit the market, but re-entered in February 2015.  (*Id.* ¶ 376.)  Allergan and Teva resumed the same pricing and market allocation agreement, with Allergan re-entering at the same price set by Teva and rapidly gaining market share.  (*Id.* ¶ 377.)  Within a few months, Allergan had almost 23% of the market.  Market share subsequently stabilized with no fluctuation, and budesonide prices remained flat.  (*Id.* ¶ 378.)

Throughout the budesonide market allocation process, Allergan and Teva representatives attended six conferences: defendants Olafsson and Saunders attended one each.  (*Id.* ¶ 380.)  Allergan and Teva executives also communicated frequently by phone during this time.  (*Id.* ¶ 379.)  The amended complaint does not allege that any individual defendants were involved in such communications.

### c.   Drospirenone and ethinyl estradiol

"Ocella," an oral contraceptive, is the generic drug for drospirenone and ethinyl estradiol ("generic ocella"). As of April 2013, both Allergan and Teva were in the generic ocella market, with Teva holding 70-75% market share. (*Id.* ¶ 381.) Another co-conspirator, Lupin, entered the market for generic ocella in July 2013, and Lupin, Allergan, and Teva engaged in negotiations until Lupin obtained its fair share market allocation in October 2013. (*Id.* ¶¶ 382-84.) Allergan's market share increased by 8% between May 2013 and October 2013, and grew by 18% between May 2013 and May 2014. Lupin also attained 6% market share. (*Id.* ¶ 385.) For years after the marker share shifts occurred, price volatility registered at or around zero, and market share similarly stabilized. (*Id.* ¶ 386.)

Throughout the generic ocella market allocation process, Allergan, Teva, and/or Lupin representatives attended six conferences: defendants Bisaro and Olafsson both attended one of those conferences. (*Id.* ¶ 388.) Allergan, Teva, and Lupin executives also communicated frequently by phone and text. (*Id.* ¶ 387.) The amended complaint does not allege that any individual defendants were involved in such communications.

### d. Nortriptyline hydrochloride

Nortriptyline hydrochloride ("nortriptyline") is an antidepressant used to control chemical balance in the brain. (*Id.* ¶ 389.) The nortriptyline market was highly concentrated from 2012 through 2013, with Allergan and Teva roughly splitting the market after Taro, one of the co-conspirators, left the market at the start of 2013. (*Id.* ¶ 390.) By February 2013, Taro was considering re-entry. (*Id.* ¶ 391.) Allergan, Teva, and Taro subsequently engaged in negotiations, which resulted in Allergan and Teva ceding certain customer accounts to Taro. (*Id.* ¶¶ 392-95.) As a result of the customer allocation, Allergan, Teva, and Taro avoided price competition; indeed, Taro re-entered the nortriptyline market at an identical price to both

Allergan and Teva, and all three companies coordinated a price increase in January 2015.  (*Id.* ¶¶ 396-98.)

Throughout the nortriptyline market allocation process, Allergan, Teva, and/or Taro representatives attended seven conferences: defendant Buchen attended two of these conferences and defendant Saunders attended one.  (*Id.* ¶ 399.)  Allergan, Teva, and Taro executives also communicated frequently by phone and text.  (*Id.* ¶¶ 400-02.)  The amended complaint does not allege that any individual defendants were involved in such communications.

  **e. Amphetamine/dextroamphetamine immediate release**

Amphetamine/dextroamphetamine immediate release ("MAS-IR") is used to treat attention deficit disorder.  (*Id.* ¶ 403.)  The MAS-IR market was highly concentrated at the end of 2013, with Teva dominating over half.  (*Id.* ¶ 404.)  In March 2014, Allergan began market allocation negotiations with Teva in preparation for its launch of MAS-IR.  (*Id.* ¶ 405.)  As a result of these negotiations, on April 16, 2014, Teva ceded one of its MAS-IR customers to Allergan.  (*Id.* ¶ 406.)  That month, Aurobindo, another co-conspirator, also launched MAS-IR and negotiated market allocation with Teva.  (*Id.* ¶ 407.)  Upon entry into the market, both Allergan and Aurobindo set their MAS-IR entry prices at the same level as Teva's pricing.  For years after Allergan, Aurobindo, and Teva executed their scheme, both pricing volatility and market share volatility dropped significantly, and they did not meaningfully compete on prices to gain market share.  (*Id.* ¶ 408.)

Throughout the MAS-IR launch and market share negotiations, Allergan, Aurobindo, and/or Teva representatives attended four events:  defendants Bisaro and Olafsson were present at one of them.  (*Id.* ¶ 412.)  Allergan, Aurobindo, and Teva executives also communicated

frequently by phone and text.  (*Id.* ¶¶ 409-11.)  The amended complaint does not allege that any individual defendants were involved in such communications.

### f.  Clonidine-TTS

Clonidine-TTS ("clonidine") is a skin patch used for the treatment of high blood pressure. (*Id.* ¶ 413.)  When Allergan launched clonidine in May 2014, the market for the medication was highly concentrated, with co-conspirators Teva and Mylan taking approximately two-thirds and one-third of the market, respectively.  (*Id.* ¶ 414.)  Allergan entered the market when its application was approved by the FDA on May 6, 2014, and immediately contacted Teva to negotiate its share.  (*Id.* ¶ 418.)  After negotiations, Teva began ceding customers so that Allergan could achieve its fair share of the clonidine market.  (*Id.* ¶ 421.)  By January 2015, Allergan had taken its agreed-upon 15% market share from Teva.  (*Id.* ¶ 422.)  During the period of collusion, market share volatility fell to nearly zero.  (*Id.* ¶ 423.)

Throughout the clonidine launch and market share negotiations, Allergan, Mylan, and Teva representatives attended two events:  at one of them, defendants Bisaro and Olafsson were present.  (*Id.* ¶ 425.)  Allergan, Mylan, and Teva executives also communicated frequently by phone and text.  (*Id.* ¶ 424.)  The amended complaint does not allege that any individual defendants were involved in such communications.

### g.  Dextroamphetamine sulfate extended release

Dextroamphetamine sulfate extended release ("dex sulfate XR") is used for the treatment of attention deficit hyperactivity disorder.  (*Id.* ¶ 426.)  At the end of 2013, the dex sulfate XR market was highly concentrated, and Teva had over 70% of the market share.  (*Id.* ¶ 427.) Allergan began planning its entry into the dex sulfate XR market, and Teva agreed to allocate some of its customers to avoid price competition.  (*Id.* ¶¶ 428-29.)  After Allergan entered the

market, pricing volatility dropped to close to zero, and market share volatility also dropped significantly.  (*Id.* ¶ 430.)

Throughout the dex sulfate XR launch and market share negotiations, Allergan and Teva representatives attended three events:  defendants Bisaro and Olafsson were present at one of them.  (*Id.* ¶ 432.)  Allergan and Teva executives also communicated frequently by phone and text during this time.  (*Id.* ¶ 431.)  The amended complaint does not allege that any individual defendants were involved in such communications.

### h.   Raloxifene hydrochloride tablets

Raloxifene hydrochloride tablets ("raloxifene") are used in the treatment or prevention of post-menopause osteoporosis.  (*Id.* ¶ 433.)  When Allergan and another co-conspirator, Camber, were engaging with Teva in raloxifene market allocation negotiations, the market was highly concentrated and Teva controlled over half.  (*Id.* ¶ 434.)  Camber first entered the market with pricing identical to Teva's, and Allergan followed one year later at the same price.  (*Id.* at ¶¶ 440-441.)  After Allergan and Camber entered the raloxifene market, the market became uncharacteristically stable with pricing volatility dropping to zero, and market share volatility also dropping significantly.  (*Id.* ¶ 443.)

Throughout the raloxifene launch and market share negotiations, Allergan and Teva representatives attended two in-person events.  (*Id.* ¶ 447.)  Allergan and Teva executives also communicated frequently by phone and text.  (*Id.* ¶¶ 444-46.)  The amended complaint does not allege that any individual defendants were present at the in-person events or involved in phone and text communications.

### i.   Celecoxib

Celecoxib is an anti-inflammatory drug used to relieve pain and discomfort caused by arthritis, menstruation, or other disorders. (*Id.* ¶ 448.) Allergan and Teva began market allocation discussions in November 2014 when the companies were in celecoxib launch preparation. (*Id.* ¶ 449.) Allergan and Teva came to an agreement they would not compete on price and market share, and entered the market around the same time in December 2014. Allergan captured 28% while Teva took 31% of the market. After entry, pricing volatility in the celecoxib market reached close to zero, and market share volatility also dropped significantly. (*Id.* ¶ 453.)

Throughout the celecoxib launch and market share negotiations, Allergan and Teva representatives attended five conferences: defendant Buchen attended two and defendant Saunders attended one. (*Id.* ¶ 455.) Allergan and Teva executives also communicated frequently by phone and text. (*Id.* ¶ 454.) The amended complaint does not allege that any individual defendants were involved in such communications.

## III.     Procedural History

### A.  The Class Action

On December 22, 2016, multiple plaintiffs led by a Swedish state pension fund and a German investment group filed a securities class action against Allergan, alleging violations of Sections 10(b), 14(a), and 20(a) of the Exchange Act by failing to disclose an alleged price-fixing conspiracy in the generic drug industry (the "Class Action"). Allergan subsequently moved to dismiss the Class Action, arguing primarily that the plaintiffs failed plausibly to allege a price-fixing conspiracy under the PSLRA, and secondarily that the claims should be dismissed as untimely because the plaintiffs should have been on notice of their claims by no later than

August 6, 2015, when media outlets reported that Allergan had disclosed its receipt of a DOJ subpoena in an SEC filing.

On August 6, 2019, this Court denied Allergan's motion. *In re Allergan Generic Drug Pricing Sec. Litig.*, Civ. No. 16-9449, 2019 WL 3562134, at *16 (D.N.J. Aug. 6, 2019). The Court held, in relevant part, that the plaintiffs had adequately pled scienter for their Exchange Act claims by alleging that there was no "reasonable explanation" for the "historically colossal price increases," which supported an inference that Allergan's management was aware of an underlying price-fixing scheme. *Id.* at *12. The Court also applied a "core operations" inference, which allows a court to impute knowledge of fraud to individual defendants where the alleged fraud "relates to the core business of the company," and it held that knowledge of the price-fixing conspiracy could be imputed to the individual defendants. *Id.* The Court also rejected Allergan's statute of limitations argument, holding that the August 6, 2015 subpoena announcement "did not reveal information sufficient for a reasonable investor to conclude that there was fraud." *Id.* at *15. The Court further held that a finding of untimeliness would have been inappropriate at the motion to dismiss stage of the litigation because whether the plaintiffs were on notice of their claims is a "fact-sensitive inquiry." *Id.*

The Class Action is still pending before this Court.

**B. The Instant "Opt-Out" Class Action**

On November 3, 2017, the instant plaintiffs filed their initial "opt-out" complaint in this action. (D.E. 1.) In addition to the claims brought in the Class Action under Sections 10(b), 14(a), and 20(a) of the Exchange Act, plaintiffs also brought clams under Sections 11, 12, and 15 of the Securities Act. (*Id.*)

14

On January 22, 2018, the Court stayed the action pending resolution of the motion to dismiss in the Class Action.  (D.E. 25.)  On October 8, 2019, plaintiffs filed their amended complaint, which adds a market-allocation theory of liability pertaining to nine drugs.  (*See* Am. Compl. ¶¶ 362-455.)

Allergan now moves to dismiss the amended complaint (D.E. 36) under Rule 12(b)(6). Consistent with its arguments when it moved to dismiss the Class Action, Allergan argues that plaintiffs' claims under both the Exchange Act and the Securities Act are untimely because plaintiffs knew of the facts underlying their claims by no later than August 6, 2015—more than two years before plaintiffs filed this action.  (D.E. 36-12, Mov. Br.)  Alternatively, Allergan seeks dismissal of plaintiffs' market-allocation theory allegations, arguing that plaintiffs failed to allege that any senior Allergan executive responsible for the purported misstatements, including the individual defendants, had any involvement in a market-allocation scheme so as to plead plausibly that Allergan had the requisite scienter under the PSLRA.  (*Id.*)

In opposition, plaintiffs counter that they could not have discovered the elements of their claims until November 3, 2016—the date on which media outlets reported that prosecutors might pursue criminal charges against Allergan and other pharmaceutical companies—and further argue that even if their claims are untimely, the commencement of the Class Action tolled the application of the statute of limitations as to all asserted members of the class under *Am. Pipe & Constr. Co. v. Utah*, 413 U.S. 538 (1974).  (D.E. 42, Opp. Br.)  Plaintiffs further contend that they adequately pled their market-allocation theory allegations because of the nature of the pleaded conspiracy, which inextricably links market allocation and price fixing.  (*Id.*)

After the motion to dismiss was fully briefed, the Court ordered the parties to submit supplemental briefing addressing whether the Third Circuit's opinion in *Aly v. Valeant Pharms.*

*Int'l Inc.*, 1 F.4th 168 (3d Cir. 2021), which addresses the issue of *American Pipe* tolling, impacts Allergan's timeliness arguments.  (*See* D.E. 62, 65-66).

## IV.    Legal Standard

In determining whether a complaint states a cause of action sufficient to survive dismissal under Fed. R. Civ. P. 12(b)(6), the Court must "accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the plaintiff."  *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878 (3d Cir. 2018).  "'[T]hreadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements'" are all disregarded. *Id.* at 878-79 (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012)).  The plaintiff's right to relief must be more than speculative; it must rise to the level of plausibility. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A claim meets the "plausibility" standard only if the factual allegations permit the Court to "'draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).

## V.    Discussion

### A.  Timeliness of Plaintiffs' Claims

Allergan primarily moves to dismiss the amended complaint on the grounds that plaintiffs' claims under both the Exchange Act and the Securities Act are untimely.  As a preliminary matter, the statute of limitations is an affirmative defense, and "the burden of establishing its applicability to a particular claim rests with the defendant."  *In re Cmty. Bank of N. Va & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.*, 622 F.3d 275, 292 (3d Cir. 2010) (quoting *Bradford-White Corp. v. Ernst & Whinney*, 872 F.2d 1153, 1161 (3d Cir. 1989)). However, "the question of when the plaintiffs should have known of the alleged violation often

requires a fact sensitive inquiry that is not appropriate at this early stage of the proceedings."
*Cal. Pub. Emps' Ret. Sys. v. Chubb Corp*., 2002 WL 33934282, at *25-26 (D.N.J. June 26,
2002). Indeed, "the point at which the complaining party should reasonably be aware that he has
suffered an injury is a factual issue 'best determined by the collective judgment, wisdom and
experience of jurors.'" *Schmidt v. Skolas*, 770 F.3d 241, 251 (3d Cir. 2014) (internal citations
omitted). Accordingly, if a statute of limitations bar "is not apparent on the face of the
complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)."
*Rycoline Products, Inc. v. C & W Unlimited*, 109 F.3d 883, 886 (3d Cir. 1997) (quoting *Bethel v.
Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978)).

Claims under both the Exchange Act and the Securities Act are subject to the "discovery"
rule, which provides that a cause of action "accrues (1) when the plaintiff did in fact discover, or
(2) when a reasonably diligent plaintiff would have discovered, the 'facts constituting the
violation' – whichever comes first." *Merck & Co. v. Reynolds*, 559 U.S. 633, 637 (2010)
(quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, n.12 (1976)) (applying discovery rule
to Exchange Act claims); *Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization
Transactions, Inc.*, 730 F.3d 263, 273 (3d Cir. 2013) (applying discovery rule to Securities Act
claims). For a cause of action to be "discovered," a plaintiff must have sufficient facts "to
adequately plead it in a complaint . . . with sufficient detail and particularity to survive a 12(b)(6)
motion to dismiss." *Pension Tr. Fund*, 730 D.3d at 275 (internal citations omitted).

### a. Securities Act Claims

The Securities Act requires that an action be commenced "within one year after the
discovery of the untrue statement or the omission, or after such discovery should have been made
by the exercise of reasonable diligence." 15 U.S.C. § 77(m).

Allergan argues that plaintiffs' Securities Act claims are untimely because they filed their complaint more than a year after numerous public reports purportedly giving rise to their claims. More specifically, Allergan claims that plaintiffs rely on a host of events that were publicly known by August of 2015, including widely-publicized investigations by the DOJ and numerous Attorneys General into the generics industry, which "were disclosed by numerous companies and the subject of extensive media attention in 2014 and 2015"; the DOJ subpoena issued to Allergan and publicly disclosed on August 6, 2015; and allegations regarding pricing trends and market structures of the generic drug industry, which caused Senator Sanders and Representative Cummings to write a widely-reported letter in 2014. (Mov. Br. at 7-8.) Allergan claims that because other litigants, including some represented by the same counsel representing plaintiffs here, "relied on that very information to file antitrust claims starting in early 2016," plaintiffs "were on notice of the basis for their claims long before they brought suit."[3] (*Id.* at 8-9.)

Allergan is correct that the filing of "substantially similar" claims could, under certain circumstances, put a "reasonably diligent plaintiff" on notice of their claims. *Pension Tr.*, 730 F.3d at 277. But, as plaintiffs point out, Allergan has not referenced a single securities class action or individual action filed before November 3, 2016 that alleges securities law violations arising out of the collusive generic drug pricing scheme described in their lawsuit. The Court is thus inclined to agree with plaintiffs that Allergan seeks an unreasonable inference that "every single investor . . . failed to act reasonably despite notice of their claims." (Opp. Br. at 29.) Rather, the more plausible inference is that plaintiffs were not aware of their claims until the

---

[3] Allergan also argues that plaintiffs cannot rely on the Court's decision in the Class Action to establish the timeliness of their claims here. (*See* Mov. Br. at 10.) Because the Securities Act claims currently before the Court were not at issue in the Class Action, the Court's prior holding is not dispositive.

November 3, 2016, media reports surfaced indicating that DOJ charges against Allergan and its

co-conspirators may be imminent.[4]  *See, e.g.*, *Ontario Teachers' Pension Plan Bd. v. Teva*

*Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 180 (D. Conn. 2019) (holding that the disclosure of

government subpoenas coupled with the November 2016 media reports which "specifically

name[d] Teva" as a company being investigated for civil and criminal misconduct was "likely

sufficient to give a reasonable investor enough of a warning that they should have investigated

further").  And the fact that plaintiffs' counsel represented litigants in one of the earlier-filed

antitrust actions—without any allegation that plaintiffs had knowledge of that complaint—is not

persuasive.  *See, e.g., Sun v. Han*, Civ. No. 15-703, 2015 WL 9304542 at *18 (D.N.J. Dec. 21,

2015) (Linares, J.) (rejecting defendants' timeliness argument, which was premised in part on

fact that plaintiff-attorney's law firm conducted earlier investigation); *Mill Bridge V, Inc. v.*

*Benton*, Civ. No. 08-2806, 2009 WL 4639641, at *14 (E.D. Pa. Dec. 3, 2009) (finding

"unconvincing" statute of limitations argument premised on plaintiffs' counsel's filing of earlier

complaint, and noting that the sharing of counsel "does not create storm warnings" absent further

evidence of the plaintiffs' knowledge).

---

[4] *Catalyst Dynamic Alpha Fund v. Valeant Pharms. Int'l, Inc.*, Civ. No. 18-12673, 2019 WL 2331631 (D.N.J. May 31, 2019), which Allergan cites, on its facts does not provide support.  In *Catalyst*, an opt-out class action, Judge Shipp held that a Wall Street Journal article could not be said to trigger the statute of limitations because "[t]he Complaint [did] not disclose what information the article contained that Plaintiffs did not already know prior to the article's publication." *Id.* at *5.  But the Wall Street Journal article was published nearly two months *after* the original consolidated class action.  Accordingly, the article (which merely disclosed that the defendant was being investigated by the DOJ and was cooperating in another ongoing investigation) did not reveal anything that the plaintiffs did not already know, and thus could not salvage their untimely claims. *Id.* at *6.  Here, on the other hand, the November 3, 2016 media report *pre-dated* the filing of the Class Action on December 22, and plaintiffs filed the instant action within one year of both the media report's publication and the filing of the Class Action.

For the foregoing reasons, Allergan's motion to dismiss plaintiffs' Securities Act claims on timeliness grounds is denied.

### b. Exchange Act Claims

To state a claim under Section 10(b)(5), "a plaintiff must demonstrate: (1) a material misrepresentation (or omission); (2) scienter; (3) a connection between the misstatement and the purchase or sale of a security; (4) reliance upon the misstatement; (5) economic loss; and (6) loss causation." *Fan v. StoneMor Partners LP*, 927 F.3d 710, 714 (3d Cir. 2019) (citing *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp,* 908 F.3d 872, 879 (3d Cir. 2018)).  Section 10(b)(5) claims must be commenced "not later than the earlier of: (i) [two] years after the discovery of the facts constituting the violation; or (ii) [five] years after such violation."  28 U.S.C. § 1658(b).

In support of its timeliness arguments here, Allergan argues—as it did with respect to plaintiffs' Securities Act claims—that multiple litigants, including litigants represented by plaintiffs' counsel in this case, filed antitrust class actions based on public disclosures more than one year before plaintiffs commenced the instant action.  For the reasons discussed above, the Court is unpersuaded by that argument.

Furthermore, even if the Court accepts Allergan's argument that plaintiffs should have been on notice by August 2015, plaintiffs' Exchange Act claims are subject to *American Pipe* tolling.  Under *American Pipe*, the commencement of the Class Action on December 22, 2016 "suspend[ed] the applica[tion of the] statute of limitations as to all asserted members of the class."  *Am. Pipe*, 414 U.S. at 554; *see Aly*, 1 F.4th at 175 ("*American Pipe* makes clear that the filing of a class action is the operative event that tolls the limitations period, and that once the period is tolled, it remains tolled for all putative members until they are no longer part of the

class."). Accordingly, even assuming that the statute of limitations period began to run in August 2015 as Allergan suggests, the commencement of the Class Action in December 2016 is well within the two-year statute of limitations for Section 10(b)(5) claims.

In this regard, the Court references the supplemental briefing the parties provided addressing whether the Third Circuit's recent decision in *Aly* impacts Allergan's timeliness arguments with respect to plaintiffs' Exchange Act claims. In its moving papers, Allergan argued that the commencement of the Class Action did not trigger *American Pipe* tolling because plaintiffs filed their complaint before a class certification decision was rendered. (Moving Br. at 14.) Allergan subsequently withdrew that argument in its supplemental briefing (D.E. 65, Supp. Br. at 1-2) in light of the Third Circuit's holding that "the filing of a class action is the operative event that tolls the limitation period." *Aly*, 1 F.4th at 175. As indicated above, the Court is satisfied that the Third Circuit's reasoning defeats Allergan's timeliness arguments respecting the Exchange Act claims. Accordingly, Allergan's motion to dismiss plaintiffs' Exchange Act claims on timeliness grounds is denied.

### B. Sufficiency of Plaintiffs' Market-Allocation Theory Allegations

Allergan also moves to dismiss on grounds that plaintiffs' market-theory allegations "are not pled with the required particularity" under the PSLRA

#### a. Pleading Standard

Where, as here, plaintiffs assert fraud claims, they are required to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Rule 9(b)'s heightened pleading standard gives defendants notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlements." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418

(3d Cir. 1997).  Moreover, plaintiffs must satisfy the greater particularity requirements imposed by the PSLRA, enacted "to supplement the Rule 9(b) standard with a uniform and stringent pleading requirement."  *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 585 (D.N.J. 2001) (internal citation omitted).

Relevant here is the fact that the PSLRA sets heightened pleading requirements for the scienter element, requiring that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  In order to support this heightened scienter requirement, plaintiffs must allege facts supporting an inference of an "intent to deceive" or "highly unreasonable [conduct]" involving "an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 148 (3d Cir. 2004) (alteration in original) (internal citation omitted).  If a plaintiff alleges more than one theory of liability, he or she must plead a "strong inference" of scienter with respect to each theory.  *See, e.g., Winer Family Trust v. Queen,* 503 F.3d 319, 335 (3d Cir. 2007) ("[S]cienter must be pleaded in regard to 'each act or omission' sufficient to support a strong inference that 'the defendant' acted with the required state of mind.") (quoting 15 U.S.C. § 78u-4(b)(2)).

### b.  Discussion

Allergan asserts that this Court's decision in the Class Action demonstrates that plaintiffs' allegations here do not support an inference of scienter.  Specifically, Allergan contrasts the "historically colossal price increases" the Court relied upon with regard to the price-fixing scheme at issue in the Class Action with the lack of price movement in the market-allocation allegations now at issue here, arguing that plaintiffs have failed to allege any facts

"from which it could be inferred that [senior management was] aware of any improper anti-competitive conduct at the time they made their public statements."  (Mov. Br. at 17-18.)  According to Allergan, the "stronger competing inference" is that senior management was "unaware of the alleged market-allocation scheme," which is evidenced by the fact that plaintiffs cannot identify a single instance in which an individual defendant engaged in communications with a co-conspirator, or the lack of introduction of an agenda from an industry conference demonstrating that market allocation was discussed.  (*Id.* at 18-20.)   In opposition, plaintiffs argue that "market allocation and price-fixing are inextricably linked in the overarching conspiracy," and Allergan's suggestion that senior management "somehow had compartmentalized knowledge of, or recklessly disregarded, only one, but not both, aspects of the Company's cartel, is implausible."  (Opp. Br. at 27-28.)

Taking the allegations in the amended complaint as true, plaintiffs have adequately pled scienter as to their market-allocation theory.  While Allergan correctly notes that plaintiffs are required to plead scienter as to each theory of liability, *see Winer,* 503 F.3d at 335, the amended complaint pleads facts linking market allocation and price fixing as features of a single conspiracy.  (*See, e.g.*, Am. Compl. ¶¶ 370, 375, 377, 384, 396, 408, 422, 430, 441, 453.)  This Court previously applied a "core operations" inference—which allows scienter to be imputed to individual defendants if the misconduct at issue involves "core business" activities—to the price-fixing allegations in the Class Action.  *See In re Allergan*, 2019 WL 3562134, at *12.  Here too such an inference is appropriate.  As plaintiffs rightly point out, plaintiffs have identified 32 collusive drugs in their amended complaint, and the number of collusive drugs designated by Allergan as "key products" has grown from three to five, representing almost one-quarter of Allergan's profit-drivers.  (Am. Comp. ¶¶ 5, 151, 167, 182, 370, 453.)  Two of those "key

products" were included in plaintiffs' market-allocation theory allegations.  (*Id.* ¶¶ 5, 370, 453.)

Therefore, it is reasonable to infer that both the price-fixing and market-allocation misconduct

related to Allergan's "core business," and knowledge can be imputed to the individual

defendants.  *See Campbell Soup Co.*, 145 F. Supp. 2d at 599 ("While asserting that defendants

approved or helped prepare public disclosures is insufficient to establish knowledge of all

aspects of the company's business . . . knowledge may be imputed to individual defendants when

the disclosures involve the company's core business.").

      The "core business" inference is also important in evaluating the amended complaint's

allegations regarding specific instances where Allergan employees knew of anti-competitive

conduct.  For example, the amended complaint includes a host of allegations that Allergan

executives engaged in phone and text communications with Allergan's co-conspirators, and that

Allergan executives—including some of the individual defendants—attended industry

conferences or other events alongside the co-conspirators.  (*See* Am. Compl. ¶¶ 372-73, 379-80,

387-88, 399-402, 409-12, 424-25, 431-32, 444-47, 454-55.)  According to the amended

complaint, these communications and in-person events occurred during the relevant period when

Allergan and its co-conspirators were engaging in market-share negotiations, price matching, and

other anti-competitive conduct.  (*Id.*)  While plaintiffs' allegations do not directly mention some

or all of the individual defendants, knowledge of this conduct can be imputed to them.  *See, e.g.*,

*Utesch v. Lannett Co.*, 385 F. Supp. 3d 408, 422-23 (E.D. Pa. 2019) (plaintiffs established

scienter, although amended complaint did not "directly mention" that individual defendants

engaged in telephone conversations or attended industry conferences, because conduct alleged

involved "core business" activities that could be imputed to individual defendants).

      Finally, as the Court found in the Class Action, "[o]ngoing investigations into

anticompetitive pricing in the market may represent 'a piece of the puzzle when taking a 'holistic' view of the purported facts as they relate to scienter.'"  *In re Allergan*, 2019 WL 3562134, at *12 (quoting *Utesch*, 385 F. Supp. 3d at 423).  Here, plaintiffs allege that Allergan was being scrutinized by the Attorneys General of numerous states, the DOJ, and even members of the United States Congress.  (*See* Am. Compl. ¶¶ 11-19.)  Allergan is also a named defendant and co-conspirator in at least two Attorney General complaints.  (*Id.* ¶ 31.)  Indeed, "[w]hile not dispositive, so many different governmental entities investigating pricing in the industry provides support—at this stage of the litigation—for an inference of scienter."  *Utesch*, 385 F. Supp. 3d at 423.

Accordingly, Allergan's motion to dismiss the market-allocation theory allegations is denied.

## VI.    Conclusion

For the foregoing reasons, Allergan's motion to dismiss is denied.  An appropriate order will issue.

/s/ Katharine S. Hayden    
Dated: September 30, 2021                          Katharine S. Hayden, U.S.D.J.